**No. 25-7781**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of California

# EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL AND FOR IMMEDIATE ADMINISTRATIVE STAY BY DECEMBER 15


BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

# TABLE OF CONTENTS

Page


INTRODUCTION ... 1

STATEMENT ... 4

A. Legal Background ... 4

B. Factual Background ... 5

C. Prior Proceedings ... 7

ARGUMENT ... 9

I. The Federal Government is Likely to Succeed on the Merits. ... 9

A. Plaintiffs Were Required to Make a Particularly Strong Showing to Justify the Injunction Requested Here ... 9

B. Under Any Standard, the District Court's Injunction Will Not Withstand Review ... 12

II. The other stay factors strongly favor the government ... 24

CONCLUSION ... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Constitution**

U.S. Const. art. I, § 8, cl. 15 ......................................................4, 13

**Cases**

*Dalton v. Spencer*,
511 U.S. 462 (1994)........................................................................ 13, 18

*District of Columbia v. Trump*,
2025 WL 3240331 (D.D.C. Nov. 20, 2025)................................................15

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022).................................................................9, 10

*Federal Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)....................................................................11

*Franklin v. Massachusetts*,
505 U.S. 788 (1992).....................................................................................18

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)............................................................ 10, 18

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012)......................................................................9

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025)...............................................2, 7, 10, 12, 24

*Newsom v. Trump*,
No. 3:25-cv-04870, 2025 WL 1663345 (N.D. Cal. June 12, 2025)....................7

*NRC v. Texas*,
605 U.S. 665 (2025)........................................................................ 11, 18

*Oestereich v. Selective Serv. System Loc. Board No. 11*,
393 U.S. 233 (1968).....................................................................................11

*Oregon v. Trump*,
154 F.4th 1161 (9th Cir. 2025)....................................................................15

*Perpich v. Department of Def.*,
496 U.S. 334 (1990) .......................................................................... 4

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................... 9, 14

**Statutes and Administrative Materials**

10 U.S.C. § 10101 .......................................................................... 4

10 U.S.C. § 10106 .......................................................................... 4

10 U.S.C. § 12406 .......................................................................... 3, 17

10 U.S.C. § 12406(2)-(3) .......................................................................... 4, 5

10 U.S.C. § 12406(3) .......................................................................... 7

10 U.S.C. § 12407(a) .......................................................................... 17

35 Fed. Reg. 5003 (Mar. 24, 1970) .......................................................................... 22

# INTRODUCTION

The district court has for a *third time* entered an extraordinary order that interjects the court into the military chain of command and superintends the Executive Branch's control over lawfully federalized California National Guard members deployed to protect federal officers and property from mob violence. This Court stayed the court's first injunction—which enjoined the Guard's federalization and deployment—concluding that the President likely acted lawfully when he deployed the Guard in the Los Angeles area to address violent attacks that interfered with federal officials' ability to enforce federal law. The district court then entered a second injunction based on the Posse Comitatus Act (PCA)—apparently the first federal court ever to assert implied equitable authority to civilly enforce a federal criminal statute against the federal government. This Court promptly administratively stayed that injunction. Now the district court has issued a third injunction, granting plaintiffs the same relief as the first injunction—even though any irreparable harm to plaintiffs now is nonexistent and at the very least dramatically less than in June, and notwithstanding that the injunction upends the status quo and will cause irreparable harm to defendants. This Court should grant an immediate administrative stay and a stay pending appeal.

Since the Guard's initial deployment, defendants have dramatically scaled down the Guard's presence in Los Angeles. By August 1, less than two months after

deployment, all Marines had left and approximately 300 Guard members remained assigned to the federal protective mission. Now, only about 100 remain deployed to the Los Angeles area—roughly 2 percent of the initial deployment.

That was not enough for the district court. The court's injunction requires immediate defederalization of those Guard members and return of control to Governor Newsom. That relief conflicts with this Court's determination of the appropriate status quo while the previous appeal remains pending. *See Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) (per curiam). It flouts this Court's previous assessment of the equities—that the federal government's "uncontested interest in the protection of federal agents," *id.* at 1054, far outweighed plaintiffs' harm from federalization and deployment—when the deployed forces were more than forty times larger. And the district court stayed its injunction for only five days, necessitating this emergency motion, even though the injunction upends the longstanding status quo and despite the absence of any colorable irreparable harm to plaintiffs.

The district court erred in analyzing the equities, and the lack of any irreparable harm to plaintiffs should have foreclosed relief. The court contended that the continued federalization of a small number of Guard members qualified as a "constitutional sovereign harm[]" that justified injunctive relief. But the claimed violations here are statutory, not constitutional, and do not create any presumption

of irreparable harm. And unlike the district court's first injunction—which at least purported to find concrete harms from deployment—the court identified no such harms here.

The district court's analysis of the merits was also, and again, wrong. Nothing about the Guard's operations in California represents an expansion from what this Court previously considered. Although this Court allowed highly deferential review of whether Section 12406's prerequisites exist at the time the National Guard is "call[ed] into Federal service," 10 U.S.C. § 12406, Congress left to the President's discretion how many Guard members should serve in the mission and for how long.

But even if the mere continuation of what this Court already allowed is reviewable, the decision to leave a small number of Guard members in place was plainly reasonable. While conditions have improved, violent threats and attacks against federal personnel and property have continued, and the improvement is undoubtedly at least in part *because of* the Guard's presence. The district court—which has repeatedly expressed disagreement with both this Court's decision staying its previous injunction and *Newsom*'s deferential standard—failed to apply that standard here. It dismissed the continuing threat of violence. And it gave defendants no credit for their dramatic reduction of the Guard's footprint (and indeed, held it against them).

Defendants respectfully request a stay pending appeal. This Court should also grant an administrative stay pending consideration of this motion, prior to expiration of the district court's temporary stay at 12:00 noon Pacific Time on December 15.

## STATEMENT

### A. Legal Background

**1.** The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15. Exercising that authority, Congress has established the National Guard. *See Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990). The National Guard is composed of both state National Guards, under the command of the States, and the National Guard of the United States, a federal entity, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President.

**2.** Congress has granted the President several authorities under which he may call forth the National Guard. Under 10 U.S.C. § 12406(2)-(3), "[w]henever [] there is a rebellion or danger of a rebellion against the authority of the Government of the United States, or [] the President is unable with the regular forces to execute the laws of the United States, the President may call into Federal service members and units

of the National Guard of any State in such numbers as he considers necessary to ... execute those laws." *Id.*

### B. Factual Background

**1.** On June 6, 2025, a violent mob, protesting the enforcement of federal immigration law, pinned down federal personnel outside a federal building in Los Angeles. The mob attacked officers with concrete chunks, chairs, and other objects, and used dumpsters as battering rams to breach the perimeter of the building. The next day, the violence intensified and spread. Large crowds assaulted federal officers for seven hours, launching commercial-grade fireworks and rocks at the officers, trapping one officer in her vehicle while pummeling it with stones, shattering the wrist of another officer, and damaging federal buildings. The violence continued in the following days: more officers were injured, and federal property was seriously damaged.

In response, the President signed a memorandum on June 7 calling into federal service at least 2,000 members of the California National Guard to protect federal personnel and property. A14-15. The Secretary later ordered federalization of additional National Guard members (approximately 4,119 in total), *see* A17, and ordered the mobilization of approximately 800 Marines. A4.

**2.** National Guard members and Marines began "providing protection to the federal buildings, the personnel working there, and by extension, the functions

ongoing at those buildings, consistent with the President's June 7 memorandum." A318; *see* A64-66, 141. Guard members and Marines "established outside perimeters, observation posts, and perimeter patrols" for federal buildings. A318. The Guard was deployed to "protect federal law enforcement, allowing them to do their law enforcement job." A140; *see also* A147, 153.

No doubt at least in part because of the deterrent effect of the Guard's presence, conditions in Los Angeles have improved. Protests are less frequent, less violent, and generally pose less risk to federal personnel and property compared to before the Guard's deployment. A318. But that risk has not disappeared. Even now, protesters are assaulting officers, damaging property, and conducting coordinated efforts to prevent enforcement of the immigration laws. A318-20. Federal Protective Services (FPS) officers have been threatened and assaulted. A318-19. In one recent instance, a protester shined a potentially blinding laser at an officer's eyes, resulting in serious injury. A318-19. And just days ago, an agitator was arrested and charged after he threw two Molotov cocktails into a federal building where ICE is located, just next to a federal building where the Guard is providing protection, and was found to have five more Molotov cocktails in his possession. A325-27.

The President's federalization of the California Guard has adapted to the changing situation on the ground. On July 30, Secretary of War Hegseth released "approximately 1,350 California National Guard personnel from Federal service,"

leaving around "260 California National Guardsmen" in federal service "for an additional 90 days." A285. Since then, the Guard's footprint in the Los Angeles area has been reduced even further to approximately 100 Guard members still deployed in the area. A318-20. Those Guard members continue to play an important role protecting federal personnel and property. A318-20; *see also* A310-12.

### C. Prior Proceedings

**1.** California and Governor Newsom sued shortly after the initial federalization and deployment. The district court granted a temporary restraining order barring federalization and deployment of the California Guard, ruling that Section 12406 did not authorize it. *Newsom v. Trump*, No. 3:25-cv-04870, 2025 WL 1663345, at *10-16, *21 (N.D. Cal. June 12, 2025).

**2.** Defendants appealed, and a panel of this Court granted a stay pending appeal. *Newsom*, 141 F.4th at 1040-41. The Court held that the President likely was authorized under 10 U.S.C. § 12406(3) to federalize the Guard. *Id.* at 1052. The Court concluded that there was ample evidence of "protesters' interference with the ability of federal officers to execute the laws" leading up to June 7. *Id.* The Court also held that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Id.* at 1054. The Court denied en banc review of the stay ruling.

**3.** The district court then entered partial final judgment for plaintiffs on their PCA claim and issued a permanent injunction. A280. The district court held that it

had implied equitable authority to civilly enforce the PCA against defendants. A251; A274-276. The court rejected defendants' argument that Section 12406(3) expressly authorizes the Guard to engage in law execution for PCA purposes, with much of its analysis devoted to disagreeing with the Court's stay decision that Section 12406(3) likely authorized federalization and deployment. A254-260. Defendants appealed the following day and sought an administrative stay and a stay pending appeal. A394-422. A panel of this Court granted an administrative stay the following day before the injunction went into effect, A423; the request for a stay pending appeal remains pending.

4. After first moving in district court (which doubted whether it had jurisdiction), plaintiffs moved in this Court to vacate the stay decision in *Newsom* or for an injunction barring the extended federalization, A369-72, but this Court denied the motion as "unnecessary," ruling that the district court had jurisdiction. A392-93.

Plaintiffs then moved on November 13 in district court for a preliminary injunction of the August and October extensions of federalization of California Guard members. A288-308. The district court granted a preliminary injunction on December 10, 2025. A330-64.

The order enjoined defendants from deploying California Guard members in the Los Angeles area and directed defendants "to return control of the California

National Guard to Governor Newsom." A363-64. The court stayed its order "until noon on Monday, December 15, 2025." A354.

## ARGUMENT

### I. The Federal Government is Likely to Succeed on the Merits.

#### A. Plaintiffs Were Required to Make a Particularly Strong Showing to Justify the Injunction Requested Here.

Plaintiffs bore the burden of establishing entitlement to the extraordinary remedy of a preliminary injunction. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And this is no ordinary injunction. For several reasons, that burden should be particularly high here.

**a.** The district court granted what is effectively a mandatory injunction given the longstanding status quo in this case. Mandatory injunctions go "beyond simply maintaining the status quo," ordering a party "to take action pending the determination of the case on its merits." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The President federalized and deployed the Guard more than six months ago. The district court's first injunction has never gone into effect and the status quo since has been that the federalized Guard remained in place in the Los Angeles area (albeit in dramatically reduced numbers). The district court's injunction upends that status quo, ordering the end of the deployment and the defederalization and return of the Guard to Governor Newsom's control.

Mandatory injunctions are "particularly disfavored," so a party must "establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). A mandatory injunction can issue only when there is a risk of "extreme or very serious damage" without relief. *Doe*, 28 F.4th at 111.

**b.** This Court has also already decided the appropriate status quo pending appeal of the first injunction. The President "likely acted within his authority in federalizing the National Guard," and returning the Guard to plaintiffs' control would result in irreparable harm—both against federal personnel and against federal property. *Newsom*, 141 F.4th at 1051. The Court concluded that a stay is warranted, and the National Guard should remain federalized and subject to the President's control. The district court's decision would reverse that status quo before this Court reaches a decision on the merits of that appeal.

**c.** Relatedly, the district court's third injunction grants relief—defederalization of the Guard and return of control to Governor Newsom—that is identical to the relief this Court previously stayed. As explained below, the best reading of this Court's decision in *Newsom* is that it is controlling here, since this appeal involves a mere continuation that was authorized by the President's June memorandum. But even if that is incorrect, the injunction is premised on a determination that the passage of just a few months has made continuation of the

mission no longer justified—and orders the total end of the deployment even though defendants have responded to somewhat improved conditions by dramatically reducing the Guard's footprint.

**d.** The burden of defending the district court's injunction should be high for an additional reason: the district court took issue with the decision to continue the Guard's protection mission. To be sure, this Court concluded in *Newsom* that the President's initial federalization decision is reviewable on a highly deferential basis. But the statutory text provides no basis for second-guessing the President's determination as to the *duration* of an otherwise proper mission. *See infra* pp. 16-18.

**e.** It bears repeating that the district's injunction was based on an ultra vires theory. Since the President is not an agency subject to the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), plaintiffs' only path to judicial review of the President's decision to invoke Section 12406, therefore, is a non-statutory ultra vires claim—a "Hail Mary pass" that "rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation omitted). Even if such an action were permissible, it would require at least that defendants engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 (1968), that "plainly and openly crossed a congressionally drawn line in the sand."

*Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (quotation marks omitted).

### B. Under Any Standard, the District Court's Injunction Will Not Withstand Review.

Against this backdrop, the district court's third injunction is likely to be vacated on appeal—and should be stayed, just as the first two were.

**a.** For starters, plaintiffs plainly failed to make a showing of irreparable harm sufficient to justify injunctive relief.

In its first injunction decision, the district court purported to identify concrete irreparable harms. First, it suggested "that the continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions on the ground." *Newsom v. Trump*, 786 F. Supp. 3d at 1261. This rioters' veto was not a legitimate basis for an injunction, but in any event, that predicted escalation did not happen—as the district court acknowledged, in characterizing the situation in Los Angeles as "calm" and noting that there had been few immigration-related protests; indeed, the district court relied on those supposedly improved conditions in its ruling. The district court also previously reasoned that federalization of the California Guard risks diverting members from important state duties. 786 F. Supp. 3d at 1261. This Court was not impressed with that contention back in June, *Newsom*, 141 F.4th at 1055; it is even weaker now that the number of federalized Guard

members has been dramatically reduced; and the district court did not rely on that as the basis for this injunction.

The only harm to plaintiffs identified by the district court in support of *this* preliminary injunction is their supposed "'constitutional sovereign harms'" resulting from federalization of the state Guard. A362. But even assuming all constitutional violations give rise to irreparable harm, plaintiffs' claim—that continued federalization of the Guard exceeds the President's authority under Section 12406—is statutory, not constitutional. *Dalton v. Spencer*, 511 U.S. 462, 473 (1994). ("claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims"). And alleged violations of a federal statute do not give rise to any presumption of irreparable harm. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024).

The district court disputed this, contending that "those statutory violations *themselves* give rise to constitutional, sovereign injury as federalization wrests control of the National Guard from the State." A362. That is not correct. The likely violations the court found—that the "unable to execute" and "regular forces" conditions in 12406(3) are not met—are statutory conditions. The text of the Militia Clause does not impose them; it assigns to Congress the power to "provide for calling forth the Militia" without preconditions concerning the regular forces' inability to execute the laws. U.S. Const. art. I, § 8, cl. 15. Because the Constitution

vested that power in Congress, it is not an authority reserved to the States under the Tenth Amendment. The National Guard in its current form is also a creation of Congress. Any violation of the conditions Congress imposed on the President's federalization of the Guard to execute the laws is thus statutory, not constitutional.

But even if the district court were correct that the federalization technically qualified as irreparable harm by itself, it is plainly not sufficient harm to justify what is effectively a *mandatory* injunction—requiring an end to the deployment and return of control over the Guard to Governor Newsom, thereby disrupting the months-long status quo. Notably, that posture distinguishes this case from the injunctions in Illinois and Oregon, on which the district court relied.

In addition, the balance of the equities cuts decisively in defendants' favor under *Winter*. A comparison with that case is instructive. There, the plaintiffs asserted concrete harms, including contending that the challenged military activities would "injure marine mammals or alter their behavioral patterns, impairing plaintiffs' ability to study and observe the animals," and the Court did "not question the seriousness of those interests." 555 U.S. at 26. If that was not enough to justify an injunction managing the military's activities, then the alleged "injury" in this case—at most a wholly abstract alleged "constitutional" harm—is certainly not sufficient.

These considerations at least underscore that an immediate administrative stay is warranted. "When considering the request for an administrative stay, our touchstone is the need to preserve the status quo." *Oregon v. Trump*, 154 F.4th 1161, 1164 (9th Cir. 2025). Here, the injunction would upend the status quo in fundamental ways: it would end a federalization and deployment ordered by the Commander-in-Chief and impose extraordinary relief this Court previously stayed, all while this Court is considering appeals of the district court's two previous injunctions, the en banc court has before it overlapping issues in the *Oregon* case, and the Supreme Court has before it overlapping issues in the *Illinois* case.

An immediate administrative stay is particularly needed given that the district court stayed its injunction for only five days. The only other court to issue an order that would upset the status quo by ending a months-long ongoing deployment of the Guard stayed its decision for 21 days (and the D.C. Circuit has since administratively stayed that injunction). *District of Columbia v. Trump*, 2025 WL 3240331 (D.D.C. Nov. 20, 2025). Even if one were to credit the district court's conclusion that the significantly reduced continued deployment qualified as irreparable harm, there was no emergency. The federalization and deployment have been ongoing for six months, and the district court enjoined them six weeks after this Court clarified that it could consider plaintiffs' motion. *See* A392-93. This Court should not allow the

district court to change the facts on the ground on a timetable that short-circuits orderly review.

**b.** The district court also had no valid basis for holding that the continuation of the deployment was likely unlawful.

**1.** *Newsom* should have controlled the district court's analysis, since nothing about the Guard's operations in California represents an expansion from what this Court considered when it stayed the first injunction. The district court stated that "on August 5, 2025, Defendants issued a *new* federalization order," A333, and that on October 16, defendants "again federalized 300 members of the California National Guard," A336. But these orders were not in any relevant sense "new." The President's June 7 Memorandum—specifying that "the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense," A14—authorized the continuation. The only change to the status quo in August was to "[r]elease approximately 1,350 California National Guard personnel from Federal service" while providing that "[a]pproximately 260 California National Guardsmen will remain in Federal service for an additional 90 days." A285. And the October 16 memorandum likewise simply continued that status quo. Those memoranda contained no new analysis and interjected no new issues into the case. And nothing in this Court's decision in *Newsom* suggested that the Court expected the deployment to end after 60 days (and no litigant has suggested that the appeal of the first

injunction became moot 60 days after that Presidential memorandum because the memorandum had supposedly expired). Even the district court—in rejecting defendants' argument that plaintiffs were at least required to amend their complaint if they wished to challenge a purportedly "new" order—pointed to the close relationship between the initial federalization and its continuation. A360-61.

**2.** Even if characterized as new decisions, the continuations are not judicially reviewable. Section 12406 provides: "Whenever" one of three prerequisites exists, "the President may call into Federal service members and units of the National Guard of any State in such numbers *as he considers necessary* …." 10 U.S.C. § 12406 (emphasis added). *Newsom* allows some measure of review of Section 12406's prerequisites when Guardsmen are "call[ed] into Federal service." But nothing in Section 12406 provides for judicial review if the federalization order is continued. In connecting Section 12406's prerequisites to President's decision to call Guard members "into Federal service," Congress decided against subjecting the continuation of a mission to further regulation. Put differently, judicial review of a continuation decision effectively second-guesses the President's judgment about the "numbers" of troops that remain "necessary," which the statute expressly commits to his exclusive discretion. Section 12406's neighboring provision confirms this point. 10 U.S.C. § 12407(a), entitled "period of service," expressly addresses how long "[m]embers and units called shall serve," extending their service to "the term

specified, unless sooner relieved by the President." *Id.* The only exception is the expiration of a Guardsmen's commission or enlistment. *Id.*

This conclusion is supported by legislative history. As initially enacted, Section 12406's predecessor statute authorized "the President to call forth, for a period *not exceeding nine months*," the state militia to repel invasions, suppress rebellions, or enable him to execute the laws. Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (emphasis added). But Congress subsequently amended the statute to remove that time limitation. Act of May 27, 1908, ch. 204, §§ 3, 4, 35 Stat. 400. The clear import is to vest in the President's discretion the decision how long to mobilize the Guard. And there is no cause of action for abuse of a discretionary authority vested in the President. *Dalton*, 511 U.S. at 475-76.

**3.** Even if the district court could review the mere continuation of a valid federalization, the district court's injunction is wrong. To enjoin the continuing deployment of approximately 100 Guard members, plaintiffs were required to overcome *Newsom*'s deferential "colorable basis" standard *and* the requirement that the law and facts "clearly favor" their position. *Garcia*, 786 F.3d at 740. Plaintiffs were also required to overcome the high standard required for *ultra vires* relief, which amounts to a "Hail Mary pass." *NRC*, 605 U.S. at 681-82. Plaintiffs thus must show that the continuation of the service of approximately 100 Guard members

*clearly* lacked any colorable basis in fact or law. Plaintiffs came nowhere close to making that showing.

For starters, defendants could reasonably conclude (both in August, after the initial mob violence, and in October, when the federalized and mobilized force had been reduced still further) that the mob violence in June demonstrated that a limited continuation of the protection mission was warranted. The district court held that every extension "must comply with Section 12406's exigency requirements *at the time it is effectuated.*" A339. But even accepting that premise, it is untenable to hold that still-recent violence is categorically irrelevant such that defendants' consideration of it does not reflect even a colorable assessment of the facts. Defendants could reasonably conclude based on this mob violence that at least a substantially reduced Guard footprint was warranted to prevent future violence that would inhibit execution of the laws.

Relatedly, defendants could colorably conclude that the decrease in violence was in part *because* of the deterrent effect of the Guard's presence, thus warranting a limited continuation of the protective mission. The immigration enforcement that prompted violent mob protests, after all, has not ceased; nor has the intense opposition to that enforcement in the Los Angeles area. The district court dismissed this commonsense point, contending that "[i]f federalization justified federalization, it would become a positive feedback loop that perpetually rationalized federal

control of state troops." A354. But it is absurd to contend that the President must remove the Guard the moment it successfully quells mob violence, and turn blinders to the likelihood that the violence will recur once that deterrent is removed. In any event, the government is not defending an indefinite deployment based on a "feedback loop." Rather, the question is whether, under *Newsom*'s highly deferential standard, there was a colorable basis for maintaining the service of a small subset of Guard members, for a limited time. There was.

As to the August extension, even the district court also recognized that ongoing protests and violent incidents had occurred in the weeks and months after the initial federalization and deployment—including on July 10, when federal law enforcement officials came under violent attack by a rock-throwing crowd in Camarillo. A353. The district court's response that ICE had no imminent plans "to return to Camarillo," A353, is unpersuasive. There is no reason to think that similar violent incidents will not occur at other locations in response to similar operations, particularly without the deterrent effect of the Guard's presence. And the court's contention that this incident was not properly considered less than four weeks later, A353, is not consistent with *Newsom*'s deferential standard.

As to the October continuation and later incidents, at every turn the district court downplayed or dismissed the violence and threats faced by federal officials. The district court acknowledged contemporaneous threats by a known gang member

to a federal law enforcement officer, but deemed that incident irrelevant because it did not ultimately lead to physical violence. A356. The district court likewise acknowledged an incident in which a protestor shone a high-power laser in a federal officer's eyes, causing him eye damage that left him unable to work, but gave it no weight. A356. And as to the Molotov cocktail attack just last week, the district court characterized it as "misconduct" that "injur[ed] no one." A346 n.16.

The court also diminished these events on the ground that the President's Section 12604(3) authority does not turn on "whether there are threats to individual federal employees, but whether the President is presently unable to execute the laws." A356. But it is obvious that federal agents would be able to effectively enforce immigration laws if they are not operating under the threat of assaults and obstruction, which pose unacceptable risks to their safety while doing their jobs. In *Newsom*, this Court did not require the President to provide particular examples of federal law enforcement that was precluded, but deferred to the President's judgment that violent encounters "significantly impeded the ability of federal officers to execute the laws." *Newsom*, 141 F.4th at 1052.

The district court also held that, even if the evidence of ongoing violence and threats established "a significant impediment to executing federal law in Los Angeles," defendants had not shown that the President could not adequately execute "federal law with the assistance of the significant available military force at his

command in California," where "[t]here were 160,074 active members of the military … as of June 2025." A359. And the court further reasoned that "there is no colorable basis to conclude that civilian law enforcement alone would have had any difficulty enabling the President to execute federal law in August or October," apparently on the basis that the President could have brought in additional federal law enforcement in addition to state and local law enforcement. A359.

But nothing in Section 12406 suggests that, before the President can federalize the Guard in response to an exigency, he must exhaust every other resource at his disposal. President Nixon certainly did not appear to think such a requirement applied when he invoked Section 12406's predecessor to federalize the National Guard in response to the 1970 postal strike. *See* 35 Fed. Reg. 5003 (Mar. 24, 1970). And again, this Court in *Newsom* did not probe whether the President could have surged DHS officials from other areas of the country or other federal law enforcement, before holding that the President likely had grounds to determine that Section 12406(3)'s predicate conditions existed.

Relatedly, the district court suggested that "regular forces" in Section 12406(3) meant the military. A357-59. That is wrong, and as the district court acknowledged, the Supreme Court will soon rule on that issue anyway. In any event, the President could reasonably determine that using the standing military would significantly impede execution of the federal immigration laws because the standing

military is less well suited than the National Guard to perform such protective functions on the streets of American cities.

Finally, under any proper analysis, it should matter that the current deployment represents only a small fraction of the deployment this Court previously held was likely lawful. As noted above, the Guard's footprint in the Los Angeles area has been limited to under 300 Guard members since early August, and is now approximately 100 Guard members. The district court gave no positive weight at all to this substantial decrease, instead repeatedly reasoning that it weighed *against* defendants' position. A346 n.16 ("[I]f Defendants truly believed that there was such a danger, how could only 100 Guardsmen be the answer?"); A356 ("[I]n sending 200 of the 300 remaining federalized California National Guard members to Oregon, and keeping them there, Defendants signaled that there was no pressing need for them in Los Angeles"). But the fact defendants have dramatically scaled down the Guard's presence, returned most Guard members to state control, and limited the remaining members' activities simply underscores that defendants are acting reasonably by limiting the federalization, deployment, and use of the Guard to the minimum extent necessary to protect federal officials and property, and allow for enforcement of federal law.

## II. The other stay factors strongly favor the government.

For the reasons explained above, plaintiffs will suffer no meaningful harm from a stay. In staying the district court's substantively identical first injunction, a unanimous panel of this Court held that the equitable factors support defendants. *See Newsom*, 141 F.4th at 1054-56. The panel recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and determined that the mob violence in Los Angeles threatened to irreparably harm that interest. And the panel further explained that any concerns that the mobilization would inflame tension or impair the State's ability to perform critical functions "are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured." *Id.* at 1055. The balance of equities favor a stay even more now that the predicted inflammation of tensions never happened, and given that the much smaller continuing protection mission does not interfere with California's state functions. *See supra* p. 12.

In contrast, the district court's preliminary injunction interjects the court into the military chain of command and countermands the Executive Branch's deployment of California National Guard members to protect federal officers and property from mob violence, thereby impeding the effective execution of federal law. A stay is warranted.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay no later than 12:00 noon Pacific Time on December 15, 2025.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*
*andrew.bernie@usdoj.gov*

December 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,553 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*Andrew M. Bernie*
ANDREW M. BERNIE

# ADDENDUM

# TABLE OF CONTENTS

**<u>District Court Docket</u>**

Declaration of Paul S. Eck,
Docket No. 8-3 (June 10, 2025)........................................................... A1

June 7 Memorandum for Adjutant General of the California National Guard,
Docket No. 25-2 (June 11, 2025)........................................................ A12

June 9 Memorandum for Adjutant General of the California National Guard,
Docket No. 25-3 (June 11, 2025)........................................................ A16

Transcript of Proceedings on August 11, 2025,
Docket No. 162 (August 17, 2025) ..................................................... A21

Order Granting Injunctive Relief,
Docket No. 176 (September 2, 2025) ................................................. A229

Declaration of Benjamin S. Kurland,
Docket No. 190-1 (September 5, 2025) .............................................. A281

Plaintiffs' Renewed Motion for Preliminary Injunction,
Docket No. 212 (November 13, 2025)................................................. A288

Declaration of Colonel Edward Sauter,
Docket No. 214-1 (November 18, 2025)............................................. A309

Declaration of Michael J. Gerardi,
Docket No. 214-2 (November 18, 2025)............................................. A313

Notice of Submission,
Docket No. 220 (December 5, 2025).................................................. A321

Order Granting Renewed Motion for Preliminary Injunction,
Docket No. 225 (November 18, 2025)................................................. A330

**25-3727 Appeal Docket**

Motion to Vacate Stay or, in the Alternative, for Injunction Pending Appeal,
Docket No. 126 (October 7, 2025)...................................................... A365

Order Denying Motion for Injunctive Relief,
Docket No. 143 (October 29, 2025)................................................... A392

**25-5553 Appeal Docket**

Emergency Motion for Stay Pending Appeal and Administrative Stay,
Docket No. 5 (September 3, 2025)...................................................... A394

Order Granting Administraive Stay,
Docket No. 7 (September 4, 2025)...................................................... A423

Case: 25-7781, 12/12/2025, DktEntry: 11.1, Page 34 of 456

ROB BONTA
Attorney General of California
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
Deputy Attorneys General
LAURA L. FAER
Acting Senior Assistant Attorney General
1515 Clay St.
Oakland, CA 94612
Telephone: (510) 879-3304
E-mail: Laura.Faer@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **DECLARATION OF PAUL S. ECK**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge: Charles R. Breyer<br>Trial Date:<br>Action Filed: 6/9/2025 |

**DECLARATION OF PAUL S. ECK**

I, Paul S. Eck, declare under penalty of perjury that the following is true and correct:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

1. I am a Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018.

2. As Deputy General Counsel for the California Military Department, I lead a blended team of California and National Guard attorneys. I provide direct legal support to the Executive Staff and other senior leaders on complex matters at the intersection of military operations, state governance, and national security. I am regularly consulted on the operational needs, objectives, movements, and orders impacting the CMD.

3. I began my service career as a Sergeant in the United States Marine Corps. I served in the United States Marine Corps. from 1980 to 1984 before being honorably discharged.

4. I completed college and law school following my service in the United States Marine Corps. and worked in private practice from 1991 to 2012.

5. From 2008 to 2012, I also worked for the San Diego Sheriff's Department as a Search and Rescue Reserve. In this capacity I provided communications and logistical support to San Diego Sheriff's Department during search and rescue operations for missing and lost persons, evidence recovery, emergency and disaster operations, and mutual aid events among other duties.

6. From 2010 to 2022, I served as a Colonel (CA) and Judge Advocate in the CMD, advising a wide array of units including the 40th Infantry Division, 3-140th Aviation Regiment, 49th Military Police Brigade, and Joint Forces Headquarters. In this capacity, I advised on both administrative law and critical operational legal support.

7. From 2012 to 2014, I worked as an attorney III for the California Department of Forestry and Fire Protection (Cal Fire).

8. From 2014 to 2018, I served as a Peace Officer with Cal Fire, ultimately rising to Chief of Investigations. In this role, I led critical investigative and law enforcement operations supporting both Cal Fire and the Office of the State Fire Marshal. I concurrently served as Bomb Squad Commander and Terrorism Liaison Officer.

9. I am certified by POST at the Basic, Intermediate, Supervisor, and Instructor levels and also hold specialized credentials, including a Post-Blast Explosives Investigator Certificate from the FBI and the FBI Certified Explosives Investigator designation.

10. I have been a National Guard Bureau Intelligence Oversight Monitor for the State of California since I joined CMD in 2018, maintaining annual certifications and ensuring strict compliance with intelligence oversight standards.

11. I have also been a Domestic Operational Law Legal Advisor since 2018, activated to support major domestic missions such as the Oroville Dam crisis and the Camp Fire response. I am trained in State Disaster Management, Advanced ICS Command, Military Resources in Emergency Management, USSOCOM OPSEC, and Army Counterintelligence.

**June 7, 2025**

12. I am aware of and have reviewed the Memorandum issued by President Trump on June 7, 2025 (Trump Memo) calling into federal service members and units of the National Guard.

13. I am also aware and have reviewed the June 7, 2025, Memorandum from Secretary of Defense Peter Hegseth (DOD June 7 Order) to the Adjutant General of California, ordering 2,000 California National Guard members into federal service.

14. I am aware that all 2,000 of the National Guard members deployed as a result of the DOD June 7 Order are members of the 79th Infantry Brigade Combat Team, which include a large number of guard members who serve in Taskforce Rattlesnake, the State's specialized fire combat unit. These service members have specialized training in wildland fire mitigation and prevention and direct fire suppression, and would be highly difficult for the State to replace.

15. The 79th Infantry Brigade also contains Counterdrug Taskforce members that specialize in providing support to stop the trafficking of fentanyl at the U.S.-Mexico Border.

16. As further described below, these deployments will impair the California National Guard's ability to perform critical functions for the State of California, including providing urgent responses to natural disasters and wildfires and drug interdiction, among other imperative missions.

**June 9, 2025**

17. I have reviewed the June 9, 2025, Memorandum from Secretary Hegseth order federalizing an additional 2,000 California National Guard members into federal service (DOD June 9 Order).

18. I have also reviewed a post by Secretary Hegseth on the X social media platform, posted at 3:24 p.m. Pacific time on June 9, 2025, stating that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "to defend federal law enforcement officers." (https://x.com/SecDef/status/1932202105361612994.)

19. Consistent with those public statements by Secretary Hegseth, on June 9 and 10, 2025, I became aware that CMD was informed of DOD's plans to issue change orders to the DOD June 7 Order and DOD June 9 Order (collectively, DOD

Orders). CMD was informed that those change orders would advise that beginning June 10, mobilized federalized California National Guard units would be providing support for counter-immigration operations across Los Angeles, in communities during immigration enforcement operations and not only at federal buildings. CMD was informed that such support activities would include holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel.

**California's National Guard**

20. The California Army National Guard and the California Air National Guard are part of the organized militia of the State of California and are federally recognized units and organizations of the reserve components of the United States military. For the purposes of this declaration, I will refer to the California Army National Guard and the California Air National Guard together as the "California National Guard."

21. Soldiers and airmen of the California National Guard serve important functions for California under the authority of the Governor of California while simultaneously training to perform their federal missions.

22. The California National Guard's purpose is to organize, train, equip, deploy, and employ California's Airmen, Soldiers, and Sailors, to deliver integrated staff, enhanced federal readiness, civil support, and historical contribution capabilities to the California Military Department, interagency partners, and the Governor.

23. The California National Guard is part of the CMD, a state agency that includes the California State Guard, which cannot be federalized and remains at the command and control of the Governor. CMD works under the Executive authority of the Governor of California and performs numerous functions to effectively

operate the California National Guard, including planning and organizing deployments, and trainings.

24. There are three duty status categories for the National Guard: State Active Duty, Title 10, or Title 32 status. In general, these statuses determine who funds an operation and whether they are under the command and control of the Governor or the President in their respective capacities as Commander-in-Chief.

25. In State Active Duty, the California National Guard is fully paid for by the California budget and federal funds are not obligated for any personnel or units. Service members in State Active Duty serve under the command and control of the Governor of California.

26. California National Guard members may serve in Title 32 status. In this hybrid status, they are under the command and control of the Governor, but the mission is paid for by federal funds. The federal government may request the Governor provide the California National Guard's assistance under Title 32 for federal missions. As an example, the California National Guard is in Title 32 status when it is deployed at the southern border to provide operational support to federal law enforcement for drug interdiction.

27. The National Guard may be called into federal service under Title 10 of the United States Code. When members of the California National Guard are called to federal service under Title 10, they become components of the Army and federal National Guard. In Title 10 status, the National Guard is paid for by the federal government and under the command and control of the President.

28. There are approximately 18,733 members of the California National Guard. Most of the California National Guard members serve as reserve forces, meaning that their role in the California National Guard is part-time, and they are generally employed in civilian roles separate from their work as service members. There are currently approximately 12,212 available members of the California National Guard.

29. There are approximately 717 California National Guard servicemembers who work full time on State Active Duty. There are 1,109 Army National Guard and 1,170 Air National Guard members who are in a full time Title 32 status and support the readiness of their guard units. These individuals serve full time for fixed terms, which are often renewed.

30. As the largest National Guard in the country, the California National Guard provides mission ready forces for the State and the Nation, supporting missions all over the world. Each service member plays a critical role, and many have years of specialized training. Pulling those members away from these assignments may imperil the State's ability to protect its residents.

**Use of the National Guard in Service of the State**

31. As Commander-in-Chief of the State's militia, the Governor of California calls members of the California National Guard into active duty to serve the needs of California. The California National Guard is vital for various State functions including emergency and natural disaster response, cybersecurity, and drug interdiction. The California National Guard acts to protect people and property in many ways and the State relies on the National Guard to be ready to intervene in emergent situations to help protect Californians.

32. On average, in the years 2020 through 2025, 3,937 servicemembers were activated for Emergency State Active-Duty each year. CMD has identified and committed 4,600 service members to achieve state specific missions, which is 38% of the available strength.

33. The needs of the State are variable depending on emergent circumstances. For example, in 2020, 12,601 services members were deployed for 488,051 duty days, representing nearly three times more than the assigned strength for the State. In 2025, there have already been 3,332 services members activated for 89,061 duty days, indicating the state will need every available service member to meet the State's operational needs. These numbers exclude specialized taskforces

such as Operation Rattlesnake and the State Counterdrug teams, discussed further below, which contribute collectivity over 600 additional personnel dedicated to state missions.

34. Presently only 6.15% of the assigned strength of CMD is not subject to Title 10 activation, meaning if there is a large federal activation the State will fall far short of the anticipated annual state requirements, even without considering specialized skills and capabilities to accomplish those missions.

35. The January 2025 Los Angeles Fires are a recent example of one of these state missions. On January 7, 2025, a devastating wildfire broke out in Los Angeles County. Governor Newsom immediately proclaimed a state of emergency and deployed the California National Guard to manage the emergency. Over the course of 24 days 2,500 service members were deployed to assist with the firefighting and emergency response efforts sprawling across 37,000 acres of fire-impacted land.

36. The California National Guard's support included firefighting brigades, aerial firefighters who provided critical fire suppression assistance, military police forces stationed at traffic control points to ensure the safety of the surrounding community and those with specialized skills in removing hazardous waste.

37. There are also a number of specialized units and missions.

38. For example, the California National Guard operates FireGuard, a wildfire satellite detection mission. During the last 18 months, FireGuard activated at least five Emergency State Active-Duty Force Packages, consisting of 360 personnel total, in support of the Bridge Fire, Line Fire, and Park Fire in California. One hundred-forty additional Emergency State Active-Duty Military Police Soldiers were also activated to operate and augment Traffic Control Points at the Line Fire and Bridge Fire.

39. The California National Guard also operates Joint Task Force Rattlesnake, a joint taskforce with CalFire to mitigate and prevent wildland fires through fuels mitigation projects and direct fire suppression. Task Force

Rattlesnake provides 14 full-time, year-round Type I Hand Crews to reduce fuels and respond to fire incidents and other emergencies across the State. Each Task Force Rattlesnake crewmember is trained to Firefighter 1C standards, which require at least 540 hours of training. Each of California's 14 Crews are staffed with a minimum of 22 California National Guard personnel and maintain a minimum of 22 Firefighter 1C trained crewmembers (308 personnel in total).

40. Over the past 18 months, Task Force Rattlesnake responded to at least 738 wildland firefighting response missions, covering 10,243 acres of land.

41. The California National Guard also participates in drug interdiction activities in conjunction with local and federal law enforcement agencies. The CMD Counterdrug Task Force includes both state funded and Title 32 servicemembers operating year-round and includes specialized training for analysts and reconnaissance personnel.

42. The State Counterdrug Task Force is funded by the State's General Fund, and currently includes 118 service members assigned as analysts in drug demand reduction at the southern border. California has invested over $60 million over four years to expand California National Guard's work to prevent drug trafficking.

43. California National Guard servicemembers who perform this crucial work are criminal analysts, reconnaissance support personnel, and drug demand reduction outreach specialists—all positions that entail specialized training. State funding for fiscal year 2025 and beyond enables the Counterdrug Task Force to maintain and enhance support to federal, state and local partners in the ability to assist in seizures of firearms, currency, and cryptocurrency from drug trafficking organizations.

44. CMD also has 700 soldiers and 100 Air Guardsmen who are in Military Police companies. These units receive training in apprehensions, detentions, less lethal weapons options, and de-escalation, and they have unique capabilities in crowd control and management. They provide critical site security to "high value

areas" such as residence buildings or state assets. Units can provide area security as well as conducting traffic control points in an emergency. California relies on these units as a part of its "Quick Reaction Force" (NGRF), which is used to rapidly respond and support the needs of Californians in an emergency.

45. The California National Guard also provides critical cybersecurity support for the State, including providing staffing to CalOES's operation of the Cal CSIC (Cyber Security Integration Center). Cal CSIC aids in identifying and tracking cyber-attacks and coordinating response efforts to combat those attacks.

46. The California National Guard operates the Cyber Network Defense Team (CND-T), which supports cyber vulnerability inspections of state agencies, state schools, and, by request, local education agencies and city and county governments. These state agency vulnerability assessments are mandated by California Government Code section 11549.3, which also authorizes CND-T to conduct vulnerability assessments, known as Independent Security Assessments (ISAs) of state agencies and state schools as coordinated through the California Department of Technology.

**Impact of Federalization**

47. As recounted above, the DOD June 7 Order federalized 2,000 members of the 79th Infantry Brigade Combat Team, which included a large number of guard members who serve in CMD's Taskforce Rattlesnake and Counterdrug Taskforce.

48. This deployment is pulling California National Guard members away from their critical drug interdiction work. This will undermine the State's critical investment in this area.

49. This deployment is also pulling away highly trained fire mitigation and prevention and direct fire suppression CMD specialists at the start of California's wildfire season.

50. Most critically, diverting members of the National Guard impairs the Governor's ability to respond to emergencies. As set forth above, California

National Guard resources are limited, and the State does not have an excess of National Guard servicemembers to carry out emergency functions, even without taking into account specialized training.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 10, 2025, at Sacramento, California.

Declaration of Paul S. Eck

# EXHIBIT 2

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN 07 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT: Department of Defense Security for the Protection of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property. To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.

In light of these incidents and credible threats of continued violence, by the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. Further, I direct and delegate actions as necessary for the Secretary of Defense to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority. The members and units of the National Guard called into Federal service shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense. In addition, the Secretary of Defense may employ any other members

of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property in any number determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property The Secretary of Defense shall consult with the Attorney General and the Secretary of Homeland Security prior to withdrawing any personnel from any location to which they are sent. The Secretaries of Defense and Homeland Security may delegate to subordinate officials of their respective Departments any of the authorities conferred upon them by this memorandum.

DONALD J. TRUMP

# EXHIBIT 3

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN - 9 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Additional Members of the California National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. Also on June 7, 2025, I implemented that order by directing 2,000 members of the California National Guard be called into Federal Service for a period of 60 days (see attached memorandum).

This memorandum further implements the President's direction. An additional 2,000 members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachments:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT: Department of Defense Security for the Protection of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property. To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.

In light of these incidents and credible threats of continued violence, by the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. Further, I direct and delegate actions as necessary for the Secretary of Defense to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority. The members and units of the National Guard called into Federal service shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense. In addition, the Secretary of Defense may employ any other members

of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property in any number determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property The Secretary of Defense shall consult with the Attorney General and the Secretary of Homeland Security prior to withdrawing any personnel from any location to which they are sent. The Secretaries of Defense and Homeland Security may delegate to subordinate officials of their respective Departments any of the authorities conferred upon them by this memorandum.

DONALD J. TRUMP

SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**Volume 1**

**Pages 1 - 207**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GAVIN NEWSOM, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA,

Plaintiffs,

VS.

**NO. 3:25-CV-04870 CRB**

DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants.

San Francisco, California
Monday, August 11, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102

**BY: JANE E. REILLEY**
**LORRAINE A. LOPEZ**
**MEGHAN STRONG**
**KENDAL MICKLETHWAITE**
**DEPUTY ATTORNEYS GENERAL**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**: (CONTINUED)

For Plaintiffs:

CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102

**BY: ANYA M. BINSACCA**
**MARISSA MALOUFF**
**SUPERVISING DEPUTY ATTORNEYS GENERAL**

For Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

**BY: GARRY D. HARTLIEB, TRIAL ATTORNEY**
**JODY D. LOWENSTEIN, TRIAL ATTORNEY**
**JEAN LIN, SPECIAL LITIGATION COUNSEL**
**BENJAMIN S. KURLAND, TRIAL ATTORNEY**
**ANDREW BERNIE, TRIAL ATTORNEY**
**ABIGAIL STOUT, TRIAL ATTORNEY**

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530

**BY: ERIC J. HAMILTON**
**JOHN BAILEY**
**DEPUTY ASSISTANT ATTORNEYS GENERAL**

Also Present:

**Kimberly Knight, Paralegal**
**Noel Garcia, Legal Analyst**
**Major General Scott Sherman**

**I N D E X**

Monday, August 11, 2025 - Volume 1


| | PAGE | VOL. |
|---|---|---|
| Plaintiffs Rest | 202 | 1 |

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **HARRINGTON, WILLIAM** | | |
| (SWORN) | 14 | 1 |
| Direct Examination by Ms. Reilley | 14 | 1 |
| Cross-Examination by Mr. Lowenstein | 43 | 1 |
| Redirect Examination by Ms. Reilley | 47 | 1 |
| **SHERMAN, SCOTT MARSHALL** | | |
| (SWORN) | 49 | 1 |
| Direct Examination by Ms. Reilley | 50 | 1 |
| Cross-Examination by Ms. Lin | 112 | 1 |
| Redirect Examination by Ms. Reilley | 143 | 1 |
| **SANTACRUZ, ERNESTO** | | |
| (SWORN) | 147 | 1 |
| Direct Examination by Ms. Lopez | 147 | 1 |
| Cross-Examination by Mr. Hartlieb | 179 | 1 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 5 | | 58 | 1 |
| 10 | | 24 | 1 |
| 12 | | 66 | 1 |
| 15 | | 53 | 1 |
| 28 | | 36 | 1 |
| 31 | | 85 | 1 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
| --- | --- | --- | --- |
| 38 | | 73 | 1 |
| 41 | | 81 | 1 |
| 53 | | 71 | 1 |
| 54 | | 72 | 1 |
| 64 | | 77 | 1 |
| 66 | | 78 | 1 |
| 68 | | 79 | 1 |
| 69 | | 83 | 1 |
| 75 | | 91 | 1 |
| 76 | | 92 | 1 |
| 79 | | 86 | 1 |
| 80 | | 86 | 1 |
| 83 | | 93 | 1 |
| 86 | | 94 | 1 |
| 87 | | 95 | 1 |
| 92 | | 96 | 1 |
| 94 | | 96 | 1 |
| 95 | | 97 | 1 |
| 96 | | 98 | 1 |
| 114 | 110 | 111 | 1 |

**Monday - August 12, 2025** **10:00 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Calling Civil Action C 25-4870, Newsom vs. Trump.

Counsel, please state your appearances for the record.

**MS. STRONG:** Good morning, Your Honor. Meghan Strong of the California Department of Justice for plaintiffs. With me at counsel table are Jane Reilley, Lorraine Lopez, Kendall Micklethwaite, Anya Binsacca, and Marissa Malouff.

**THE COURT:** Good morning.

**MR. HAMILTON:** Good morning, Your Honor. Eric Hamilton for the defendants. With me at counsel table is John Bailey, Garry Hartlieb, Jean Lin, Jody Lowenstein, Ben Kurland, Andrew Bernie, Abby Stout.

**THE COURT:** Good morning.

**MR. HAMILTON:** Thank you.

**THE COURT:** Well, let me thank the parties, first of all, for complying with the many orders that we've issued in the last two or three weeks concerning preparation, discovery, and so forth. It's extremely helpful to have an order to things, especially in cases that are high-profile cases and where there are deadlines to be met, and the parties did meet the deadlines and I'm grateful for that.

So I thought I would make a brief statement as to what I

understand - when I say "I," I mean the Court -- understand this process to be, where we are as of today.

The trial that is going to commence this morning is about a single factual issue to which a number of legal challenges have been asserted.

First, the factual issue. The factual issue is as follows: Did the military, in this case the Marines and the federalized National Guard, violate the Posse Comitatus Act? Now, that act, which is a statute, which means it's a law, reads as follows, and it's rather brief. It's 18 U.S.C., Section 1385, and it's entitled "Use of Army, Navy, Marine Corps, Air Force, and Space Force as Posse Comitatus." It reads [as read]:

> "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned . . . ."

And it goes on to discuss the penalty.

Now, the first question, obviously, is it doesn't say "National Guard"; however, I think it's recognized by the parties that with the federalization of the National Guard, they then would be included within this prohibition, which is

listed as -- which is contained in the Posse Comitatus Act.

So it means, in the Court's view, in other words, the military, as defined, cannot be used to enforce domestic laws unless expressly authorized by the Constitution or act of Congress. The factual question which the Court must address is whether the military was used to enforce domestic law and, if so, whether there continues to be a threat that it would be done again. Evidence will be presented on this issue today and tomorrow.

On Wednesday, the Court will hear argument on the major legal issues that have -- that the federal government has raised in connection with the implementation of this statute, and the major issues are as follows:

One, the Posse Comitatus Act provides no civil cause of action for relief. The Posse Comitatus Act is a criminal statute and, therefore, to bring it in a civil context is not permitted under the law. That's number one.

Number two, California, the State of California, cannot bring a claim that the military was acting *ultra vires* under these circumstances.

Number three, California lacks standing to bring the claim.

And, number four, that there is another statute, which is 12406, under which the National Guard was federalized, and that statute constitutes federal authorization for exempting this

conduct under the Posse Comitatus Act because, remember, when I read the Posse Comitatus Act, it's not a blanket, it's not a blanket statute. It says "unless expressly authorized by act of Congress or by the Constitution." And the federal government takes the position that 14604 -- I'm sorry -- 12406 -- I'm getting my numbers transposed. That's a little dangerous when I do that -- it's 12406, expressly constitutes that exception to the Posse Comitatus Act.

We'll have that discussion, and I promise you we'll have it, on Wednesday after the evidentiary issues have been -- have been presented to the Court.

So I also want to point out, to anybody who's interested, is that the parties have written extensively on this subject. This is not the first time these issues have been raised in this Court, and both sides have addressed it. I will give you another opportunity to address those issues, but I want you to be assured that I actually have considered it, I have read your briefs, and I understand -- at least I believe I understand what the issues are.

So thank you. That is my opening. I gave the opening statement here today. So I think that we should move right into the evidentiary portions because we have a number of witnesses. I want to make sure that they're heard and go through it and there's ample time for cross-examination of the witnesses.

So I turn to the State of California. They are the plaintiff in this case.

And you may call your first witness.

**MS. STRONG:** Thank you, Your Honor.

Before we call our first witness, I just have one housekeeping item and one exhibit-related item I want to bring the Court's attention to.

**THE COURT:** Okay.

**MS. STRONG:** So, first, the parties have already discussed and agreed that the witnesses shall be sequestered during respective testimony, except that I understand that defendants are designating a party representative. I believe they designated Major General Sherman as their party representative.

**THE COURT:** Okay. And he may attend.

**MS. STRONG:** In addition, Your Honor, as you may have seen if you've had the chance review --

**THE COURT:** Let me clarify the sequestration.

What we've done is we've put the witnesses in a secure location, in a courtroom actually, but they're there. They're not here to hear the evidence, but they have -- they are with each other. It's unrealistic to assume that they would never talk to each other. It may be a good idea that they do talk to each other. I don't know. But they're sequestered in that sense.

**MS. STRONG:** Yes, Your Honor.

**THE COURT:** They're not sequestered one from the other.

**MS. STRONG:** Yes, Your Honor, that's my understanding, and they don't have access to the audio feed or otherwise ability to --

**THE COURT:** I believe that's correct.

**MS. STRONG:** -- hear the testimony.

**THE COURT:** I believe that's correct.

**MS. STRONG:** So the second item, Your Honor, is on our exhibit list, you may have seen the parties have stipulated to the admissibility and to admit the vast majority of the exhibits on the exhibit list; and in order to streamline trial today and enable free use of these exhibits during the exams, we'd like to go ahead and admit all of the stipulated exhibits now.

**THE COURT:** So admitted.

**MS. STRONG:** Thank you. Would Your Honor like me to individually address each exhibit or can we reference them?

**THE COURT:** No. I would like you not to have to address it.

**MS. STRONG:** Thank you, Your Honor. That's my preference as well.

In that case, that's all from me. I'm going to turn it over to my colleague to call our first witness.

**THE COURT:** Okay. Is there anything from the federal government that you want to address? Good morning.

**MS. LIN:** Good morning, Your Honor.

**THE COURT:** And you have to give me your name again, please.

**MS. LIN:** Jean Lin on behalf of the Department of Justice.

**THE COURT:** Thank you.

**MS. LIN:** So one housekeeping that the defendants have is that we have a pending motion to seal two types of information, and one is a small redaction -- redaction to certain exhibits that the parties either have stipulated to or not; and then the -- and the other is we have one document that we wanted to seal in entirety, and we have that motion pending. And if Your Honor would like to hear arguments about the sealing motion because it would affect portions that are redacted as well as one document that we're withholding, we're hoping to withhold in full.

**THE COURT:** Well, I don't want to hear it now unless it's necessary for me to hear it now in light of the order of evidence.

But, I mean, the problem, quite practically speaking, is clearing the courtroom, having the hearing. I mean, if it's under seal, it's under seal. But is it necessary for me to adjudicate that now?

**MS. LIN:** So for defendants, we don't intend to talk about any portions of the exhibits that have been redacted or withheld in full. That's one.

And when we filed the motion yesterday, the defendants -- the plaintiffs represented that they do not oppose --

**THE COURT:** Well, let me --

**MS. LIN:** -- the motion.

**THE COURT:** -- see what the plaintiff says.

**MS. STRONG:** We don't take a position on the sealing itself, Your Honor. We'll defer to the Court on that.

We do intend to use the exhibits that are redacted. However, we think that the easiest way to address this is for us to simply put the redacted versions up. If we display anything on the public screen, we'll use the redacted versions. Your Honor and the witness will, of course, have the under-seal, unredacted issues, but we think that would reasonably address this issue during the trial.

**THE COURT:** Okay. Let's do it that way, and let's proceed.

Thank you.

**MS. STRONG:** Thank you, Your Honor.

**MS. LIN:** Okay. Thank you, Your Honor.

**THE COURT:** Thank you very much.

Okay. Good morning.

**MS. REILLEY:** Good morning, Your Honor. Deputy

Attorney General Jane Reilley for the plaintiffs.

Plaintiffs call Deputy Chief of Staff William Harrington as their first witness.

**THE COURT:** Thank you. Now, is the witness in the --

**MS. REILLEY:** I believe he's one of the witnesses who's been sequestered.

**THE COURT:** Okay. Well, maybe the marshals can...

**MS. REILLEY:** And his name is William Harrington.

**THE COURT:** Thank you.

(Pause in proceedings.)

**THE COURT:** By the way, I might as well address, while we're waiting, the -- as the parties know, the sound is being broadcast. So there is a link. The link is a public link, anyone can access it, and so they will hear, if they're interested, these proceedings.

In terms of the video, I issued an order, I think on Saturday, granting the federal government -- I've got to talk about federal government and state government -- the federal government's request, and therefore, there is no video of these proceedings.

However, the Court is a public court. It's open. People come in. They can look at the witnesses as the witnesses testify. Okay? So we just understand that.

And I've now filled the necessary time because the witness is here.

(Witness enters the courtroom and steps forward to be sworn.)

**THE COURT:** Would you come forward, please.

**THE COURTROOM DEPUTY:** Good morning. Step up. Watch your step.

Please raise your right hand.

**WILLIAM HARRINGTON,**

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** Yes, ma'am.

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

Please state your full name for the record and spell your last name.

**THE WITNESS:** William Harrington, H-a-r-r-i-n-g-t-o-n.

**THE COURTROOM DEPUTY:** Thank you.

**THE COURT:** You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Good morning, Mr. Harrington.

**A.** Good morning, ma'am.

**Q.** It's nice to see you again.

Do you recall that I deposed you in this matter approximately two weeks ago?

**A.** I do remember.

**Q.** All right. And --

**THE COURT:** And could you go a bit closer to the microphone and keep your voice up?

**THE WITNESS:** Yes, sir.

**THE COURT:** Thank you.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, you are a civilian who's employed by the U.S. Army; is that right?

**A.** Yes, ma'am.

**Q.** Would you please state your rank and current assignment with the Army?

**A.** GS-13, Deputy Chief of Staff, Task Force 51.

**Q.** What is Task Force 51?

**A.** Task Force 51 is U.S. Army North's deployable contingency command post.

**Q.** Task Force 51 was involved in the deployment of federalized California National Guard soldiers and Marines to Los Angeles that began in June of this year; is that correct?

**A.** Yes, ma'am.

**Q.** And specifically Task Force 51 had operational control over all of the federalized California National Guard soldiers who were deployed to Los Angeles?

**A.** Yes, ma'am.

**Q.** That was approximately 4,000 soldiers in total; correct?

**A.** Yes, ma'am.

**Q.** Task Force 51 also had tactical control over all of the

Marines who were deployed to Los Angeles?
**A.** Yes, ma'am.
**Q.** And that was approximately 700 Marines in total?
**A.** Correct.
**Q.** If today I use the phrase "Task Force 51 troops," do you understand that I'm referring to all of the federalized California National Guard soldiers and all of the Marines who are under Task Force 51's command during the deployment to Los Angeles?
**A.** Yes, ma'am.
**Q.** And the U.S. Department of Defense oversees the entire Army, including Task Force 51; is that right?
**A.** Correct.
**Q.** During the deployment to Los Angeles, Task Force 51 worked with and provided assistance to members of the Department of Homeland Security?
**A.** Yes, ma'am.
**Q.** And the Department of Homeland Security has several divisions, including Immigration and Customs Enforcement, Enforcement and Removal Operations, Customs and Border Protection, and Homeland Security Investigations?
**A.** Yes, ma'am.
**Q.** But the Department of Homeland Security is not part of the military; right?
**A.** No, ma'am.

**Q.** The Department of Homeland Security is a federal law enforcement agency?
**A.** Correct.
**Q.** And the Department of Defense, which includes Task Force 51 and is made up of military, is separate from the Department of Homeland Security, which is made up of federal law enforcement agents; is that right?
**A.** Yes, ma'am.
**Q.** How long have you served as the deputy chief of staff for Task Force 51?
**A.** For about two and a half years.
**Q.** In that role, you're responsible for managing the staff of Task Force 51; is that correct?
**A.** Correct.
**Q.** You also carry out any tasks that are assigned to you by the chief of staff for Task Force 51?
**A.** Yes, ma'am.
**Q.** Previously you were an instructor for the U.S. Army Northern Command's Defense Support for Civil Authorities course?
**A.** It wasn't U.S. Army. North Com is a joint headquarters, so it's not underneath the Department of the Army.
**Q.** All right. But it was underneath the Department of Defense; is that correct?
**A.** Yes, ma'am.

**Q.** And that course applied to all of the military branches, not just the Army?
**A.** Yes, ma'am.
**Q.** All right. And the course was entitled "Defense Support to Civil Authorities"; is that right?
**A.** Yes, ma'am, the Phase 2 course.
**Q.** The Phase 2 course?
**A.** Yes.
**Q.** All right. And you were the instructor of that Phase 2 course for two years?
**A.** Yes, ma'am.
**Q.** And that course covers how the Department of Defense provides security to federal law enforcement agencies when the need arises; is that right?
**A.** Well, there is a legal brief and part of that legal brief includes Posse Comitatus.
**Q.** All right. And in June you deployed to Los Angeles with Task Force 51; is that correct?
**A.** Yes, ma'am.
**Q.** One of your responsibilities during that deployment was to write a nightly report for the commanding general of Task Force 51?
**A.** Yes, ma'am.
**Q.** At the beginning of the deployment, Major General Scott Sherman was the commanding general of Task Force 51 with

respect to that deployment; is that correct?
**A.** Yes, ma'am.
**Q.** And Major General Scott Sherman was in command until July 10th?
**A.** Yes, ma'am.
**Q.** And from July 10th onward, is it correct that Major General Neve Nell was the commanding general?
**A.** Yes, ma'am.
**Q.** In your nightly reports to the commanding general, you included information about the daily activities of Task Force 51; correct?
**A.** Yes.
**Q.** And that included information about Task Force 51's activities in response to requests for assistance from the Department of Homeland Security?
**A.** Yes, ma'am.
**Q.** And the information you included in your nightly reports came from information uploaded to a centralized network by each of Task Force 51 units; is that right?
**A.** Yes, ma'am.
**Q.** And you also received real-time reports from the units via email, phone calls, and Microsoft Team messages?
**A.** Correct.
**Q.** But you never personally were present during any of Task Force 51's field operations during the deployment; is that

right?
**A.** Correct.
**Q.** So the information you included in your nightly reports was received secondhand from the units?
**A.** I don't know if it was secondhand. It was direct reporting from the units; but, yes.
**Q.** Okay. So but all the -- you didn't personally witness any of the actions that you included in your report; is that right?
**A.** Correct.
**Q.** All right. You first received orders in connection with Task Force 51's deployment to Los Angeles on June 7th; is that correct?
**A.** Yes, ma'am.
**Q.** And on that day you received a phone call ordering you to come to Army North headquarters for a briefing?
**A.** Yes, ma'am.
**Q.** You attended that June 7th briefing; correct?
**A.** I did.
**Q.** And the commanding general of Army North was also present at that briefing?
**A.** Yes, ma'am.
**Q.** The chief of staff for Army North was also present?
**A.** Yes, ma'am.
**Q.** So was the G3?
**A.** Yes, ma'am.

**Q.** And the G3 is the operations officer; correct?
**A.** Correct, ma'am.
**Q.** And the Task Force 51 lawyer was present at the briefing?
**A.** I don't remember.
**Q.** All right. What about the staff judge advocate? Was that individual present at the briefing?
**A.** I think they're the same person, ma'am. I don't -- I don't remember if she was there or not.
**Q.** All right. At the June 7th briefing, you were told that Task Force 51 would be deployed to Los Angeles; is that right?
**A.** Yes, ma'am.
**Q.** And you were told that Task Force 51 would serve as the command and control headquarters for the deployment?
**A.** Yes, ma'am.
**Q.** And at the time you attended that briefing, you already knew what the Posse Comitatus Act was; correct?
**A.** Correct, ma'am.
**Q.** And your knowledge of the Posse Comitatus Act comes from trainings that you've received during your time at the Department of Defense; is that right?
**A.** Yes, ma'am.
**Q.** And it also comes from your time as an instructor of the Defense Support to Civil Authorities Phase 2 course?
**A.** Correct, ma'am.
**Q.** I believe you mentioned earlier that course included a

legal brief that addressed the Posse Comitatus Act?

**A.** Yes, ma'am.

**Q.** And you during your time as instructor, you received that legal briefing 28 times?

**A.** About 28 times. I've sat through it about that number.

**Q.** Okay. So during the June 7th briefing, you raised the issue of the Posse Comitatus Act; correct?

**A.** I did, ma'am.

**Q.** Specifically you said that any -- if any National Guard troops were federalized as part of the deployment, they would lose the ability to conduct law enforcement activities because of the Posse Comitatus Act; correct?

**A.** Correct, ma'am.

**Q.** And when you said that, the commanding general of U.S. Army North specifically said that federalized National Guard troops involved in the mission would not be performing law enforcement functions; is that right?

**A.** Correct, ma'am.

**Q.** And everyone in the briefing agreed that as soon as California National Guard troops were called into federal service, they would be subject to the Posse Comitatus Act; is that right?

**A.** Yes, ma'am.

**Q.** And because of the Posse Comitatus Act, those federalized National Guard troops would not be able to engage in law

enforcement activities?

**MR. LOWENSTEIN:** Objection, Your Honor. This is improper opinion testimony under 701.

**THE COURT:** Overruled.

**BY MS. REILLEY:**

**Q.** You may answer the question.

**A.** Can you repeat the question, please.

**Q.** Certainly. And this goes back to the --

**THE COURT:** You're asking him what his understanding is, what his state of mind is, as distinct from a legal opinion; but his legal opinion may very well govern his state of mind. But he can testify as to what his beliefs were, what he thought of the law, and so forth.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, the question was: Because of the Posse Comitatus Act, it's your understanding that those federalized troops would not be allowed to engage in civilian law enforcement activities --

**A.** Correct.

**Q.** -- during their deployment?

Thank you.

And during the June 7th briefing, you were reassured that federalized National Guard troops would not engage in any actions that would violate the Posse Comitatus Act during the

deployment; right?
**A.** Correct, ma'am.
**Q.** And you're not aware of anyone within the U.S. Northern chain of command who ever believed that the federalized National Guard troops in Los Angeles were not subject to the Posse Comitatus Act; is that right?
**A.** Okay. There was like a double negative in there, so I think you're saying that everyone knew that Posse Comitatus applied; is that correct?
**THE COURT:** To your knowledge.
**THE WITNESS:** Yes, sir. Yes, ma'am.
**BY MS. REILLEY:**
**Q.** You never heard anyone express an opinion that they thought Posse Comitatus did not apply; is that correct?
**A.** Correct.
**Q.** All right. Thank you.
Task Force 51 troops received training on which specific activities they are not allowed to engage in because of Posse Comitatus; is that correct?
**A.** Yes, ma'am.
**Q.** And this training included a slideshow presentation?
**A.** Yes, ma'am.
(Trial Exhibit 10 received in evidence.)
**BY MS. REILLEY:**
**Q.** Mr. Harrington, in front of you there's a binder. I'll

ask you to turn to Tab 10 of that binder. This is a document that's been previously admitted as Exhibit 10.

Mr. Harrington, do you recognize this document?

**A.** I do.

**Q.** This is a copy of the slide deck that was used during the training that Task Force 51 troops received during the deployment to Los Angeles; is that correct?

**A.** Yes, ma'am.

**Q.** Do you know who created this slide deck?

**A.** I do not.

**Q.** And you did not attend any of the training sessions where these slides were presented to the Task Force 51 troops; is that correct?

**A.** That's correct.

**Q.** You're not aware of any transcripts or recordings that show what was said during the training sessions?

**A.** Correct.

**Q.** So apart from what's included in these slides, you do not know what information, if any, was provided to the troops during the training sessions?

**A.** Correct.

**Q.** If you could please turn to what's been marked as page DEFS00001100, and we'll publish that page to the screen in front of you.

**A.** Okay. I'm on the page, ma'am.

**Q.** All right. And do you recognize this training slide?
**A.** Yes, ma'am.
**Q.** At the top of the page, it says "PCA," and that refers to the Posse Comitatus Act; correct?
**A.** Yes, ma'am.
**Q.** And the slide goes on to read [as read]:

"PCA prohibits active direct pursuit, arrest, apprehension, search and seizure, security patrols, traffic control, crowd control, riot control, evidence collection, and interrogation."

**A.** Yes, ma'am.
**THE COURT:** One moment, please.
Lashanda, it's not on the screen.
Is it on the screen? Is the audience able to see it? No.
**THE COURTROOM DEPUTY:** Noel has it. The tech person will need to display it.
**THE COURT:** The tech. Okay. Can you explain to --
**THE COURTROOM DEPUTY:** We tested on Thursday, so he just needs to publish.
**THE COURT:** Okay. Let's wait just a minute because you're going through these, and I think it's useful for everybody to be able to see the exhibit.
**MS. REILLEY:** Thank you, Your Honor.
**THE COURT:** So let's wait till your tech person...
(Pause in proceedings.)

**THE COURT:** It's very important to have a tech person under the age of 50.

(Pause in proceedings.)

**THE COURT:** All right. I now see it on the screen.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, do you see that?

**THE COURT:** Can you see it as well?

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. Thank you.

**BY MS. REILLEY:**

**Q.** All right. And the page that's shown on the screen in front of you, that is the same document we were just discussing; is that correct?

**A.** Yes, ma'am.

**Q.** Thank you.

While he was the commander of Task Force 51 with respect to the deployment to Los Angeles, Major General Sherman made it very clear that the troops were not to impede vehicle or pedestrian traffic; is that right?

**A.** Yes, ma'am.

**Q.** And that's because impeding vehicle or pedestrian traffic is a law enforcement function?

**A.** Yes, ma'am.

**Q.** And the troops were told that they were not allowed to block public roads under the Posse Comitatus Act?

**A.** Yes, ma'am.
**Q.** Task Force 51 troops were trained that they could detain civilians, though; is that correct?
**A.** Yes, ma'am.
**Q.** But there's no scenario that you can conceive of where a Task Force 51 soldier would be able to detain a civilian who is not committing any criminal act without violating Posse Comitatus; is that right?
**A.** No, ma'am. I do not agree with that statement.
**Q.** All right. You gave a deposition in this matter two weeks ago. Do you recall that testimony from earlier?
**A.** Yes, ma'am.
**Q.** All right. If you could, please, turn to Volume 4 of the binder. If you could please turn to Tab 98.
Do you recognize this as the transcript of the deposition that you gave in this matter?
**A.** (Witness examines document.) Yes, ma'am.
**Q.** When you were deposed in this matter, you gave testimony under oath; correct?
**A.** Yes, ma'am.
**Q.** And as part of that oath, you swore to tell the truth as completely and accurately as you could; right?
**A.** Yes, ma'am.
**Q.** And after the deposition, you had a chance to review your transcript and make any changes to it?

**A.** Yes, ma'am.

**Q.** Then you signed the transcript under oath; is that correct?

**A.** Yes, ma'am.

**Q.** Could you please turn to page 177 of your deposition. Let me know when you're at that page.

**A.** (Witness examines document.) Okay. I'm there, ma'am.

**MS. REILLEY:** May I have one moment, Your Honor.

**THE COURT:** Yes.

(Pause in proceedings.)

**BY MS. REILLEY:**

**Q.** All right. And do you recall at your deposition when I asked you [as read]:

"Can you conceive of any scenario where a Task Force 51 soldier would be able to temporarily detain a civilian who is not committing any criminal act without violating Posse Comitatus?"

**THE COURT:** Well, are you referring to a particular page? Are you referring to a particular page?

**MS. REILLEY:** Yes, Your Honor. We are pulling that cite.

**THE COURT:** Okay. Let's wait a moment and see if we can find the page.

If not, you can return to this; but I think in fairness to the witness, the witness should be able to look at --

**MS. REILLEY:** Yes, Your Honor, and I apologize for the delay.

**THE COURT:** That's all right.

**MS. REILLEY:** We're pulling the cite now.

**BY MS. REILLEY:**

**Q.** Oh, if I could please have you turn to page 179, I apologize, of your deposition transcript, and if I could direct your attention to line 18.

Do you see where I asked you [as read]:

"Can you conceive --

And this is, again, based on your training and experience as a deputy chief of staff.

[As read]:

"Can you conceive of any scenario where a Task Force 51 soldier would be able to temporarily detain a civilian who is not committing any criminal act without violating Posse Comitatus?"

Do you see where I asked you that question?

**A.** Yes, ma'am.

**Q.** If you could please turn to the following page, page 180, of your deposition.

Do you see at line 6 where you responded [as read]:

"No, ma'am"?

**A.** (Witness examines document.) Yes, ma'am.

**Q.** And you did not change that testimony when you reviewed

and signed your transcript; correct?
**A.** Yes, ma'am.
**Q.** During the deployment to Los Angeles, Task Force 51 responded to requests for assistance from federal law enforcement agencies; is that right?
**A.** Correct.
**Q.** And that included requests for assistance from the Department of Homeland Security and its subdivisions?
**A.** Yes, ma'am.
**Q.** During the deployment, Task Force 51 received a total of 64 requests for assistance from federal law enforcement agencies; is that right?
**A.** Yes, ma'am.
**Q.** Some of those requests for assistance involved Task Force 51 guarding federal buildings?
**A.** Protecting federal buildings, yes, ma'am.
**Q.** And many of the other requests for assistance asked for Task Force 51 troops to provide force protection to federal law enforcement agents while they were conducting search warrant operations?
**A.** While they were providing -- while they were executing federal functions, yes, ma'am.
**Q.** All right. And those federal functions were search warrant operations?
**A.** Those are some of the federal functions.

**Q.** All right. And Task Force 51 approved and responded to the majority of the 64 requests for assistance it received; correct?

**A.** Yes, ma'am.

**Q.** And whenever they responded to a request for assistance during the deployment, Task Force 51 troops carried weapons with live ammunition in their magazines?

**A.** Yes, ma'am.

**Q.** One of the requests for assistance asked for Task Force 51 troops to be involved in a law enforcement operation near Mecca, California; is that correct?

**A.** Yes, ma'am.

**Q.** That law enforcement operation took place in mid-June?

**A.** Yes, ma'am.

**Q.** And that law enforcement operation involved a marijuana farm; is that correct?

**A.** Yes, ma'am.

**Q.** Task Force 51 approved and responded to the request for assistance related to the Mecca operation; is that right?

**A.** Yes, ma'am.

**Q.** Approximately 300 Task Force 51 troops participated in that operation?

**A.** Correct, ma'am.

**Q.** And approximately 20 of Task Force 51's military vehicles were also involved in the Mecca operation; correct?

**A.** I don't know the number of vehicles, but probably a little more than that to carry 300 troops.
**Q.** All right. So probably 20 or more vehicles; correct?
**A.** Yes, ma'am.
**Q.** And those military vehicles were Humvees?
**A.** Well, they were Humvees; LMTVs, which are large cargo vehicles; and probably JLTVs, which is -- you know, it's -- it's an updated version. It's kind of like a Humvee but it's slightly larger.
**Q.** If you know, could you please state the full term of the acronyms you just gave in your prior response?
**A.** Oh. Let's see. LMTV is a light medium transportation vehicle. You know, it's a cargo vehicle. It can also carry soldiers.
JLTV, I think it stands for joint land tactical vehicle. Some- -- you know, something to that effect. It's -- it carries a handful of soldiers in it.
**Q.** During the Mecca operation, federal agents did not require any force protection from the Task Force 51 troops; is that right?
**A.** Correct, ma'am.
**Q.** And there was also a request for assistance for Task Force 51 troops to be involved in a law enforcement operation in Camarillo, California; is that right?
**A.** Yes, ma'am.

**Q.** That law enforcement operation also involved a marijuana farm?

**A.** Yes, ma'am.

**Q.** And Task Force 51 approved and responded to that request for assistance; correct?

**A.** Well, I think it was in the approval process and then the requesting federal agency canceled the request.

**Q.** All right. Was there ever an occasion where Task Force 51 troops participated in a law enforcement operation in Camarillo?

**A.** Yes, ma'am.

**Q.** All right. That was not in response to a standalone request for assistance? That's your testimony?

**A.** Correct.

**Q.** All right. Was that -- were the Task Force 51 troops' involvement in that operation as a mobile response force?

**A.** Yes, ma'am.

**Q.** All right. And there were approximately 80 Task Force 51 soldiers who were on site in Camarillo during that operation; correct?

**A.** Yes, ma'am.

**Q.** And Task Force 51 military vehicles were also involved in the Camarillo operation?

**A.** Yes, ma'am.

**Q.** Those military vehicles were Humvees and transportation

vehicles?

**A.** Yes, ma'am.

**Q.** There's also a request for assistance that asked Task Force 51 troops to be involved in a law enforcement operation in Los Angeles' MacArthur Park on July 7th; is that correct?

**A.** Yes, ma'am.

**Q.** And Task Force 51 approved and responded to that request for assistance?

**A.** Well, we -- Task Force 51 did not approve that one. That one went up to a higher level authority for approval.

**Q.** Did the Secretary of Defense ultimately approve the MacArthur Park operation?

**A.** I believe so, ma'am.

**Q.** So Task Force 51 troops did participate in the MacArthur Park operation?

**A.** Yes, ma'am.

**Q.** Thank you.

And there were approximately 80 Task Force 51 troops who participated in the MacArthur Park operation; correct?

**A.** Yes, ma'am.

**Q.** And military vehicles from Task Force 51 were involved in that operation as well?

**A.** Yes, ma'am.

**Q.** And those were Humvees and tactical vehicles?

**A.** Yes, ma'am.

(Trial Exhibit 28 received in evidence.)

**BY MS. REILLEY:**

**Q.** All right. If you could please turn to Tab 28 of Volume 1 of the binder in front of you. This has been previously admitted as Exhibit 28.

**A.** (Witness examines document.)

**Q.** And, Mr. Harrington --

**THE COURT:** Let's see if we can get it up on the screen.

**MS. REILLEY:** We were going to -- Your Honor, we were going to publish two pages of the document.

**THE COURT:** Okay. So identify those, and they can -- they can go on the screen.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** So the first page we were going to publish is 2875.

Mr. Harrington, first I want to ask you about all of the documents that -- pages that are included within Exhibit 28, and that's labeled 2872 through 2893. Do you recognize those documents?

**A.** Yes, ma'am.

**Q.** These are Task Force 51 documents related to the July 7th MacArthur Park operation; correct?

**A.** Yes, ma'am.

**Q.** All right. If I could please have you turn to page 2875, and this has also been published on the screen in front of you.

And, Mr. Harrington, this page is entitled "Operation Excalibur Executive Summary." Does Operation Excalibur refer to the MacArthur Park operation?

**A.** It does, ma'am.

**Q.** Could you please read aloud the paragraph that's written under the header "Mission"? And if it's helpful, we've zoomed in on that portion on the screen in front of you.

**A.** Okay. It says [as read]:

> "On Order 118 CAF Squadron provides static interagency site protection, mounted mobile security, and joint force land component command reserve support to Customs and Border Patrol and supporting federal agencies whose intent at MacArthur Park is to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles joint operations area."

**Q.** That is your understanding of the mission of the MacArthur Park operation; correct?

**A.** Well, I don't know what the lead federal agencies' intent was. That's what -- this is what our slide says; but, yes, ma'am.

**Q.** And you don't have any reason to dispute the description you just read; correct?

**A.** No, ma'am.

**Q.** If you could please read aloud the section that's written under the header "Purpose," and we will zoom in on that section on the screen in front of you.

**A.** Okay.

[As read]:

"The purpose of this operation is to enable and protect the execution of joint federal law enforcement missions in a high-visibility urban environment while preserving public safety and demonstrating federal reach and presence."

**Q.** That is your understanding of the purpose of the MacArthur Park operation; correct?

**A.** Yes, ma'am.

**Q.** If you could please turn to page 2892 of the document? And we will publish that page to the screen now.

Mr. Harrington, that page is entitled "Operation Excalibur Executive Summary Risk Assessment." Do you see that's written?

**A.** Yes, ma'am.

**Q.** And you recognize this page; correct?

**A.** Yes, ma'am.

**Q.** Do you see where -- near the bottom of the page, where it says "Risk of inaction low"?

**A.** Yes, ma'am.

**Q.** Could you please read aloud the four lines immediately

below the statement "Risk of inaction low"?

**A.** [As read]:

"Current intelligence does not indicate a high-value target or threat to federal functions at this location. No indication that failure to act would result in loss of life or significant property damage. Expected law enforcement action is limited in scale, with few detainees anticipated and no high-risk warrants involved. Operation not informed by time-sensitive intelligence or part of an integrated targeting cycle."

**Q.** You watched the MacArthur Park operation live on television; is that right?

**A.** Yes, ma'am.

**Q.** And other members of Task Force 51 watched the broadcast with you?

**A.** Yes, ma'am.

**Q.** When you watched the broadcast, you saw that the federal agents in the park walked through the park uninhibited; correct?

**A.** Yes, ma'am.

**Q.** And it wasn't necessary for Task Force 51 troops to provide any force protection during the MacArthur Park operation; is that right?

**A.** Correct, ma'am.

**Q.** And federal law enforcement agents ultimately didn't end up making any arrests during the MacArthur Park operation; is that right?
**A.** Correct, ma'am.
**Q.** Mr. Harrington, do you currently have any involvement with the Los Angeles deployment?
**A.** What do you mean? I don't understand the question.
**Q.** As of the time I took your deposition, you were still deployed to Los Angeles; correct?
**A.** Yes, ma'am.
**Q.** Are you still deployed to Los Angeles?
**A.** No, ma'am.
**Q.** When did your involvement with the deployment in Los Angeles end?
**A.** Friday the 8th of August.
**Q.** How did you learn that your involvement in the deployment was ending on August 8th?
**A.** I was told that I was coming here.
**Q.** After the trial in this matter concludes, are you going to return to Los Angeles?
**A.** No, ma'am.
**Q.** Will you be going back to Fort Sam Houston?
**A.** I will.
**Q.** All right. Do you have any knowledge of what the remaining federalized National Guard soldiers in Los Angeles

are doing?

**A.** Yes, ma'am.

**Q.** What is your understanding of what those federalized troops are doing?

**A.** They're supporting the requests for assistance from the lead federal agency.

**Q.** So federalized National Guard soldiers are continuing to assist federal law enforcement agents in Southern California; is that correct?

**A.** Well, they're -- they are still supporting requests for assistance, yes, ma'am.

**Q.** At the time that your involvement in the deployment ended on August 8th, how many requests for assistance was Task Force 51 continuing to respond to?

**A.** Four, ma'am.

**Q.** Are you aware that this morning Secretary of Defense Hegseth announced the deployment of National Guard troops in Washington, D.C.?

**MR. LOWENSTEIN:** Objection. Scope. Relevance.

**THE COURT:** Well, the relevance, I would assume, is the likelihood -- is whether or not it's likely that this deployment or kind of deployment will occur in the future. I mean, that's one of the tests for injunctive relief; right? Right?

**MR. LOWENSTEIN:** That's correct.

**THE COURT:** Right. So it's relevant to -- present conduct may be relevant on that issue. The extent to which it's relevant, how it's the same, how it's different, those are all factors to be considered obviously, but I think it's relevant. So on that basis, the objection is overruled.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** And, Mr. Harrington, did -- you testified that you are aware of that announcement that was made this morning?

**A.** No, I was not aware.

**Q.** All right. Secretary Hegseth said in his announcement that the D.C. National Guard will, quote, "stand with their law enforcement partners," closed quote, and that, quote, "we did the same thing in Los Angeles," closed quote. Did you hear that statement?

**A.** No, ma'am.

**MR. LOWENSTEIN:** Objection. Foundation. He wasn't aware of this.

**THE COURT:** Well, the question is did he -- I assume if he's unaware of it, he didn't hear it. I mean, that generally is the case.

Did he say he didn't hear the announcement? Somebody may have said something to him and so forth. So I'll allow the question is he aware of it; however, the fact that the statement is made or what was contained in the statement is not

evidence in and of itself by virtue of the question that's asked.

So to the extent it may assume facts not in evidence, it would be granted, but I don't have the statement in front of me to know whether it's attributed to the Secretary or not. Okay? Satisfied?

**MR. LOWENSTEIN:** Yes. Thank you.

**THE COURT:** Great.

Go ahead.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, you said that you were not aware of that statement that Secretary Hegseth made this morning?

**A.** Correct, ma'am.

**Q.** Do you have any involvement with the deployment of National Guard troops in the D.C. area?

**A.** No, ma'am.

**MS. REILLEY:** At this time, plaintiffs have no further questions for Mr. Harrington.

**THE COURT:** Any cross?

**MR. LOWENSTEIN:** Yes, Your Honor.

**THE COURT:** Okay.

**CROSS-EXAMINATION**

**BY MR. LOWENSTEIN:**

**Q.** Jody Lowenstein for defendants.

Good morning, Mr. Harrington.

**A.** Good morning, sir.
**Q.** I just have a few questions for you.
You're testifying here today based on your personal knowledge; correct?
**A.** Yes, sir.
**Q.** You've testified a bit about your background earlier. Do you recall that?
**A.** Yes, sir.
**Q.** Are you a lawyer?
**A.** No, sir.
**Q.** Do you have a law degree?
**A.** No, sir.
**Q.** Your understanding of the Posse Comitatus Act is not informed by any specialized legal training; is that right?
**A.** Correct, sir.
**Q.** Do you recall testifying just a moment ago about Task Force 51's involvement in the Mecca operation?
**A.** Yes, sir.
**Q.** And you testified in response to counsel's question that they were involved in that operation. Do you recall that?
**A.** Yes, sir.
**Q.** Can you explain what you mean by "they were involved in that operation"?
**A.** Well, they were asked to provide force protection for the agents while they were performing their federal functions. The

soldiers actually did not engage in any activity other than they were located near the facility, several hundred yards away. There was actually a canal between where the soldiers were and the facility that the agents were performing their law enforcement functions.

Soldiers had no interactions with any civilians. They were -- they were near the facility, did not go in the facility, did not interact with any civilians. So they were there to -- you know, prepared to provide force protection but did not actually get employed to do that.

**Q.** In your view, did Task -- any Task Force 51 troops perform law enforcement functions at the Mecca operation?

**A.** No, sir.

**Q.** Do you recall receiving questions regarding an operation in Camarillo?

**A.** Yes, sir.

**Q.** And in response to counsel's questions, you testified that Task Force 51 troops were involved in and participated in that operation. Do you recall testifying to that?

**A.** Yes, sir.

**Q.** Can you explain what you mean when you testified that Task Force 51 was involved in and participated in the Camarillo operation?

**A.** Yes, sir. So the federal agents, CBP, and I think there was ICE and ERO as well, were already executing their law

enforcement functions at the facility in Camarillo. And as I stated before, they had canceled the request for assistance to Task Force 51, which was RFA Number 48. They canceled it.

And as they were executing the operation, crowds formed on the roads near the facility, so we received a request for a mobile response force to provide force protection of those agents.

**Q.** Do you recall or do you know what kind of conduct those crowds were engaging in at the Camarillo operation?

**A.** Yes, sir. They were -- they were throwing rocks at the agents. They were throwing rocks at the vehicles. They had damaged the vehicles. They had built -- they had taken sections of garden hose and run nails through the hoses as spike strips, and they were popping the tires of the federal law enforcement vehicles. So they were -- it was an unruly crowd.

**Q.** Did Task Force -- any Task Force 51 troops engage in any law enforcement functions during the Camarillo operation?

**A.** No, sir.

**Q.** Do you recall receiving questions regarding the MacArthur Park operation?

**A.** Yes, sir.

**Q.** In response to counsel's questions, do you recall testifying that Task Force 51 participated in that operation?

**A.** Yes, sir.

**Q.** Can you please explain what you meant by Task Force 51 participated in the MacArthur Park operation?

**A.** So we had approximately 80 soldiers, I think it was 19 vehicles, and they were there to provide force protection of the federal agents who were -- they had established four separate traffic control points around the park and two separate blocking positions. Our soldiers were near those positions to provide force protection of the agents.

And, again, they were not employed, did not interact with the civilians at any of those locations, and the operation took about 20 minutes total. It actually took more time to drive there than it took the agents to walk through the park. And then our soldiers returned back to joint force training base Los Alamitos around noon that day.

**Q.** Did Task Force 51 -- did any Task Force 51 troops engage in any law enforcement functions during the MacArthur Park operation?

**A.** No, sir.

**MR. LOWENSTEIN:** No further questions, Your Honor, for the witness.

**THE COURT:** Okay. Redirect or recross?

**MS. REILLEY:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Mr. Harrington, Mr. Lowenstein just asked you a moment ago

about your knowledge of the activities that troops participated in during the Mecca operation. Do you recall that testimony?
**A.** Yes, ma'am.
**Q.** You were not present at the Mecca operation; correct?
**A.** Correct.
**Q.** So any information that you have about activities performed during that operation came from the units who were present; is that right?
**A.** Yes, ma'am.
**Q.** All right. And as to the Camarillo operation, you also were not present for that operation; correct?
**A.** Correct.
**Q.** So any information that you have about the activities that were engaged in at that operation you received from the troops; correct?
**A.** Not all of it, ma'am. Some of it, received from reports from the unit. The rest of the information, we watched it live on TV in the Operations Center.
**Q.** All right. And as to MacArthur Park, the only information that you have about what actually happened on the ground during MacArthur Park came from watching the news broadcasts and hearing from the troops who were present; correct?
**A.** No, ma'am. There was -- we had the Deputy Secretary of DHS in our Operations Center who had a feed to -- so an aircraft that also showed footage of the operation.

**Q.** Was that a DHS aircraft?
**A.** Yes, ma'am.
**MS. REILLEY:** All right. No further questions.
**THE COURT:** Anything further?
**MR. LOWENSTEIN:** Nothing further, Your Honor.
**THE COURT:** Thank you. You're excused. Thank you for coming.

(Witness excused.)

**THE COURT:** Call your next witness.
**MS. REILLEY:** Thank you, Your Honor.
Plaintiffs call Major General Scott Sherman.
**THE COURT:** Okay.

(Witness enters the courtroom and steps forward to be sworn.)

**THE COURTROOM DEPUTY:** Good morning.
**THE WITNESS:** Good morning.

**SCOTT MARSHALL SHERMAN**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** I do.
**THE COURTROOM DEPUTY:** Thank you. You may be seated.
Please state your full name for the record and spell your last name.
**THE WITNESS:** Sure. Scott Marshall Sherman, last spelling, S-h-e-r-m-a-n.
**THE COURTROOM DEPUTY:** Thank you.

**DIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Good morning, Major General Sherman.

**A.** Good morning.

**Q.** Do you recall giving a deposition in this matter last Wednesday?

**A.** I do.

**Q.** And you remember me from that deposition, don't you?

**A.** I do.

**Q.** Nice to see you again.

**A.** Nice to see you.

**Q.** Would you please state your rank and current assignment with the U.S. Army?

**A.** Sure. I'm a major general in the United States Army. I am the deputy commanding general support for U.S. Army North, and I'm also the commander of Task Force 51, which is the contingency command post for U.S. Army North.

**Q.** You've held these positions for approximately two years; is that correct?

**A.** That's correct. Since September of 2023.

**Q.** For how many years have you been a soldier in the U.S. Army?

**A.** I've been a soldier for 33 years.

**Q.** In June of this year, you deployed to Los Angeles with Task Force 51; correct?

**A.** Correct.
**Q.** And from June 9th until June 10th, you served as the commanding general of Task Force 51 with respect to that deployment; is that right?
**A.** That is correct.
**Q.** And today if I use the phrase "Task Force 51 troops," do you understand that I'm referring to the federalized California National Guard soldiers and Marines who were under Task Force 51's control and command during that deployment?
**A.** I do.
**Q.** As commanding general, is it true that one of your responsibilities during the deployment was to ensure Task Force 51 troops were properly trained?
**A.** That is correct.
**Q.** And another of your responsibilities was to ensure Task Force 51 troops were prepared for their operations?
**A.** Correct.
**Q.** You were also responsible for ensuring Task Force 51 troops followed the law; is that right?
**A.** Correct.
**Q.** You never personally accompanied any Task Force 51 troops during any field operations; is that right?
**A.** That's correct. Only at -- only at the positions where we were doing protection of federal property.
**Q.** All right. So in any operations that took place off of

federal property, you did not personally attend; is that fair?
**A.** That's correct.
**Q.** All right. You would receive briefings on the field operations after they took place, though; is that right?
**A.** Before and after, yes, that's correct.
**Q.** All right. So your knowledge of what took place during Task Force 51's field operations was received from the briefings you received before and after the fact; correct?
**A.** Correct, and reports from commanders.
**Q.** All right. Prior to deploying to Los Angeles in June, you were aware of the Posse Comitatus Act; correct?
**A.** Correct.
**Q.** And your knowledge of the Posse Comitatus Act is based on trainings and legal guidance you've received throughout your 33 years as a soldier?
**A.** That is correct.
**Q.** And as commanding general, it's important that you have a clear understanding of the Posse Comitatus Act so you can ensure that your troops are complying with it; is that right?
**A.** That is correct.
**Q.** Based on your training and experience, it's your understanding that Task Force 51 troops who are deployed to Los Angeles are subject to the Posse Comitatus Act; right?
**A.** That is correct.
**Q.** And based on your training and experience, it's your

understanding that because Task Force 51 troops are subject to the Posse Comitatus Act, they cannot engage in civil law enforcement activities; correct?

**A.** That is correct.

(Trial Exhibit 15 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 15 of the binder that's in front of you.

**A.** (Witness examines document.)

**Q.** And we are going to publish page 2532 of this document to the -- to the screen.

**THE COURT:** All right.

**BY MS. REILLEY:**

**Q.** Major General Sherman, do you recognize the document at Tab 15? And this has been previously admitted as Exhibit 15.

**A.** I do recognize it.

**Q.** And this is a memorandum from Undersecretary of Defense Elbridge Colby to Secretary of Defense Hegseth; is that right?

**A.** That is correct.

**Q.** And this memorandum includes the Undersecretary of Defense's assessment of what Task Force 51 soldiers and Marines could legally do during the deployment to Los Angeles?

**A.** That was in line with the Posse Comitatus Act, that is correct.

**Q.** And you reviewed this memorandum during the deployment in

or around mid-June?

**A.** That is correct.

**Q.** And if you could please turn to page 2532, and this will be published to the screen.

**A.** (Witness examines document.) I'm there. I'm sorry.

**Q.** It's all right. We're just getting it queued up on the --

**A.** Okay.

**Q.** -- on the screen.

(Pause in proceedings.)

**THE COURT:** With technology, one has to have a great deal of hope. You see, we hope it will arrive in due course, but...

**MS. REILLEY:** Yes, Your Honor.

(Pause in proceedings.)

**BY MS. REILLEY:**

**Q.** Major General Sherman --

**THE COURT:** Let's just wait a second and see. He seems to be on to something here. We can also use the Elmo.

(Pause in proceedings.)

**MS. REILLEY:** Your Honor, I understand from our team that there's an HDMI disconnect with the --

**THE COURT:** Well, what about the Elmo? Will that work?

**THE COURTROOM DEPUTY:** Do you have a hard copy that you can show?

**THE COURT:** Or we could take a recess if that's --

**MS. REILLEY:** If we could take a brief recess to attempt to address --

**THE COURT:** Yeah, okay. We'll be in recess for ten minutes.

**MS. REILLEY:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

(Recess taken at 11:03 a.m.)

(Proceedings resumed at 11:17 a.m.)

**THE COURT:** The record will show all parties are present.

My understanding is the federal government is able to show these exhibits; is that correct?

**MS. LIN:** Yes, Your Honor.

**THE COURT:** So I want to thank the federal government for accommodating the state government. It's a wonderful example of federal-state cooperation.

(Laughter.)

**THE COURT:** Thank you so much, and we'll proceed.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** And we will publish at this time page 2532 of Exhibit 15.

Major General Sherman, do you see the header in this document that reads "Detention/Arrest Authority"?

**A.** I do.

**Q.** Can you please read aloud the paragraph immediately below that header?

**A.** [As read]:

"CUI" -- which is just unclassified material but -- "DHS has requested service members' direct assistance in detaining and/or arresting individuals observed to be committing a crime. Use of military personnel in a Title X duty status to enforce the law, such in the arrest or detention of civilians for violations of the federal criminal code, would be a violation of the Posse Comitatus Act, 18 U.S. Code paragraph 1385, which prohibits the use of military for domestic law enforcement purposes."

**Q.** You agreed with this portion of the Undersecretary's memorandum when you read it in June; correct?

**A.** I agree with part of it. It's not the full document but, yes.

**Q.** All right. But as to the portion you just read, you agree with that; correct?

**A.** I would.

**Q.** At the outset of the deployment, did you ever hear from any source that there was a rebellion in Los Angeles?

**A.** No, not a rebellion, but there were there people that were preventing federal officials and federal law enforcement from doing their job and also threatening federal buildings, that is

correct.

**Q.** But no one that you spoke with from the Department of Defense ever used the term "rebellion"; correct?

**A.** That is correct.

**Q.** All right. And even though the Posse Comitatus Act applies to Task Force 51 troops, you also believe that there is an exception to the Posse Comitatus Act that also applies to the troops; correct?

**A.** Through my training -- I'm not a lawyer, but through my training I've gotten that there are constitutional exceptions.

**Q.** And specifically with respect to this deployment, it's your understanding that Task Force 51 troops are allowed to protect federal property and personnel as they do their federal law enforcement functions; is that correct?

**A.** That is correct, in accordance with the second paragraph here, under detention and arrest authority.

**Q.** All right. And you learned about this exception by reading the operations order that was issued by the U.S. Army Northern Command at the outset of the deployment; is that right?

**A.** And also the training that we received on the standing rules on the use of force, which were provided by our legal personnel.

**MS. REILLEY:** All right. If you could please turn to Tab 5 of the binder in front of you. This has been previously

introduced as Exhibit 5.

(Trial Exhibit 5 received in evidence.)

**THE WITNESS:** (Witness examines document.)

**BY MS. REILLEY:**

**Q.** You recognize this document; correct?

**A.** Yes. This is General Order Number 1 signed by Lieutenant General Allan Pepin, the commander of U.S. Army North.

**Q.** And it's your understanding that this order set forth the exception to the Posse Comitatus Act that applied to the Task Force 51 troops?

**A.** I don't know that to be fact. I'd have to read it.

**Q.** If you could please read it.

**A.** Can you help me -- where it is? This is a three-page document.

**Q.** You testified at your deposition that this general order was the document that, in your view, set forth the exception to the Posse Comitatus Act; correct?

**A.** Well, this order is established. Any General Order 1 is your baseline personnel conduct that's expected of any personnel, any DOD personnel that are under the command.

**Q.** So it is your testimony that this General Order Number 1 does not set forth the exception to the Posse Comitatus Act that applied to the troops in Los Angeles?

**A.** This is more about Code of Conduct, personal Code of Conduct, what they're allowed to do. It talks about what we

expected of them as far as what their -- what we expect of soldiers to do, how they should be treating everybody, how they should be treating anybody that they encounter. And it talks right here in 5(b) about follow and adhere to the standing rules in the use of force.

**Q.** Was there a different order that was issued with respect to the Los Angeles deployment that you believe set forth the exception to the Posse Comitatus Act that applied to the troops?

**A.** It was strictly briefed to them when they got the standing rules on the use of force that is in line with the memorandum that the Secretary signed to his guidance to the commander of U.S. Northern Command that our mission was to protect federal facilities, allowing federal personnel that were there and federal law enforcement to do their job; and then outside federal facilities, to support federal law enforcement strictly to protect them to allow them to do their federal law enforcement job.

**Q.** And that exception that you just testified about, that was written in Secretary Hegseth's memorandum at the outset of the deployment?

**A.** It's not written directly, but it is the guidance that we were given. It was -- it was discussed with the soldiers in the standing rules and the use of force of why the Secretary's memo and why their guidance is that they're allowed to protect

federal facilities and then also protect federal law enforcement as they do their federal law enforcement duties.

**Q.** So you never saw the exception to the Posse Comitatus Act that you just testified about written down in any of the materials in this deployment; is that your testimony?

**A.** It was written down in the standing rules on the use of force brief that was given by our legal personnel that was given to every soldier and Marine that went on the mission.

**Q.** All right. So other than those training slides, that was the only place where this exception was written; correct?

**A.** That is correct.

**Q.** All right. And under that exception, Task Force 51 troops were trained that they could set security perimeters; is that correct?

**A.** They could set security perimeters around the federal facility on the federal property if there was a crowd demonstrating that was threatening the facility. They could get -- even with the federal law enforcement that was there in the facility to protect the facility.

And then, the federal law enforcement, as they were doing the federal law enforcement job, if they encountered any kind of crowds or any kind of -- anyone or even a vehicle that was presenting any kind of threat to them, they could get in front of those personnel to protect them.

**Q.** So it's your testimony that Task Force 51 troops were

trained they could set security perimeters on federal property if there was a threat; correct?
**A.** Correct, and they could guard the property like they did all the time they were there.
**Q.** Was there any standardized definition of threat that was used by Task Force 51?
**A.** No. It made a decision on the ground by both the -- if you're talking about facilities that were guarded by the Marines on the ground or by the commanders or their platoon leaders even that were there on the ground, witnessing what was happening in front of them.
**Q.** So if the commander on the ground felt threatened, they could order Task Force 51 troops to set a perimeter on federal property; correct?
**A.** That is correct, if they felt that they were threatened.
**Q.** And directing your attention to field operations that took place off federal property, Task Force 51 troops were trained that they could set security perimeters off of federal property; correct?
**A.** Only to protect federal law enforcement, allowing them to do their federal law enforcement job.
**Q.** So, again, Task Force 51 troops could set security perimeters off federal property as long as the commander on the ground felt threatened; right?
**A.** As long as there was a group there that was some kind of

event happening that they felt there was a threat to the federal law enforcement or a threat to the soldiers that were there, correct.

**Q.** But Task Force 51 didn't have any standardized definition of what constituted a threat for purposes of forming a security perimeter off of federal property; right?

**A.** No. That's within commander's guidance within -- they're allowed to make a decision on the ground, because every situation is different, that they're allowed to take in what's happening, understand what's happening; if they feel it's a threat to either the soldiers or to federal law enforcement, then they could.

**Q.** So even if the crowd wasn't making physical threats towards anyone, a commander on the ground could still order troops to form a security perimeter if that commander felt the crowd was a threat; is that right?

**A.** It was also a feeling. If the federal law enforcement was not allowed to do their job, if he had -- if he or she had that feeling on the ground that they were being not able to do their job because a crowd was reacting with them or that they felt unsafe, then they could.

**Q.** All right. So even if no one in the crowd was committing any criminal act, Task Force 51 commanders could order their troops to set a security perimeter; correct?

**A.** In line with the explicit guidance they were given, that

if they felt there was any kind of threat or was not allowing federal law enforcement to do their job, in that particular incident, whatever it was, then they could.

**Q.** That's a "yes" to my question, Major General Sherman?

**A.** Yes.

**Q.** Thank you.

Task Force 51 troops have set security perimeters around federal buildings during the deployment; correct?

**A.** That is correct.

**Q.** And Task Force 51 troops also set security perimeters during field operations that took place off the federal property; correct?

**A.** Yes.

**Q.** Including at private residences?

**A.** Only of -- one time that I know of right offhand, that's correct.

**Q.** And Task Force 51 troops were also trained that they were not allowed to set traffic blockades unless there was a hostile vehicle coming towards a federal law enforcement agent; correct?

**A.** That is correct. It needed to be something hostile that was threatening federal law enforcement.

**Q.** And that's because setting up a traffic control point is considered a law enforcement function; right?

**A.** That is correct.

**Q.** Task Force 51 troops were trained that they could temporarily detain civilians; correct?

**A.** They could if they deemed that that -- it was a threat -- that person was a threat to either the soldiers or to the federal law enforcement.

**Q.** And on June 12th of 2025, a Task Force 51 Marine did detain a civilian; correct?

**A.** That is correct.

**Q.** That took place at the Wilshire federal building?

**A.** That is correct.

**Q.** And the civilian in question was a veteran who was going to the VA; right?

**A.** That is correct.

**Q.** And the Marines told the veteran to stop, but he didn't because he was wearing headphones; right?

**A.** That is correct.

**Q.** And at some point you learned that the Marines told the veteran to leave the property and come back in the correct way, and it was only after the civilian came back in the correct way that he was detained; right?

**A.** The only --

**MS. LIN:** Objection. Foundation.

**THE COURT:** Overruled.

**BY MS. REILLEY:**

**Q.** You may answer the question.

**A.** The only time I've seen that, and I don't know it to be correct, is an email that you showed me during my deposition.
**Q.** All right. So -- and that email came from a Department of Homeland Security area commander; correct?
**A.** I believe it came from, yes, Federal Protective Service, some individual.
**Q.** So prior to when I showed you that email at deposition, you never were informed about the civilian coming back in the correct way before he was detained; is that correct?
**A.** That person -- that is not correct. That person did not come in the correct way even when they came in. Even if that person did cross the yellow line, which is what -- or cross underneath the tape barrier, which is what that email said, even when that person came to the right location to be entered into the facility, that person did not stop, did not provide identification, did not identify themselves and why their business was supposed to be on the federal -- or why they were there on the Wilshire building.
**Q.** Would you please turn to Tab 12 of the binder in front of you. This is a document that's been produced by the federal government as DEFS00001212 through '14.
Major General Sherman, is this the email that you were just testifying about?
**A.** I believe it is.
**Q.** All right. And we're going to publish page 1213 at this

time.

**MS. LIN:** Objection. This is not in evidence and this is a hearsay, out-of-court statement --

**THE COURT:** Okay.

**MS. LIN:** -- that's being offered for the truth of the matter asserted, and we move to exclude this piece of evidence.

**THE COURT:** I think the question -- I think the question is whether he heard about this.

**MS. REILLEY:** Correct, Your Honor.

**THE COURT:** So it goes to his state of mind. It's not being introduced for the truth of the matter. It's being introduced for other than the truth of the matter, so it's not hearsay.

**MS. REILLEY:** Correct, Your Honor.

So at this time, we will publish page 1213, and we will move Tab 12 into evidence as Exhibit 12.

**THE COURT:** Okay. But not being introduced for the truth of the matter.

**MS. REILLEY:** Correct.

**THE COURT:** Admitted.

(Trial Exhibit 12 received in evidence.)

**BY MS. REILLEY:**

**Q.** All right. Major General Sherman, do you see the document that's labeled 1213 on the screen in front of you?

**A.** I do.

**Q.** Do you see where it reads [as read]:

"Summary: FPS advise the subject will be released and not cited per guidance from on-duty AUSA. The subject is a veteran and came under yellow tape to come into the VA. After the USMC told him to leave, he did so and came back in the correct way. The USMC detained him for repeat offense. The individual has departed property and will return another day"?

Do you see where that's written?

**A.** I do.

**Q.** Is this the email that I showed you at your deposition that you were just testifying about?

**A.** It is.

**Q.** All right. And "FPS" stands for Federal Protective Service; is that right?

**A.** That is correct.

**Q.** USMC is the United States Marine Corps?

**A.** It is.

**Q.** And that refers to members of the U.S. Marine Corps who were under Task Force 51's control during the deployment; correct?

**A.** That's correct.

**Q.** All right. And you did not learn any of the information that's contained in this email while you were the commanding

general of Task Force 51; correct?
**A.** I did not.
**Q.** And if you ever heard from any source that the veteran who was detained was detained after he came back onto federal property the correct way, you would have asked the battalion commander to investigate that detention; correct?
**A.** Yes. If he came in the wrong -- if he did not come in the right way, if he did not stop and have himself identified, that is correct.
**Q.** All right. And because you did not hear this information, you did not order any investigation of the detention; correct?
**A.** That is correct.
**Q.** And while he was detained by the Marines, the civilian's hands were restrained in flex cuffs; correct?
**A.** That is correct. For his safety and for the Marines' safety, that is correct.
**Q.** And the Marines detained the veteran for approximately 25 minutes?
**A.** That is correct. While they were waiting for law enforcement to come and take control of him, that is correct.
**Q.** And the Marine who detained the veteran never determined that the veteran was threatening federal agents or any other person; correct?
**A.** No, because the questioning that needed to happen then would have to be done by law enforcement. That's a law

enforcement action. So they flex cuffed that person just for his safety and for their safety, sat him down on a picnic table, covered, and waited for federal law enforcement to come and take control of him.

**Q.** But prior to the detention actually taking place, the Marines who were at the federal Wilshire building never saw the veteran partake in any action they considered to be a threat; correct?

**A.** Well, they didn't know because he came through the stop. He did not stop. He had his headphones on, got told quite a few times -- I don't know the number, at least two -- to stop, "You need to stop." He did not. He went right through, barreled right through the checkpoint, and then that's when they stopped him.

**Q.** And other than not stopping because he was wearing his headphones, there is no other conduct that that veteran was engaging in that was cited for the -- as a reason for the detention; correct?

**A.** That's correct.

**Q.** During the deployment to Los Angeles, federal law enforcement agencies would submit requests for assistance to Task Force 51; right?

**A.** That is correct.

**Q.** And as commanding general, you had primary responsibility for approving those requests for assistance?

**A.** I did once they were -- they went through the staffing process and were legally reviewed, that's correct.
**Q.** And as part of the staffing process's review, there was a legal review performed; correct?
**A.** That is correct.
**Q.** All right. And whenever they responded to requests for assistance, Task Force 51 troops were armed with weapons that had live ammunition in the magazine; right?
**A.** In the magazine but not in the chamber.
**Q.** Based on their training, the average Task Force 51 soldier/Marine could load an active round into a chamber in a matter of about two seconds?
**A.** That is what I said in my deposition, correct.
**Q.** And that's correct?
**A.** That is.
**Q.** And Task Force 51 troops were also armed with batons whenever they went out into the field; correct?
**A.** That was part of what they were also with. That was part of the civil disturbance operations kit.
**Q.** All right. And Task Force 51 wore face shields whenever they went out in the field; right?
**A.** That is correct.
**Q.** They also had body armor?
**A.** That is correct.
**Q.** They wore helmets?

**A.** They did.

**Q.** Task Force 51 troops accompanied federal law enforcement agents on warrant service operations; right?

**A.** They did.

**Q.** And they also accompanied Immigrations and Customs Enforcement agents as those agents made arrests?

**A.** They did.

(Trial Exhibit 53 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 53, and this is included in Volume 2 of the evidence binder. And this has been previously admitted as Exhibit 53, and we'll publish it to the screen now.

**THE COURT:** Okay.

**BY MS. REILLEY:**

**Q.** And, Major General Sherman, you've seen these photographs before; correct?

**A.** I have during the deposition.

**Q.** And you don't know when these photographs were taken?

**A.** I do not.

**Q.** Directing your attention to the left-hand photograph, the individual shown in that photograph who's wearing a camouflage uniform, that's a Task Force 51 soldier; right?

**A.** It is.

**Q.** And you don't know what the soldier in this photograph is

doing?
**A.** I do not.
**Q.** Looking now at the right-hand photograph, you are not able to tell if the two individuals wearing camouflage uniforms in that photograph are Task Force 51 soldiers; right?
**A.** I cannot.
(Trial Exhibit 54 received in evidence.)
**BY MS. REILLEY:**
**Q.** If you can please turn to Tab 54, and this has been previously admitted as Exhibit 54, and we'll publish it to your screen now.
You've seen this photograph before; correct?
**A.** I have.
**Q.** And the individual who's shown on the right-hand side of the photograph who's wearing a camouflage uniform, that's a Task Force 51 soldier; right?
**A.** Well, I can't tell from that, but I can tell from the vehicle, when it says "79th IBTC 143rd MP."
**Q.** All right. So the Humvee shown on the right side of the vehicle is a Task Force 51 vehicle; correct?
**A.** It could be, depending on when the date of this picture was.
**Q.** Do you see the date on this photograph is June 10th, 2025?
**A.** Yes. So with that, it would be.
**Q.** All right. And you don't know where this photograph was

taken; right?
**A.** I do not.
**Q.** And you can't explain what the soldier in this photograph is doing; yes?
**A.** I cannot.

(Trial Exhibit 38 received in evidence.)

**BY MS. REILLEY:**
**Q.** All right. If you could please turn to Tab 38 of your binder, and we'll publish this. This is an exhibit that's been previously admitted as Exhibit 38.
Major General Sherman, you recognize this document; correct?
**A.** Only -- yes. You showed me in the deposition.
**Q.** Prior to your deposition when I showed you this document, you never saw it while you were the commanding general of Task Force 51?
**A.** No. This is at a platoon level. I never saw it.
**Q.** And this was drafted by a second lieutenant of the Third Platoon, Company Bravo, First Battalion, 160th Infantry? That's correct?
**A.** That is correct.
**Q.** This document is dated June 13th, 2025?
**A.** Yes. I'm sorry. Yes.
**Q.** And at that time, the Third Platoon, Company Bravo, First Battalion, 160th Infantry was under Task Force 51's command;

correct?
**A.** It was.
**Q.** And under "Patrol Narrative," do you see where it reads, quote [as read]:

"On 13 June 2025, at approximately 0500, soldiers from COB 1160N attended an FBI briefing IVO" -- there's an address that's been redacted -- "in the city of Carson, California, to execute the arrest of" --

And there's an individual's name who's been redacted.
Do you see where that's written?
**A.** I do.
**Q.** And you were aware that Task Force 51 troops were involved in this operation on or around June 13th; correct?
**A.** I can't recall the exact operation, no.
**Q.** All right. Did you -- do you recall testifying at your deposition that you vaguely recalled this operation?
**A.** Yeah. I vaguely recall. I don't know the exact specifics.
**Q.** You were not personally present during this operation; right?
**A.** I was not.
**Q.** You did not receive any briefing on this operation after it took place; correct?
**A.** I did not.

**Q.** So you don't have any information about what actually happened during this operation other than what's written in this report; right?

**A.** Correct.

**Q.** Directing you to the bottom of the page, where it says "Patrol Narrative," do you see that box?

**A.** I do.

**Q.** Could you please read aloud the three paragraphs written in that box.

**A.** The three paragraphs here?

**Q.** Yes.

**A.** [As read]:

"On 13 June '25 at approximately 0500, soldiers from Bravo Company, 1" -- "First Battalion 160th Infantry attended an FBI briefing in the vicinity of this address, 21356 Avalon Boulevard, in the city of Carson, California, to execute an arrest of an individual."

Can I ask a question real quick? You want me to read here the stuff that's been redacted?

**Q.** No. Please read the version off the screen, if you would.

**A.** Yeah, okay.

**Q.** Thank you.

**MS. LIN:** Your Honor, one moment. The screen document is the unredacted.

**THE COURT:** Sorry?

**MS. LIN:** If you could please read off the redacted version.

**MS. REILLEY:** The version on the screen is redacted.

**MS. LIN:** Okay. Just to make sure. Thank you.

**THE COURT:** Yes. So you should read it off the screen rather than that.

**THE WITNESS:** Yes, Your Honor.

[As read]:

"Videos of this person surfaced on 7 June 2025 when it was reported he was throwing rocks and injuring federal officers on the 6400 block of Alondra Boulevard in the city of Paramount. Soldiers arrived at the briefing site today and learned the objective would be at" -- that's PII -- "in the city of Long Beach. They were tasked to cordon the southbound lanes of Long Beach Boulevard from East Ellis Street and East 55th Street. One van with 12 packs was set up to block on the south side of the objective along with" -- or -- "along Long Beach Boulevard, and one van with 12 packs was set up to block on the north side of the objective.

"When National Guard, DEA, and FBI elements arrived at the objective, blockades were established, and each blockade was accompanied by a marked

Los Angeles Sheriff's vehicle. Both blockades were also accompanied by DEA SWAT and armed with less than lethal munitions such as pepper ball guns.

"National Guard soldiers established their blocking positions at approximately 0600, and the DEA" -- and that's 0600 hours -- "and the DEA and FBI began their operation at the target residence. PII was not located, but his brother was detained. It is known" -- "It is unknown if his brother was arrested. The motorcycle that this person was riding during the assault on the federal officers was recovered and stored for evidence."

**BY MS. REILLEY:**

**Q.** And you do not know or have any information as to whether Task Force 51 soldiers prevented any civilians from using the public road as part of this operation; right?

**A.** I do not.

**MS. REILLEY:** Thank you.

(Trial Exhibit 64 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 64 of the binder. And this has been previously admitted as Exhibit 64, and we'll publish that exhibit to the screen.

And, Major General Sherman, you recognize this document as a printout from the DVIDS website; correct?

**A.** I do.

**Q.** And "DVIDS" stands for Defense Visual Information Distribution Service?

**A.** That is correct.

**Q.** And this is a website run by the Department of Defense?

**A.** That is correct.

**Q.** The photograph shown here was taken by Sergeant Chase Murray; correct?

**A.** That is correct.

**Q.** And Sergeant Murray was a part of Task Force 51 when this photograph was taken?

**A.** He was a member of the public affairs section, that is correct.

**Q.** Attached to Task Force 51?

**A.** That is correct.

**Q.** And the four individuals standing behind the yellow caution tape in this photograph are all Task Force 51 soldiers; right?

**A.** It appears so, yes.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

(Trial Exhibit 66 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 66 of the binder, which

has been previously admitted as Exhibit 66, and we'll publish this document to the screen.

**A.** (Witness examines document.)

**Q.** Showing you another photograph that was taken by Sergeant Murray that was published on the DVIDS website, the five individuals in the foreground of this photograph who are wearing camouflage uniforms and holding shields are also Task Force 51 soldiers; correct?

**A.** They are.

**Q.** And you can't explain what those soldiers in this photograph are doing; right?

**A.** I cannot.

(Trial Exhibit 68 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 68, which has been previously admitted as Exhibit 68, and we'll publish that to the screen.

This is another photograph taken by Sergeant Murray that was published on the DVIDS website.

And the four individuals in this photograph who are holding shields are also Task Force 51 soldiers; correct?

**A.** The four holding the shields are Task Force 51 soldiers.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

**Q.** And you don't know where this photograph was taken; right?
**A.** I do not, except the buildings look similar to the last photograph you showed me.
**Q.** All right. And while you were the commanding general of Task Force 51, you approved two requests for assistance that involved search warrant operations at cannabis farms; correct?
**A.** Correct.
**Q.** The first was an operation in Mecca, California?
**A.** Correct.
**Q.** And Mecca is a long way from the center of Los Angeles; right?
**A.** It is.
**Q.** You didn't have any specific knowledge of any particular threat related to the Mecca operation; correct?
**A.** No, we did not.
**Q.** And you didn't have any specific information that there were going to be riots during the Mecca operation; right?
**A.** We did not.
**Q.** There were approximately 300 Task Force 51 soldiers who participated in the Mecca operation; correct?
**A.** That is correct.
**Q.** And there were only about 200 federal law enforcement agents involved in that operation; right?
**A.** That is correct.
**Q.** So during the Mecca operation, Task Force 51 troops

outnumbered federal law enforcement agents by over a hundred?
**A.** That is correct.
**Q.** The Mecca operation involved approximately 50 military vehicles?
**A.** That is correct.
**Q.** And those military vehicles included Humvees?
**A.** They did.
**Q.** And 5-ton trucks?
**A.** They did.
**Q.** During the Mecca operation, neither the Task Force 51 troops nor the federal law enforcement agents faced any resistance; right?
**A.** I do not know about the federal law enforcement. I know that our soldiers did not face any resistance on the outside.
**Q.** And no Task Force 51 soldier was required to provide force protection to any federal agent during the Mecca operation; correct?
**A.** No. Not inside the perimeter, that is correct.

(Trial Exhibit 41 received in evidence.)

**BY MS. REILLEY:**
**Q.** All right. If you could please turn to Tab 41 of your binder. This has been previously admitted as Exhibit 41, and we'll publish this document to the screen.

You recognize this document; correct?
**A.** I do.

**Q.** This is a storyboard of the Mecca operation that was made by the 143rd Military Police Battalion?

**A.** That is correct.

**Q.** And the 143rd Police Battalion was part of Task Force 51 at the time of the Mecca operation; correct?

**A.** That is correct.

**Q.** Could you please read aloud the paragraph under the header "End State," which is in the bottom left corner of the document?

**A.** [As read]:

"Joint federal and military companies, headquarters and headquarters company, 143rd MP Battalion, 40th Military Police Company, 330th Military Police Company, and 670th Military Police Company established outer cordons and secured designated sites, enabling safe entry for DEA personnel.

"Actions resulted in the seizure of narcotics, approximately 87 suspected human trafficking victims, and disruption of illegal marijuana cultivation" -- I can't read that last one -- "tied to organized criminal activity."

**Q.** And you saw this slide shortly after the Mecca operation took place; correct?

**A.** I did.

(Trial Exhibit 69 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 69 of your binder. This has been previously admitted as Exhibit 69, and we'll publish that document to the screen.

You recognize this photograph that was published on the DVIDS website?

**A.** I do.

**Q.** This photograph is also taken by Sergeant Murray?

**A.** That is correct.

**Q.** And this photograph shows Task Force 51 troops during the Mecca operation; correct?

**A.** I believe so, correct. Yes.

**Q.** And if you look at the description under the photograph, do you see where it reads [as read]:

"Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title X status, established a security perimeter in Mecca, California, June 18th, 2025"?

**A.** Correct.

**Q.** All right. And the second request for assistance that you approved while you were the commanding general of Task Force 51 that involved a search warrant at a cannabis farm was an operation in Carpinteria, California?

**A.** Correct.
**Q.** And is it correct that you approved the Carpinteria operation while you were still commanding general; but by the time the operation actually took place, you were no longer in command?
**A.** That is correct.
**Q.** During the Carpinteria operation, Task Force 51 troops were tasked with protecting federal agents who had set up traffic control blocks?
**A.** They had set up traffic control points east and west on -- for Carpinteria; that is correct.
**Q.** All right. And Task Force 51 troops were given that assignment because without the troops, the federal agencies involved in the operation would have had to station more of their personnel at the traffic control points; right?
**A.** Correct.
**Q.** And if the federal agencies had had to station more of their personnel at the traffic control points, the operation would have taken longer; correct?
**A.** That's what they told me, that's correct.
**Q.** And the Carpinteria operation involved approximately 100 to 120 Task Force 51 troops?
**A.** I believe that's correct.
**Q.** And there were approximately 20 to 25 Task Force 51 military vehicles involved in that operation as well?

**A.** Correct.
**Q.** And those military vehicles were Humvees and 5-ton trucks?
**A.** Correct.
(Trial Exhibit 31 received in evidence.)
**BY MS. REILLEY:**
**Q.** Could you please turn to Tab 31 of your binder. This has been previously admitted as Exhibit 31, and we're going to show a page of that document that's labeled 3519 on the screen.
**THE COURT:** What page?
**MS. REILLEY:** We'll be publishing 3519.
**THE COURT:** Thank you.
**BY MS. REILLEY:**
**Q.** Major General Sherman, you recognize this document; correct?
**A.** I do.
**Q.** This is a brief that battalion staff prepared in advance of the Carpinteria operation?
**A.** That is correct.
**Q.** And directing you to page 3519, which is shown on the screen in front of you, do you see where it reads "Risk of inaction low"?
**A.** Yes.
**Q.** Could you please read the section that immediately follows that statement "Risk of inaction low"?
**A.** [As read]:

"The Assessment: No indication that failure to act would result in loss of life or significant property damage to federal personnel at both traffic control points given the volume of HSI" -- so Homeland Security Investigations -- "personnel on scene."

(Trial Exhibit 79 received in evidence.)

**BY MS. REILLEY:**

**Q.** Could you please turn to Tab 79 of your binder. This has been previously admitted as Exhibit 79.

Major General Sherman, you recognize this photograph; correct?

**A.** You showed it to me at my deposition, yes.

**Q.** And this is a photograph that was taken by Monica Solorzano, who's the vice mayor of Carpinteria, during the Carpinteria operation. And you recall during your deposition that I asked you to label this photograph?

**A.** Yes.

**Q.** And at your deposition you labeled the individual who was wearing sunglasses and a mask as a federal agent?

**A.** That is correct.

**Q.** And you also labeled the individuals who were wearing camouflage uniforms and hats as Task Force 51 soldiers?

**A.** They all appear to be, yes.

(Trial Exhibit 80 received in evidence.)

**MS. REILLEY:** All right. At this time, I'm going to show you a video that's been previously admitted as Exhibit 80.

And for the record, this is a video that was taken by Vice Mayor Solorzano during the Carpinteria operation.

**THE COURTROOM DEPUTY:** One moment, Judge.

(Pause in proceedings.)

(Video was played but not reported.)

**MS. REILLEY:** Your Honor, were you able to see the entire video, or did that start partway through?

**THE COURT:** Do you want to reshow it?

**MS. REILLEY:** Could we? Thank you. I just want to make sure we see the entire video.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** Major General Sherman, you've seen this video before; right?

**A.** I have.

**Q.** And the two individuals who are wearing camouflage uniforms in that video are Task Force 51 soldiers; correct?

**A.** They are.

**Q.** In fact, all the individuals who are wearing camouflage uniforms in that video are Task Force 51 soldiers; correct?

**A.** Yes.

**Q.** And you don't have any information indicating that the woman in this video who is holding the megaphone threatened

anyone, including any federal agents; right?

**A.** No, I don't have the context of this.

**Q.** Thank you.

If you could please turn to Tab 70 --

**THE COURT:** Wait. Before we do that, could you go back on this for a minute?

**MS. REILLEY:** Yes.

**THE COURT:** Okay. Maybe show it again. I want to ask the general a question.

(Video was played but not reported.)

**THE COURT:** Freeze it there. Freeze it there. Stop it.

Okay. So I see three law en- -- what I'll call law enforcement people; that is, people either in military gear or in other gear. And my question is: The military people, the people in camouflage, they are part of Task Force 51; is that correct?

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** Okay. There's a third person there. And do you have any information as to who that person -- what force that person belongs to?

**THE WITNESS:** I can't tell off the video. I can't -- I'm not close enough to see the badge. They do have "Police" on there, and there's usually "Federal Police" on their uniform. It says that too, Your Honor, but I can't tell. But

there is a "Police" -- it says "Police" on the left-hand side there.

**THE COURT:** Okay. So you don't know whether that's federal or state?

**THE WITNESS:** It would be federal, Your Honor.

**THE COURT:** It would be federal?

**THE WITNESS:** Yes.

**THE COURT:** Okay. My question is: I assume the Task Force camouflage-dressed officers have identification on them; is that correct?

**THE WITNESS:** That is correct.

**THE COURT:** So it's Army regulation that they have their name above their lapel or at some place prominently displayed on their uniform?

**THE WITNESS:** It is correct -- that's correct, Your Honor. It is blocked here by the body armor that they're wearing. You can see the rank. Like this is a sergeant right here who's got the glasses, facing right here. She's -- you can tell that it's an Army patch she has on, but her name -- her name is covered by the body armor.

**THE COURT:** Okay. So she is -- for intents and purposes, she's anonymous in terms of whether an individual who is not part of the operation can identify that particular person; is that correct?

**THE WITNESS:** That's correct, Your Honor. They can

tell what unit she's in by the unit patch.

**THE COURT:** Her rank?

**THE WITNESS:** And her rank, yes, sergeant E5.

**THE COURT:** Right. Now, the person who you believe to be a federal law enforcement officer but not sure what branch they belong to or what department they belong to, that person is wearing a mask; is that correct?

**THE WITNESS:** That is correct.

**THE COURT:** Okay. So nobody could -- it would be difficult to identify who that person is by virtue of the fact that the person is wearing a mask. Is that person identified in any other way?

That is to say, if somebody was standing there, would they be able, after the fact, to say, "Officer X," identifying Officer X, who's masked, can make that identification?

**THE WITNESS:** Your Honor, they could tell that it's police. And now that I look at it, it says "HSI" under the "Police." They can tell.

**THE COURT:** HSI?

**THE WITNESS:** Yes. It says it. That's a "Police" -- that the body vest that he's wearing, which is body armor, says "Police" and it says "HSI" under it.

**THE COURT:** And HSI is?

**THE WITNESS:** I think Homeland Security Investigations I believe, Your Honor.

**THE COURT:** Okay. All right. Thank you so much.

**THE WITNESS:** Yes, Your Honor.

**BY MS. REILLEY:**

**Q.** Major General Sherman, you stated a moment ago that even though you can't see the soldier's name, you would be able to tell she was a sergeant; is that right?

**A.** That is correct.

**Q.** And you would know that from the chevrons on her hat?

**A.** Both on her hat and right there right above her body armor, right there it says -- it shows her rank too. Same thing.

**Q.** But if you were not familiar with military insignia, you would not know that those two chevrons denoted a sergeant; correct?

**A.** Those three. There are actually three, but that's correct.

(Trial Exhibit 75 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 75 of your binder. This has been previously admitted as Exhibit 75, and we will publish this to the screen now.

This is another photograph that was published on the DVIDS website, again taken by Sergeant Murray. You recognize this photograph; correct?

**A.** I do.

**Q.** At least some of the individuals in this photograph who are wearing camouflage are Task Force 51 troops; correct?
**A.** Yes, with a lot of federal agents in there -- mixed in there too.
**Q.** And below the picture, do you see where it reads [as read]:

"Soldiers assigned to the 870th Military Police Company, 185th Military Police Battalion, 49th Military Police Brigade, California National Guard, serving under Title X status, provide a security perimeter for federal personnel conducting law enforcement activities in Carpinteria, California, July 10th, 2025"?

**A.** I do.

(Trial Exhibit 76 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 76 of your binder. This has been previously admitted as Exhibit 76, and it's being published to the screen now.

Showing you another photograph that was published on the DVIDS website, taken by Sergeant Murray during the Carpinteria operation, you recognize this photograph; correct?
**A.** I do.
**Q.** At least some of the individuals in this photograph who are wearing camouflage are Task Force 51 troops?

**A.** Yes.

**Q.** And beneath this photograph is the same description as the previous photograph; correct?

**A.** That is correct.

**Q.** While you were commanding general, there was also an occasion where a mobile response force of Task Force 51 troops assisted in a federal law enforcement operation at a cannabis farm in Camarillo, California; correct?

**A.** That was after I left, correct.

**Q.** Okay. But you do have knowledge of Task Force 51's involvement in that operation?

**A.** I have knowledge from what I read from General Nell's report and talking to General Nell, but that would be it.

**Q.** So you don't have any knowledge about what specifically took place during the Camarillo operation; correct?

**A.** I do have knowledge that about 48 hours ahead of time before the operation, they canceled -- the CVP canceled the request for assistance. So there would not be any soldiers on that mission with federal law enforcement.

**Q.** All right. So that's -- to my question, that's a "yes"? You don't -- because you were no longer commanding general, you don't know specifically what took place during the Camarillo operation; right?

**A.** I don't. I was actually flying at the time this happened.

(Trial Exhibit 83 received in evidence.)

**BY MS. REILLEY:**

**Q.** Okay. If you could please turn to Tab 83 of your binder. And this has been previously admitted as Exhibit 83, and we'll publish that to the screen now.

And for the record, this is a photograph of the Camarillo operation that was taken by Genevieve Flores-Haro of the Mixteco/Indigena Community Organizing Project.

Major General Sherman, you've seen this photograph before; correct?

**A.** I have.

**Q.** And the eight individuals in this photograph who are wearing face shields are Task Force 51 soldiers; right?

**A.** The ones that are wearing clear face shields -- I don't know that federal agent that's there in the middle, if that's a face shield. I can't tell. But it appears, yes, the ones that are wearing clear face shields are soldiers, members of, I believe, Task Force 51. I can't see the patches, but I assume so.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

(Trial Exhibit 86 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 86 of your binder, and we'll publish this. This is Exhibit 86, another photograph

taken by Ms. Flores-Haro during the Camarillo operation.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And the four individuals in this photograph who are wearing clear face shields and shin guards are Task Force 51 soldiers; correct?

**A.** Yes. I can't see the patches, but this is gear that they were issued, yes.

**Q.** And you can't explain what the soldiers are doing in this paragraph; correct?

**A.** I cannot.

(Trial Exhibit 87 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 87, which we will publish now. This is another photograph taken by Ms. Flores-Haro during the Camarillo operation.

You've seen this photograph before; correct?

**A.** Yes, I have.

**Q.** And the five individuals in this photograph who are wearing face shields -- clear face shields and shin guards are Task Force 51 soldiers; right?

**A.** They are Task Force 51 soldiers behind the federal agent there, that's correct.

**Q.** And you can't explain what the soldiers in this photo are doing; correct?

**A.** I cannot.

(Trial Exhibit 92 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab ninety- -- turn to Tab 92, which is Exhibit 92. We'll publish this now.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And the three individuals in this photograph who are wearing face shields and shin guards are Task Force 51 soldiers; correct?

**A.** I see -- well, there's two that are cut off that have, appears to be, face shields and then two more of that face shields; and then the other ones are not 51, Task Force 51, that's correct.

**Q.** So the two individuals on the left-hand side of the photograph who are wearing shin guards and holding batons, those are Task Force 51 soldiers; right?

**A.** They appear so, yes.

**Q.** And you can't explain what the soldiers in this photograph are doing; right?

**A.** I cannot.

(Trial Exhibit 94 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 94. This is Exhibit 94, another photograph taken by Ms. Flores-Haro during the

Camarillo operation.
You've seen this photograph before; correct?
**A.** I have.
**Q.** And we're zooming in on the photograph now.
The individuals in this photograph who are standing next to the field and holding shields are Task Force 51 soldiers; right?
**A.** They are.
**Q.** And you don't know what the soldiers in this photograph are doing; correct?
**A.** I do not.
(Trial Exhibit 95 received in evidence.)
**MS. REILLEY:** At this time, I'm going to show you a video that's been admitted as Exhibit 95. This was also taken by Ms. Flores-Haro during the Camarillo operation.
(Video was played but not reported.)
**BY MS. REILLEY:**
**Q.** You've seen that video before; correct?
**A.** I have.
**Q.** And the individuals in this video who are wearing the clear face shields and holding shields are Task Force 51 soldiers; right?
**A.** That is correct.
**Q.** And you don't know what the soldiers in this video are doing?

**A.** No. I could make -- I wasn't there, so I'm not going to make a decision but -- or make a statement on that. No, I do not. I don't have context.

(Trial Exhibit 96 received in evidence.)

**MS. REILLEY:** All right. Now I'm going to show you a video that's been admitted as Exhibit 96. Again, this was taken by Ms. Flores-Haro during the Camarillo operation.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** You've seen this video before; correct?

**A.** I have.

**Q.** And the individuals in this video who are wearing camouflage uniforce -- uniforms and gas masks are Task Force 51 troops?

**A.** Not necessarily.

**Q.** When the video panned to the right and it showed individuals in camouflage uniforms who are wearing gas masks and clear face shields, those are Task Force 51 soldiers; correct?

**A.** Yes, but there are also federal agents wearing gas masks on that one too.

**Q.** But the federal agents are wearing solid green, not camouflage; correct?

**A.** I believe so. I'd have to take a better look. I don't -- I don't know.

**Q.** We could replay the video if you'd like.
**A.** Sure.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** Having seen the video for a second time, it's correct that the individuals wearing camouflage are Task Force 51 soldiers; correct?
**A.** Correct. Behind the federal agents, that's correct.
**Q.** And you can't explain what these soldiers in this video are doing; correct?
**A.** Well, with the crowd there, it appears like they're doing a traffic control point, holding people back, but I don't have any other information.
**Q.** And you were not present for this operation; correct?
**A.** I was not.
**Q.** And you were not commanding general at the time this operation took place; correct?
**A.** Which operation is this one?
**Q.** Camarillo.
**A.** Oh, no, I was not.
**Q.** All right. Task Force 51 soldiers also participated in a law enforcement operation at MacArthur Park on July 7th, 2025; correct?
**A.** Correct.
**Q.** And the original request for assistance that related to

the MacArthur Park operation called for the operation to take place on Father's Day?

**A.** That is correct.

**Q.** And it also called for Task Force 51 military vehicles to be on the section of Wilshire Boulevard that runs through MacArthur Park; correct?

**A.** It did. It had them going through the middle, yes.

**Q.** You objected to that original request for assistance related to the MacArthur Park operation; correct?

**A.** That is correct.

**Q.** And Chief Gregory Bovino of the Department of Homeland Security criticized you for objecting to that request; correct?

**A.** He did. He did.

**Q.** And specifically Chief Bovino questioned your loyalty to the country for objecting to that original MacArthur Park operation?

**A.** He did.

**MS. LIN:** Objection. Relevance.

**THE COURT:** Sorry? The objection.

**MS. LIN:** Objecting to relevance of this line of questioning of the conversations that counsel is --

**THE COURT:** Why is it irrelevant? I mean, if somebody is making decisions and then people who are part of the decision-making process turn to the person who makes a decision based upon his judgment and calls him disloyal, why is that

irrelevant?

**MS. LIN:** The only question before the Court today is the scope of the Posse Comitatus Act.

**THE COURT:** Yes. We're talking about -- it's in an operation; isn't it? Isn't this related to the MacArthur Park?

**MS. LIN:** Yes, yes, it is, but the discussion about loyalty or disloyal, that's not part of --

**THE COURT:** But wasn't that -- I'm sorry. Was that not part of the discussion? Are you saying that wasn't part of the discussion, Counsel?

**MS. LIN:** It was, but --

**THE COURT:** Well, so if it's part of the discussion, why isn't it then related to the decision that was made in that context? Why isn't it?

I'm actually asking you these questions because you're the one objecting, so you have to explain it to me.

**MS. LIN:** Yes, Your Honor. The scope --

**THE COURT:** Why don't you come up to the microphone so I can hear you.

**MS. LIN:** The scope of the issue before the Court is simply about whether there have been violations of the Posse Comitatus Act. What a law enforcement agency's view about the military's loyalty or disloyalty is not relevant, in our view, to that narrow question of whether a violation --

**THE COURT:** But why isn't it relevant?

**MS. LIN:** -- of law has occurred.

**THE COURT:** If, in fact, a person is making a decision, who's a military officer, who's had 33 years of experience and I assume -- we haven't gone through the decorations, but I assume there was least one decoration over your career -- is told by civilian authorities that he is disloyal to the United States of America, why isn't that relevant to whatever decisions are made in connection with this officer, the general?

I'm just trying to understand your objection. You say it's not -- it's not relevant because of what?

**MS. LIN:** Because that question of loyalty does not directly go to the issue of whether violations of the Posse Comitatus Act has occurred and is --

**THE COURT:** Well, maybe it goes to his state of mind. Maybe it goes to the fact he's now being -- he's exercising his military judgment in connection with the Posse Comitatus Act; and in doing so, in doing so, he is told that he is disloyal to the United States of America.

Why is it any different from turning, as an example, to an attorney who makes an argument and then you say to the arguer, "You can't make that argument. You're disloyal"? Why isn't it relevant?

**MS. LIN:** Your Honor has ruled.

**THE COURT:** Okay.

**MS. LIN:** My objection remains the same.

**THE COURT:** Thank you. Overruled.

Okay. Go ahead.

**BY MS. REILLEY:**

**Q.** Major General Sherman, your answer to my last question was, yes, Chief Bovino did question your loyalty to the United States of America; correct?

**A.** Yes.

**Q.** You did not ultimately approve the MacArthur Park operation that took place on July 7th; right?

**A.** That's correct.

**Q.** That request for assistance was actually approved by the Secretary of Defense?

**A.** It was not approved by the Secretary of Defense. Or I don't really understand your question.

**Q.** So my question relates to the operation that, in fact, took place on July 7th.

**A.** Oh, okay, yes.

**Q.** Was -- that operation was pursuant to a request for assistance; correct?

**A.** It was. It was the third time we have -- we had planned MacArthur Park. Because of the high risk, it went to the commander of U.S. Northern Command for his approval; and from there, it did go to the Secretary of Defense for the approval.

**Q.** And when you say "high risk," you are referring to the

high risk it posed to your Task Force 51 troops; correct?
**A.** It could be Task Force 51 troops. It could also be federal law enforcement. It was both a risk just to the operation.
**Q.** And there were approximately 120 to 150 Task Force 51 soldiers involved in the MacArthur Park operation?
**A.** I believe that's too high. I believe it's more like 90 that were there on the site. We had some Mobile Response Force people that were outside if they needed to respond, but I think there was about 90 on the ground right there.
**Q.** Do you recall at your deposition when you testified that there were approximately 120 to 150 Task Force 51 soldiers?
**A.** I think if you're including the MRP, that's probably -- or the Mobile Response Force, that's a correct number.
**Q.** And the Mobile Response Force was stationed near MacArthur Park during the operation; correct?
**A.** They were at -- we had them at Roybal, at Wilshire, and Los Angeles Air Force base.
**Q.** All right. And there were approximately 40 Task Force 51 military vehicles that were involved in the MacArthur Park operation?
**A.** I believe that's correct, yes.
**Q.** And those military vehicles included Humvees; right?
**A.** They did.
**Q.** It also included transport vehicles?

**A.** It did. It had LMTVs and I also believe there were some JLTVs involved in that too.
**Q.** It included 5-ton trucks as well; right?
**A.** Yes. Those are the LMTVs, that's correct.
**Q.** If you could please turn to Tab 28 of your binder. This has been previously admitted as Exhibit 28. And of this document, we are going to publish page 2892.
Major General Sherman, you recognize this document; correct?
**A.** I do. I don't know the date of which when this was published, but, yes, I do.
**Q.** And this relates to the MacArthur Park operation; correct?
**A.** I assume so, yes.
**Q.** Operation Excalibur --
**A.** Yes.
**Q.** -- refers to MacArthur Park?
**A.** Yes, you're right. That's correct.
**Q.** And this relates to the July 7th operation; correct?
**A.** If these are a full slide set, I could tell you by looking at one.
(Witness examines document.) Yes, that's correct.
**Q.** If you could please turn to page 2892.
Do you see where it reads "Risk of inaction low"?
**A.** Yes.
**Q.** And can you please read aloud the section that immediately

follows that header?

**A.** Yes. [As read]:

"So risk of inaction low assessment. Current intelligence does not indicate a high-volume or high-value target to federal function at this location. No indication that failure to act would result in loss of life or significant property damage. Expected law enforcement action is limited in scale, with few detainees anticipated and no high-risk warrants involved. Operation not informed by time-sensitive intelligence or part of an integrated targeting cycle."

**Q.** And the MacArthur Park operation took place on July 7th, which was a Monday morning; correct?

**A.** Correct.

**Q.** And given that it took place on a Monday morning, that summary you just read is an accurate assessment of the risk presented by the MacArthur Park operation; correct?

**A.** That is correct. It was changed because of the -- of an operation that did take place on Monday, the 7th, after the Fourth of July holiday.

**Q.** All right. So even if Task Force 51 troops had not been involved in the MacArthur Park operation on July 7th, the risk to the federal law enforcement officers would have been low; correct?

**A.** That was our assessment.
**Q.** Do you have any current involvement with the Los Angeles deployment?
**A.** I do not.
**Q.** In fact, you have not had any involvement with the deployment since July 10th; correct?
**A.** That is correct.
**Q.** You are aware, though, that there are 300 federalized California National Guard soldiers who are still deployed; right?
**A.** I am.
**Q.** And 300 soldiers is a full battalion?
**A.** No, it's not. It's like three-quarters of a battalion.
**Q.** All right.
**A.** It depends on the type of battalion that you're talking about. If this is an MP battalion, it's about three-quarters of it.
**Q.** And to your knowledge, those 300 federalized California National Guard troops are still providing assistance to federal law enforcement agencies; correct?
**A.** They are conducting four requests for assistance as of last night.
**Q.** And what are those four requests for assistance? What operations are you assisting?
**A.** They have personnel at the Roybal building in case it

needs defended, they have personnel at the Paramount facility in case that needs defended, and then two Mobile Response Forces.

**Q.** And the Mobile Response Forces can be called upon to engage in field operations; correct?

**A.** Yes, they could.

**Q.** Are you aware that this morning, Secretary of Defense Hegseth announced the deployment of National Guard troops in Washington, D.C.?

**A.** I read it on the news.

**Q.** Did you watch any news coverage of Secretary Hegseth's announcement?

**A.** I did not.

**Q.** Are you aware that Secretary Hegseth said in his announcement that the D.C. National Guard will, quote, "stand with their enforcement partners," closed quote, and that, quote, "We did the same thing in Los Angeles"?

**A.** I do not -- I did not read that. That's what he said. I did not see that.

**MS. REILLEY:** At this time, Your Honor, we would like to play that footage given that this is the party opponent representative and the Secretary's statement is a party opponent statement.

**THE COURT:** Okay. You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

**MS. LIN:** Your Honor, objection from us. This is not on the exhibit list. This is not --

**THE COURT:** You actually have to -- it's important we have a record, so that's why you should come forward.

And also --

**MS. LIN:** Apologies, Your Honor.

**THE COURT:** -- I must tell you -- don't apologize. It's perfectly all right.

**MS. LIN:** I thought --

**THE COURT:** I have a hard time hearing you when you're at counsel table. So I do want to hear what you have to say.

**MS. LIN:** Okay. That this particular, I believe it was characterized as a press statement or video, is not part of the exhibits list. It's not part of the evidence of this case. We were not informed that they were going to use this, even as of this morning.

**THE COURT:** Okay. So how could it have been part of the exhibit list when it occurred today?

**MS. LIN:** We were not informed this morning either.

**THE COURT:** Okay. Well, now you're informed, and it comes in subject to a motion to strike.

**MS. LIN:** And, Your Honor, is it being offered for the truth of the matter?

**THE COURT:** It's being offered as a statement by a party opponent. The Secretary of Defense is a party opponent,

isn't he?

**MS. LIN:** Yes. Understood.

**THE COURT:** Okay. Thank you.

It may be played --

**THE COURTROOM DEPUTY:** The exhibit number?

**THE COURT:** -- subject to a motion to strike.

**MS. REILLEY:** This will be the next exhibit in order, which I believe is 114. Thank you.

(Trial Exhibit 114 marked for identification.)

(Pause in proceedings.)

**THE COURT:** Do we have an estimate as to how long this is going to take?

**MS. REILLEY:** Your Honor, I was going to propose we could try to download it if we took a recess.

**THE COURT:** Yes, let's do that.

Well, do you have any other questions other than this?

**MS. REILLEY:** No. This will be my last one.

**THE COURT:** Okay. So let's do this: Let's take our noon recess, and we will resume at 1 o'clock sharp, and you may play this at 1 o'clock sharp.

**MS. REILLEY:** Thank you, Your Honor.

**THE COURT:** And you may step down. Thank you, General.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Okay. We're in recess till 1:00.

(Luncheon recess taken at 12:27 p.m.)

**Afternoon Session** **1:02 p.m.**

**THE COURT:** Let the record show all parties are present. The witness has returned to the witness stand.

You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

(Trial Exhibit 114 received in evidence.)

**MS. REILLEY:** At this time, we are going to play what's been admitted as Exhibit 114, which is the Secretary of Defense Hegseth's statement from this morning.

**THE COURT:** Okay. You may proceed.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** Major General Sherman, you have not seen that video clip before just now; correct?

**A.** That's correct.

**Q.** And you were not aware that Secretary of Defense Hegseth made those statements before just now?

**A.** That's correct.

**MS. REILLEY:** At this time, the plaintiffs have no further questions for Major General Sherman.

**THE COURT:** Thank you.

Any examination?

(Pause in proceedings.)

**THE COURT:** Why don't you come over here.

**MS. LIN:** Oh.

**THE COURT:** It will be easier.

**CROSS-EXAMINATION**

**BY MS. LIN:**

**Q.** Good afternoon, General Sherman.

**A.** Good afternoon.

**Q.** Earlier today you were asked to look at several photographs that were published by DVIDS. Do you recall that?

**A.** I do.

**MS. LIN:** So if we could have maybe the same photograph -- at least one of the photographs, 64, that was discussed this morning, Exhibit 64.

**BY MS. LIN:**

**Q.** And then there were others as well that you were asked questions about. And just for the record, if I got them correctly, the DVIDS photos included Exhibit 66, 68, 75, and 76, and these were represented as being taken by Sergeant Chase Murray?

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Overruled.

**MS. LIN:** I'm sorry. I didn't hear, Your Honor.

**THE COURT:** I said overruled.

**BY MS. LIN:**

**Q.** And just to get an understanding of these photos, I think you testified that you were not there and you did not know what

the circumstances were when the photos were taken?
**A.** Correct.
**Q.** Okay. As the commander of Task Force 51, do you have an understanding of what Sergeant Chase Murray's responsibility was in taking these photographs?
**A.** Sure. So Sergeant Chase Murray was attached to Task Force 51 in our public affairs section. By him taking photos and for him posting on DVIDS, his whole purpose was to show the Army, the military side of the operation. He was a member of Task Force 51, so he was able to be inside the actual interior lines, if you will, taking pictures. And his focus was really taking pictures of soldiers or Marines, highlighting what DOD was doing for the operation.
**Q.** So was there any guidance to photographers, such as Sergeant Chase Murray, about whether they were to also include federal law enforcement personnel if they were there?
**A.** It was much -- it was because federal personnel were starting to get doxed. They were starting to have real issues there. His guidance, given by our head public affairs officer, is to avoid as much as possible taking any pictures of federal law enforcement that were any kind of facial recognition or names could be used in those -- those federal law enforcement being doxed.
**Q.** And so do you believe that the photos that were -- that you were asked questions about from DVIDS fall within that

general guidance that was given to photographers attached to Task Force 51?

**A.** They were.

**MS. REILLEY:** Objection. Calls for speculation.

**THE COURT:** I'll allow it.

**THE WITNESS:** There are some photos in here, not all, but there are some where he's gotten into position where he makes sure that he hasn't taken pictures of federal law enforcement; he's taken pictures of DOD personnel.

**BY MS. LIN:**

**Q.** And if I could focus your attention on the first photograph that I mentioned, Exhibit 64.

**A.** Correct.

**Q.** I think you were asked questions about this particular photograph.

Do you see there's a yellow caution tape in front of the -- I think you said the Task Force -- Task Force 51 soldiers?

**A.** That's correct.

**Q.** Is this yellow caution tape the type of equipment standard issued for Task Force 51 troops?

**A.** No. Only federal law enforcement had that type of tape.

**Q.** What other equipment were the Task Force 51 troops issued for part of -- for this federal protection mission?

**A.** So they had -- they had -- so for the civil disturbance,

beyond their typical uniform, which was just a standard uniform, was boots, camouflage uniform. They did have on their armored vests -- they're what we call IOTV, but they're vests that carried their armor plates -- and their ballistic helmet. And then part of it was their civil disturbance kit, which included kneepads, a body shield, a face shield, and a baton. And then they also had their personal weapon that was slung across their back.

**Q.** To your knowledge, was any Task Force 51 soldiers used the issued batons during the federal protection mission?

**A.** I do not know of any instance where they actually used it to hit anybody. That never happened.

**Q.** And does your knowledge extend beyond -- I think you discussed earlier you left California on July 10th.

**A.** Correct.

**Q.** Do you have knowledge, after you left on July 10th, as to what -- whether that was -- whether any soldiers used a baton --

**A.** No. I was --

**Q.** -- during their mission?

**A.** I was still on the distribution for the nightly reports, and I did not see any reports where batons were ever used.

**Q.** When you mentioned that you were on the distribution, this is the distribution from, I believe you testified, General Nell?

**A.** Correct. General Nell would send her usual -- same thing I did, send a nightly report to General Pepin and to General Guillot, the commander of U.S. Northern Command.

**Q.** And when you talk about the civil disturbance equipment, did it include non-lethal munition?

**A.** It did not include non-lethal munitions. We considered that a law enforcement action, so only civilian law enforcement had any of that equipment.

**Q.** And you mentioned that you were asked questions about the personal weapons. Can you let us know whether any soldiers, pursuant to Task Force 51's federal protection mission, used their personal weapons?

**A.** They did not. No -- no rounds were ever -- well, a term we use -- "lock and loaded," which was putting a round into the chamber. They did have -- they did have magazines that were loaded, but they never -- nobody ever chambered a round, never were in a position that they thought that their life was in jeopardy that they needed to do that.

**Q.** And why is it that they were able to carry lethal weapons but not non-lethal munitions?

**A.** So strictly for self-defense. If they thought their life was in peril, that was the only time they were allowed to use their personal weapon, is strictly for self-defense or defense of another soldier or any lethal protection or any -- if they saw some lethal force put against a federal law enforcement.

**Q.** Thank you.
And if I can direct your attention to the discussion earlier about Exhibit 38 that was -- you were asked questions about it.
**A.** Yes.
**Q.** Do you have it in front of you on the screen?
**A.** I don't see it on the screen, but I have it in front of me.
**Q.** I believe you were asked questions -- or I'm sorry.
I believe you were asked to read the last paragraph of the "Patrol Narrative" section?
**A.** I was.
**Q.** Can I direct your attention to the third paragraph that began with "National Guard soldiers establish their blocking positions at approximately 0600," and the sentence continued?
**A.** Yes.
**Q.** Were National Guard soldiers attached to Task Force 51 permitted to establish blocking positions as part of the federal protection mission?
**A.** No. It had to be -- because we considered that a law enforcement action. They could establish a blocking position perimeter, if you will, if there was -- any time that they thought law enforcement -- there was -- either preventing them from doing their job or some kind of -- they saw as an imminent threat of anything on that. But in this --

**Q.** So --
**A.** Oh, I'm sorry.
**Q.** So the reference here about National Guard soldiers establishing their blocking positions, is that contrary to what they were trained to do? Or I guess I'm trying to get an understanding of --
**A.** Well, so --
**Q.** -- why is it they established --
**MS. REILLEY:** Objection.
**THE COURT:** Well, wait, wait, wait.
What is your question? You started asking two questions at the same time.
**MS. LIN:** Okay. My apologies, Your Honor.
**BY MS. LIN:**
**Q.** So I'm asking whether you can explain to me if what you're saying is that they are not permitted to establish blocking positions, but the paragraph here is talking about National Guard soldiers establishing their blocking positions.
**MS. REILLEY:** Objection. Calls for speculation.
**THE COURT:** I'll allow it.
**THE WITNESS:** So on the previous paragraph, where it talks about -- where it started with "National Guard, DEA, and FBI arrived at the objective. Blockades were established and each blockade was accompanied by a marked Los Angeles Sheriff's vehicle."

The sheriffs were used in this operation because this person had already been -- saw that they had -- had caused significant -- they'd hurt a federal agent. So, actually, this was a time when Los Angeles Sheriff's Department was allowed; they were actually part of this operation. So not only were they there on the checkpoint -- they call it blockade in this case. I don't like his wording here, but this is a very young, 22-year-old officer here.

But both blockades were also accompanied by DEA SWAT, so Drug Enforcement Agency SWAT teams that were also at those blockades, which are traffic control points, with less than lethal munitions. So it was law enforcement in the lead, with our soldiers behind them.

**BY MS. LIN:**

**Q.** So pursuant to the federal protection mission, are the soldiers permitted to be establishing blocking positions if the law enforcement personnel were the lead at that operation?

**A.** They're allowed to be behind the federal law enforcement or, in this case, L.A. County Sheriff were the ones establishing the traffic control point, the blocking position, and our soldiers were behind them strictly to protect them if there was any threat.

**Q.** So I think you testified that you were not at this operation. So I guess my question to you then is: What are the soldiers trained to do with respect to blocking positions

as part of the federal protection mission?

**A.** So this is my number one priority -- or my number two priority. My number one priority was always the welfare and safety of soldiers and Marines, but Number 2 was to ensure that they followed the standing rules on the use of force exactly as was written.

And for these operations, when battalion commanders and their staffs would brief me on the operations, that was the first question I asked: What's your mission? What are you allowed to do? What are you not allowed to do? And what are you doing?

It's standard, but it's something -- especially when you're talking something as early as the first week of this operation, the 13th, it was making sure they fully understood because these are soldiers that had done previous riot operations in a Title 32 state active duty status, which is different, I wanted to make sure they fully understood under Title X what they were allowed to do.

And then part of this was they weren't allowed to do any law enforcement actions. Law enforcement had to do it themselves. This is, we were strictly there to protect federal law enforcement, allowing them to do their law enforcement job.

**Q.** Okay. And so, to your knowledge, no Task Force 51 soldiers acting pursuant to the federal protection mission established blocking positions that were just by themselves,

not connected with law enforcement personnel on the scene?

**A.** That's correct. The only time they got out in front and established a blocking position is if there was some kind of risk posed to the federal law enforcement, not allowing them to do their job.

**Q.** And I think you mentioned earlier about the risk posed and the feeling of the commander, if I'm remembering your testimony correctly. I think you mentioned that if the commander felt threatened.

Can you explain a little bit more when you are describing if a commander felt threatened? What is that -- what does that entail, as far as you know, as the commander --

**A.** Well, we use a --

**Q.** -- of Task Force 51?

**A.** Sure. We use a thing in the military called mission command. That means the commander knows what their left and right boundaries are. They understand the mission. They understand the reason they were there: either they were at a facility to protect a federal facility or they were out on a mission to protect federal law enforcement, allowing them to do their job.

They have the ability on the ground to make decisions, depending on how they sense how things are going. And that's a sense if they're feeling a threat, do they feel like the crowd is hostile, do they feel like the law enforcement is prevented

from doing their job, or that it could be a dangerous enough -- something could be happening that they could actually hurt or endanger the law enforcement, then they had the ability to react.

**Q.** Okay. So this is, from your description, you're talking -- am I correct to say that you're talking about they can conduct a risk assessment on the ground?

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Sustained.

**MS. LIN:** Let me ask the question differently.

**BY MS. LIN:**

**Q.** So when you say they felt threatened, I think you gave me some explanation as to what that meant. My question is: Did that -- what did it entail if you have to identify them?

**A.** It was them on the ground, gauging from their own sense, doing assessment, if you will, of how they felt the crowd was reacting. If they thought it was endangering the federal agents, one, or preventing them from doing their job, then they could act.

**Q.** And did it actually -- did it have to be an actual threat or was it -- that's my question. Did it have to be an actual threat?

**A.** No. It could be -- there could be a crowd that's pushing up against the federal law enforcement, not allowing them to do their job. It's a preventive measure too.

**Q.** Preventive measure?

**A.** Sure.

**Q.** So when you say "preventive measure," does that mean that if there were no crowd, would it still be permissible?

**A.** No.

**Q.** -- as a preventive measure?

**A.** So if there was no crowd, they wouldn't be going forward. They'd be -- still the federal law enforcement have their traffic control point. There would be no reason. They'd just be standing behind them. Very similar to some of the pictures we saw.

**Q.** I see. So they would still be permitted to be standing next to or behind -- I'm sorry -- standing behind law enforcement?

**A.** Correct. Somewhere within a -- you know, a distance where they could react quickly if the situation -- if something happened and they deemed it necessary, they needed to react.

**THE COURT:** I'm sorry. I want to make sure I understand that.

If there's no threat and there was never an expectation of a threat, is it your testimony you could still have military out on the operation? If there was no threat.

**THE WITNESS:** Well, the only -- Your Honor, the threat we had, so that -- like those threat assessments that were put up there as --

**THE COURT:** So let's say you got a threat assessment which said it was low or non-existent.

**THE WITNESS:** Sure.

**THE COURT:** Can you send out military?

**THE WITNESS:** Absolutely, Your Honor, because that's just an assessment of what we thought would happen on the ground, but it could -- it could get much worse.

**THE COURT:** So it's your testimony that whenever there is local law enforcement carrying out an operation, and even if there is no threat, you can send the military out?

**THE WITNESS:** Yes, sir, that's correct. With this mission, with the federal law enforcement -- because it was just an assessment that they didn't think anything would happen; but if something did happen, take, for instance, they had a low -- a low assessment, there was one time we didn't -- we didn't have any force there, we actually had to respond. They had a low threat assessment. There was -- they didn't think anything was going to happen, but they started to -- they went to a house to -- to act on a warrant, and there was actually a construction site across the street and that crowd, actually the people from the construction site, came down and started harassing the federal law enforcement officers.

**THE COURT:** So that's a case in which a threat developed.

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. But my question is a different question. My -- and maybe it was anticipated that that's a possibility, but if it's not -- if it's not seen as a situation in which there is a threat, then is it your testimony you can still deploy the military because there may be a threat in carrying out the operation?

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** So, in other words, if you have -- let's say you are executing the laws of the immigration -- the immigration laws, which are, in certain circumstances, unpopular, in certain contexts, unpopular --

**THE WITNESS:** Right.

**THE COURT:** -- but you have no evidence that there's a threat or that people would constitute a threat. Is it your testimony you can send out the military on that operation?

**THE WITNESS:** Yes, and we did, Your Honor.

**THE COURT:** Okay. Now, let's say you had cases involving low compliance with the tax laws and you have a person who is a tax protestor but there's no evidence that that person constitutes a dangerous situation -- constitutes a dangerous situation. Send out military in that?

**THE WITNESS:** Well, we never had a situation like that, Your Honor. We never supported the IRS on any type of operation as far as going and anybody who was evading taxes.

**THE COURT:** But it's a federal law. I'm just trying

to figure out, if you are enforcing -- if there is a federal law, such as the tax law or the immigration law or the drug laws, which are co-terminus federal and state, if you're enforcing these laws and there's some indication that the law is unpopular among the public or among the group that is the subject of the enforcement, is it your view you can send out the military in the -- that you can send out the military to support the operation?

**THE WITNESS:** Your Honor, if it was -- if it was in line with the direction that we've gotten with both the President's memo and the Secretary's memo and it was supporting federal agencies or federal law enforcement beyond DHS, that was performing functions and it was legally reviewed and they deemed it a valid mission, we could do that.

**THE COURT:** Well, I'm actually not asking you whether the lawyers looked at it.

**THE WITNESS:** Right.

**THE COURT:** But maybe they would. I assume that.

But I'm trying to figure out really what boundaries there are established by the Posse Comitatus Act.

And I looked through the file, and I saw a very helpful slide presentation of: You can't do this. You can't do that. You can't do a third thing. You can't do a fourth thing. So -- and there are a number of things you can't do.

And essentially I'm trying to figure out whether you can

do any of those things when what the -- what the law enforcement -- not the military -- the law enforcement is trying to enforce an unpopular law. Can you then, because it's an unpopular law, use the Posse Comitatus -- I mean, use federal forces?

**THE WITNESS:** Well, I'm not a lawyer.

**THE COURT:** Well, your judgment. You're the one who's telling me --

**THE WITNESS:** Well, in my judgment, if it's -- if it's in line and it also fits, according to the brief that you saw, our standing rules on the use of force brief, which actually had constitutional exceptions in there that's showing that we're protecting federal property and enforcing federal law or allowing personnel to enforce law, then we deemed it that it was legally appropriate.

**THE COURT:** Do you draw any distinction between enforcing federal law and protecting federal property?

**THE WITNESS:** No. The -- well, so federal property was -- part of that, Your Honor, was to protect federal property from defacement, from being damaged, and to allow the federal employees that were there, allow them to do their job.

**THE COURT:** Well, but my question is a little different. I understand -- at the Roybal building, I understand. You know, I understand what -- this building. I understand federal property.

**THE WITNESS:** Right.

**THE COURT:** And I understand that there is -- there may be a particular role in protecting federal property, but I'm not talking about federal property. I'm now talking about federal law, which, in some cases, obviously, involve federal property, but I'm talking about those cases in which it's not involved, MacArthur Park or some marijuana farm somewhere. Though there may be federal laws that are implicated, there's not federal property.

So if there are federal laws that are implicated and those laws are unpopular laws and there is no threat, known threat, to the military that there's going to be force used in connection with the implementation of the law, is it your view that you can send out the military?

**THE WITNESS:** Yes, Your Honor, we could because it was our view, because it was just an assessment that we had of the situation on the ground, it could turn out to be differently, happen very different.

**THE COURT:** And that's true, isn't it, always the case? In other words, it's always the case you have an assessment, a preincident assessment, and then you have the reality of what happened.

Now, it doesn't -- the reality doesn't tell us what the alternatives are, and I appreciate that. But assessments that are preincident or predeployment are done in advance, aren't

they?

**THE WITNESS:** They are, Your Honor.

**THE COURT:** They may turn out to be inaccurate in the sense that actually circumstances develop different from what the assessment would have been.

**THE WITNESS:** Absolutely, Your Honor. Could I further explain on that?

**THE COURT:** You sure can. You go right ahead.

**THE WITNESS:** So in the military --

**THE COURT:** I don't want to cut you off.

**THE WITNESS:** In the military, we develop plans. We tell very comprehensive plans. You can see inside these books. These are -- these -- all of these detailed plans, these were all done by military planners because it's kind of the detail planning that we need because we're very much -- we're very much an NFL team, if you will. We make sure that we plan in detail both offense and defense, that we fully understand the situation on the ground and that we're able to react.

In this case, we know that a plan only is good enough until you actually -- it actually commences because we always say the opposition has a vote. Some things happen; and while I wasn't there, we saw that at Camarillo. We had had an operation planned in RFA and two days before it happened, the Border Patrol or CBP had canceled that RFA because the assessment was that there wasn't going to be military needed at

that location.

Well, after the -- after the operation that happened at Carpinteria and all that being on the -- on the news and with the helicopters there, that's when a lot of people showed up. And then there was one instance where they actually -- well, at that instance at Camarillo, they actually had more illegal aliens than they originally thought was going to be there. It was actually 300, which overwhelmed them right then. And then they started having large crowds come to their traffic control points; and right from there, that's when they -- yeah, they had large crowds that came to their traffic control points. And then from there, they knew they had a situation that they needed extra help, and that's when they called Task Force 51 to bring personnel in from our Mobile Response Force to help them with the situation on the ground. Because they knew they had a very -- they had a crowd that was very upset, somewhat hostile, and they needed help because they got overwhelmed.

**THE COURT:** But they were called in when there was a demonstrable threat.

**THE WITNESS:** Correct.

**THE COURT:** Okay.

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** Thank you.

**THE WITNESS:** Yes.

**THE COURT:** Thank you very much.

**BY MS. LIN:**

**Q.** General Sherman, I think the judge posed the question about if a law is unpopular, how does that factor into your decision as the commander of Task Force 51.

My question to you is: Who makes the law enforcement determination as to whether the law is unpopular or whether that law enforcement operation is a valid law enforcement operation?

**A.** So that's happened at the IEC. We don't have any part in that part of it. The actual law enforcement operation, that was decided at the interagency coordination cell, along with the Attorney General that's there for that district, along with the FBI, along with all the federal agencies, they go through the process.

With our mission that we were given, we were there to go on the federal -- on their law enforcement missions to protect them when and if needed.

**Q.** So you're not concerned, as part of your federal protection mission, as to whether the law is popular or unpopular? That's not part of your consideration; is that correct?

**A.** It was not.

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Sorry?

**MS. REILLEY:** I objected to the question as leading.

**THE COURT:** I'll allow it.

Go ahead.

**THE WITNESS:** No, that wasn't with our mission. That wasn't a part of -- we certainly don't do federal law enforcement functions. It's not our -- it is not our place to make any determination. That's federal law enforcement. On whether a law is popular or unpopular, they're enforcing federal law. It was our mission in this case to go along with them, to partner with them, to be there to protect them if they did encounter any hostile crowds or actions.

**BY MS. LIN:**

**Q.** And the judge asked you earlier about the list of activities, and you also -- in response, you mentioned the standard -- standing rules for the use of force, and I believe counsel also asked you about that.

Can I have you look at that exhibit, which has already been admitted into evidence and is Exhibit Number 10?

**THE COURT:** And the page is?

**BY MS. LIN:**

**Q.** And the page number on that, if I could direct your attention to page 1101; or to be more accurate, DEFS 00001101.

Do you see the section that's entitled "Constitutional Exceptions"?

**A.** I do.

**Q.** Do you see if one of these items listed here -- and

there's one, two, three, four, five -- whether that describes what you believe to be your current federal protection mission?

**A.** Well, number two is from the protection of federal property functions and personnel.

**Q.** So in carrying out this -- in trying to protect federal property functions and personnel, is it your view that you are conducting law enforcement activities?

**A.** No, not conducting law enforcement; protecting federal property, functions, and personnel, allowing them to -- federal personnel to do their job.

**Q.** So just so I'm understanding your answer correctly, when you're protecting federal personnel, does that involve the federal personnel being on law enforcement missions that's not -- that's at large?

**A.** No. They could be -- actually be federal personnel not on mission. That would be at the federal property, doing their job. But certainly, yes, if they were doing their federal law enforcement job, it's protecting them, allowing them to do their function, to do their federal law enforcement job, and to protect them.

**Q.** And so the judge asked you questions about the threat assessment. I think you gave one example or two examples. One was a search warrant and the other one was the Camarillo.

Is this the type of anticipated threat or actual threat that is part of your consideration as whether to grant a

request for assistance? Or is it --

**A.** No. No. So I --

**THE COURT:** I'm sorry. I don't understand the question.

**MS. LIN:** Let me rephrase it. That was --

**THE COURT:** Is the existence of a search warrant part of the witness's consideration? Is that your question?

**MS. LIN:** No, I'm sorry. Your Honor, let me strike my question.

**THE COURT:** Okay.

**MS. LIN:** I'll ask a better question.

**BY MS. LIN:**

**Q.** So we were talking earlier about the example of a search warrant being carried out and also the Camarillo situation.

In both instances, I gather from your testimony was that you didn't anticipate that there was going to be any threat, but threat developed during the operation. Am I correct?

**A.** That's correct.

**Q.** And so I think the judge's question to you was if there were no such -- if you had no knowledge whether any threat was going to occur, how does that factor into your decision whether to grant the request for assistance?

**A.** It really didn't. It -- it came to -- it was really determined that threat assessment that we did, those were actually our staff that did that, that was what we thought was

going to happen at the operation.

It -- it played into -- especially with high risk, if that's where we -- that's where it needed to go up higher than me. I approved everything moderate and below. But anything of high risk or extremely high risk, it went to a higher commander just because we thought it was either a very risky operation to either federal law enforcement and/or our soldiers in this case, if it was an operation outside the federal facilities.

But those -- that assessment was strictly our own. It played into just our risk we thought the operation was. What didn't play in, if we were going to protect them for an operation. They had the request. They believed -- federal law enforcement believed they wanted to have law enforcement -- or they wanted to have military there to protect them in case. It was their belief that something could happen there. So it was -- and the operation totally abided by the law, as we saw it, and that it was legal, then we went ahead and -- went ahead and approved the operation.

**THE COURT:** Well, General, let's take your example. You said that there was a risk assessment which showed that it was low, and that it didn't -- that the information that you had, which was developed internally or developed by your forces or the people who advise you --

**THE WITNESS:** Correct.

**THE COURT:** -- your staff, they said there's a low

risk of force or violence. That's what you're told. And I think you gave two examples of it, or maybe one. It escapes me at the present time. Forgive me. But that you were told by somebody that the forces should be employed, notwithstanding the risk assessment that you were given. As I understand, that's your testimony.

**THE WITNESS:** Yeah. As part of the risk --

**THE COURT:** Okay.

**THE WITNESS:** -- the request for assistance, the law enforcement still would like military.

**THE COURT:** And who told you -- who told you, in those cases? Who said to you, "General, I know you're the commander of Task" -- what is it? -- "Task Force 51. I know you're the commander and I know you've received an assessment of no danger, but I'm advising you that I want you, nevertheless, to employ troops"? Who told you that?

**THE WITNESS:** Nobody talked to me directly if you say it that way, for most operations, Your Honor, because it was a request that they sent up. They had gone through the interagency coordination cell, through our personnel there and had come to Task Force 51. The law enforcement was asking for military support.

**THE COURT:** I understand, but the Task -- you say the law enforcement. The law enforcement is local; is that right? When I say "local" --

**THE WITNESS:** No.

**THE COURT:** Pardon me. The law enforcement is non-military that you're referring to?

**THE WITNESS:** Correct. That's correct.

**THE COURT:** So non-military -- non-military people told you that they wanted your -- the military force to be present, notwithstanding the information you got from the military people?

**THE WITNESS:** Correct. That -- well, they were requesting. They didn't tell me. They requested. They were asking for military support. Even if our assessment was low, they had a belief or even if -- even if they thought it was low, it was -- it was a safety measure for them to ensure that if something did happen at that location, they had protection.

**THE COURT:** And, General, wouldn't that always be the case? Whenever -- if it's even a low risk, if the civilian -- what I'm calling the civilian as distinct from the military --

**THE WITNESS:** Yes, sir.

**THE COURT:** -- the civilian may tell you, "You know, we want military just in case" --

**THE WITNESS:** Absolutely.

**THE COURT:** -- "something happens."

**THE WITNESS:** Absolutely, Your Honor. They always wanted military there, and we had plenty of capacity to do that.

**THE COURT:** All right. Okay. I think that answers the question. Thank you, General.

**THE WITNESS:** Yes, Your Honor. Thank you.

**THE COURT:** Anything further?

**MS. LIN:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MS. LIN:** Just a couple more points in relation to what was discussed earlier.

**BY MS. LIN:**

**Q.** I think if I could turn your attention to Exhibit 41 that you were asked questions about.

Do you have it?

**A.** I do.

**Q.** I believe you were asked to read the last paragraph earlier by counsel, and in this paragraph it mentions establishing outer cordon. Do you see that?

**A.** I do.

**Q.** Were Task Force 51 troops permitted to establish outer cordon?

**A.** Well, so you see there where the "End State. Joint federal and military companies," why -- I think it's poorly written, poorly worded. But joint federal and military companies, when they say "federal," they meant joint federal law enforcement and military companies.

In this case, military police companies established the

outer cordons, secured designated sites, enabling safe entry for DEA personnel.

**Q.** And you do not recall this particular operation or did you?

**A.** Oh, no, I know this operation. This is the -- this is the Mecca operation, yes.

**Q.** So to be clear, what were the soldiers trained to do with respect to the ability to establish outer cordons?

**A.** So they were there -- so I think -- so there was a large irrigation ditch, canal, outside this grow operation. So they were actually outside, lined up along the road there, and they got out of their vehicle to watch the operation that was happening inside the -- inside the grow area that was there.

There was only one place that they had a traffic control point, and that was actually a bridge that crossed from the canal over into the grow area. We had soldiers there, but it was run by federal law enforcement. I don't know if it was DEA or not. But federal law enforcement ran that traffic control point.

There was a news crew there. There wasn't any -- they didn't -- they didn't encounter any resistance at all or anything. It was one news crew because they had seen all the vehicles coming down the road because they had come in from March Air Reserve Base. So it was about an hour and a half drive, so there was plenty of people to see them and call.

**Q.** I see. But as far as you know, do you whether law enforcement -- sorry -- whether Task Force 51 troops conducted any law enforcement activities?

**A.** They did not. They didn't -- they just stayed on the outside. They were not needed. They were there to first protect the traffic control point; but if they did encounter -- federal law enforcement encountered resistance inside of this large grow operation, their job was to go in to help them, protect them, break contact, if you will, if they were receiving any kind of fire, and break contact and get them out safely.

**Q.** So, in your view, their activities were consistent with what they were charged to do, which is the federal protection mission?

**A.** That's correct, yeah. They were there to -- they were there strictly to protect federal law enforcement as they did their law enforcement jobs.

**Q.** And just one last question also about the photographs that we were talking about earlier. If I can refer you to Exhibit 69. This is another picture that you were asked questions about.

**A.** Yes.

**Q.** And just -- and this is another photograph I believe --

**A.** I don't think it's up on the screen yet, but...

**Q.** Oh.

**A.** Yes.

**Q.** So you were asked to -- or you were read to -- the caption was read to you, and the second sentence of this caption references establishing a security perimeter in Mecca, California?

**A.** Correct.

**Q.** Is this reference to a security perimeter in Mecca, California, consistent with the federal protection mission that the Task Force 51 troops were charged with carrying out?

**A.** No. Is it a perimeter? It's a perimeter because they have their vehicles lined up right there because they're actually down -- they're lined up on a road that actually -- you see right there in front of them is actually a canal. You can see that little part, which that means nobody could get across -- anybody coming out of the grow operation couldn't get across that canal unless they were swimming.

But they were there, lined up, just watching what was going on inside the actual grow operation itself. They had the vehicles lined up. If they did need to drive in from there, it was just a lot of vehicles. I think over 40 -- 40, 50 vehicles. It was -- you know, precisely it was 314 soldiers. So it was a lot of vehicles, a lot of soldiers there that were lined up on both sides of the traffic control point there. They were outside their vehicles, on alert.

There's another photo in here where you see them talking

on -- there's some leaders talking on a radio. So they were all in contact finding -- you know, just keeping up-to-date what was happening inside the grow operation.

You're talking about, as I understand it, it was -- it was a land that was about 800 acres. It was a very large operation. And, you know, they heard everything going on the radios. There was contact. All the company commanders and above did have radios, so they could hear what law enforcement was talking about.

But -- and we did have intelligence -- I wouldn't call it intelligence. They just had -- law enforcement told us that they had -- they thought that there were people inside this operation, human smuggling, enslavement, if you will. They found I believe it was about 87 Chinese nationals that were handcuffed inside -- inside buildings that were there not on their own free will.

**Q.** Okay. So, to your knowledge, though, looking at this photograph, it does not -- does it indicate to you whether this is consistent with the federal protection mission?

**A.** Yeah, with what this operation was because there was just one small little area they could actually get across the canal into the grow operation. Yes, this was consistent.

Were they doing a cordon here? No. They were lined up, ready to go if they needed to get called in. They just happened to be lined up that way.

**MS. LIN:** I have no further questions, Your Honor, but we do have General Sherman as our case-in-chief tomorrow.

**THE COURT:** Yes. However, I assume the testimony he will give tomorrow will not be cumulative to what he gave today.

**MS. LIN:** We'll certainly attempt to do that other than to bring in the topic or the background.

**THE COURT:** I'll aid you in that endeavor, I promise.

**MS. LIN:** We appreciate that, Your Honor.

**THE COURT:** Okay. All right.

You may cross.

**MS. REILLEY:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Major General Sherman, you were not present when Sergeant Murray took any of the photographs that were published to the DVIDS website; correct?

**A.** I was not.

**Q.** All right. And so you don't have any information about where Sergeant Murray was standing relative to the troops when he took those photographs?

**A.** No, I wouldn't say that. Did I know his directions that he was given by the public affairs officer of Task Force 51 to make sure that he got soldiers -- or he got pictures of soldiers? I know that for a fact because I was -- I was, like,

"Where are the pictures of soldiers? We need pictures of them doing their duty."

**Q.** So you know what the instructions he was given were, but you don't know physically where he was standing when he took the photographs; correct?

**A.** No, I don't. I could make an assumption, but I don't know.

**Q.** You testified a moment ago that Task Force 51 troops never used their batons to hit during the deployment, but you were not present during any of the field operations; correct?

**A.** That's correct.

**Q.** And you do not know if batons were used for any other purpose, such as to block pedestrian foot traffic; correct?

**A.** There was no report ever brought up to me on that.

**Q.** All right. Again, you weren't present on those operations, so unless a report was brought to you, you would not have heard about it; correct?

**A.** Correct.

**Q.** You testified a moment ago about Exhibit 38, which was the briefing from the Long Beach operation, and you testified that law enforcement was in the lead on that operation. Do you recall that testimony?

**A.** I do.

**Q.** You were not present at that operation; correct?

**A.** I was not.

**Q.** And you testified earlier today that you did not receive any briefing after that operation; correct?
**A.** I did not.
**Q.** So you do not know for a fact that the troops did actually stay behind federal law enforcement agents during that operation; correct?
**A.** That is correct.
**Q.** And you also don't know for a fact that the individual who drafted that report is 23 years of age; correct?
**A.** He's a young second lieutenant, so he could be -- I don't know his exact age, but he's young. I remember him. He's a very young officer.
**Q.** And you testified with Ms. Lin a moment ago that there are constitutional exceptions to the Posse Comitatus Act; is that your understanding?
**A.** That's what we've been trained, yes, with the standard rules on the use of force briefing, correct.
**Q.** And, again, you're not a lawyer; correct?
**A.** That is correct, I'm not a lawyer.
**Q.** So you could not point me to the portion of the Constitution that sets forth the exception you've been testifying about today; correct?
**A.** I cannot.
**Q.** And you testified about the training slides that Task Force 51 reviewed. That was Exhibit 10. Those slides

were drafted by the staff judge advocate for Task Force 51; correct?

**A.** For, I believe, Army North. Army North did the slides.

**Q.** And that individual who drafted the slides, the staff judge advocate is a lawyer; correct?

**A.** Correct.

**MS. REILLEY:** Plaintiffs do not have any further questions at this time.

**THE COURT:** Thank you.

Anything further?

**MS. LIN:** No, Your Honor.

**THE COURT:** Okay. Thank you very much, General, and you're excused from this portion, but you may remain in the courtroom.

**THE WITNESS:** Thank you, Your Honor.

(Witness excused.)

**THE COURT:** All right. Call your next witness.

**MS. LOPEZ:** Good afternoon, Your Honor. Lorraine Lopez, Deputy Attorney General, for the plaintiffs.

We would like to call Ernesto Santacruz Jr. as our next witness.

**THE COURT:** Okay. And let's see. Yes, please would you bring him in?

(Pause in proceedings.)

**THE COURT:** And is this your third and final witness,

or do you have four?

**MS. LOPEZ:** Yes, Your Honor.

**THE COURT:** Okay. Thank you.

(Pause in proceedings.)

(Witness enters the courtroom and steps forward to be sworn.)

**ERNESTO SANTACRUZ**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** Yes.

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

Please state your full name for the record and spell your last name.

**THE WITNESS:** Ernesto Santacruz. Last name S-a-n-t-a-c-r-u-z.

**MS. LOPEZ:** Thank you.

**DIRECT EXAMINATION**

**BY MS. LOPEZ:**

**Q.** And nice to see you again, Mr. Santacruz.

You are currently employed by U.S. Immigration and Customs Enforcement; correct?

**A.** That is correct.

**Q.** And you are employed in Enforcement and Removal Operations specifically; correct?

**A.** Yes, that is correct.

**Q.** And that is sometimes referred to as ERO; correct?

**A.** That is correct.
**Q.** And ICE is a U.S. federal law enforcement agency; correct?
**A.** That is correct.
**Q.** And it is overseen by the Department of Homeland Security?
**A.** That is correct.
**Q.** You previously provided two separate declarations in support of the defendants' case; correct?
**A.** I provided three. You're talking about for this specific case?
**Q.** For this specific case.
**A.** I believe it was three.
**Q.** And when you say "three," do you mean your two declarations and a deposition?
**A.** I provided the initial declaration and I believe it was two supplementals.
**Q.** Okay. And you also had a deposition in this case; correct?
**A.** That is correct.
**Q.** Okay. And that occurred on July 24th, 2025?
**A.** I don't recall exactly the date. I'm sorry.
**Q.** It's okay. However, since then, you have had an opportunity to review your testimony; correct?
**A.** Yes, I have.
**Q.** Okay. And, to your knowledge, no changes have been made to the substance of your testimony; correct?

**A.** I think there were just a few minor changes that were made on there, if I remember correctly.
**Q.** Thank you.
And you are currently the field office director for Enforcement and Removal Operations in Los Angeles; correct?
**A.** That is correct.
**Q.** And you've been in this position since April 6, 2025?
**A.** That is correct.
**Q.** You've held several other positions at ICE and its predecessor, Immigration and Naturalization Services, since 2002; correct?
**A.** Yes, that is correct.
**Q.** Okay. And you were previously the deputy field office director for Enforcement and Removal Operations in L.A.?
**A.** Yes.
**Q.** You were the assistant or acting assistant field office director for Enforcement and Removal Operations?
**A.** Yes.
**Q.** You were also a supervisory detention and deportation officer?
**A.** Yes.
**Q.** And you were also a deportation officer in Los Angeles?
**A.** Yes.
**Q.** And you were an immigration enforcement agency [sic] also in Los Angeles?

**A.** Can you repeat that? I'm sorry.
**Q.** You were also an immigration enforcement agent in Los Angeles?
**A.** Yes.
**Q.** And you were a detention enforcement officer for INS?
**A.** Yes.
**Q.** So overall, you've had approximately how many years of experience?
**A.** With?
**Q.** With ICE.
**A.** This current agency?
**Q.** Yes.
**A.** With this current agency, along with legacy Immigration and Naturalization Service, slightly over 23 years.
**Q.** And you have served in the military; correct?
**A.** That is correct.
**Q.** And you served in the U.S. Army?
**A.** That is correct.
**Q.** How long did you serve for?
**A.** Three years.
**Q.** And what was the highest rank you held?
**A.** E4, specialist.
**Q.** All right. Enforcement and Removal Operations is a unit of U.S. Immigration and Customs Enforcement; correct?
**A.** Correct.

**Q.** And you are familiar with Homeland Security Investigations, also referred to as HSI; correct?
**A.** That is correct.
**Q.** Okay. Are they also a unit of Immigration and Customs Enforcement?
**A.** Yes.
**Q.** Homeland Security Investigations also engages in immigration-related law enforcement?
**A.** Yes.
**Q.** Los Angeles Enforcement and Removal Operations is responsible for immigration enforcement within a specific region; correct?
**A.** That is correct.
**Q.** And that is referred to as Enforcement and Removal Operations area of responsibility; correct?
**A.** Can you repeat that one more time, please.
**Q.** This is referred to as Enforcement and Removal Operations area of responsibility?
**A.** Area of responsibility is just an area that a specific field office covers. Enforcement and Removal Operations is an agency that deals with enforcing the immigration laws within the interior of the United States.
**Q.** So the area of responsibility for your office encompasses the Central District of California; correct?
**A.** Yes, that is correct.

**Q.** And that is an area of 36,000 square miles?
**A.** Approximately, yes.
**Q.** And it includes seven counties; correct?
**A.** That is correct.
**Q.** It includes San Luis Obispo County?
**A.** Yes.
**Q.** Ventura County?
**A.** Yes.
**Q.** Santa Barbara County?
**A.** Yes.
**Q.** San Bernardino County?
**A.** Yes.
**Q.** Riverside County?
**A.** Yes.
**Q.** Los Angeles County?
**A.** Yes.
**Q.** And Orange County; correct?
**A.** Correct.
**Q.** Okay. You also oversee suboffices in San Bernardino, Camarillo, and Santa Ana; correct?
**A.** Correct.
**Q.** And you oversee just over 500 personnel?
**A.** No. It's approximately --
**Q.** Oh, sorry. Just under 500 personnel?
**A.** Yes.

**Q.** And you oversee two detention centers as well?
**A.** Correct.
**Q.** And both of those are in Adelanto?
**A.** That is correct.
**Q.** As part of your responsibilities as Los Angeles field office director, you oversee all Enforcement and Removal Operations immigration enforcement actions that take place in the area of responsibility; correct?
**A.** In the Central District, yes, that is correct.
**Q.** And your office is in Los Angeles?
**A.** Yes.
**Q.** As the field office director, you are kept informed of all Enforcement and Removal Operations immigration enforcement operations taking place in the area of responsibility; correct?
**A.** Correct.
**Q.** And that includes being informed of joint operations with other federal law enforcement agencies even if Enforcement and Removal Operations isn't the lead agency; correct?
**A.** I have some knowledge to it, yes.
**Q.** You were first told on the morning of June 8th, 2025, that the federalized National Guard and Marines would be deployed to Los Angeles; correct?
**A.** That is correct.
**Q.** Okay. And you were first informed by Homeland Security Investigations' counterpart, named John Pasciucco, over

telephone; correct?

**A.** That is correct.

**Q.** You understood that the deployed troops were there to protect federal property or to protect federal officers in the event something went wrong; correct?

**A.** That is correct.

**Q.** The information that you received is that the federalized National Guard and Marines were in Los Angeles to protect federal property and to protect personnel and that was it; correct?

**A.** Initially it was just the National Guard when I was informed.

**Q.** And the Department of Defense did not explain what "protect" means?

**A.** Protect?

**Q.** Yes.

**A.** They did not specify as far as what protection. I know that they mentioned that they were there to protect federal property and federal personnel.

**Q.** And you were not told what the Department of Defense can and cannot do to protect Enforcement and Removal Operations officers; correct?

**A.** Not to my knowledge.

**Q.** And you do not know what the federalized troops did to protect federal officers related to that request; correct?

**A.** That is correct.
**Q.** And you did not witness what the federalized troops actually did to protect federal officers; correct?
**A.** Not personally. I wasn't on the ground to oversee that.
**Q.** ICE Enforcement and Removal Operations request assistance from the federalized National Guard through a request for assistance, known as an RFA; correct?
**A.** Correct.
**Q.** There is required information you must include in these requests; correct?
**A.** That is correct.
**Q.** You had to include the purpose and the need for the protection -- I'm sorry -- for the request?
**A.** Correct.
**Q.** And those requests are submitted to a Department of Defense liaison?
**A.** That is correct.
**Q.** If a request was denied, are you provided with an explanation?
**A.** I have never received any denials from any requests that I personally made.
**Q.** And you personally only submitted two requests for assistance; correct?
**A.** I provided, yes, that is correct, two and then just follow-ups.

**Q.** Okay. And you would be made aware of any request for assistance originating from Enforcement and Removal Operations even if you were not the person submitting the request for assistance; correct?

**A.** Correct.

**Q.** And you do not know how many requests for assistance were submitted by Enforcement and Removal Operations; correct?

**A.** I do not have the number of that.

**Q.** You do not know how many requests for assistance by Enforcement and Removal Operations were granted in total; correct?

**A.** My understanding is the requests that we made -- I'm not sure exactly how many were -- were all granted. I've never received any information of any being denied.

**Q.** Okay. But you don't know the exact number; correct?

**A.** I do not.

**Q.** As the field officer -- sorry -- field director for ICE Enforcement and Removal Operations for this region, you oversee the personnel making the request for assistance; correct?

**A.** Correct.

**Q.** And you also oversee the planning and operations for immigration operations conducted by your office; correct?

**A.** Regarding for ERO? Correct.

**Q.** Yes.

On or about June 8th, 2025, you submitted a request for

assistance to the Department of Defense; correct?

**A.** I don't recall exactly what the date was, but I do recall making requests.

**Q.** Would it refresh your recollection if you took a look at your deposition transcript?

**A.** Yes.

**Q.** Okay. So I'm going to -- there is a binder and it's the third one at the bottom there.

**A.** This one?

**Q.** Yes. And that is Volume 7 -- I'm sorry -- Volume 5, Exhibit 99. So turn -- once you're ready, let me know.

**A.** Can you repeat what --

**Q.** Sure. So you're going to turn to Tab 99.

**THE COURT:** What page?

**MS. LOPEZ:** The very first page, Your Honor, of Tab 99.

**BY MS. LOPEZ:**

**Q.** All right. So, again, you took this deposition on July 24th. And when you took the deposition, you took an oath; correct?

**A.** Yes.

**Q.** And you took an oath to tell the truth; correct?

**A.** Correct.

**Q.** And since taking your deposition, you reviewed the transcript; correct?

**A.** Correct.

**Q.** And you signed it to show you approved of what was in it; correct?

**A.** Say that one more time.

**Q.** You -- I'm sorry.

You reviewed the transcript and signed it to show that you approved of what was in it; correct?

**A.** Correct.

**Q.** All right. Okay. So now if you can turn -- apologies.

Okay. If you can turn to page 27. All right. And starting at line 3, I ask [as read]:

"You are" --

Sorry. You say [as read]:

"**ANSWER:** You are asking specifically for me on what I requested?

"**QUESTION:** Correct, yes. What kind of assistance would ICE be requesting? What would be that process?"

So the question is [as read]:

"**QUESTION:** Correct, yes. What kind of assistance would ICE be requesting? What would be that process?"

**THE COURT:** What is your question?

**MS. LOPEZ:** I'm sorry, Your Honor. I think I have the wrong page on here.

Actually, strike that, Your Honor. That is the wrong citation and wrong page.

Actually, turn to page 149.

**THE COURT:** 149?

**MS. LOPEZ:** Yes.

**THE COURT:** Okay.

**MS. LOPEZ:** Apologies for that.

**BY MS. LOPEZ:**

**Q.** Are you on page 149?

**A.** I'm getting there.

**Q.** Okay. Let me know when you get there.

**A.** (Witness examines document.) Okay.

**Q.** Okay. So if we go to line 7, the question reads [as read]:

"**QUESTION:** Now, as far as the request that you do remember making, you said it was early on. How early on was it?"

And the answer is [as read]:

"**ANSWER:** Shortly after June 8. If not on June 8, shortly after that."

Is what I read accurate?

**A.** That is correct.

**Q.** Okay. Does that refresh your recollection?

**A.** Yes.

**Q.** Okay. So the request for federalized National Guard personnel to protect federal officers conduct -- is for protecting federal officers conducting at-large operations;

correct?

**A.** Correct.

**Q.** And "at-large operations" means Enforcement and Removal Operations everyday routine arrests in the field; correct?

**A.** Correct.

**Q.** This includes immigration raids and arrests of individuals who are not the targets but are apprehended during an operation; correct?

**A.** Well, we don't do immigration raids. We do at-large operations.

**Q.** Does at-large operations sometimes include joint operations with other federal law enforcement agencies?

**A.** Yes.

**THE COURT:** What do you mean "at-large operations"?

**THE WITNESS:** Your Honor, at-large operations means that we are conducting and going after criminal aliens or any individual that has violated immigration law out into the field.

**THE COURT:** So the distinction you draw between an immigration raid, which you say you don't do, and an at-large operation, which you say you do --

**THE WITNESS:** Right.

**THE COURT:** -- is what exactly?

**THE WITNESS:** So a raid would be, in my opinion, somewhere where you would go and just start raiding a certain

location versus you're going after different individuals that you are having some known or idea or intelligence that they are in the country illegal or maybe a certain target. So it's targeted operations where we go after a specific individual.

**THE COURT:** So the defining line between the two types of operations are, in an immigration raid, you don't have information that any individuals who would be subject to that operation are illegal or undocumented aliens, whereas an at-large operation, you have received information of some kind that individuals are undocumented? Is that the -- I'm just trying to figure out the distinction because you said you don't do one; you do another. So I want to make sure I understand what it is that defines the difference between the two.

**THE WITNESS:** No, I understand, Your Honor.

So at-large operations, whether it be targeted enforcement operations, is someone that we do have information on that's either in the country illegally or has a final order of deportation or is in some type of process that an immigration judge has already deemed them unfit to be in the country.

**THE COURT:** Specific information.

**THE WITNESS:** Specific information.

As far as raids, we don't conduct raids. What raids, in my opinion, would be something along the lines if we were just to go to a specific area and just raid a -- let's say, for example, like a worksite enforcement ERO.

**THE COURT:** Pardon me?

**THE WITNESS:** A worksite enforcement, for example, would not be a -- something that ERO does, Enforcement and Removal Operations, because we typically just deal with targeted or at-large operations, is what we've known it to be.

**THE COURT:** Okay. Thank you.

**BY MS. LOPEZ:**

**Q.** So just to be clear, ERO does not conduct raids; correct?

**A.** That is correct.

**Q.** Who does conduct those?

**A.** I don't know anyone who actually conducts raids.

**Q.** And going back to your June 8th request, was that request accepted?

**A.** The one that I personally made, yes.

**Q.** And the same day that the request you made on June 8th was approved, was there a meeting?

**A.** Just so -- to clarify, I'm not exactly sure if it happened on June 8th or shortly after June 8th, but the ones that I did make shortly after were approved. And I didn't get the last part of the question. I'm sorry.

**Q.** Was there a meeting after the one that you believe to have been requested on June 8th? There was a meeting; correct?

**MR. HARTLIEB:** Objection. Vague as to whether there was a meeting.

**THE COURT:** I'm sorry. You say the term "meeting" is

vague?

**MR. HARTLIEB:** Yes, Your Honor.

**THE COURT:** Okay. So can you clarify -- fine.

Can you clarify what you mean by "meeting" in the question? Just be more specific.

**MS. LOPEZ:** Yes.

**BY MS. LOPEZ:**

**Q.** There was a follow-up meeting about the request; correct?

**A.** I don't believe there was a follow-up meeting right there and then. I'm sure there may have been a follow-up meeting the very next day. I can't -- I would defer to DOD if they had any internal meetings on that.

**Q.** So let's go back to your deposition transcript then. So if you can go to page 26, and let me know when you get there.

**A.** (Witness examines document.) Okay.

**Q.** All right. And I'm going to bring your attention to line 7. The question posed was [as read]:

"**QUESTION:** When did you find out the purpose of the deployment to Los Angeles?"

And on line --

**MR. HARTLIEB:** Your Honor, if I may just interject. I'm not sure that we are working on the same deposition transcript. My line 7 on page 26 does not contain that language.

**THE COURT:** Mine does. Well, let's clarify. I mean,

counsel is entitled to --

**MS. LOPEZ:** Yes, Your Honor.

**THE COURT:** -- to have the correct version. Is there another version of the deposition?

**MS. LOPEZ:** So there was a corrected version, Your Honor, and it is labeled --

**THE COURT:** Okay. Let's just take a moment. Everybody get on the same page. And if you'd like, Counsel, you can just stand right next to her and look at it. That's fine.

So it's Exhibit -- Exhibit 99?

**MS. LOPEZ:** Exhibit 99.

**THE COURT:** Page 26, line 7.

**THE WITNESS:** Your Honor? Can I get some water, Your Honor?

**THE COURT:** Pardon me?

**THE WITNESS:** Can I get some water?

**THE COURT:** Oh, absolutely. Help yourself.

**THE WITNESS:** Thank you.

**THE COURT:** It's Hetch Hetchy. It's very good water we have in San Francisco.

**MR. HARTLIEB:** Thank you, Your Honor.

**THE COURT:** It's designer water.

**MR. HARTLIEB:** Thank you for the indulgence. I'm on track.

**THE COURT:** Okay. Question, line 7 [as read]:

"**QUESTION:** When did you find out the purpose of deployment to Los Angeles?"

You were about to give the answer.

**MS. LOPEZ:** Yes.

**BY MS. LOPEZ:**

**Q.** And the answer was [as read]:

"**ANSWER:** I think after the morning, they showed up. In a meeting, we were told that they were going to be here to protect and assist Federal Protective Service and the security of federal property."

What I read, is that accurate?

**A.** Yes.

**Q.** Okay. Thank you.

So at that meeting, you were told the purpose of the deployment; correct?

**A.** Correct.

**Q.** But you were not given full information as to the activities that the National -- the federalized National Guard could engage in to fulfill the request; correct?

**A.** For what specific reason?

**Q.** For -- you were not given information as to the activities that the federalized National Guard could engage in to fulfill your request?

**A.** My personal request for at-large operations?

**Q.** Correct.
**A.** Yes. They were told that they were there to provide protection for the federal officers that were conducting at-large operations.
**Q.** But you were not provided any other information aside from that; correct?
**A.** That is correct.
**Q.** Okay. And troops accompanied your ERO officers on the majority of operations; correct?
**A.** That is correct.
**Q.** Roughly about 75 percent; correct?
**A.** That was an approximate estimate that I gave during my deposition, yes.
**Q.** Thank you.
This was the case up until about four weeks ago; correct?
**A.** In terms of what?
**Q.** In terms of having federalized National Guard troops accompany your ERO officers?
**A.** Approximately, yes.
**Q.** Okay. And at that time, their participation started to decrease in Enforcement and Removal Operations, at-large operations; correct?
**A.** Regarding the National Guard of --
**Q.** The federalized National Guard.
**A.** Yes.

**Q.** So your request for assistance, did that cover all Enforcement and Removal Operations, at-large operations, from the date you made the request up until the time their participation started to decrease?

**A.** No.

**Q.** What time period did the request for assistance cover?

**A.** I'm not sure exactly what period it covered. There was a period there where I took leave; and upon my return from leave, it had already scaled down.

**Q.** To your knowledge, was your personal request for assistance still ongoing before you went on leave?

**A.** Yes, I believe so.

**Q.** And requests for assistance are typically made in advance of each non-at-large Enforcement and Removal Operations operation; correct?

**A.** So just to clarify, any request that I made was for an ongoing period. Any other requests that needed to be made, please keep in mind that there's other federal law enforcement agencies that made their own requests, and I would defer to those specific agencies.

**Q.** And just for continuing questions, I will only be asking you about Enforcement and Removal Operations --

**A.** Okay. Understood.

**Q.** -- requests. Okay?

So going back to your request for assistance for at-large

operations, you do not know what the federalized National Guard did during those operations to provide protection; correct?

**A.** I don't have that firsthand knowledge as I was not on the ground during those daily at-large operations.

**Q.** And you do not know what activities the federalized National Guard engaged in on the ground to protect Enforcement and Removal Operations agents; correct?

**A.** I do not know specifically how they did it.

**Q.** Okay. And you also made a request for assistance for the Adelanto facility; correct?

**A.** That is correct.

**Q.** Okay. And this request was in response to reports of potential protests at the Adelanto facility; correct?

**A.** That is correct.

**Q.** And that request was approved as well?

**A.** Yes, it was.

**Q.** And the protesters didn't yield as expected at the Adelanto facility; correct?

**A.** We did have protesters, but not to the scale where we anticipated.

**Q.** And you don't know what the federalized National Guard troops actually did in response to that request; correct?

**A.** I do not know what they actually did there. I would defer to DOD or FPS, who oversees that portion of protecting federal properties.

**Q.** And you're going to have an opportunity to add anything else you'd like during direct, but for my questions, a lot of this is going to be "yes" or "no." Okay?
**A.** Okay.
**Q.** You have not received any information regarding Department of Defense staff intervening and protecting Enforcement and Removal Operations agents during any request for assistance; correct?
**A.** Intervening?
**Q.** Yes.
**A.** Is that how I understood it?
Okay. I have no reports or any knowledge to that.
**Q.** The federalized troops provide a safety blanket for Enforcement and Removal Operations officers conducting operations; correct?
**A.** Correct.
**Q.** And the federalized National Guard troops served as a quick reaction force during immigration enforcement operations; correct?
**A.** Correct.
**Q.** Prior to the federalized National Guard deployment, a quick reaction force to provide protections for Enforcement and Removal Operations agents was staffed with your own personnel; correct?
**A.** It depends on what type of operation we were conducting.

**Q.** And it also depended on whether you had the capacity; correct?

**A.** Correct, depending on the specific operation that we were conducting.

**Q.** In that case, a quick reaction force could be anybody; correct?

**A.** It can be anybody, yes.

**Q.** And you do not know what the quick reaction force engages in because you were not on the ground during enforcement operations during the National Guard deployment; correct?

**A.** Specifically to National Guard?

**Q.** Yes.

**A.** They were there to protect federal officers and federal property.

**Q.** But you do not know the specifics of what they were doing during those deployments; correct?

**A.** No. As I mentioned before, I was not on the ground.

**Q.** Having the federalized National Guard serve in this role was helpful to Enforcement and Removal Operations; correct?

**A.** Correct.

**Q.** And it helped to ensure that Enforcement and Removal Operations were not impeded by the public or protests; correct?

**A.** Correct.

**Q.** And it helped your Enforcement and Removal Operations officers to be able to conduct -- or make arrests without

having the public or anyone else hinder or impede or assault them during at-large operations; correct?

**A.** That is correct.

**Q.** Okay. And having their presence out there in the event of something happening, allowing your officers to safely conduct their work without having to worry about protesters, violent protesters, that might impede their ability to effect an arrest while conducting at-large operations; correct?

**A.** That is correct.

**Q.** Having the federalized National Guard present during operations at large was a huge deterrent to the public; correct?

**A.** Yes.

**Q.** The mere presence of the federalized National Guard could be a deterrent to members of the public considering hindering an arrest; correct?

**A.** Correct.

**Q.** At this time, I would like to reintroduce what has been previously admitted and marked as Exhibit 53. So if you can go to Volume 3 of the binders.

**THE COURT:** 53?

**MS. LOPEZ:** Yes, Your Honor.

(Pause in proceedings.)

**MS. LOPEZ:** And we will be displaying that document shortly.

**BY MS. LOPEZ:**
**Q.** So you're going to go to Tab 53.
**A.** (Witness examines document.)
**Q.** Okay. And you see the photo on the page there?
**A.** Yes.
**Q.** You've seen this photograph before; correct?
**A.** Yes.
**Q.** In the photo on the right side of the two individuals in camouflage, they look like they're protecting the officers conducting the arrest; correct?
**A.** Based on this photo that I have in front of me, it looks like they're standing and looking at something that is out of my view, to the right side.
**Q.** But they do look like they're protecting the officers conducting the arrest; right?
**A.** I would say so, yes.
**Q.** And based on what you see, the way these two individuals were standing in front of that officer, that would be considered a contingent perimeter; correct?
**A.** A contingent perimeter? It's hard to say what it is just based on this photo. I have a very narrow scope of what I have in front of me. It's hard to see what's to the left or to the right. If they're just -- if there's no one on the right side of them in front of them, then they would just be kind of just posting versus if there was a group of folks that were looking,

then at that point then it would be some type of protection from those folks from intervening or any potential bad actors.

**Q.** So, again, we did discuss this at your deposition, so let's go back to Exhibit 99.

**A.** Tab 99?

**Q.** Tab 99, yes.

**THE COURT:** Page?

**MS. LOPEZ:** Page 73. Thank you, Your Honor.

**THE COURT:** 73?

**MS. LOPEZ:** Page 73.

**BY MS. LOPEZ:**

**Q.** Let me know when you get there.

**A.** Is that in the other book?

**Q.** Yes. That's in Volume 5.

**A.** What page again? I'm sorry.

**Q.** Page 73.

**A.** (Witness examines document.) Okay.

**Q.** All right. So I'm going to take you down to line --

**THE COURT:** I think this testimony is consistent with what he said on the stand, isn't it?

**MS. LOPEZ:** It is somewhat consistent, Your Honor.

**THE COURT:** I don't think it's inconsistent.

Okay. Move on.

**MS. LOPEZ:** We'll move on then, Your Honor. Thank you.

**BY MS. LOPEZ:**

**Q.** And as you just mentioned, if there was a threat on the other side of the camouflaged individuals, you would expect these camouflaged individuals to protect the ICE officers; correct?

**A.** That is correct.

**Q.** And you have not received any reports from your Enforcement and Removal Operations officers about instances where the federalized National Guard intervened to protect them; correct?

**A.** No, I did not.

**Q.** Enforcement and Removal Operations agents wear uniforms; correct?

**A.** Repeat that one more time. I'm sorry.

**Q.** Enforcement and Removal Operations agents wear uniforms; correct?

**A.** Not necessarily.

**Q.** What do you mean by "not necessarily"?

**A.** So the only uniforms that we do have involve our special response team. All of our other agents -- excuse me -- are plainclothes, plainclothes agents.

**Q.** And the special response team, these agents wear camouflage uniforms?

**A.** That is correct.

**Q.** And the special response team for Enforcement and Removal

Operations are not the only law enforcement agency with a camouflage uniform; correct?
**A.** That is correct.
**Q.** Other federal law enforcement agencies also have camouflage uniforms; correct?
**A.** Correct.
**Q.** And these camouflage uniforms are similar to the camouflage for military uniforms; correct?
**A.** Correct.
**Q.** Enforcement and Removal Operations special response team wears a brownish-greenish camouflage uniform; correct?
**A.** Correct.
**Q.** And the military wears a green or a multicamouflage uniform; correct?
**A.** Correct.
**Q.** And you have knowledge of the different types of uniforms as well because of your previous military service; correct?
**A.** Correct.
**Q.** So you know what identifying features to look for on a military uniform; correct?
**A.** Correct.
**Q.** For example, you know how to look for patches; correct?
**A.** Correct.
**Q.** And someone without knowledge of the different types of military and law enforcement uniforms wouldn't be able to

differentiate between the two; correct?
**A.** I could only speculate, but I know what I know as far as how to be able to identify that.
**Q.** How -- or even for someone like you, who has experience, it's not easy to tell who is military and who isn't without being up close and personal to see patches; correct?
**A.** That is correct.
**Q.** So at this time, I'd like to reintroduce Exhibit 54, which has previously been admitted as Exhibit 54. So you're going to go back to Volume 3.
**A.** (Witness examines document.)
**Q.** Ready?
**A.** Yes.
**Q.** Tab 54.
Okay. And for the record, again, this is a photo from the U.S. Immigration and Custom Enforcement's X account dated June 10th, 2025, at 11:56 a.m.
You've seen this photo before; correct?
**A.** That is correct.
**Q.** And from this photo, given that they have similar uniforms, you cannot tell who is military and who is federal law enforcement; correct?
**A.** Well, I can tell that this person right in front of us -- or in front of the picture is DEA. It's hard to make out the person in the back, who that actually is.

**Q.** And the person in the back, just for the record, is wearing camouflage; correct?

**A.** Based on this, in the book picture, yes.

**Q.** And based on that camouflage uniform and in that photo, you cannot tell if that is military or federal law enforcement; correct?

**A.** I cannot.

**Q.** Okay.

All right. So we're going to stick with Volume 3, and if you can go to Tab 92. And this has been previously admitted as Exhibit 92, and this is a photo from Camarillo.

**A.** Okay.

**Q.** You've seen this photo before as well; correct?

**A.** That is correct.

**Q.** Okay. And from this photo, you cannot tell who is military and who is federal law enforcement; correct?

**A.** I can tell who's federal law enforcement on one specific person.

**Q.** And which person is that?

**A.** The person in the center of this photograph.

**Q.** How about the individuals in the back?

**A.** It's hard to tell. I think I mentioned this before. The picture is kind of grainy, and the distance is kind of pushed back, so it's hard to tell who that actually is.

**Q.** And you can't identify any of the patches on those

uniforms; correct?

**A.** I can identify the individual in the front just based on my experience and knowledge that -- who that agency is.

**Q.** But for the individuals in the back, you can't identify any of the patches; correct?

**A.** I can't make them out, no.

**Q.** Okay. And based on this photo, the individuals in the camouflage in the back, they are forming a perimeter; correct?

**A.** It looks like they're standing in a line behind this federal officer, and it looks like a loose perimeter, in my perception, based on my experience.

**Q.** Thank you.

And you heard about the cannabis farm raids in Camarillo and Carpinteria; correct?

**A.** Correct.

**Q.** And Enforcement and Removal Operations was not the lead agency on that operation; correct?

**A.** That is correct.

**Q.** And Enforcement and Removal Operations, although not the lead agency, was one of several federal agencies participating in the operation; correct?

**A.** That is correct.

**Q.** Okay. And in your 23 years of experience with ICE, has the military ever accompanied ICE in a security function on non-border immigration enforcement operations?

A. Not that I can recall.

**MS. LOPEZ:** At this time, I have no more questions, Your Honor.

**THE COURT:** Cross or whatever.

**CROSS-EXAMINATION**

**BY MR. HARTLIEB:**

Q. Good afternoon. Garry Hartlieb for the defendants. And good afternoon to you, Mr. Santacruz.

I would like to follow up on certain topics that you discussed with opposing counsel just now.

And before we delve into some of those specifics, I'd like to better understand the scope of responsibilities that you held as field office director.

Can you describe what you did and how you kept yourself informed of ERO's personnel and their activities?

A. During this specific time?

Q. In general, as field office director, how do you supervise 490 personnel?

A. Well, our chain of command structure encompasses me as the field office director. I have two deputy field office directors that work right below me. I also have a chief of staff and approximately 12 assistant field office directors. Those assistant field office directors have various responsibilities or portfolios that cover every facet that ERO, Enforcement and Removal Operations, enforces.

I also have approximately -- each of those assistant field office directors have about six or seven first-line supervisors who then oversee the various programs within ERO that cover the seven counties within the Central District of California.

On top of the two detention populations or detention centers that I have regarding detainees, we have two different portfolios that two deputy field office directors oversee, which is -- one portfolio is the enforcement portfolio, and the other portfolio is the detention portfolio.

**Q.** How do you stay apprised of all of the activities encompassed by those portfolios?

**A.** Well, we do have countless meetings. We have daily meetings with my core management staff. We do have weekly meetings. Then we do have -- every month we do have an assistant field office director meeting where everyone comes together and discuss the various topics.

We do have ad hoc meetings where any information or pertinent information that needs to be relayed that comes from the very top or any pivot changes or mission changes, we have discussions, whether it be MS Teams, whether it be phone calls, or whether it be in-person meetings.

**Q.** You mentioned pertinent information. What is the type of pertinent information that comes up to your attention?

**A.** There's various types of information that we receive. Anything from a use-of-force incident, anything from an officer

assault incident, employees getting injured, detainees being injured, the health and welfare of detainees that may go to the hospital. Any -- any type of serious misconduct, various information that we receive, to include any pivot changes or mission changes that may come from our headquarters' component.

**Q.** Do you receive that information only in meetings or also in written reports?

**A.** Written reports. We do have situational reports that we do have. We also have significant incident reports any time, for example, there is an officer assault, any use-of-force incidents, any time a detainee or a law enforcement officer has to go to the hospital for whatever reason, but there's various reports and different type of formats that we receive those in.

**Q.** Did anything about your responsibilities in day-to-day work change after the National Guard was federalized?

**A.** Yes.

**Q.** How did it change?

**A.** It changed more now that we have -- the DOD representative now is something that we had to encompass in terms of making sure that everyone was on the same page, whether it be just coordinating or having discussions regarding the day-to-day activities.

**Q.** You mentioned the DOD representative. Did you work with that representative in a particular place?

**A.** Yes.

**Q.** What was that place?

**A.** It was at the Federal Command Center, the Incident Command Center. It has a lot of terms; right? Incident Command Center, Federal Command Center, and then the Interagency Command Center, but that's where all the different federal heads sat, to include DOD representatives.

**Q.** What is your understanding of what the function of the Interagency Command Center was?

**A.** Well, it's basically a funnel point with all the federal partners that are working together on Immigration Title 8 at-large operations. That's where all the information and that's where all the federal heads sit to discuss any ongoing or any potential operations that come up. And it's -- all the information gets relayed from each component, and from there it gets filtered out to each headquarters component from that point.

**Q.** How specifically did you work with Task Force 51 representatives in the Interagency Command Center?

**A.** Well, as I mentioned previously, I have worked closely with them in the sense of me, personally, I had to make a couple of requests for assistance, and that was for protection of federal property or federal personnel.

**Q.** How would you submit those requests for assistance?

**A.** The ones that I personally made were in person. Since they're in the same room as we were in the command center, I

would have a conversation with the DOD representative and pretty much provide the specifics on what we needed.

**Q.** What type of information would you provide when making requests for assistance?

**A.** So it was basically the who, where, what, and why type of situation. They needed to know what the -- what type of assets were going to be required, what location, when, why. And we would provide that information, and then they ran it up their chain of command.

**Q.** When you made a request for assistance, did you ever request the specific function that members of Task Force 51 were to perform?

**A.** No. It was a general request. It was a request -- for example, when I made the request to provide additional support at the Adelanto facility, we requested personnel to go out there to assist in the protection of that federal property.

**Q.** Now, you said that you didn't make a specific request about the function that Task Force 51 members were to perform. Was there a reason that you didn't specify what those members should be doing?

**A.** Well, from the very beginning, their purpose there was to protect federal property and federal personnel. As far as the policies and procedures regarding that, I would defer to DOD as I am not sure how or what instructions they would be receiving from their chain of command.

**Q.** Did you ever request that Task Force 51 or the National Guard help assist in the performance of ERO's law enforcement functions?

**A.** No.

**Q.** Why not?

**A.** Like I mentioned before, DOD is only there to protect federal personnel or protect federal property.

**Q.** How did you learn that DOD was only protecting personnel or property?

**A.** Early on, that was the discussion that we had in our meeting, is that they were here to protect federal property and federal personnel.

**Q.** And who is the "we" in that last sentence?

**A.** Everyone in that Interagency Command Center.

**Q.** And who was it that communicated that DOD's role would be restricted to protecting federal personnel and property?

**A.** I can't remember exactly who that was. I mean, there were various DOD representatives. It's a -- initially it was a 24-hour operation where there was different folks there.

**Q.** But it was -- is it fair to say that it was a DOD employee that communicated the restriction that DOD was there --

**A.** That's correct.

**Q.** -- to protect?

Okay. What would happen after you submitted a request for assistance?

**A.** I could only assume that they -- the DOD would send it up their chain of command.

**Q.** Do you have any visibility into how DOD evaluated your request?

**A.** I do not.

**Q.** I want to talk about a couple of the specific requests that were discussed that you made. How many requests did you personally make to Task Force 51?

**A.** I believe I made two requests that also required follow-up requests.

**Q.** What was the first request that you made?

**A.** I believe the first one that I made was for additional personnel to be assigned to at-large teams that were conducting field operations for protection of federal officers due to the increase in, spike of officer assaults.

**Q.** And what was the second request?

**A.** The second request was when we received information that they were -- there was going to be a potential large protest at one of our detention facilities, at the Adelanto detention facility. We requested additional DOD personnel to assist and protect the federal property.

**Q.** With respect to at-large operations, did you ever request that DOD execute arrests on behalf ERO?

**A.** No, I did not.

**Q.** With respect to at-large missions, did you ever request

that DOD assist with detentions?
**A.** No, I did not.
**Q.** With respect to at-large missions, did you ever request that DOD execute search warrants?
**A.** No, I did not.
**Q.** Do you have a general understanding of what Task Force was doing to assist on at-large operations?
**A.** I was not there, present on the ground. As a field office director, I was in the command center. So I have no knowledge of how each team operated independently within those specific DOD teams that were assigned to them.
**Q.** Well, let me ask it this way: Do you know if DHS and Task Force 51 were performing the same functions with respect to your requests for assistance?
**A.** They were not performing the same functions.
**Q.** How were they different?
**A.** Well, the federal officers that have Title 8 authority have arrest powers to arrest individuals that are here, you know, breaking the immigration laws or having some type of immigration order. DOD is only here to protect federal property and only to protect federal personnel.
**Q.** In terms of these at-large operations, would DHS and Task Force 51 personnel ride in the same vehicles?
**A.** No, they do not.
**Q.** Do you recall prior questioning by plaintiffs' counsel

about deterrence?
**A.** Can you repeat that one more time? I'm sorry.
**Q.** Do you recall a question about the presence of the National Guard having a deterrent effect?
**A.** Yes.
**Q.** When you made the statement that having the National Guard provided a deterrent effect, who was being deterred?
**A.** I would say any potential bad actors out there that previously, prior to them showing up, ended up becoming violent in the sense where they started assaulting federal officers by, you know, throwing projectiles to our folks that were there to protect the buildings.
**Q.** When you submitted your requests for assistance, did you ever have an intent that Task Force 51 would deter lawful actors and citizens and members of the public from lawful activity?
**A.** What I was looking for was for -- to protect our -- my officers that were out conducting operations, because due to the increase of vehicle -- officer assaults that we were -- the frequency was so high at that time, and we needed to protect our workforce to continue to do their, you know, ERO mission. So my whole purpose was to protect -- provide protection for the folks that are conducting that work.
**Q.** You mentioned officer assaults. How frequently would you receive reports of officer assaults on at-large missions in

early June 2025, prior to the federalization of the National Guard?

**A.** Daily, multiple times a day, we would receive officer assault reports.

**Q.** Did the frequency with which you received those reports of officer assaults change after Task Force 51 began providing protection on at-large missions?

**A.** We still had officer assault situations, but they did reduce drastically after DOD were assigned to our teams.

**Q.** Now, in lieu of these officer assaults in early June 2025, did you believe ERO was able to carry out its federal functions at an acceptable level?

**A.** They were carrying out their functions, but I would not say that it was at an acceptable level due to the increase of violence towards our federal workforce. We had to pretty much pivot to combat that.

**Q.** Can you give an example of how an at-large operation was interrupted by officer assaults?

**A.** So one that comes off the top of mind is we do have federal partners that work together, ERO and federal partners, whether it be FBI, DEA, Marshals, any of the other federal partners that have Title 8 authority.

We did have an individual that was taken into custody, and the moment the handcuffs were put on him and he was being walked to the vehicle, members of the public, they pretty much

got outnumbered to the point where they ended up pulling the individual from the officers' grasp and they got overran. They became too dangerous, to where the public ended up helping the individual escape in handcuffs.

And the officers, due to the safety factor, had to vacate the scene because there was just an overwhelming presence of folks that were impeding not only their exit to leave in vehicles, but also affecting their ability to make arrests.

**Q.** Was that interference a factor in your decision to submit a request for assistance?

**A.** That was one of many instances that, yeah, a decision is that we needed to do something to help our workforce conduct its operations.

**Q.** Are you aware of any interference with your federal functions at federal property or federal buildings?

**A.** Yes.

**Q.** Please describe what comes to mind.

**A.** Well, early on, prior to DOD or after?

**Q.** Prior to the deployment of Task Force 51.

**A.** So prior to their arrival on June 6, for example, after that worksite enforcement that HSI, Homeland Security Investigations, conducted on June 6, that evening, later on at the Roybal Federal Complex, which also encompasses MDCLA, Metropolitan Detention Center there in Los Angeles, with the Federal Bureau of Prisons and the Federal Building, 300 North

Los Angeles, it's a three-building complex there where we had approximately 1500 protesters that late afternoon, and it became violent and they became -- they started assaulting the Federal Protective Service there.

That impeded our ability to be able to go in and out of that federal complex. And keep in mind it's not just ICE, ERO that's in that. You're talking about a federal building that has over 29 tenants there that could not safely vacate that premises on a Friday.

**Q.** So prior to the federalization of the National Guard, did you ever develop plans on how to address your concerns of officer safety?

**A.** In regards to?

**Q.** In general, did you ever take any action to try to address concerns about officer assaults or officer safety with respect to at-large missions before the National Guard was federalized?

**A.** So, yes. So we had to pivot and we had to pretty much condense teams to have a larger footprint, but that impacted obviously our ability to conduct our missions.

**Q.** How did it impact your ability to conduct missions?

**A.** Well, because we had to condense teams, collapse teams into other teams to have a larger footprint due to the spike of assaults on federal officers.

So that meant that if we had a certain amount of locations that we were conducting at-large operations, that it had to be

minimized or scaled down just so we wouldn't sacrifice officer safety.

**Q.** After the National Guard was federalized in California, did you pursue other plans to address your concerns of officer safety?

**A.** Other plans? So, I mean, yeah, when they got federalized, that's when I made that request. In a sense, we had that additional resources. I requested to have the National Guard assigned to our at-large teams to help out as a QRF, as a Quick Reaction Force, in the event of any potential assaults on federal officers.

**Q.** So now thinking of after the National Guard has been federalized and at-large missions, are you aware of any safety threats to DHS personnel after that time period?

**A.** After that time period, it minimized it just because we knew -- or the officers also knew that they had a force multiplier out there; and just having their mere -- their mere presence out there, it was definitely a deterring factor for any potential bad actors that maybe in the past did act in a violent way but would definitely think twice having that additional support.

But not only that, it also was a huge relief for our workforce, knowing that they're not going to get blindsided if they are effecting an arrest and have someone, you know, necessarily intervene or try to assault them or impede their

ability to take someone into custody.

**Q.** I want to focus your attention specifically on the Camarillo operation. Are you familiar with that operation?

**A.** Yes, I am.

**Q.** Do you have a belief about whether there were any safety threats to officers on that operation?

**A.** There was actually some safety threats that I obviously -- a lot of that was televised live. Even though I was not on the ground personally, but I did see some threats towards federal officers.

**Q.** What did you see?

**MS. LOPEZ:** Objection. Speculation.

**THE COURT:** Let's take a break now. My court reporter has asked for it. So we will resume at 3:15. Resume at ten after 3:00.

(Recess taken at 2:53 p.m.)

(Proceedings resumed at 3:10 p.m.)

**THE COURT:** Let the record show all parties are present.

You may continue.

**MR. HARTLIEB:** Thank you, Your Honor. Again, Garry Hartlieb on behalf of the Department of Justice, United States Department of Justice.

**BY MR. HARTLIEB:**

**Q.** So, Mr. Santacruz, before we took a break, we were

beginning to talk about Camarillo. Are you familiar with the DHS operation in Camarillo, California?
**A.** Yes.
**Q.** Were you personally present at that operation?
**A.** I was not.
**Q.** How did you learn about the Camarillo operation?
**A.** We had discussions about it.
**Q.** Were those discussions before or afterwards?
**A.** Before.
**Q.** Did you receive any reports afterwards that described the Camarillo operation?
**A.** Yes.
**Q.** Was there any other way in which you learned about the Camarillo operation outside of your conversations and your reports?
**A.** No. It would be just basically after-action reports that were generated after the fact. We also did discuss it in meetings as well after.
**Q.** Did you watch anything about the operation on the television?
**A.** Yes.
**Q.** So that would be an additional way in which you --
**A.** An additional way, yes.
**Q.** -- you learned about it?
Do you have a belief about whether there were any safety

threats to officers of DHS and ERO at that operation?
**A.** There was.
**MS. LOPEZ:** Objection. Speculation.
**THE COURT:** Overruled.
**MR. HARTLIEB:** So I'll reask that question.
**BY MR. HARTLIEB:**
**Q.** Do you have a belief about whether there were any safety threats to officers at that operation?
**A.** There was.
**Q.** And to confirm, was ERO present at the Camarillo operation?
**A.** So we did have ERO presence there.
**Q.** What was the nature of the safety threats that were present at that operation?
**A.** So once the crowd started forming around the area of the operation, we had members of the public who were there and became violent. We had a lot of officers that were out there, especially transportation vans, that were assaulted by members of the public with projectiles, rocks, to include vans that actually carried detainees; and they were smashing the windows, throwing rocks at the security element that was there, to include -- we did witness, because we were watching it live from the command center, that was what was happening on the ground, where individuals were pretty much conducting deadly force situations on our federal officers.

**Q.** What do you mean by conducting deadly force situations on your officers?
**A.** So there was an individual there that actually had a weapon that appeared to look like he was shooting in the direction of our officers.
**Q.** How would gunshots during an operation impact your officers' ability to carry out their federal functions?
**A.** Well, you're talking about deadly force at that point; right? That's the worst possible threat that you can think of as a law enforcement officer, is being shot by someone. So it weighs heavily on the security of officer safety and the security of the operation.
**Q.** Notwithstanding the existence of these safety threats at Camarillo, are you aware of the National Guard ever taking any law enforcement activities in response?
**A.** I was not there on the ground to know exactly what the National Guard did. I would defer to the DOD. I know that they were there simply to -- they were assigned as a QRF, Quick Reaction Force, for that specific deployment, but I would defer to HSI.
**Q.** Now, you said that they were assigned as a QRF. Does that mean that they were assigned as security and intended to be at the operation in advance?
**A.** All I know is that they were assigned to play the role of a QRF. I would -- like I said, I would defer to DOD and HSI.

I was not part of those discussions, as far as specific roles, other than the QRF.

**Q.** Is the assignment of a QRF different from general provision of protection on the at-large missions?

**A.** So almost the same concept in the sense that if something were to go in the wrong way, assaults on our officers or whatnot, but their role was there to protect federal officers.

**Q.** Staying on the topic of Camarillo, you were asked some questions about whether certain photographs looked like they depicted a perimeter. Do you recall that?

**A.** Yes.

**Q.** When you answered those questions generally, was that based on your personal knowledge and opinion or something else?

**A.** My personal knowledge and opinion.

**Q.** Do you know how Task Force 51 understands or defines the term "perimeter"?

**A.** I do not. I don't know their policies and procedures. I would defer to the DOD.

**Q.** With respect to the photographs at Camarillo that you were shown, do you know what was happening outside of the frames of any of the photographs that you looked at?

**A.** I do not. I've been -- I was shown various photos regarding that -- that operation, and it was hard to -- I only had a snapshot of what was in front of me, so it's hard to tell without seeing the whole scope or the layout of what was

actually going on.

**Q.** With respect to those pictures that appeared to show certain people in uniform in a line, do you know what any of those uniformed personnel were doing?

**A.** I was shown various pictures. To be specific as far as what they were doing, it's hard to tell. If they were standing in a line, that could have been a loose perimeter. But without seeing the whole scope and seeing what's in front or behind them, what's taking place, what does the perimeter consist of, it's hard to tell.

**Q.** Do you know why Task Force 51 members of the National Guard were present at Camarillo?

**A.** Well, like I said, I was not there on the ground to know why or how they ended up at -- if they were there, but I know that they were a Quick Reaction Force and called upon if needed.

**Q.** Do you recall a question earlier about the percent of at-large operations for ERO that had Task Force 51 support?

**A.** Yes.

**Q.** So when you testified that the National Guard assisted on 75 percent of at-large operations, was that opinion based on specific facts and data, or how did you come up with it?

**A.** It was a -- because if I remember that question, I said I'd be widely guessing, you know, what that percentage was. And I believe they -- plaintiffs' counsel said, "Would

75 percent sound accurate?" And based on everything in my experience and the amount of folks that were assigned to some of the at-large teams, which wasn't all of them, 75 percent seemed about accurate.

**Q.** Has that number changed since you testified that the National Guard was assisting on 75 percent of ERO's at-large operations?

**A.** Yes, it has.

**Q.** What is that number today?

**A.** It's zero.

**Q.** When did that number change?

**A.** That number had to have -- it's hard to say when that number changed. I know -- like I mentioned earlier, I was on annual leave, and that number had to change somewhere between that time frame where I was on annual leave.

**Q.** When were you on annual leave?

**A.** I took annual leave from June 28th until July 7th. So when I returned, that number had already decreased.

**Q.** So by July 7th, the 75 percent number was already decreasing?

**A.** Yes.

**Q.** Now, I asked you questions earlier about the specifics of your requests for support on the front end. What I want to ask about now is, thinking to all of the at-large operations where ERO received Task Force 51 support, did you ever receive

after-action reports of what actually happened on those at-large missions?

**A.** Not for every at-large mission. Keep in mind that we have quite a few at-large missions going on at the same time, multiple teams out there. Each team has multiple locations that they were targeting. The only thing that I would get were, like, anything that needed to be reported up.

**Q.** And can you clarify what types of things would need to be reported up?

**A.** So, for example, and I think I mentioned this earlier, on daily reports that show up would be the amount of teams that are currently out in the field, how many arrests were conducted, what federal agencies assisted or were involved, to include DOD and the number of personnel for each specific team.

**Q.** Of those reports that you reviewed, did you ever come to know that Task Force 51 was carrying out any of ERO's law enforcement operations?

**A.** They were not carrying out our operations. They were just assigned.

**Q.** Based on those reports that you reviewed, did you ever see any indication that Task Force 51 members committed arrests?

**A.** No, they did not.

**Q.** Based on those reports that you reviewed, did you ever see that Task Force 51 members had committed any searches or seizures?

**A.** No, I did not.
**Q.** Mr. Santacruz, you are testifying here today based on your personal knowledge and the information that you've learned in connection with your role; correct?
**A.** That is correct.
**Q.** Are you presently employed by the military?
**A.** No, I'm not.
**Q.** Do you have any awareness of what the military's restrictions are on Task Force 51 members who assist DHS operations?
**A.** I don't know the specifics of those, what their orders are. I know that they're just here to protect federal property and to protect federal personnel.
**Q.** So do you have any specific knowledge of what instructions Task Force 51 members may have received about what they can and cannot do?
**A.** No, I have no knowledge of what their chain of command instructed them to do.
**Q.** Do you have any knowledge of what the Posse Comitatus Act allows or prohibits?
**A.** I do not.
**Q.** Do you know what DOD has instructed military members with respect to the Posse Comitatus Act?
**A.** I do not.
**Q.** Thinking of your entire involvement now with

Task Force 51, who had the authority to decide what activities DOD would permit its forces to conduct on a prospective operation?

**A.** I can't speak for DOD as far as what they were told. Like I stated before, the only information that we received, federal partners, they're there to protect federal personnel and federal property.

**Q.** Thinking to your entire involvement with Task Force 51, did DHS or DOD control the activities of what DOD forces actually did in assistance of at-large operations?

**A.** No.

**Q.** Let me rephrase the question. Which entity -- between DHS and DOD or some other entity, which entity controlled the activities of Task Force 51?

**A.** Well, the only ones -- I could speak for ERO. I'm the only one and some of my folks that may have made requests for the assistance of the at-large teams, for them to go out as a QRF, to include the federal property. So that was the only general ask that we made.

Now, as far as how their chain of command relayed that information to its soldiers, I would not have any knowledge of that.

**Q.** So I wanted to clarify that a little bit.

ERO did or did not control the activities of Task Force 51?

**A.** Well, to a certain point we only controlled the ask that we -- the general ask to have them come out with our specific teams and to protect federal property, the only instances that I -- the only one that I made, which was at the Adelanto facility. Beyond that, how they do it and how they were directed to do it is not within my scope.

**Q.** Whose scope would it be within?

**A.** That would be under DOD.

**MR. HARTLIEB:** No further questions. Thank you, Mr. Santacruz.

**THE COURT:** Anything further?

**MS. LOPEZ:** Nothing further, Your Honor.

**THE COURT:** Okay. Thank you. You're excused.

**THE WITNESS:** Thank you very much.

(Witness excused.)

**THE COURT:** Okay. Anything further from the plaintiff?

**MS. STRONG:** Nothing further, Your Honor.

**THE COURT:** Plaintiff rests?

**MS. STRONG:** Yes, Your Honor, the plaintiff rests.

**THE COURT:** Okay. So we will proceed tomorrow morning. You have one witness; is that right, who's already testified in this matter?

**MR. HAMILTON:** Yes, Your Honor.

**THE COURT:** Okay. Do you have an estimate as to how

long now, in light of the testimony that he's given and which won't be repeated, his testimony will be?

**MS. LIN:** Your Honor, we are hoping to be very efficient and two to two and a half hours at the maximum.

**THE COURT:** How long?

**MS. LIN:** Two to two and a half hours maximum, but we are going to go through and make sure that we avoid duplicates. So after tonight, maybe the estimate will change.

**THE COURT:** Okay. All right. Well, that would be useful.

So what I want to do is, at the conclusion of your witness's testimony, and assuming you rest at that point, then go into an argument as to the evidentiary aspects of the case. I want to do that tomorrow, reserving till Wednesday morning the legal issues that you've asserted. Okay?

**MS. LIN:** Understood, Your Honor, but can we clarify with plaintiffs that the two witnesses that have already testified today, whether they could be released. That would be Mr. Santacruz and Mr. Harrington.

**THE COURT:** Well, that's up to them. They can -- you can have a discussion as to that. I mean, I -- it may be -- they may or may not want to have an issue as to rebuttal. I have no idea. They haven't heard -- they haven't heard the testimony -- the new testimony of the general. So you can have a discussion. It's whatever you agree to is fine with me, if

you can agree.

And then I will just see you tomorrow morning. We'll start -- let's see. Let's start at 9:30. Yes.

**MS. STRONG:** Your Honor, I just want to clarify --

**THE COURT:** Sure.

**MS. STRONG:** -- to make sure we understand what Your Honor is expecting for tomorrow afternoon versus Wednesday.

So is it Your Honor's expectation that the parties give closing arguments on the evidence presented so far tomorrow afternoon and that then we would then present arguments on the four legal issues you discussed this morning on Wednesday, or is it the reverse?

**THE COURT:** Exactly.

**MS. STRONG:** Okay.

**THE COURT:** That's exactly my --

**MS. STRONG:** Thank you.

**THE COURT:** The only thing is when you say "tomorrow afternoon," we don't know how long the general's testimony is going to be; and once its concluded, I want to move right into the argument. So that means tonight you should prepare whatever you want to say about the evidentiary features of the case.

**MS. LIN:** So, Your Honor, the reason I mentioned Mr. Harrington and Mr. Santacruz is that if there's expectation

that would go longer, so the timing would be affected by that. That's my only point.

**THE COURT:** Well, obviously, if they testify, if they're called back for some rebuttal, if they are, then that changes the timetable.

But, I mean, actually, this is all sort of simple, isn't it? There's nothing complicated about what I've said, is it?

**MS. LIN:** No.

**MS. STRONG:** No, Your Honor.

**THE COURT:** Great.

**MS. STRONG:** I just wanted to clarify: Evidentiary argument first; legal argument to follow. That's how you prefer our process.

**THE COURT:** Exactly.

**MS. STRONG:** Thank you, Your Honor.

**THE COURT:** Okay. Anybody here didn't get that?

**MS. LIN:** We got it, Your Honor, but we'd also like to be heard just a few more minutes today if that's possible.

**THE COURT:** Oh, sure. I've got time. Everybody's got time. Sure.

Okay. Well, anyway, that's where we are right now; and then if somebody wants to say something, please do.

**MR. HAMILTON:** Thanks, Your Honor.

I'm mindful of the fact that the Court --

**THE COURT:** You have to identify yourself for the

record.

**MR. HAMILTON:** I'm sorry, Your Honor. Eric Hamilton for defendants.

**THE COURT:** Sure.

**MR. HAMILTON:** -- mindful of the fact that the Court has set aside time on Wednesday for legal arguments. For the record, we just want to move for judgment as a matter of law under Rule 52(c) now that plaintiffs have closed their case based on the fact that plaintiffs have failed to prove a violation of the Posse Comitatus Act, as well as for all of the threshold defects that we argued in our opposition to the original motion for a preliminary injunction, as well as the supplemental opposition brief that we filed.

**THE COURT:** Great. I'll take that under submission.

**MS. STRONG:** I'm happy to respond to it, Your Honor, but I don't need to if you don't feel the need for a response.

**THE COURT:** Well, I think the federal government is right to raise it, and -- but I'm not going to decide it until we move ahead and see where we are, though it has to be decided on the record that's been adduced so far. In other words, the plaintiff put in their case, so it either succeeds or fails on that motion as of the conclusion of their case. And anything you do after doesn't affect that particular motion; right?

**MR. HAMILTON:** Yes. Yes, Your Honor.

**THE COURT:** That also is not complicated. Okay.

There we go.

Anything else?

**MS. STRONG:** Not from me, Your Honor.

**THE COURT:** So we're hopeful that the IT will all work tomorrow.

**MS. STRONG:** I think --

**THE COURT:** Hopeful. That's sort of an aspirational view.

**MS. STRONG:** I think we owe thanks to your IT Department for that, Your Honor. So thank you for that.

**THE COURT:** Oh, our IT Department is crack. Crack.

Okay. Great. See you all tomorrow. Thank you so much.

(Proceedings adjourned at 3:31 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, August 11, 2025

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GAVIN NEWSOM, et al.,
Plaintiffs,

v.

DONALD J. TRUMP, et al.,
Defendants.

Case No. 25-cv-04870-CRB

**OPINION GRANTING INJUNCTIVE RELIEF**

Congress spoke clearly in 1878 when it passed the Posse Comitatus Act, prohibiting the use of the U.S. military to execute domestic law. Nearly 140 years later, Defendants—President Trump, Secretary of Defense Hegseth, and the Department of Defense—deployed the National Guard and Marines to Los Angeles, ostensibly to quell a rebellion and ensure that federal immigration law was enforced. There were indeed protests in Los Angeles, and some individuals engaged in violence. Yet there was no rebellion, nor was civilian law enforcement unable to respond to the protests and enforce the law.

Nevertheless, at Defendants' orders and contrary to Congress's explicit instruction, federal troops executed the laws. The evidence at trial established that Defendants systematically used armed soldiers (whose identity was often obscured by protective armor) and military vehicles to set up protective perimeters and traffic blockades, engage in crowd control, and otherwise demonstrate a military presence in and around Los Angeles. In short, Defendants violated the Posse Comitatus Act.

Almost three months after Defendants first deployed the National Guard to Los Angeles, 300 National Guard members remain stationed there. Moreover, President Trump and Secretary Hegseth have stated their intention to call National Guard troops into

federal service in other cities across the country—including Oakland and San Francisco, here in the Northern District of California—thus creating a national police force with the President as its chief. Because there is an ongoing risk that Defendants will act unlawfully and thereby injure Plaintiffs, Governor Newsom and the State of California, the Court **ENJOINS** Defendants from violating the Posse Comitatus Act as detailed below.

## I. PROCEDURAL HISTORY

On June 9, 2025, Plaintiffs filed this case, bringing three causes of action against Defendants: (1) an ultra vires claim against all Defendants, (2) a Tenth Amendment claim against all Defendants, and (3) an Administrative Procedures Act claim against Secretary Hegseth and the Department of Defense. Compl. (dkt. 1). The next day, Plaintiffs moved for a temporary restraining order. TRO Mot. (dkt. 9). After expedited briefing and a hearing, the Court granted Plaintiffs' motion, holding that Defendants had acted ultra vires and violated the Tenth Amendment when they federalized the California National Guard without satisfying the statutory criteria of 10 U.S.C.§ 12406. See TRO (dkt. 64). Though Plaintiffs also sought a temporary restraining order based on the Posse Comitatus Act, the Court held that Plaintiffs had not shown that Defendants had violated or were likely to violate the Act. Id. at 26–29. The Court therefore entered an injunction requiring Defendants not to deploy the California National Guard in Los Angeles and to return control of the California National Guard to Governor Newsom. Id. at 35–36.

Defendants appealed the Court's entry of a temporary restraining order, and the Ninth Circuit administratively stayed the order. See Newsom v. Trump, 141 F.4th 1032, 1039 (9th Cir. 2025) (per curiam). The Ninth Circuit heard expedited argument and then issued an order staying the temporary restraining order pending appeal, concluding that it was likely that President Trump lawfully federalized the California National Guard under § 12406(3). Id. at 1040. The Ninth Circuit explained that § 12406 affords the President significant discretion such that courts can review only whether the president had a colorable, good-faith basis for invoking that statute. Id. at 1049–51. The Ninth Circuit declined to weigh in on Plaintiffs' Posse Comitatus Act arguments. Id. at 1055.

With Plaintiffs' motion for a preliminary injunction (dkt. 77) still pending, this Court advanced the trial on the merits as to Plaintiffs' Posse Comitatus Act claim pursuant to Federal Rule of Civil Procedure 65(a)(2). Sched. Order (dkt. 109). The Court presided over the trial from August 11 to August 13, 2025. See Dkts. 155–57. The Court's findings of fact and conclusions of law follow. See Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT

### A. ICE Activities in LA

In early June 2025, Immigration and Customs Enforcement initiated a series of immigration enforcement actions in Los Angeles, California. Olmstead Decl. (dkt. 8-2) ¶ 6. ICE targeted "several locations in downtown LA and its immediate surroundings" that are "known to have significant migrant populations and labour-intensive industries." Espíritu Decl. (dkt. 8-1) Ex. G. On June 6, the first day of the enforcement actions, ICE detained between 70 and 80 people and arrested 44. Id. The next day, Customs and Border Protection officers arrived from San Diego to assist with immigration enforcement operations. Santacruz Decl. (dkt. 22-1) ¶ 18.

Public protests quickly followed. At the site of one of the June 6 enforcement actions, a group of people gathered and tried to prevent ICE from leaving. Id. ¶ 7; Espíritu Decl. Ex. D. That evening, crowds of people in downtown Los Angeles protested against ICE's enforcement actions. Espíritu Decl. Ex. D; Santacruz Decl. ¶¶ 9, 10. At the Roybal Federal Complex—which houses the Metropolitan Detention Center—some protestors threw "concrete chunks, bottles of liquid, and other objects" at Federal Protective Service officers guarding a parking garage gate, while others tried "to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate." Santacruz Decl. ¶ 11; Trial Tr. Vol. I (dkt. 162) at 189:20–190:9. Protests continued downtown and in several nearby cities on June 7. At protests in Paramount and Compton, some protestors threw rocks and other objects (including mangos, fireworks, and a Molotov cocktail), burned a vehicle, barricaded a street with shopping carts, briefly trapped an ICE agent in a car, and vandalized property. Santacruz Decl. ¶ 20.



United States District Court
Northern District of California

The Los Angeles Police Department and Los Angeles Sheriff's Department responded to these protests and maintained control of the situation. Even before the protests downtown on the evening of June 6, LAPD had reassigned additional officers to the area. Olmstead Decl. ¶ 6. When some protestors acted violently at the Roybal Complex, LAPD officers successfully pushed the crowd away. Santacruz Decl. ¶¶ 13, 15. Shortly thereafter, LAPD declared an unlawful assembly, and most protestors departed the area by 11:00 p.m. Id. ¶¶ 16–17. As for the June 7 protests, LASD dispatched 200 deputies to Paramount and Compton, including a team with specialized training in handling civil unrest, and LAPD was "fairly in control" of the protests downtown. Olmstead Decl. ¶¶ 7, 9.

As a result of the protests on June 6 and 7, two federal buildings were vandalized and sustained minor damage, and a DHS fence and three government vehicles were also damaged. Santacruz Decl. ¶¶ 17, 21. These protests led to one recorded injury to a law enforcement officer—a CBP officer whose wrist was struck by a thrown object. Id. ¶¶ 7–22. LAPD made 29 arrests on June 7. Olmstead Supp. Decl. (dkt. 39-3) ¶ 14.

**B. Deployment of the National Guard**

On June 7, President Trump issued a memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security in which he called the National Guard into federal service. June 7 Presidential Memo (Trial Ex. 17). President Trump's memorandum cited 10 U.S.C. § 12406 as his legal authority for federalizing the National Guard and stated as a factual basis that:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.

Id. at 1. President Trump did not invoke the Insurrection Act, 10 U.S.C. §§ 251–255.

President Trump's memorandum called the National Guard into federal service "to

temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur." June 7 Presidential Memo at 1. President Trump also authorized the Secretary of Defense to "employ any other members of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property." Id. at 1–2. He purported to authorize the military to "perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property." Id. at 2. The memorandum never specifically mentioned Los Angeles or California; to the contrary, it instructed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard." Id. at 1.

The same night, Secretary Hegseth issued a memorandum in which he implemented President Trump's direction. June 7 DOD Memo (Trial Ex. 18). Secretary Hegseth called 2,000 members of the California National Guard into federal service and instructed that they be placed under the command and control of U.S. Northern Command. Id. Two days later, Secretary Hegseth issued another memorandum in which he federalized an additional 2,000 California National Guard members, June 9 DOD Memo (Trial Ex. 3), and posted on social media that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "defend federal law enforcement officers," Eck Decl. (dkt. 8-3) ¶ 18. The 4,000 federalized National Guard troops, as well as the approximately 700 U.S. Marines, were placed under the control of Task Force 51, U.S. Army North's deployable contingency command post. Trial Tr. Vol. I at 15:12–16:4.

On June 7, a briefing took place at U.S. Army North with the Army North commanding general, chief of staff, operations officer, and deputy chief of staff William Harrington present. Id. at 18:17–19, 20:17–21:2. Mr. Harrington has over two years of experience in his role at Task Force 51, id. at 17:9–11, and he previously worked for two



United States District Court
Northern District of California

years as an instructor for U.S. Northern Command teaching a course titled "Defense Support to Civil Authorities," which included material on the Posse Comitatus Act, id. at 17:18–18:16. At the June 7 briefing, Mr. Harrington stated—based on his experience and training within the Department of Defense—that "if any National Guard troops were federalized as part of the deployment, they would lose the ability to conduct law enforcement activities because of the Posse Comitatus Act." Id. at 21:15–22:13. Everyone at the briefing agreed with Mr. Harrington's assessment, id. at 22:19–23, and the commanding general assured him that "federalized National Guard troops involved in the mission would not be performing law enforcement functions," id. at 22:14–18, 23:23–24:2. To Mr. Harrington's knowledge, everyone in U.S. Northern Command knew that the Posse Comitatus Act applied, and no one expressed a contrary view. Id. at 24:3–15.

### C. Task Force 51's Training

Task Force 51 troops—both the federalized National Guard troops and the U.S. Marines deployed to Los Angeles—received training on the permitted scope of their activities under the Posse Comitatus Act. Id. at 24:17–20, 60:6–8 ("[T]he standing rules on the use of force brief that was given by our legal personnel [] was given to every soldier and Marine that went on the mission."); Task Force 51 Training Slides (Trial Ex. 10). The training materials for Task Force 51 provided that "active-duty military personnel may not provide 'direct, active assistance to civilian law enforcement authorities by performing law enforcement functions,' unless a Constitutional or an Act of Congress exception specifically permits it." Task Force 51 Training Slides at 5 (emphasis in original).

Major General Scott Sherman, the deputy commanding general support for U.S. Army North and commander of Task Force 51, oversaw the training of Task Force 51. Trial Tr. Vol. I at 50:14–17, 51:11–14. He testified that his number two priority (after troops' welfare and safety) was "to ensure that they followed the standing rules on the use of force exactly as was written." Id. at 120:2–6. Accordingly, he ensured that Task Force 51 troops knew that "they weren't allowed to do any law enforcement actions. Law enforcement had to do it themselves." Id. at 120:19–21. Among other instructions, Task

Force 51 troops were told that they could not impede vehicle or pedestrian traffic or block public roads, because these are law enforcement functions. Id. at 27:16–28:1.

But Major General Sherman's instructions were not absolute. For instance, the Task Force 51 training materials specified the law enforcement functions prohibited by the Posse Comitatus Act:




Task Force 51 Training Slides at 6. Although the training materials list twelve prohibited functions, Task Force 51 troops were orally instructed that the four functions listed in red—security patrols, traffic control, crowd control, and riot control—were subject to a so-called constitutional exception to the Posse Comitatus Act. Id.; Trial Tr. Vol. II (dkt. 163) at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25. This instruction came "all the way from the top of [the Department of Defense] down to Task Force 51."[1] Trial Tr.

[1] Defendants objected to this testimony as privileged. Trial Tr. Vol. II at 280:12–13. By introducing evidence regarding legal advice given by Department of Defense lawyers,



United States District Court
Northern District of California

Vol. II at 283:1–3. The Department of Defense instructed U.S. Northern Command and Task Force 51 that the President and Secretary's June 7 memoranda created a constitutional exception to the Posse Comitatus Act and thereby authorized Task Force 51 to engage in the four functions listed in red. Id. at 235:17–236:14; 237:8–17.

This instruction was initially not put in writing. Id. at 283:7–11. Eventually, Secretary Hegseth issued a memorandum that explained the scope of the alleged constitutional exception to the Posse Comitatus Act. June 23 DOD Memo (Trial Ex. 2); Trial Tr. Vol. II at 275:5–276:5; see also Task Force 51 Training Slides at 7 (highlighting an exception for "Protection of Federal property, functions, and personnel"). Secretary Hegseth's memorandum, issued to U.S. Northern Command, directed Task Force 51 to:

> - Deploy to Federal Government properties, including Federal buildings and monuments. When deployed to Federal Government properties, Service members will support Federal law enforcement and may take reasonable measures to prevent the destruction or defacement of Federal Government property including crowd control, temporary detention, cursory search (such as safety-related searches for weapons incident to temporary detention), measures to ensure the safety of persons on the property, and the establishment of security perimeters reasonably necessary to protect the property.
> - Deploy to support Federal law enforcement to protect Federal functions and to protect Federal personnel from harm or threat of bodily injury, including Federal law enforcement officers and other Federal Government officials and employees. This may include measures for temporary detention, cursory search, and the steps necessary to ensure the safety of Federal personnel. For example, while other Federal personnel execute their duties, [Department of Defense] Service members may provide perimeter protection against third parties and such crowd control measures as are reasonably necessary to ensure the execution of Federal functions and the safety of Federal personnel.

June 23 DOD Memo. This memorandum—in particular, the second bullet point—asserts that wherever federal personnel go, Task Force 51 troops can accompany them and establish perimeter control, engage in crowd control, and otherwise perform any functions "necessary to ensure the execution of Federal functions and the safety of Federal personnel." Id.

---

however, Defendants waived any assertion of privilege. E.g., id. at 244:19–245:12; see Weil v. Inv./Indicators, Rsch. & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981).



United States District Court
Northern District of California

Defendants took the position at trial that there did not even need to be an actual threat to federal property, personnel, or functions to deploy Task Force 51. Trial Tr. Vol. I at 122:20–23. In fact, Defendants contend that the potential for unexpected threats to develop would be sufficient to deploy Task Force 51, even where the military's own assessment is that an operation is low- or no-risk. Id. at 124:1–22. Defendants go still further, proposing that even where there is no threat to the safety or security of federal personnel or property, the mere possibility that federal law enforcement agents might not be able to do their job could justify deployment of Task Force 51 as "a preventative measure." Id. at 122:23–25.

Task Force 51 troops were trained to report violations of the Standing Rules for Use of Force, including violations of the Posse Comitatus Act. Trial Tr. Vol. II at 242:8–23; Task Force 51 Training Slides at 42, 44. There are no known reports by Task Force 51 troops of violations of the Standing Rules for Use of Force. Trial Tr. Vol. II at 242:24–243:7. That said, in spite of troops' training to report violations, Task Force 51 troops were openly instructed that they could, consistent with the Posse Comitatus Act, engage in some law enforcement actions as long as they were doing so to protect federal property, personnel, or functions. Task Force 51 Training Slides at 7; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.

**D. Task Force 51's Operations**

The first federalized Task Force 51 troops deployed to Los Angeles on June 8. In these early days of their deployment, "it was not clear what role they were to play." Espíritu Decl. Ex. R. Task Force 51 troops were initially stationed at the Roybal Complex—specifically at the Metropolitan Detention Center—while protests against ICE activity continued in downtown Los Angeles. Olmstead Decl. ¶ 12.

On June 10, several days after the first Task Force 51 troops arrived in Los Angeles, a representative of U.S. Army North sent an email "coach[ing]" federal law enforcement agencies as to what language to use when submitting requests for assistance (which are how federal agencies requested support from Task Force 51 troops). RFA Email Thread

(Trial Ex. 39); Trial Tr. Vol. I at 155:5–8. Specifically, law enforcement agencies were instructed to "[s]ubstitute 'protection' for 'security'" and "detect, monitor, and report" for "surveillance." RFA Email Thread. "If the requested activity cannot be converted to a 'protection' term," the email stated, "then we cannot perform it." Id. The Department of Defense did not explain what "protection" meant, nor did it clarify for federal agencies which functions troops could lawfully perform. Trial Tr. Vol. I at 154:13–23. Pursuant to the email instructions, though, federal law enforcement agencies' requests for assistance included requests for "protection" of federal property and for "force protection" of federal law enforcement agents who were conducting search warrant operations. Id. at 31:14–25.

While on the ground in and around Los Angeles, Task Force 51 troops wore military uniforms, which were green or multicamouflage. Id. at 88:15–18, 175:13–15. At least some ICE agents wore camouflage uniforms too. Id. at 174:22–175:11. It is difficult, even for someone familiar with military uniforms and insignia, to differentiate between the uniforms from a distance or where there is a lot of commotion.[2] Id. at 175:16–176:7. Indeed, Major General Sherman and Ernesto Santacruz—the Los Angeles field office director for ICE's Enforcement and Removal Operations and a veteran himself—were both unable to determine whether multiple individuals in photographs of ICE enforcement actions were Task Force 51 troops or federal law enforcement personnel. See id. at 72:3–6, 176:20–177:7, 177:15–178:6. Task Force 51 troops were also armed, carrying weapons with live ammunition. Id. at 32:5–8.

Task Force 51 responded to 64 requests for assistance in and outside of Los Angeles County. Id. at 31:3–13. These requests for assistance came from various federal law enforcement agencies, many (but not all) within the Department of Homeland Security. Id.

---

[2] Department of Defense regulations require federal troops to have their name displayed on their uniform. Army Reg. 670-1 § 2-7, Dep't of the Army Pamphlet 670-1 § 21-25. Yet some Task Force 51 troops wore body armor that obscured their names. Trial Tr. Vol. I at 89:12–20. Federal law enforcement personnel in Los Angeles did not display their names on their uniforms. Id. at 90:4–25. In fact, many wore plain clothes instead of a uniform that would identify them as law enforcement at all. Id. at 98:22–25, 174:15–21.



United States District Court
Northern District of California

United States District Court
Northern District of California

**1. Operations in Los Angeles County**

Task Force 51 troops accompanied ICE officers on approximately 75% of their enforcement and removal operations in and around Los Angeles through mid-July. Id. at 166:8–19; see also, e.g., ICE Twitter Posts (Trial Exs. 53, 54) (photographs of Task Force 51 troops standing next to ICE agents while the agents detained individuals). The presence of Task Force 51 deterred engagement by the public, especially by those who might have attempted to hinder or protest an arrest by ICE agents. Trial Tr. Vol. I at 170:24–171:17.

The Marines who were part of Task Force 51 were tasked only with protecting federal property in Los Angeles. Trial Tr. Vol. II at 214:25–215:7. One such facility was the Wilshire Federal Building, which houses the Veterans Affairs office. Trial Tr. Vol. I at 64:6–10. On June 12, a Marine briefly detained a veteran who twice attempted to enter the building but who did not stop when asked, provide identification, or state his business. Id. at 64:11–13, 65:10–18. The Marine restrained the veteran's hands in flex cuffs and detained him for approximately 25 minutes, after which point federal law enforcement arrived and took custody of him. Id. at 68:13–20. The Marine did not question the veteran or otherwise engage with him. Id. at 68:21–69:4.

Not all of Task Force 51's deployments in Los Angeles were related to ICE or other DHS agencies. For example, on the morning of June 13, Task Force 51 troops accompanied DEA and FBI officers on a joint DEA–FBI operation at a private residence in Long Beach. June 13 Mission Debrief (Trial Ex. 38). Task Force 51 troops and military vehicles, in conjunction with DEA SWAT teams, cordoned off Long Beach Boulevard in two directions from the residence while DEA and FBI agents approached the residence to look for an individual who had thrown rocks during one of the June 7 protests. Id. ("National Guard soldiers established their blocking positions at approximately 0600."); see also Trial Tr. Vol. I at 119:9–13 ("[I]t was law enforcement in the lead, with our soldiers behind them."). The record is unclear as to whether Task Force 51's blockades prevented any civilians from using Long Beach Boulevard, a public road, while the operation was ongoing. Trial Tr. Vol I at 77:14–17.

Nor was Task Force 51 deployed only in support of federal enforcement actions. On July 7, approximately 80 Task Force 51 troops participated in a DHS operation, titled Operation Excalibur,[3] at MacArthur Park in Los Angeles. Id. at 35:3–24, 99:21–24; Operation Excalibur Slides (Trial Ex. 28). This was DHS's third attempt at the operation, and Secretary Hegseth himself approved it.[4] Trial Tr. Vol. I at 35:8–14, 103:19–24; Trial Tr. Vol. II at 261:24–262:3. Operation Excalibur involved federal law enforcement officials marching across MacArthur Park while Task Force 51 remained stationed on the outside of the park in military vehicles—Humvees and tactical vehicles—including at two traffic control points to prevent vehicular traffic along a stretch of Wilshire Boulevard. Operation Excalibur Slides at 5; Trial Tr. Vol. I at 35:25–36:1. DHS's mission in executing Operation Excalibur was "to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles Joint Operations Area." Operation Excalibur Slides at 4. And the operation's purpose was to "enable and protect the execution of joint federal law enforcement missions in a high-visibility urban environment, while preserving public safety and demonstrating federal reach and presence." Id.

Operation Excalibur was rated high-risk for DHS agents due to (among other things) likely crowds and concerns about an international gang presence. Id. at 21. So Task Force 51 conducted "numerous rehearsals," which were "very large" and involved "all of the key leaders of the operation." Trial Tr. Vol. II at 265:9–17. Despite the risks

---

[3] Excalibur is, of course, a reference to the legendary sword of King Arthur, which symbolizes his divine sovereignty as king.

[4] Initially, Operation Excalibur was planned to take place on Father's Day and to have Task Force 51 military vehicles stationed on the section of Wilshire Boulevard that runs through MacArthur Park. Trial Tr. Vol. I at 99:25–100:7. Major General Sherman objected to that request for assistance, expressing concern that (1) there would be a large number of people in the park for Father's Day, (2) Wilshire Boulevard was in the middle of the Park (the operation's law enforcement area), and (3) the initial proposal to use helicopters would attract large crowds in opposition to the operation. Id. at 100:8–10; Trial Tr. Vol. II at 263:22–264:15. Chief Bovino of the Department of Homeland Security criticized Major General Sherman for his opposition to the initial plan, questioning Sherman's loyalty to the country. Trial Tr. Vol. I at 103:5–8. This is relevant because Chief Bovino's accusations of disloyalty go to the state of mind of decisionmakers who are tasked with ensuring that the Posse Comitatus Act is followed.

United States District Court
Northern District of California

associated with Operation Excalibur and the numerous rehearsals, DHS planned to give LAPD only two hours' notice of the operation. Operation Excalibur Slides at 4. Further, the risk of inaction—that is, the risk of not performing the operation at all—was low due to the lack of any high-value targets or threats to federal functions at MacArthur Park. Id. at 21. The only identified risk to inaction was the hypothetical concern that "it could weaken the public's perception of federal responsiveness and reduce deterrence in other areas if the federal presence seems limited or absent." Id. Ultimately, federal law enforcement faced no resistance at MacArthur Park, and Task Force 51 did not need to provide any force protection. Trial Tr. Vol. I at 39:18–25.

**2. Operations Outside Los Angeles County**

Task Force 51's assistance to federal law enforcement operations in southern California expanded beyond Los Angeles. The evidence at trial showed that federal troops were deployed three times in support of federal law enforcement operations targeting marijuana farms: once in Mecca (Riverside County), once in Carpinteria (Santa Barbara County), and once in Camarillo (Ventura County).

**Mecca.** On June 18, over 300 Task Force 51 troops were deployed to support a DEA operation with only about 200 federal law enforcement agents at a marijuana farm in Mecca, California—over 140 miles from downtown Los Angeles. Trial Tr. Vol. I at 32:9–33:4, 80:19–23. There was no specific threat or risk of riot in Mecca. Id. at 80:13–18.

The troops were stationed several hundred yards outside the farm itself, where they established a security perimeter with riot shields and military vehicles. Id. at 44:22–45:10; DVIDS Mecca Photos (Trial Exs. 69–73). The underlying DEA operation "target[ed] illegal narcotics activity," and the operation "resulted in the seizure of narcotics, approximately 87 suspected human trafficking victims, and disruption of illegal marijuana cultivation tied to organized criminal activity." Mecca Storyboard (Trial Ex. 41).

**Carpinteria.** On July 10, between 100 and 120 Task Force 51 troops were deployed to a cannabis farm in Carpinteria, California—over 80 miles from downtown Los Angeles. Trial Tr. Vol. I at 83:22–84:1, 84:21–23. There was no specific threat or risk of

riot in Carpinteria, and DHS notified California Highway Patrol and the Santa Barbara County Sheriff's Office only at the time of the operation. Carpinteria Slides (Trial Ex. 31) at 2, 3, 11. Homeland Security Investigations requested Task Force 51 to help set traffic control points because without the troops, federal law enforcement agencies would have had to station more personnel at traffic control points, which would have slowed down the operation. Trial Tr. Vol. I at 84:7–20. The risk of inaction was low "given the volume of [HSI] personnel on scene." Carpinteria Slides at 11.

Task Force 51 troops and federal law enforcement officers together blocked traffic on Casitas Pass Road on the outskirts of Carpinteria. DVIDS Carpinteria Photos (Trial Exs. 75–76); Solorzano Photo (Trial Ex. 79); Solorzano Video (Trial Ex. 80); Trial Tr. Vol. I at 86:19–24. In a photo taken by Carpinteria's vice mayor, Monica Solorzano, troops stand several feet behind a federal law enforcement officer (whose clothing does not indicate which agency he is affiliated with). See Solorzano Photo. In a photo published by the Department of Defense, a Task Force 51 member is standing on a military vehicle on Casitas Pass Road. See DVIDS Carpinteria Photo (Trial Ex. 75). And as shown in a video taken by Ms. Solorzano, Task Force 51 troops physically turned away a woman with a megaphone as she approached the traffic blockade. See Solorzano Video.

**Camarillo.** Also on July 10, approximately 80 Task Force 51 troops were deployed to a cannabis farm in Camarillo, California—approximately 50 miles from downtown Los Angeles. Trial Tr. Vol. I at 34:18–21. Though there was initially a request for assistance from Task Force 51 in Camarillo, the lead agency canceled the request two days before the operation. Id. at 34:4–11, 45:24–46:3, 129:22–130:1.

Once federal law enforcement began the operation in Camarillo, however, they determined that they needed assistance from Task Force 51 to respond to crowds that had gathered on the roads near the facility and that were throwing rocks and damaging federal vehicles, including with a makeshift spike strip. Id. at 46:4–16; 130:2–17; 194:15–25. Federal law enforcement agents were also overwhelmed by the number of undocumented

United States District Court
Northern District of California

immigrants at the cannabis farm.[5] Id. at 130:6–8. Task Force 51 troops were deployed and assisted with forming a perimeter to prevent individuals and vehicles from traveling on roads near the law enforcement operation. Id. at 99:9–13; 178:7–11; Flores-Haro Photos (Trial Exs. 82–94); Flores-Haro Videos (Trial Exs. 95–96).

### E. The Future of the National Guard in California

As of August 11, 300 federalized California National Guard members remain part of Task Force 51. Trial Tr. Vol. I 107:8–11. Those 300 troops are responding to four requests for assistance: two requests for protection of federal property and two requests for protection of federal personnel and functions. Id. at 107:18–108:6. Secretary Hegseth extended the deployment of these troops in Los Angeles by 90 days. Aug. 5 Activation Order (Trial Ex. 97).

Los Angeles was the first U.S. city where President Trump and Secretary Hegseth deployed troops, but not the last. Following criticisms by President Trump of the crime rate in Washington, D.C., Secretary Hegseth announced that National Guard troops would be deployed there to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles. August 11 Hegseth Video (Trial Ex. 114).[6] President Trump has since raised similar criticisms about Oakland, Baltimore, Chicago, and San Francisco, insinuating that he intends to send the National Guard or military to those cities. August 11 Trump Video (Trial Ex. 115); S. DiNatale, Trump Adds San Francisco to List of Cities Where He Wants to Send Troops, S.F. Chronicle (Aug. 22, 2025), https://perma.cc/6Z8A-R2QH ("'Look at what the Democrats have done to San Francisco,' Trump told reporters. 'They've destroyed it. We could clean that up, too. We'll clean that one up, too.'").

[5] In fact, a farmworker, Jaime Alanís, died after falling off the roof of a greenhouse during the operation. O. Rodriguez, California Farmworker Who Fell from Greenhouse Roof During Chaotic ICE Raid Dies, AP News (July 13, 2025), https://perma.cc/GV83-L8Y2.

[6] Defendants objected to the relevance of Secretary Hegseth's August 11 statements. These statements go directly to the propriety of injunctive relief.



United States District Court
Northern District of California

## III. CONCLUSIONS OF LAW

The Court begins with a discussion of the historical context in which the Posse Comitatus Act was passed. Then, the Court addresses two of Defendants' threshold arguments—their challenge to Plaintiffs' standing and their contention that the Posse Comitatus Act does not apply to National Guard troops federalized under 10 U.S.C. § 12406(3)—before evaluating whether Defendants violated the Posse Comitatus Act. Finally, the Court considers the propriety of injunctive, ultra vires relief. Before turning to the history and the parties' arguments, though, some observations are in order.

First, "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Without question this principle applies to cases, like this one, where the Executive is accused of overstepping bounds set out by the Legislature. "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." Trump v. United States, 603 U.S. 593, 608 (2024) (citation omitted). Especially where the foundation of our constitutional system is at issue, "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 194 (2012) (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821)); cf. Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (discussing "[t]he allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department' can effectively be resisted" (quoting The Federalist, No. 51 (J. Madison))).

Second, though courts have not yet squarely faced the issue of a President using the military domestically in violation of federal law, the Supreme Court has clarified that the courts are not powerless to stop such executive overreach. After the assassination of Dr. Martin Luther King, Jr., President Johnson ordered federal troops to assist local authorities with domestic surveillance pursuant to the Insurrection Act. Laird v. Tatum, 408 U.S. 1, 3–5 (1972). A group of citizens concerned about this surveillance brought a class action

seeking declaratory and injunctive relief. Id. at 2. The Court found that the plaintiffs had not alleged injury in fact and therefore lacked standing, rejecting the plaintiffs' argument under the First Amendment that the government's surveillance chilled their speech. See id. at 12–15. Though the Court could have ended there, it did not; it went on to explain:

> The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint—reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Id. at 15–16 (emphasis added). The Supreme Court thus emphatically rejected the notion that the federal courts lack authority to respond to the President's unlawful domestic use of the military.

### A. History of the Posse Comitatus Act

In 1878, Congress passed the Posse Comitatus Act, which as amended states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

10 U.S.C. § 1385. To fully grasp the Posse Comitatus Act and its role in our constitutional system of government requires a historical perspective.

#### 1. Founding Era

The presence and role of British troops in the colonies gave rise to some of the first American criticisms of the domestic use of military troops in peacetime. For instance,

British troops were stationed in Boston "as a force of uniformed peace-keepers, or policemen." J. Elsea, Cong. Rsch. Serv., RL 42659, The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law 4 n.17 (2018) (citing H. Zobel, The Boston Massacre 135 (1987)). "Public resentment of the use of the troops in such a manner sparked the [Boston Massacre], which led in turn to further heightened resentment." Id. at 4. Indeed, resentment of Britain's use of military troops as a police force was manifested in the Declaration of Independence, where one of the American colonists' grievances was that the King had "affected to render the Military independent of and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776).[7]

Concerns about the domestic role of the military persisted into the drafting and ratification of the Constitution, where they came into tension with pragmatic realities surrounding the founding of a new Nation. On the one hand, many of the Founders recognized the dangers imposed by a centralized military force, and some advocated for significant (if not total) reliance on militias rather than federal troops. M. Bahar, The Presidential Intervention Principle: The Domestic Use of the Military and the Power of the Several States, 5 Harv. Nat'l Sec. J. 537, 545–46 (2014); 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 401 (1836) (quoting Edmund Randolph at the Virginia ratification convention: "With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution."). On the other hand, some Founders recognized that a standing army would be necessary to the security of the young United States. See Bahar, The Presidential Intervention Principle, supra, at 546; see also, e.g., The Federalist No. 24 (A. Hamilton) (arguing in favor of a standing army as a security force against Britain, Spain, and indigenous nations); The Federalist No. 41 (J. Madison) ("A standing force, therefore, is a dangerous, at the same time that it may be a necessary, provision.").

[7] Other grievances related to Britain's use of troops in the colonies were that the King had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures" and "Quarter[ed] large bodies of armed troops among us." Id. paras. 13, 16.

The structure of the Constitution reflects these debates. The Constitution granted to the federal government significant authority over the military, but it split that authority between the Executive and the Legislature. The Constitution provided that the President "shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1. But the Constitution gave to Congress—not the President—the bulk of the federal authority over the military, including the power to "declare War," id. art. I, § 8, cl. 11; to "raise and support Armies," id. art. I, § 8, cl. 12; to "provide for calling forth the Militia to execute the Laws of the Union, suppress insurrections and repel Invasions," id. art. I, § 8, cl. 15; and to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," id. art. I, § 8, cl. 16. Alexander Hamilton explained: "the whole power of raising armies was lodged in the LEGISLATURE, not in the EXECUTIVE," and "this legislature was to be a popular body, consisting of the representatives of the people periodically elected." The Federalist No. 24.

Focusing in on the Militia Clause's language permitting Congress to "provide for calling forth the Militia to execute the Laws of the Union"—language that evokes the principles at issue in the Posse Comitatus Act—reveals uncertainty in the Nation's early years regarding whether and how the federal military (including the federalized militia) could engage in federal law enforcement. To start, this language was a subject of some debate during the ratification process for the Constitution: Patrick Henry, for example, worried that Congress would regularly use this provision to enforce federal law. 3 Elliot, Debates, supra, at 387. George Nicholas, a member of the Virginia House of Delegates, responded that Congress's power to call forth the militia to execute the laws would be exercised only if "found absolutely necessary." Id. at 392. James Madison explained that the use of the militia for this purpose "would never be put in practice" where civil authorities were able to execute the laws on their own. Id. at 384. Hamilton, too, specifically rejected the idea that the Militia Clause would permit the militia to serve as a

posse comitatus to enforce domestic law unless necessary. In response to criticisms that the Constitution provided no authority for the federal government to call out a posse comitatus to enforce the laws, Hamilton explained that Congress's right "to pass all laws NECESSARY AND PROPER to execute its declared powers" would necessarily "include that of requiring the assistance of the citizens to the officers who may be intrusted with the execution of those laws." The Federalist No. 29 (A. Hamilton) (emphasis added). He went on to explain why that the militia could not serve as a posse comitatus: "It being therefore evident that the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of color, it will follow, that the conclusion which has been drawn from it, in its application to the federal government over the militia, is as uncandid as it is illogical." Id.

The Founders thus coalesced around a narrow interpretation of the Militia Clause—one which granted power to Congress, not the President.

**2. Reconstruction Era**

Almost exactly 100 years after the original thirteen states ratified the Constitution, Congress passed the Posse Comitatus Act. The historical context of Reconstruction is as important to interpreting the Act as the constitutional framework described above.

In the aftermath of the Civil War, federal troops remained stationed in southern states and continued to enforce federal law. Elsea, The Posse Comitatus Act and Related Matters, supra, at 21. This included federal voting law and the Reconstruction Amendments: in the 1876 presidential election, federal troops were stationed near polling places in Florida, South Carolina, and Louisiana to ensure that newly enfranchised former slaves could vote. S. Harman-Heath, The Quasi-Army Law Enforcement, Value Judgments & the Posse Comitatus Act, 11 Cal. L. Rev. Online 367, 375 (2020); U. Grant, Special Message to the House of Representatives (Jan. 23, 1877), in 7 J. Richardson, A Compilation of the Messages and Papers of the Presidents 1789-1907, at 421 (1897). When the election results came in with President Hayes (a Republican from Ohio) winning by a slim margin—and in dubious circumstances, following disputed wins in the three

states where federal troops were stationed—Southern Democrats promptly sought to remove federal troops from their states. A. Buttaro, The Posse Comitatus Act of 1878 and the End of Reconstruction, 47 St. Mary's L.J. 135, 161 (2015); Elsea, The Posse Comitatus Act and Related Matters, supra, at 21.

In May 1878, Representative William Kimmel of Maryland introduced the Posse Comitatus Act in the House of Representatives. 7 Cong. Rec. 3579 (1878). He began his support for the Act by stating:

> I have the deepest conviction that upon a proper adjustment of it depends the peace and, I fear, the liberties of the people. I confess that the more deeply I inquire into the steady growth of the standing Army and the uses to which it has been applied, the stronger my conviction becomes that the highest patriotism demands the wisest precautionary measures.

Id. Kimmel went on to discuss English, Roman, and early U.S. history, citing various Founders in support of his position. Id. at 3579–81, 3583–84. He then turned to the concern that deploying the military domestically to execute the laws would enlarge the power of the Executive:

> Governors, sheriffs, and other State and local officers, and United States district attorneys, assistant marshals, marshals, collectors of revenue, and other revenue officers, requested these generals, and these generals at the requests of these officers precipitated these troops upon the people. If this may be done in one district may it not be done in all the districts? If so, and the interest of a President demands, may he not use this power for his own purposes? May he not by this means subject every reluctant commander to the order of any political miscreant he may choose to make an assistant collector of revenue, until the whole Army is under his control, and then provoke the resistance he seeks for the employment of force and in the name of order substitute his will for law?

Id. at 3782. To be sure, Kimmel's high-minded principles were not Southern Democrats' only (or even their primary) motivation for passing the Posse Comitatus Act; the Act was in many ways a referendum on whether Black Americans would be able to vote in Southern states. Buttaro, The End of Reconstruction, supra, at 174–81 (describing debates in the House and Senate). But whatever political motivations lay behind Congress's vote on the Posse Comitatus Act, the fact remains that the Act was a response to systemic

United States District Court
Northern District of California

federal military involvement in domestic law enforcement.

**B. Standing**

With the background of the Posse Comitatus Act in mind, the Court now turns to the question of Plaintiffs' standing to sue. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 102 (1998). Article III of the Constitution requires that a plaintiff "have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). Moreover, an injury in fact must be "legally and judicially cognizable." United States v. Texas, 599 U.S. 670, 676 (2023) (citation omitted).

The parties focus on whether California (rather than Governor Newsom) has standing to pursue this action against Defendants. That is sufficient for Article III purposes. Id. (citing Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006)). Defendants challenge (1) whether an injury exists and (2) whether any such injury is cognizable. Supp. Opp. (dkt. 136) at 11–12. Plaintiffs identify three potential injuries: (1) an injury to California's role in the federal system, (2) a fiscal injury to the state economy, and (3) an injury to the health and well-being of California citizens. Supp. Reply (dkt. 140) at 4–7. The Court considers these three proposed injuries to determine whether they are cognizable, redressable injuries.

**1. Federal–State Relations**

States have "an interest in securing observance of the terms under which [they] participate[] in the federal system." Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 607–08 (1982). So states have standing "when they believe that the federal government has intruded upon areas traditionally within states' control." Kentucky v. Biden, 23 F.4th 585, 598 (6th Cir. 2022); see also Texas v. United States, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on [] federal assertions of authority to regulate matters they believe they control.'" (cleaned up) (citations omitted)).

In this case, Plaintiffs alleged that Defendants have violated the Posse Comitatus Act and, in so doing, infringed on California's police power. Supp. Reply at 6–7. The police power is the quintessential power that the Constitution reserves to the states. See United States v. Morrison, 529 U.S. 598, 618 (2000) (observing that the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation."). Because Defendants' alleged violations of the Posse Comitatus Act include allegations that Task Force 51 troops have engaged in law enforcement—a domain traditionally within the state's control—California has suffered an injury that gives it standing to challenge those violations.[8]

Next is the question whether California's injury is legally and judicially cognizable—that is, whether the "dispute is traditionally thought to be capable of resolution through the judicial process." Texas, 599 U.S. at 676 (citation omitted). Defendants argue that there is no historical example of a litigant "obtaining a prospective injunction requiring federal governmental compliance with a federal criminal statute, with a willfulness requirement, that the Executive Branch is charged with enforcing." Supp. Opp. at 11–12. To the extent that this is a question of standing, as opposed to a merits question about whether injunctive relief is appropriate or available here,[9] it specifically

[8] The Court earlier explained why Defendants' use of 10 U.S.C. § 12406 to federalize the California National Guard likely violated the Tenth Amendment. See TRO at 29–31. That analysis is different from the analysis here, which is whether—even if Defendants' federalization of the National Guard was lawful—Defendants separately injured California in an Article III sense by violating the Posse Comitatus Act. Thus, this analysis is not affected by the Ninth Circuit's review of Plaintiffs' standalone Tenth Amendment claim.

[9] Defendants get out over their skis in proposing that the Court parse the question more finely at the standing stage and ask now whether, in a one-of-a-kind scenario, a specific remedy can be had against a specific party. That issue is better addressed after a thorough analysis of Plaintiffs' claims when determining what remedy, if any, is appropriate. The Court will address Defendants' arguments about the propriety of injunctive relief at that point in its order. This approach is perfectly consistent with United States v. Texas, where the Court found that a wholly novel form of relief was fundamentally at odds with well-established doctrines of prosecutorial and enforcement discretion and was not redressable as a matter of law. 599 U.S. at 677.

United States District Court
Northern District of California

implicates redressability. See Texas, 599 U.S. at 676 (asking whether "the asserted injury is traditionally redressable in federal court" (emphasis added)). No one disputes that injunctive relief is available against the federal government and its agencies. See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326–27 (2015). And an injunction preventing Task Force 51 troops from engaging in law enforcement activities traditionally reserved to the states is likely to redress some of the harms discussed above. Thus, for purposes of establishing standing, Plaintiffs have suffered a cognizable injury.

**2. State Economy**

States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." Alfred L. Snapp & Son, 458 U.S. at 607; see also Biden, 600 U.S. at 490 (recognizing economic harm as an injury in fact). Plaintiffs assert that the State and its residents have suffered various forms of fiscal harm due to Defendants' alleged Posse Comitatus Acts violations.

As to the state's financial losses, Plaintiffs explain that the presence of the National Guard in Los Angeles has led to increased state law enforcement expenses. Supp. Reply at 5. The problem with this argument is that California's alleged fiscal injury is not traceable to a Posse Comitatus Act violation but to the National Guard's presence in Los Angeles in general. For instance, Plaintiffs state that their "largest expenditures" in response to federal officers' and troops' presence in Los Angeles came on June 9, 10, and 11, id., but their first specific example of a Posse Comitatus Act violation occurred on June 12, when Marines briefly detained a veteran at the Wilshire Federal Building. Because Plaintiffs do not connect their increased expenditures to any Posse Comitatus Act violations, their fiscal harms do not give them standing.

The same is true of the asserted economic harms to California residents. See Supp. Reply at 5–6. ICE and Task Force 51's activity in Los Angeles has certainly sent economic shockwaves through southern California. See, e.g., J. Cowan & M. Dwyer, Federal Agents March Through L.A. Park, Spurring Local Outrage, N.Y. Times (July 7, 2025), https://perma.cc/ZJQ8-B349; L. Sumagaysay & L. Hepler, From San Diego to the

United States District Court
Northern District of California

Bay Area, California Residents Are On Edge over Immigration Raids, CalMatters (Jun 19, 2025), https://perma.cc/KVV7-MWX4 (describing the impact across industries). But it is not apparent on this factual record which of these economic harms are traceable to alleged Posse Comitatus Act violations, or even the presence of Task Force 51 troops; it instead appears as though ICE operations generally have caused most of the economic impact to California residents. Once again, the alleged economic harm is not traceable to the conduct being complained of, so it is not sufficient for standing purposes.[10]

**3. Citizens' Health and Welfare**

As explained above, states have a quasi-sovereign interest in the physical and economic health and well-being of their residents. Alfred L. Snapp & Son, 458 U.S. at 607; accord Pennsylvania v. West Virginia, 262 U.S. 553, 591–92 (1923) (state can sue to ensure natural gas is available to residents). At the same time, a state cannot assert an action purely on behalf of its citizens. Alfred L. Snapp & Son, 458 U.S. at 607. The Supreme Court has declined to draw clear lines as to how large a population must be affected for a state's claim to be quasi-sovereign and not simply derivative of its citizens' claims, but it has instructed that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." Id.

Plaintiffs claim that Defendants' alleged violations of the Posse Comitatus Act have "escalat[ed] tensions within the city of Los Angeles" and "sow[n] chaos and fear daily throughout Southern California." Supp. Reply at 4–5. This purported injury is not merely

[10] The Court recognizes that the consolidation of Plaintiffs' motion for a preliminary injunction with a trial on the merits expedited the timeline such that both parties had a limited opportunity to engage in discovery, including into issues of standing. See Joint Resp. to Consol. (dkt. 115) at 2. It may be that, given time for more thorough discovery and fact development, Plaintiffs could identify harms that are traceable to alleged Posse Comitatus Act violations. Given the Court's determination that Plaintiffs have standing on other grounds, though, the Court concludes that Plaintiffs were not prejudiced by consolidation. See Glacier Park Found. v. Watt, 663 F.2d 882, 886 (9th Cir. 1981) (consolidation proper "so long as the procedures do not result in prejudice to either party").

derivative of California citizens' own potential claims; California as a state has an interest in ensuring that its citizens have a productive, rather than a fearful, relationship with law enforcement. To that end, California (like many states) has passed legislation regulating peace officers' use of force to achieve this end. See Cal. Gov't Code § 7286. That said, Plaintiffs' generalized references to "tensions," "chaos," and "fear" are intangible harms that are not concrete enough to establish Article III standing. See Spokeo, Inc. v. Robins, 578 U.S. 330, 340–41 (2016). The same goes for a few isolated references in the record to the deterrent effect of Task Force 51's presence in and around Los Angeles, as it is not clear who and what is being deterred.

Accordingly, the Court concludes that Plaintiffs have established standing for injuries to federal–state relations but not for their own economic injuries or for injuries to California residents' physical and economic health and welfare.

### C. 10 U.S.C. § 12406(3)

With Plaintiffs' standing secure, one more preliminary question remains before addressing whether Defendants have violated the Posse Comitatus Act. Recall that President Trump federalized the National Guard under 10 U.S.C. § 12406(3), which provides that the President can do so "[w]henever … the President is unable with the regular forces to execute the laws of the United States." See also Newsom, 141 F.4th at 1052 (concluding that the President likely acted properly under § 12406(3)). Defendants argue that § 12406(3) is an exception the Posse Comitatus Act, so the Act does not even apply to the federalized National Guard. Supp. Opp. at 12–15; see also 10 U.S.C. § 1385 (providing an exception for "cases and [] circumstances expressly authorized by the Constitution or Act of Congress"). The Court now addresses that contention.

To start, the Court is unaware of any person—government lawyer, military or civilian official, court, or commentator—who has made this argument other than Defendants' lawyers in this case. The Department of Defense has not taken this position in its publications on the Posse Comitatus Act. See Dep't of Def. Instruction No. 3025.21, encl. 3 ¶ 1.b(5) (Feb. 27, 2023) (listing statutory exceptions to the Posse Comitatus Act);

Ctr. for L. & Mil. Opers., Domestic Operational Law: 2024 Handbook for Legal Personnel 96–97 (2024) (same), available at https://perma.cc/E7BC-JKUZ. Mr. Harrington and Major General Sherman, both of whom have extensive experience and training in contexts that involve domestic military operations, explained that they understood the Posse Comitatus Act to apply to National Guard troops federalized under 10 U.S.C. § 12406. Trial Tr. at 21:15–22:13, 52:25–53:4. As Mr. Harrington put it, "everyone knew that the Posse Comitatus Act applied." Id. at 24:8–9. Defendants, however, advocate for this novel reading of § 12406(3) and Posse Comitatus Act that would represent a marked shift in the balance of power between the Executive and the Legislature.

The impact of Defendants' argument is largely due to the Ninth Circuit's reading of § 12406(3) in its order staying this Court's temporary restraining order pending appeal. In that order, the Ninth Circuit held that courts can review the President's invocation of § 12406 only to determine (1) if it has a colorable basis and (2) if it is made in good faith. Newsom, 141 F.4th at 1050–51.[11] The Ninth Circuit did not clarify these standards further. For example, it did not explain how a plaintiff could challenge—or how a district court could evaluate, especially on an expedited basis in proceedings for preliminary injunctive relief—a presidential invocation of § 12406 for lack of a colorable basis or good faith. Nor does the Ninth Circuit suggest that courts are well positioned to evaluate whether the President acted in good faith, rather than as pretext for federalizing the

[11] This standard purportedly comes from the Supreme Court's decision in Sterling v. Constantin. Id. (citing 287 U.S. 378, 399–400 (1932)). In Sterling, the Court determined that the governor of Texas had acted lawfully when he restricted oil production across the state. 287 U.S. at 387. Though the Court found that the governor had acted in good faith, it did not set forth any actual test for evaluating executive discretion. Id. at 399–400. Rather, it relied on earlier cases holding that the Executive has inherent discretion by virtue of his role as Commander-in-Chief and his obligation to "take care that the laws be faithfully executed." Id. (citing Martin v. Mott, 25 U.S. (12 Wheat.) 19, 29–32 (1827), and Luther v. Borden, 48 U.S. (7 How.) 1, 44–45 (1849)). Neither of those cases instructed courts to evaluate whether the Executive had a colorable basis for his actions or whether he acted in good faith. Martin, 25 U.S. at 31; Luther, 48 U.S. at 43–44. Furthermore, as explained below, Martin, Luther, and Sterling's reliance on the Commander-in-Chief and Take Care Clauses conflicts with the Supreme Court's more recent interpretation of those Clauses in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

National Guard.[12] The Ninth Circuit also suggested that the President can invoke § 12406(3) if his ability to execute federal law has been "significantly impeded," rather than the stricter statutory requirement that he be "unable with the regular forces to execute the laws." Id. at 1052. Thus, under the Ninth Circuit's test, the President could federalize the National Guard in any number of cases:

- The President, relying upon IRS data showing that a sizeable percentage of corporations and individuals are using tax shelters to avoid paying taxes, could claim that he is unable to execute the tax laws.[13]
- The President, relying upon EPA studies showing that pollution in a river cannot definitively be traced back to a specific manufacturing plant, could claim that he is unable to execute the Clean Water Act.
- The President, relying upon health data showing the number of individuals who present to hospitals with narcotic-related symptoms, could claim that he is unable to execute the federal drug laws.
- The President, relying upon anecdotes from state election officials that voting machines are glitching, or that fraud exists, could claim that he is unable to execute the election laws.

In each instance above, the President would have asserted a colorable, good-faith claim. Under the Ninth Circuit's test, that is all he would need in order to call the National Guard into federal service—and then, under Defendants' urged interpretation of § 12406(3), use those troops to execute domestic law. Though Defendants initially did not disclose the implications of reading § 12406(3) as a grant of significant presidential discretion (those

---

[12] For instance, the Ninth Circuit's test would likely enable a President to use federal law enforcement agents to stoke tensions and then use any resistance as justification to call forth the National Guard. As long as the President actually believed that the resistance significantly impeded his ability to execute federal law, it is hard to see how a court could find that he acted in bad faith, especially under the Ninth Circuit's deferential standard of review. See Good Faith, Black's Law Dictionary (12th ed. 2024).

[13] Incidentally, when Congress debated the Militia Act of 1792—a distant predecessor to § 12406—Representative Abraham Clark posited in opposition that the law would make it "so that if an old woman was to strike an excise officer with her broomstick, forsooth the military is to be called out to suppress an insurrection." 3 Annal of Cong. at 575 (1792).

implications being Defendants' current position that § 12406(3) is an exception to the Posse Comitatus Act), they have now fully fleshed out their views. In doing so, they make plain the consequences of the Ninth Circuit's highly deferential reading of the statute.

It is unclear from Defendants' briefs and oral argument whether they believe that § 12406(3) allows federalized National Guard troops to execute any laws or just those that the President found he could not enforce under § 12406(3). The former interpretation is certainly extreme: Could the President, for instance, assert that he is unable to enforce obscure tax or drug laws and then use the federalized National Guard to execute the election laws? But the latter interpretation is equally flawed. Consider the context in which Congress passed the Posse Comitatus Act. There is little question that, without the support of federal troops in southern states, the voting laws that enfranchised newly freed Black men would not be enforced. Buttaro, A History of the Posse Comitatus Act, supra, at 178 (citing W.E.B. Du Bois, Black Reconstruction in America 391 (1935)). So, in Defendants' view, the federal government would have been authorized to invoke the predecessor statute to § 12406 and circumvent the Posse Comitatus Act. This reading would have rendered the Posse Comitatus Act effectively useless at the time it was passed. Courts should avoid statutory interpretation that leads to such absurd results. Abramski v. United States, 573 U.S. 169, 181–82 (2014) (rejecting interpretation that would render the statute "utterly ineffectual"); see also United States v. Castleman, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in the judgment) ("Congress presumably does not enact useless laws."); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) ("The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered."). Relatedly, Congress does not "hide elephants [e.g., a sweeping grant of authority to use the military for domestic law enforcement] in mouseholes [e.g., one subsection of a procedural statute]." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). The Court will not take Defendants' invitation to create a brand-new exception to the Posse Comitatus Act that nullifies the Act itself.

Moreover, a close look at the recognized statutory exceptions to the Posse Comitatus Act counsels against, rather than in favor of, Defendants' position. Many of these statutes apply only in very specific circumstances. See, e.g., 16 U.S.C. § 23 (authorizing the Secretary of the Army to use troops to prevent trespassers or intruders in national parks); 25 U.S.C. § 180 (authorizing the President to use military force to remove persons unlawfully present on "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe"); 42 U.S.C. § 97 (authorizing the Secretary of Health and Human Services to use military officers to enforce quarantines). These exceptions are narrow; unlike Defendants' proposed exception, they do not undermine the whole act.

Nor does the Insurrection Act, 10 U.S.C. §§ 251–255,[14] support Defendants' position here. To be sure, the Insurrection Act is a recognized exception to the Posse Comitatus Act. Dep't of Def. Instruction No. 3025.21, encl. 3 ¶ 1.b(4). Yet the Insurrection Act, which provides three avenues for the President to deploy the National Guard (or other branches of the military), imposes meaningful guardrails on the President's authority. The President can invoke the Insurrection Act only if (1) the state legislature or governor so requests it, 10 U.S.C. § 251; (2) he determines that "unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings," id. § 252 (emphasis added); (3) he determines that "any insurrection, domestic violence, unlawful combination, or conspiracy … so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law" and that "the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection" to the State's citizens, id. § 253.

Under the Insurrection Act, then, the President's authority is restricted in some

[14] The Insurrection Act was, until recently, codified at 10 U.S.C. §§ 331–335.

way—either by a request by a state legislature or governor, by findings of the courts,[15] or by the inability or unwillingness of local officials to act. In other words, the Insurrection Act sets a default presumption that state and local officers will be able and willing to protect a right, privilege, or immunity secured to the people. But President Trump did not rely on the Insurrection Act when he federalized the California National Guard. See June 7 Presidential Memo. Defendants again disclaimed reliance on the Insurrection Act at trial. Trial Tr. Vol. III (dkt. 164) at 369:15–16. This is, perhaps, a tacit admission that President Trump would be unable to make the showing, required under the Insurrection Act, to rebut the presumption that state and local officials in Los Angeles were unable or unwilling to act. (Of course, neither the California Legislature nor Governor Newsom requested troops, and there is no court order to enforce here, so those provisions of the Insurrection Act do not apply.)

The Ninth Circuit's interpretation of § 12406(3) provides no similar limiting principle. While a straightforward reading of § 12406(3), which references "the regular forces," might suggest that it would apply only if civilian officials are unable or unwilling to execute federal law,[16] the Ninth Circuit indicated that it would not adopt such a view. Newsom, 141 F.4th at 1051–52. The Ninth Circuit's expansive view of presidential discretion to invoke § 12406(3) affects the viability of Defendants' argument that the statute operates as an exception to the Posse Comitatus Act. Their argument, when

[15] The earliest predecessor statute to 10 U.S.C. § 252 required that, before the President could invoke his statutory authority to call forth the militia, a court must make a finding that federal law could not be enforced by the ordinary course of judicial proceedings. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264. Though Congress later removed the requirement that courts make an ex ante finding, it is still clear that Congress understands this to be an area where the courts can exercise oversight as to the Executive's discretion. Cf. Exec. Order No. 10,730, Fed. Reg. 7628 (Sept. 24, 1957) (executive order by President Eisenhower invoking the Insurrection Act to authorize the Army to enforce federal court orders requiring the desegregation of the Little Rock School District).

[16] Such a reading of § 12406(3) would be most consistent with the Supreme Court's federalism jurisprudence, which counsels against "obliterat[ing] the distinction between what is national and what is local and creat[ing] a completely centralized government." United States v. Lopez, 514 U.S. 549, 557 (1995) (citation omitted). It would also respect the submissions of local law enforcement agencies that they were capable of handling the immigration-related protests without military assistance. See Amicus Br. of County of Los Angeles (dkt. 86-1) at 2–4; Supp. Amicus Br. of City of Los Angeles (dkt. 78-1) at 3–4.



United States District Court
Northern District of California

combined with the Ninth Circuit's reading of § 12406(3), would create a loophole in the Posse Comitatus Act that would swallow the entire Act—and the Insurrection Act along with it, as § 12406(3) would place no meaningful guardrails on the federalization and use of National Guard troops and would thereby render the Insurrection Act redundant.

The Court therefore concludes that § 12406(3) is not an exception to the Posse Comitatus Act. If the President wants to avoid the Act's restrictions, he must invoke a valid exception—like the Insurrection Act, along with its requisite showing that state and local law enforcement are unable or unwilling to act.

**D. Posse Comitatus Act Violations**

Having determined that the Posse Comitatus Act applies to Task Force 51, the Court now turns to the troops' conduct in Los Angeles to determine whether the Posse Comitatus Act has been followed. Once again, the Posse Comitatus Act states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

10 U.S.C. § 1385. The Court approaches this issue in three steps: first by stating the test for evaluating an alleged Posse Comitatus Act violation; second by determining whether the Posse Comitatus Act's prohibition on using the military to execute domestic law permits the so-called constitutional exceptions to protect federal property, personnel, and functions; and third by reviewing Task Force 51's conduct.

**1. Posse Comitatus Act Test**

Few courts have addressed the Posse Comitatus Act directly, but those that have tend to coalesce around several formulations of the same basic test for determining whether the Act has been followed. Under the Posse Comitatus Act, the military may not engage in activities that "constitute the exercise of regulatory, proscriptive, or compulsory military power," that "amount to direct active involvement in the execution of the laws," or that "pervade the activities of civilian authorities." United States v. Dreyer, 804 F.3d

1266, 1275 (9th Cir. 2015) (en banc) (quoting United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994)). Though framed as three separate inquiries, the test is at its core the same: whether the military has executed domestic law or actively assisted with the execution of domestic law, which would violate the Act, or whether the military's involvement is so indirect as to not violate the Act. Id.

The facts of earlier cases provide some guidance on the Court's inquiry here. In Dreyer, for example, the NCIS initiated an operation to search for individuals sharing child pornography, and the officer's investigation formed the basis for a search warrant. Id. The Ninth Circuit found that the officer's activities "pervaded the actions of civilian law enforcement" and thereby violated the Posse Comitatus Act. Id. at 1275–76. In United States v. Yunis, by contrast, the Navy housed and transported a criminal defendant while he was in FBI custody; the D.C. Circuit found that this was "passive" involvement that did not exercise "regulatory, proscriptive, or compulsory military power," and accordingly did not violate the Posse Comitatus Act. 924 F.2d 1086, 1094 (D.C. Cir. 1991); see also Kahn, 35 F.3d at 432 (use of Navy ships and backup support not a Posse Comitatus Act violation); United States v. Hartley, 796 F.2d 112, 115 (5th Cir. 1986) (Air Force did not violate Posse Comitatus Act when it conveyed information to civilian authorities regarding unidentified aircraft); United States v. Bacon, 851 F.2d 1312, 1313 (11th Cir. 1988) (per curiam) (participation by a single army officer in a drug investigation did not "pervade the activities of civilian officials" and thus did not violate Posse Comitatus Act). This limited case law—though a helpful starting point for what it means to "execute the laws"—does not provide clear answers for President Trump's unprecedented deployment of the military in Los Angeles.

### 2. Constitutional Exceptions

Defendants contend that the Posse Comitatus Act harbors an exception beyond the framework that the case law establishes. Supp. Opp. at 18; Trial Tr. Vol. II at 321:23–25. Under this "constitutional exception," as Defendants call it, the President has inherent constitutional authority to protect federal property, federal personnel, and federal



United States District Court
Northern District of California

functions, so any actions that can be construed as such "protection" are lawful in spite of the Posse Comitatus Act. This assertion is not grounded in the history of the Act, Supreme Court jurisprudence on executive authority, or common sense.

Starting with history, there is little support in the Founding Era for an inherent constitutional authority for the President to call forth the militia, or to use the military generally, to execute the laws. As discussed above, the Founders did not intend that the Militia Clause be used to deploy the military to execute domestic law unless absolutely necessary. In the early nineteenth century, Congress did, on occasion, expressly grant the President the authority to use the militia: in 1807, for example, Congress passed the Enforcement Act, which allowed President Jefferson to use the militia to enforce a trade embargo. Bahar, The Presidential Intervention Principle, supra, at 585–86. But such authority came from Congress, not Article II of the Constitution. As President Jackson wrote during the Nullification Controversy, "until some act of force is committed or there is some assemblage of an armed force … to resist the execution of the laws of the United States, the Executive of the United States has no legal [and] constitutional power to order the militia into the field to suppress it." Letter from A. Jackson to J. Poinsett (Feb. 7, 1833), in The Statesmanship of Andrew Jackson as Told in His Writings and Speeches 25–26 (Thorpe, ed. 1909).

President Fillmore was the first to expressly assert an inherent constitutional power for the Executive to use the military to enforce federal law. Id. at 595. In the context of deploying the military to enforce the Fugitive Slave Act, President Fillmore explained: "[T]he power of the President under the Constitution, as Commander of the Army and Navy, is general, and his duty to see the laws faithfully executed is general and positive." Presidential Message to the Senate (Feb. 19, 1851), available at https://perma.cc/2KPW-N2ZY. Though President Fillmore did not identify a specific constitutional provision providing for this inherent power, he appears to have drawn it from the Take Care Clause. See U.S. Const. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed.").

Defendants likewise rely on the Take Care Clause as the basis for their supposed

constitutional exception to the Posse Comitatus Act. Supp. Opp. at 18. They contend that, because the Constitution tasks the President with taking care that the laws are faithfully executed, the President has an "inherent" protective power. Id. That power, Defendants argue, overrides the Posse Comitatus Act. Id.

Defendants' argument lacks legal support. For one, it ignores the actual text of the Posse Comitatus Act, which provides for exceptions only where the Constitution or Congress "expressly authorize[]" them. 10 U.S.C. § 1385 (emphasis added).[17] For another, it adopts an expansive reading of the Take Care Clause that the Supreme Court confronted and rejected in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

Youngstown is instructive here, both on the facts and on the law. In 1951, toward the beginning of the Korean War, President Truman ordered the Secretary of Commerce to seize and operate steel mills across the country after a series of strikes paralyzed steel production. Id. at 582–83. In taking this action, President Truman relied on his inherent authority stemming from two constitutional provisions—the Commander-in-Chief Clause and the Take Care Clause. Id. at 587. The Court rejected both arguments. As to the Commander-in-Chief Clause, the Court explained that, even during wartime, it could not "with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities." Id. The Court was equally dismissive of President Truman's Take Care Clause argument: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." Id. President Truman's order did "not direct that a congressional

[17] The word "expressly" was added as a compromise between the House version of the Posse Comitatus Act (which included no constitutional exception) and the Senate version (which included a constitutional exception without the word "expressly"). Elsea, The Posse Comitatus Act and Related Matters, supra, at 28–29. Though Congress at the time was divided on whether the word "expressly" carried any weight, see id., modern canons of statutory interpretation instruct the Court to construe the statute to give full effect to every word. See Chickasaw Nation v. United States, 534 U.S. 84, 93 (2001) ("'[E]very clause and word of a statute' should, 'if possible,' be given 'effect.'" (citation omitted)).

policy be executed in a manner prescribed by Congress"; it directed "that a presidential policy be executed in a manner prescribed by the President." Id. at 588. This, the Court explained, exceeded the President's Article II authority and was unlawful. Id. at 588–89.[18]

Several Justices wrote separately in Youngstown to explain their views as to why President Truman's actions violated Congress's command and, more fundamentally, the Constitution's separation of powers. Justice Jackson, for instance, carefully explained that the latitude of President's constitutional authority necessarily depends on what, if anything, Congress has said on the matter:

- "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. … If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power." Id. at 635–37 (Jackson, J., concurring).
- "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." Id. at 637.

[18] In rejecting President Truman's assertions of inherent executive authority, the Supreme Court undermined the exact precedent that the Ninth Circuit relied on in affording the President significant discretion under § 12406. In Martin v. Mott, the Supreme Court cited both the Commander-in-Chief and Take Care Clauses to explain why the President "is necessarily constituted the judge of the existence of the exigency in the first instance." 25 U.S. at 31. So too in Sterling v. Constantin, where the Court wrote: "By virtue of his duty to 'cause the laws to be faithfully executed,' the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen." 287 U.S. at 399. Youngstown reframed the analysis, requiring that courts first determine whether the President's actions are within the scope of his Article II authority before determining what discretion, if any, he is entitled to. 343 U.S. at 587–89; id. at 635–38 (Jackson, J., concurring); see also Trump, 603 U.S. at 608 ("[O]nce it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." (emphasis added)).



United States District Court
Northern District of California

- "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id.

Justice Jackson concluded that President Truman's seizure of the steel mills fell into the third category—not because Congress had expressly legislated that he could not engage in such actions, but because Congress had already regulated the field and had not provided the President with the kind of power that President Truman sought to invoke. Id. at 639. Justice Jackson also took the opportunity to reject President Truman's argument that the Commander-in-Chief Clause granted him the power he sought, writing:

> It also was expressly left to Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights. On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

Id. at 644–45 (cleaned up) (emphasis in original).[19]

Defendants' arguments mirror those that President Truman made in 1952, and they cannot be squared with Youngstown. They contend that the President's implied executive authority to protect federal property, personnel, and functions supersedes a law duly passed by Congress pursuant to Congress's own express constitutional authority. See U.S. Const. art. I, § 8, cl. 15. That Defendants characterize this as an "exception" to the statute is mere wordplay; it does not change the fact that they seek to override Congress's legitimate

---

[19] The Supreme Court has cited Justice Jackson's Youngstown concurrence in dozens of cases—at least twenty majority opinions as well as several high-profile separate opinions. Kristen E. Eichensehr, Courts, Congress, and the Conduct of Foreign Relations, 85 U. Chi. L. Rev. 609, 619 (2018); see, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 10 (2015) ("In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from Youngstown Sheet & Tube Co. v. Sawyer.").



United States District Court
Northern District of California

exercise of its own authority. See Bissonette v. Haig, 776 F.2d 1384, 1388–89 (8th Cir. 1985) ("Congress has acted to establish reasonable limits on the President's use of military forces in emergency situations, and in doing so has circumscribed whatever, if any, inherent power the President may have had absent such legislation."). Congress was clear about what constitutes an exception to the Posse Comitatus Act: an express provision by either the Constitution or by Congress itself. In doing so, Congress occupied the field and precluded the President from exercising all but his express constitutional authority. Id. The President thus cannot declare an exception to the Posse Comitatus Act any more than he can refuse to follow it outright. "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Youngstown, 343 U.S. at 638 (Jackson, J., concurring).

Defendants, for their part, point to two nineteenth-century cases in support of their assertion that the President has inherent authority to use the military to execute domestic law, at least within the context of protecting federal property, personnel, and functions. Neither is persuasive reason to cast aside Youngstown—which, of course, postdates both.

Defendants first rely on In re Neagle. Supp. Opp. at 18 (citing 135 U.S. 1, 69 (1890)). That case arising from as unique a factual situation as any. Concerned about threats against sitting U.S. Supreme Court Justice Field, the U.S. Attorney General ordered David Neagle, a deputy marshal, to accompany Justice Field while he rode circuit in California. Neagle, 135 U.S. at 48–52. In California, two individuals who had previously threatened Justice Field approached him, and one physically assaulted him. Id. at 52–53. When the assailant reached into his pocket, Neagle shot and killed him. Id. at 53. Neagle was arrested and charged with murder in California state court; he then filed a federal petition for a writ of habeas corpus, which eventually made its way to the Supreme Court. Id. at 53–54. The Court explained that the Supremacy Clause shielded Neagle from state criminal charges because "it was his duty" to protect Justice Field and he "did no more than what was necessary and proper for him to do" to carry out that duty. Id. at 75–76.

In reaching this conclusion, the Court asked:

> So, if the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed and the mail carriers assaulted and murdered in any particular region of country, who can doubt the authority of the President or of one of the executive departments under him to make an order for the protection of the mail and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice Field, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

Id. at 65. This hypothetical is the sole instance in the Court's seventy-five page decision where it referenced soldiers, the army, the military, the troops, or any possibility of the military executing of federal law. Nor did the Court ever reference or acknowledge the Posse Comitatus Act, which had been passed twelve years prior. That makes good sense, though: Neagle was a U.S. marshal, not a military officer, and the question presented to the Court was whether the Supremacy Clause barred state prosecutions of federal officials acting pursuant to lawful orders. The Neagle Court did not purport to decide whether, when, or how the President could use military forces to execute domestic law.[20]

Defendants next point to In re Debs, which arose out of President Cleveland's response to the 1894 Pullman Strike. Supp. Opp. at 18 (citing 158 U.S. 564 (1895)). That railway strike effectively stalled train traffic (and with it, most interstate commerce) across the western United States. See Nat'l Park Serv., The Strike of 1894 (updated Dec. 29, 2022), https://perma.cc/BQZ4-6YRD; D. Papke, The Pullman Case: The Clash of Labor and Capital in Industrial America 35 (1999); 2 J. Commons et al., History of Labour in the United States 502 (1918). President Cleveland sent federal troops to Indiana, without first consulting the governor, to enforce a court order preventing strikers from obstructing mail

[20] Recently, the Supreme Court rejected an expansive reading of Neagle, though in a slightly different context. In Martin v. United States, the Court explained that "In re Neagle does not speak to a situation where, as here, Congress has entered the field and expressly bound the federal government." 145 S. Ct. 1689, 1702 (2025); see also id. at 1702 n.2 ("To date at least, this Court has also generally understood In re Neagle as providing federal officers a shield against only state criminal prosecution.").

delivery. Bahar, The Presidential Intervention Principle, supra, at 618–19. The Supreme Court was not asked to evaluate President Cleveland's deployment of the troops, but instead to consider two related questions: (1) whether the federal government can prevent obstructions to interstate commerce and mail delivery and (2) whether the federal courts have jurisdiction to issue injunctions in aid of such federal authority. Debs, 158 U.S. at 577. In other words, the Court's analysis focused on the power of the federal government writ large, not the power of the Executive. To that end, the Court concluded that "it is within the competency of Congress to prescribe by legislation that any interferences with [interstate commerce and the transportation of the mails] shall be offenses against the United States, and prosecuted and punished by indictment in the proper courts." Id. at 581 (emphasis added). To be sure, the Court went on to say:

> The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care. The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation, to compel obedience to its laws.

Id. at 582. The Court did not, however, indicate who would declare such an emergency, what such an emergency might look like, whether such a declaration would be reviewable, or how the military could respond to such an emergency.

No doubt Neagle and Debs, when read together, stand for principles of federal supremacy. But the context of these decisions matter: Neagle arose from well-documented threats against a sitting Supreme Court Justice (one assailant had previously tried to brandish a knife at Justice Field in a courtroom, 135 U.S. at 45), and Debs involved a massive strike that effectively halted mail delivery across the country. When the Court spoke about the federal military in these cases, it was in response to these circumstances, not the day-to-day execution of federal law.

Immediately following the Civil War, the Supreme Court provided a clear example of why context matters in cases like these. The Court explained with respect to the

imposition of martial law in Indiana:

> [T]here are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction.

Ex parte Milligan, 71 U.S. (4 Wall.) 2, 127 (1866) (emphasis in original). The Court thus explained that—even during the Civil War itself—martial law was "lawless violence" outside "the locality of actual war." Id. Milligan thus stands for the principle that that the exercise of federal power is always dependent on context.

So too here. It is improper to rely on suggestions of federal authority generally (not authority vested in the Executive specifically) made in response to historic threats[21] to grant the President a perpetual, atextual right to defy Congress if he determines it necessary to protect federal property, personnel, or functions.[22] Such an exception would

---

[21] No doubt the protests in Los Angeles were large, and in some instances violent. Local law enforcement is no stranger to such protests, though. See Amicus Br. of County of Los Angeles at 3–4 (describing LASD responses to the Occupy L.A. movement (which involved hundreds of protestors camped at public parks), Black Lives Matter protests (which closed a major public freeway downtown), and the "sometimes riotous" street parties following the Dodgers' and Lakers' World Series and NBA Championship wins). The June 6 and 7 protests were far more similar to these events than they were to the 1894 Pullman Strike, which crippled interstate commerce across the western United States.

[22] To be sure, troops protecting federal property are unlikely as a descriptive matter to execute federal laws in violation of the Posse Comitatus Act. This is illustrated by an Office of Legal Counsel memorandum from then–Assistant Attorney General Rehnquist addressing whether the President can use the military to prevent Mayday protestors from blocking federal employees from reaching their job posts. Authority to Use Troops, 1 Supp. Op. O.L.C. 343 (1971). Such use, Rehnquist correctly concluded, would not constitute law enforcement. Id. at 343. The Court disagrees with Defendants' implication, Supp. Opp. at 18, that the memorandum describes an inherent protective power that overrides the plain text of the Posse Comitatus Act. If the memorandum suggested such a power, the Court would decline to afford that suggestion any weight. See Crandon v. United States, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) (OLC opinions not entitled to deference); Ecological Rights Found v. Pac. Gas & Elec. Co., 874 F.3d 1083, 1097 n.5 (9th Cir. 2017) (same). Law enforcement activities are not insulated from the Posse Comitatus Act just because they can be framed as property protection.

be limitless in principle: it would allow the President to deploy troops to accompany any federal employee whose job puts them at some risk—as do the jobs of many federal employees, from OSHA inspectors to IRS agents to U.S. marshals. There is no question that federal personnel should be able to perform their jobs without fearing for their safety. But to use this as a hook to send military troops alongside federal agents wherever they go proves too much and would frustrate the very purpose of the Posse Comitatus Act.

### 3. Task Force 51's Conduct

The Court now turns to the actual conduct of Task Force 51 in and around Los Angeles. To start, the Court observes that Task Force 51 was expressly instructed that it could engage in certain law enforcement activities: setting up protective perimeters, traffic blockades, crowd control, and the like. Task Force 51 Training Slides at 6–7; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25. That instruction was incorrect. There is no exception to the Posse Comitatus Act for such conduct, and neither President Trump's June 7 memorandum nor Secretary Hegseth's June 23 memorandum changed that.

The record is replete with evidence that Task Force 51 executed domestic law in these prohibited ways. Task Force 51 set up traffic blockades on roads at a residential enforcement operation in Long Beach, as part of Operation Excalibur at MacArthur Park, and as part of the Carpinteria cannabis farm operation. June 13 Mission Debrief; Trial Tr. Vol. I at 119:9–13; Operation Excalibur Slides at 5; DVIDS Carpinteria Photos; Solorzano Photo; Solorzano Video. Task Force 51 similarly used riot shields and military vehicles to establish a perimeter at the DEA enforcement operation in Mecca. Trial Tr. Vol. I at 44:22–45:10; DVIDS Mecca Photos. Bystanders at multiple locations and even federal officials at trial were unable to distinguish Task Force 51 troops from federal law enforcement agents. Trial Tr. Vol. I at 72:3–6, 176:20–177:7, 177:15–178:6. All this points to Task Force 51 engaging in prohibited activities in Los Angeles.

Indeed, Task Force 51 troops' conduct clearly qualifies as Posse Comitatus Act violations under the tests that courts use to apply the Act. Defendants' presence to bolster

United States District Court
Northern District of California

DHS and DEA operations and shows of force exercises regulatory, proscriptive, and compulsory power on the surrounding public, and their participation in operations in numbers that match or outnumber law enforcement agents pervade the activities of those civilian agents.[23] See Dreyer, 804 F.3d at 1275. This was intentional—Defendants instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act.

In fact, these violations were part of a top-down, systemic effort by Defendants to use military troops to execute various sectors of federal law (the drug laws and the immigration laws at least) across hundreds of miles and over the course of several months—and counting. The instructions to train Task Force 51 on the purported constitutional exception and thereby excuse unlawful military conduct came "all the way from the top" of the Department of Defense. Trial Tr. Vol. II at 283:1–3. And as Major General Sherman testified at trial, federal law enforcement agencies "always wanted military there, and we had plenty of capacity to do that." Trial Tr. Vol. I at 137:23–25. Accordingly, Secretary Hegseth himself ordered troops to MacArthur Park as a "show of presence" and to "demonstrat[e] federal reach and presence." Id. at 103:24; Operation Excalibur Slides at 4. Troops drove over a hundred miles to Mecca, where they significantly outnumbered federal law enforcement agents, to support a drug enforcement operation. Trial Tr. Vol. I at 32:9–33:4, 80:19–23; Mecca Storyboard. Troops also drove nearly a hundred miles in a different direction to Carpinteria to set up traffic control points so that federal law enforcement agents could more efficiently execute their search warrant of a cannabis farm. Trial Tr. Vol. I at 84:7–20.[24]

---

[23] By contrast, some individual examples of Task Force 51's conduct, like the detention of a veteran at the Wilshire Federal Building, are too isolated to violate the Posse Comitatus Act. The Marines stationed at the Wilshire Building minimized their interaction with the veteran, turning him over to law enforcement authorities at the first possible occasion. Moreover, the record does not indicate that the military's presence at federal buildings in Los Angeles involved any impermissible law enforcement activity.

[24] Even if there is a "constitutional exception" that authorizes the military to engage in law enforcement anywhere in the field under the label of "protection," these activities would

United States District Court
Northern District of California

That sets this case apart from others where courts have so far addressed the Posse Comitatus Act. Those cases involve military actions that are both passive and isolated in nature. See, e.g., Yunis, 924 F.2d at 1094 (Navy "housing, transporting, and caring for [a criminal defendant] while he was in the custody of the FBI" not a Posse Comitatus Act violation); Kahn, 35 F.3d at 432 (Navy provision of ships and backup support during a single search of a ship transporting illegal drugs not a Posse Comitatus Act violation); Hartley, 796 F.2d at 115 (Air Force communication of information regarding an unidentified aircraft entering the country not a Posse Comitatus Act violation); Bacon, 851 F.2d at 1313 (participation by a single army officer in a drug investigation not "aggravated or repeated," and thus not a Posse Comitatus Act violation). Where military conduct is more coordinated and systemic, by contrast, courts have found Posse Comitatus Act violations. E.g., Dreyer, 804 F.3d at 1275–76 (NCIS investigation was "systemic" and thus violated Posse Comitatus Act); see also Bissonette, 776 F.2d at 1385 (ten-week-long occupation at Wounded Knee violated the Posse Comitatus Act).

Yet another departure from those prior cases is Defendants' complete sidelining of state and local authorities here. Even though multiple federal agencies and Task Force 51 rehearsed Operation Excalibur several times, Trial Tr. Vol. II at 265:9–17, they provided LAPD and LASD with a mere two hours' notice of the operation, see Operation Excalibur Slides at 4. Likewise, federal agencies notified local law enforcement of cannabis farm raids only at the time of the raids, not beforehand. See Carpinteria Slides at 3. This is not typical. In those Posse Comitatus Act cases where state and local law enforcement had jurisdiction (i.e., not cases like Kahn, which involved events in international waters), federal troops generally worked alongside state and local officials. See, e.g., Bacon, 851 F.2d at 1313 (Army investigator worked jointly with local sheriff's office); Hartley, 796 F.2d at 113 (Customs and other non-military officials performed search based on

---

not fall under such an exception. Troops do not serve a protective function when they act as a force multiplier at a "show of presence" (as in MacArthur Park), when they outnumber federal personnel by 100 at a remote location with a low risk of resistance (as in Mecca), or when they are deployed merely to speed up federal operations (as in Carpinteria).

United States District Court
Northern District of California

information provided by Air Force officer); Dreyer, 804 F.3d at 1270–71 (NCIS agent shared findings with local police department). Defendants' lack of cooperation with their state and local counterparts raises red flags. It also highlights the lack of any showing by Defendants that state and local officials were unable or unwilling to execute the laws before Defendants deployed troops to engage in typical law enforcement functions.

Moreover, Defendants violated the Posse Comitatus Act willfully. See 10 U.S.C. § 1385 (imposing a willfulness requirement); Aaron v. SEC, 446 U.S. 680, 701 (1980) ("[W]hen scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue."). Defendants knowingly contradicted their own training materials, which listed twelve functions that the Posse Comitatus Act bars the military from performing. Task Force 51 Training Slides at 6; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25. They did so while refusing to meaningfully coordinate with state and local officials. Operation Excalibur Slides at 4; Carpinteria Slides at 3. And they "coach[ed]" federal law enforcement agencies as to what language to use when submitting requests for assistance in an attempt to circumvent the Act. RFA Email Thread. These actions demonstrate that Defendants knew that they were ordering troops to execute domestic law beyond their usual authority. Whether they believed that some constitutional or other exception applied does not matter; "ignorance of the law is no excuse." Bryan v. United States, 524 U.S. 184, 195 (1998).[25]

Defendants' systemic use of Task Force 51 troops to execute domestic law in and around Los Angeles violated the Posse Comitatus Act.

[25] "The word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." Bryan, 524 U.S. at 191 (citation omitted). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'"—or, "[i]n other words," "knowledge that his conduct was unlawful." Id. at 191–92 (citations omitted). That definition fits here, as the constitutional concerns that sometimes demand a stricter reading of the statute are not applicable where the statute is straightforward and criminal enforcement is not at issue. See id. at 194–95 (a stricter definition of willfulness applies where "highly technical statutes," such as the Internal Revenue Code, is at issue); Ratzlaf v. United States, 510 U.S. 135, 147–49 (1994) (ambiguous statutes construed in favor of a criminal defendant).

United States District Court
Northern District of California

### E. Injunctive Relief

The Court now addresses what relief, if any, is appropriate for the Court to award in response to Defendants' Posse Comitatus Act violations. Defendants argue that the Court cannot impose injunctive relief for three reasons: (1) Plaintiffs lack a historical analogue for enjoining the federal government to comply with a criminal statute like the Posse Comitatus Act, Supp. Opp. at 6–8; (2) Plaintiffs cannot pursue an ultra vires theory of relief, id. at 8–11; and (3) the equities weigh against injunctive relief, id. at 25.

#### 1. Historical Analogue

Defendants first assert that the Court's equitable power does not extend to enjoining them from violating the Posse Comitatus Act because there is no historical analogue for a court to enter an injunction against the federal government based on a criminal statute. Their argument principally relies on the Supreme Court's recent decision in Trump v. CASA, Inc., 145 S. Ct. 2540 (2025). In CASA, the Court explained that the Judiciary Act of 1789, which "endowed federal courts with jurisdiction over 'all suits in equity,'" is limited to "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." Id. at 2551 (citation omitted) (cleaned up). Accordingly, the Court found that universal (or nationwide) injunctions lack a sufficient historical analogue and therefore cannot be maintained in federal court. Id. The Court's holding in CASA does not require "an exact historical match," though, only a "founding-era antecedent." Id. at 2554.

Defendants' position, which focuses on the nature of the Posse Comitatus Act as a criminal statute rather than the nature of the injunction that Plaintiffs seek, misapplies CASA's historical inquiry and demands too exact of a match. CASA requires the Court to ask whether the form of its injunction—here, an injunction prohibiting the Secretary of Defense and Department of Defense from violating a federal statute—has a historical analogue. Id. at 2551 (evaluating "form[s] of relief"); see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 322 (1999) ("We do not question the proposition that equity is flexible; but in the federal system, at least, that flexibility is

confined within the broad boundaries of traditional equitable relief. To accord a type of relief that has never been available before … is to invoke a 'default rule' not of flexibility but of omnipotence." (emphasis added)). It does not require the Court to analyze the underlying statute to determine whether that statute permits equitable relief.

CASA itself explained that there is a historical analogue for an injunction against government officials: "Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct." Id. at 2254 n.9 (favorably citing Ex parte Young, 209 U.S. 123 (1908), as an example of equitable relief supported by "a long line of cases" even though there was no exact remedy at English common law). The Supreme Court has also explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." Armstrong, 575 U.S. at 327. In fact, even in eighteenth-century England, though "personal injury from the king to a subject [was] presumed to be impossible," the courts "furnishe[d] various methods of detecting the errors and misconduct of those agents." Marbury, 5 U.S. at 165 (citing 3 William Blackstone, Commentaries *255). Surely any historical inquiry would recognize that the Founders did not break off from England to constrain the available judicial remedies against the Executive. Precedent also recognizes the feasibility of injunctions against military departments and officials. See, e.g., Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

Nor is Defendants' contention that injunctions cannot issue based on criminal statutes as absolute as they suggest. Though "injunctions against criminalized conduct have historically been disfavored[,] … in keeping with the characteristic flexibility of equitable remedies, they have never been absolutely prohibited." FTC v. Accusearch Inc., 570 F.3d 1187, 1202 (10th Cir. 2009). Where a plaintiff can show "some separate injury to private interest," as California has shown here with respect to federal–state relations, an injunction prohibiting criminalized conduct can properly lie. United States v. Dixon, 509 U.S. 688, 695 (1993). This is especially true where "the party aggrieved has no other

adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights." Debs, 158 U.S. at 593–94 (citation omitted). That is the case here: without injunctive relief, California would lack any remedy against Defendants' unlawful use of the U.S. military in a way that infringes on California's police power and risks economic and other harms to California's residents.

To the extent that there remains any question as to the equitable power of the Court to enjoin Defendants from violating the Posse Comitatus Act, the history and purpose of the Act strongly weigh in favor of the availability of injunctive relief. Recall that Congress passed the Posse Comitatus Act to prevent the federal government from deploying troops into the South to police polling places and thereby ensure that federal voting law was followed. Buttaro, The End of Reconstruction, supra, at 161–62; Elsea, The Posse Comitatus Act and Related Matters, supra, at 21. President Grant himself ordered federal troops into the three states that swung the 1876 for the Republicans. See Grant, Special Message, supra. It is ahistorical and illogical to think that Congress reacted to this by passing a statute that had as its sole enforcement mechanism federal prosecution of individual troops by the same federal government that would have ordered the troops to engage in domestic law enforcement.

Thus, the injunctive relief that Plaintiffs seek in this case is proper.

**2. Ultra Vires Relief**

Defendants next contend that ultra vires relief—the vehicle by which Plaintiffs assert their claim for violations of the Posse Comitatus Act—is unavailable in this case.[26] An ultra vires theory of relief succeeds only if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." NRC v. Texas, 605 U.S. 665, 681 (2025) (emphasis in original) (citation omitted). "Ultra vires review is also unavailable if … a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial

[26] No one disputes that the Posse Comitatus Act does not provide a cause of action for civil damages. Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 40 (D.D.C. 2021).

review,' or if a statutory review scheme forecloses all other forms of judicial review." Id. (citation omitted).

Defendants make much of how limited ultra vires review is. To be sure, as then-Judge Kavanaugh put it, ultra vires review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009). But emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory. As explained above, Plaintiffs have proven that Defendants—by improperly training Task Force 51 troops on the scope of the Posse Comitatus Act and then ordering them to engage in law enforcement activities in violation of the Act—exceeded the authority delegated to them by Congress and directly violated the Posse Comitatus Act's specific prohibition against domestic military law enforcement.[27] See Youngstown, 343 U.S. at 644–45 (Jackson, J., concurring) ("[T]he Constitution's policy [is] that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. … Congress has forbidden [the President] to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." (emphasis in original)). Defendants point to no other statute that provides Plaintiffs a meaningful and adequate opportunity for relief, nor is there any statute precluding judicial review of Posse Comitatus Act violations. See NRC, 605 U.S. at 681. If anything, given the lack of other avenues for Plaintiffs to seek to remedy their injuries and the Supreme Court's prior statements on the role of the Judiciary in addressing presidential overreach, this case presents a classic situation for an ultra vires claim. See Laird, 408 U.S. at 15–16 ("[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of

[27] Defendants appear to argue that, because any Posse Comitatus Act violations were committed by individual troops and not the Department of Defense writ large, an ultra vires claim cannot lie. Supp. Opp. at 10. That misconstrues the nature of the Posse Comitatus Act violations in this case. The violations were not one-off acts by individual servicemembers but were rather the function of systematic and willful orders to troops to execute domestic law.

those asserting such injury.”). As Chief Justice Marshall wrote: “The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.” Marbury, 5 U.S. at 163.[28]

Defendants again point to the fact that the Posse Comitatus Act is a criminal statute and argue that ultra vires claims typically involve civil violations. Supp. Opp. at 6–7, 9. It is counterintuitive, though, to think that the exceptional remedy of ultra vires relief is available where Congress has imposed civil penalties but not where it has taken the more severe step of imposing criminal penalties. In any case, Defendants’ proposition that the Posse Comitatus Act can only be enforced by federal criminal prosecution is remarkable, as the same federal government that the Act limits would be tasked with enforcing it. More specifically, the same branch of the federal government that the Act limits—the Executive—would be tasked with enforcing the Act against itself. This raises obvious concerns about conflicts of interest. See Morrison, 487 U.S. at 677. Surely the Act must provide for some other enforcement mechanism, otherwise it would have been ineffective when passed and would remain so today.

**3. Balancing the Equities**

Defendants’ final argument is that the equities—specifically, the harm threatened to federal property and personnel—weigh against an injunction. Supp. Opp. at 25. This does not survive scrutiny given the scope of the issues presented. An injunction prohibiting Task Force 51 troops from engaging in law enforcement activities would have no bearing whatsoever on their ability to protect federal property. Nor is “protection,” whether of federal property or personnel, the talismanic word that Defendants seem to believe it is. No doubt Defendants have an inherent interest in the safety of federal personnel, but they can and must ensure this safety in a lawful manner—such as, for example, by coordinating with state and local law enforcement. Defendants have no legitimate interest in violating

[28] The outcome in Marbury (dismissal for lack of jurisdiction) does not detract from the Supreme Court’s holding that Marbury had a legal remedy for his claim. Id. at 168.

the Posse Comitatus Act, for protection or for any other reason. See Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

Defendants mention that only 300 National Guard troops remain stationed in Los Angeles, suggesting that injunctive relief is unwarranted because their footprint is smaller than it was in early June. Their point is not well taken. Those 300 National Guard troops are set to remain deployed through November, see Aug. 5 Activation Order, and they have already been improperly trained as to what activities they can and cannot engage in under the Posse Comitatus Act. Further, President Trump's recent executive orders and public statements regarding the National Guard raise serious concerns as to whether he intends to order troops to violate the Posse Comitatus Act elsewhere in California. See, e.g., Exec. Order No. 14,339, § 2(d)(ii), 90 Fed. Reg. 42121 (Aug. 25, 2025) (ordering the Secretary of Defense to ensure that state National Guard units are trained "in quelling civil disturbances and ensuring the public safety and order whenever the circumstances necessitate"); C-SPAN, President Trump Holds Cabinet Meeting at 3:12:29–40 (Aug. 27, 2025), available at https://tinyurl.com/bb6sa5bp (regarding deployment and use of the National Guard in Chicago: "I have the right to do anything I want to do. I'm the President of the United States. If I think our country is in danger, and it is in danger in these cities, I can do it."). Injunctive relief is therefore appropriate. See West Virginia v. EPA, 597 U.S. 697, 719–20 (2022) ("'[V]oluntary cessation does not moot a case' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (citation omitted)).

Finally, the Court's injunctive relief in this case is narrowly tailored to address Defendants' statutory violations. The injunction applies only to Defendants' use of the National Guard in California, not nationally. Defendants are not required to withdraw the 300 National Guard troops currently stationed in Los Angeles, nor are they barred from using troops consistent with the Posse Comitatus Act. In fact, the Court essentially just orders Defendants to follow the (unedited) training materials that they introduced in this

trial. See Task Force 51 Training Slides at 6. Thus, for example, federal troops can continue to protect federal property in a manner consistent with the Posse Comitatus Act.

## IV. CONCLUSION

For the foregoing reasons, the Court **ORDERS** that Defendants[29] are enjoined from deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until Defendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act. The Court **STAYS** this injunction until 12:00 noon on Friday, September 12, 2025.

**IT IS SO ORDERED.**

Dated: September 2, 2025

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

[29] The Court may lack jurisdiction to enjoin President Trump in the performance of his official duties. See Franklin v. Massachusetts, 505 U.S. 788, 802–03 (1992) (plurality opinion); Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501 (1866). So this injunction applies only against Secretary Hegseth and the Department of Defense, which is sufficient to redress Plaintiffs' injuries.

BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 598-7755
ben.kurland@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, et al.,<br><br>*Defendants*. | Case No. 3:25-cv-04870-CRB<br><br>**DECLARATION OF BENJAMIN S. KURLAND IN SUPPORT OF DEFENDANTS' RESPONSE BRIEF REGARDING JURISDICTION** |

I, Benjamin S. Kurland, declare, pursuant to 28 U.S.C. § 1746 and Local Rule 7-5, as follows:

1. I am a member in good standing of the Bar of the District of Columbia. I am a Trial Attorney in the United States Department of Justice, Civil Division, Federal Programs Branch, and an attorney of record for Defendants in this action. I am authorized to practice in this Court under Local Rule 11-2. I make this declaration in support of Defendants' Response Brief Regarding Jurisdiction.

2. I am over the age of 18. The facts set forth in this declaration are within my personal knowledge or based upon documents and information I have received in the course of this litigation.

3. On September 2, 2025, Plaintiffs moved for a preliminary injunction to: (1) enjoin the continued service of approximately 300 members of the California National Guard; and (2) return control of the California National Guard to Governor Newsom. *See* ECF No. 183.

4. On September 3, 2025, the Court ordered Defendants to file a response limited to the question of this Court's jurisdiction over Plaintiffs motion no later than noon on Friday, September 5, 2025. ECF No. 188 at 1.

5. Defendants are filing a responsive brief to the Court's order in conjunction with this filing.

6. Attached herein as Exhibit A is a true and accurate copy of a memorandum signed by Secretary of Defense Pete Hegseth on August 15, 2025, entitled Force Structure for the Presidentially Directed Mission to Protect Federal Law Enforcement Personnel and Functions in California.

7. Attached herein as Exhibit B is a true and accurate copy of letter signed by Secretary Pete Hegseth on August 15, 2025, addressed to Major General Matthew P. Beevers, Adjutant General of the California Military Department.

8. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 5, 2025

Respectfully submitted,

____________________

Benjamin S. Kurland

# EXHIBIT A

**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

AUG 15 2025

MEMORANDUM FOR COMMANDER, U.S. NORTHERN COMMAND

SUBJECT: Force Structure Decisions for the Presidentially Directed Mission to Protect Federal Law Enforcement Personnel and Functions in California

At the direction of the President, I called California National Guard units into Federal service under 10 U.S.C. § 12406 to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations.

On July 30, 2025, at your recommendation and that of the Chairman of the Joint Chiefs of Staff, General John D. Caine, I have decided to undertake the following actions:

- Release approximately 1,350 California National Guard personnel from Federal service.
- Approximately 260 California National Guardsmen will remain in Federal service for an additional 90 days, concluding on November 4, 2025.

These actions are to be effective immediately. Those Service members still deployed to Los Angeles and the surrounding counties will be expected to continue performing the Federal protective mission.

I appreciate the hard work of our Service members in the protection of our Nation and of the rule of law.

THANKS GAVIN!

cc:
CJCS
USD(P)
USD(P&R)
Chief, NGB

OSD008249-25/CMD010596-25

**EXHIBIT B**

**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

AUG 15 2025

Major General Matthew P. Beevers, USA
The Adjutant General of the California Military Department
Sacramento, CA 95827

Dear General Beavers:

I am writing to notify you that on July 30, 2025, the Secretary of Defense directed that approximately 1,350 of the remaining 1,638 California National Guard (CA NG) personnel now executing the Federal protective mission in Los Angeles be released from Federal service. Approximately 300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025.

We appreciate your cooperation on this matter as we both seek to reduce the violence against Federal personnel in Los Angeles and the surrounding counties.

Sincerely,

cc:
The Honorable Gavin Newsom
Governor of California

thanks!

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN, SBN 222993
THOMAS S. PATTERSON, SBN 202890
Senior Assistant Attorneys General
ANYA M. BINSACCA, SBN 189613
MARISSA MALOUFF, SBN 316046
JAMES E. STANLEY, SBN 316288
Supervising Deputy Attorneys General
JESSE BASBAUM, SBN 273333
BRENDAN HAMME, SBN 285293
IRAM HASAN, SBN 320802
BARBARA HORNE-PETERSDORF, SBN 327738
JANE REILLEY, SBN 314766
DELBERT TRAN, SBN 323993
MEGHAN H. STRONG, SBN 324503
Deputy Attorneys General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO. 3:25-cv-04870-CRB**<br><br>**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Introduction ........ 1
Statement of Facts ........ 2
I. Defendants Federalize and Deploy the National Guard for 60 Days on June 7 and June 9, 2025. ........ 2
II. Defendants Use the Federalized National Guard for Routine Federal Law Enforcement Missions. ........ 3
III. Defendants Federalize the California National Guard for an Additional 90 Days Despite Acknowledging Any Violence Has Subsided. ........ 4
IV. Defendants Expand Their Military Campaign to Oregon. ........ 5
V. Defendants Send California Troops to Portland. ........ 6
VI. Defendants Send National Guard Troops to Illinois. ........ 8
VII. Citizens of Los Angeles Continue to Protest Peacefully ........ 9
Legal Standard ........ 10
Argument ........ 10
I. Plaintiffs Are Likely to Succeed on the Merits of Their Argument That Further Federalization Orders of the California National Guard Were and Are Unjustified ........ 10
II. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ........ 13
III. The Remaining *Winter* Factors Favor Injunctive Relief ........ 15
Conclusion ........ 15

**CASES**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
901 F.3d 1166 (9th Cir. 2018) ........ 10

*Advocate Health Care Network v. Stapleton*
581 U.S. 468 (2017) ........ 12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
458 U.S. 592 (1982) ........ 13

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ........ 13, 14

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023) ........ 13

*Bond v. United States*
564 U.S. 211 (2011) ........ 14

*Bowen v. Massachusetts*
487 U.S. 879 (1988) ........ 14

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ........ 10

*Illinois v. Trump*
2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ........ 11, 14

*Illinois v. Trump*
2025 WL 2937065 (7th Cir. Oct. 16, 2025) ........ 9, 11

*Kentucky v. Biden*
23 F.4th 585 (6th Cir. 2022) ........ 14

*Laird v. Tatum*
408 U.S. 1, 15 (1972) ........ 15

*Maryland v. King*
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........ 14

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) ........ 15

*Newsom v. Trump*
141 F.4th 1032 (9th Cir. 2025) ........ 2, 11, 13

*Newsom v. Trump*
No. 25-3727, Dkt. 136.1 ........ 12

*Newsom v. Trump*
No. 25-5553, Dkt. 7.1 (9th Cir. Sept. 4, 2025) .......... 4

*Oregon v. Trump*
2025 WL 2817646 (D. Or. Oct. 4, 2025) .......... 11

*Oregon v. Trump*
2025 WL 3008050 (Graber, J., dissenting) .......... 12, 14

*Oregon v. Trump*
No. 26-6268, Dkt. 61.1 .......... 7

*Oregon v. Trump*
No. 3:25-cv-01756, ECF No. 1 .......... 6, 8, 9

*Preston v. Thompson*
589 F.2d 300 (7th Cir. 1978) .......... 14

*Printz v. United States*
521 U.S. 898 (1997) .......... 13

*Riley's Am. Heritage Farms v. Elsasser*
32 F.4th 707 (9th Cir. 2022) .......... 15

*Trump v. Illinois*
No. 25A443 .......... 11

*United States v. Morrison*
529 U.S. 598 (2000) .......... 14

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 10, 15

**STATUTES**

10 U.S.C. § 12406 .......... *passim*

United States Code, Title 10
§ 12406(2) .......... 11
§ 12406(3) .......... 8, 11, 12, 13

Posse Comitatus Act .......... 4, 5

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Tenth Amendment .......... 8, 13, 14

## INTRODUCTION

There have been soldiers deployed to the Los Angeles area for more than five months, with current orders for continued deployment at least until February 2026 (and subject to further extension). After using isolated incidents of violence in June as a pretext to federalize the California National Guard, Defendants have now implemented a months-long military occupation, without any justification, and with no apparent end in sight. Even if events in June justified the *initial* federalization and deployment of the military in Los Angeles, there is no lawful basis for keeping troops there now. The June violence has long since subsided. Yet still, troops remain in the Nation's second-largest city. Since Plaintiffs first challenged Defendants' renewed federalization of California National Guard troops in September, Defendants' unlawful orders have multiplied and expanded. In the span of just a few weeks, Defendants federalized and deployed National Guard troops to two additional states—Oregon and Illinois—including moving 214 of the federalized California National Guard from Los Angeles to Oregon (after initially planning to send all 300), then shuffling 14 of those troops from Oregon to Illinois. Meanwhile, Defendants continue to keep 101 federalized soldiers stationed in Los Angeles, despite the absence of any justification for doing so. Defendants' actions make clear that what Plaintiffs warned from the start has now come to pass: Defendants are treating the President's June 7 memorandum as a blank check that allows them to federalize state National Guard troops in any number and for any duration they please and to send those troops anywhere in the country, even to places that were not part of their justification for the original federalization. Whatever 10 U.S.C. § 12406 permits, it certainly does not authorize the sort of broad-ranging, never-ending federalization and military occupation of American cities that Defendants are perpetrating.

There was no colorable basis to again federalize the California National Guard in Los Angeles on August 5, and there remains no basis for keeping them in California now. The lack of any violence or other justifying events in Los Angeles and Defendants' choice to remove most of those troops from Los Angeles confirms it. The Court should grant Plaintiffs' motion, enjoin any continued federalization and deployment of National Guard troops in and around Los Angeles, and end this unlawful federalization now.

## STATEMENT OF FACTS

### I. DEFENDANTS FEDERALIZE AND DEPLOY THE NATIONAL GUARD FOR 60 DAYS ON JUNE 7 AND JUNE 9, 2025.

On Friday, June 6, 2025, Department of Homeland Security (DHS) agents began carrying out aggressive and pervasive immigration enforcement operations across Los Angeles County. These operations included detentions and arrests at community locations including two Home Depot stores, a doughnut shop, and a clothing wholesaler, all in and around the Los Angeles area. Espíritu Decl., Ex. G, ECF No. 8-1 at 52. In the course of these operations, DHS agents took actions that inflamed tensions and provoked protests. *Id.* at 54. These protests were primarily peaceful, but there were instances of violence and other unlawful behavior. Olmstead Decl., ECF No. 8-2, ¶¶ 9-11. State and local law enforcement moved quickly to arrest lawbreakers, protect federal property and personnel, and quell violence. *Id.* at ¶¶ 6-9; Order Granting TRO, ECF No. 64 at 4. Governor Newsom and other elected officials immediately and unequivocally condemned unlawful conduct. Espíritu Decl., Exs. L, N. Q, ECF No. 8-1 at 70, 72, 87.

On June 7, 2025, President Trump issued a memorandum proclaiming that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion" and calling into "Federal service members and units of the National Guard under 10 U.S.C. § 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions," as well as "to protect Federal property, at locations where protests against these functions are occurring or are likely to occur." Espíritu Decl., Ex. O, ECF No. 8-1 at 108. Later that day, Secretary of Defense Pete Hegseth called into service 2,000 members of the California National Guard for a period of 60 days. *Id.* at 107. On June 9, 2025, Secretary Hegseth called into service an additional 2,000 members of the California National Guard for 60 days, as well as 700 U.S. Marines. Espíritu Decl., Ex. P, ECF No. 8-1 at 111.

On June 12, 2025, this Court found Plaintiffs were likely to succeed on their claim that Defendants' actions violated § 12406 and issued a temporary restraining order, which Defendants immediately appealed. Order Granting TRO, ECF No. 64. Though the Ninth Circuit stayed the TRO pending appeal, *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), that court has not yet

decided the merits of that appeal. This Court retains jurisdiction over all aspects of the case not subject to the appeal, including Plaintiffs' current challenge to Defendants' subsequent federalization orders. ECF No. 204.

## II. DEFENDANTS USE THE FEDERALIZED NATIONAL GUARD FOR ROUTINE FEDERAL LAW ENFORCEMENT MISSIONS.

Though Defendants initially claimed that the military was needed to respond to violence in Los Angeles, that mission quickly pivoted and expanded to encompass broad-ranging immigration enforcement activities far beyond Los Angeles. In the months that followed the June federalization orders, Defendants sent National Guard troops to accompany federal law enforcement on immigration raids in communities over 100 miles away from Los Angeles. Far from responding to threats to federal personnel or property, federal law enforcement officials routinely requested and received the assistance of federalized troops for operations as a "safety measure," even if the military's risk assessment showed that there was not any threat that would require military support. Sherman Test., Trial Tr. 137:5-18, ECF No. 162. In fact, Major General Scott Sherman, the Commander of Task Force 51 and its federalized National Guard members, testified that the military could be deployed anywhere federal law is being enforced, even in the absence of any threat at all, including to support the Internal Revenue Service, because a threat could always materialize. *Id.* at 124:1-128:18. Los Angeles Enforcement and Removal Operations Field Office Director Ernesto M. Santacruz Jr. estimated that in the weeks following the deployment, federal troops accompanied ICE Enforcement and Removal Operations on approximately 75 percent of their *routine* at-large, in-the-field operations, and described the National Guard as a "force multiplier" and a "security blanket" for federal immigration enforcement. Santacruz Test., Trial Tr. 169:13-16, 191:15-17, 197:17-198:21, ECF No. 162.

In June and July, troops were sent out of Los Angeles to places such as Mecca and Carpinteria, often in numbers that outnumbered the federal law enforcement officers present and even when there was "[n]o indication that failure to act would result in loss of life or significant property damage." Sherman Test., Trial Tr. 80:4-81:18, 86:1-6, ECF No. 162. Even within Los Angeles, soldiers were called on, not to provide actual protection, but to engage in mere "show[s]

of presence" in, for example, local parks. Harrington Test., Trial Tr. 37:16-18, ECF No. 162.

In short, in the initial 60-day federalization of the California National Guard, the Guardsmen spent most of their time not responding to violence or protecting federal personnel or property, but as routine law enforcement officials. On September 2, 2025, this Court held that those activities separately violated the Posse Comitatus Act and issued an injunction barring any further activities of the kind. ECF No. 176. That order is currently administratively stayed. *Newsom v. Trump*, No. 25-5553, Dkt. 7.1 (9th Cir. Sept. 4, 2025).

### III. DEFENDANTS FEDERALIZE THE CALIFORNIA NATIONAL GUARD FOR AN ADDITIONAL 90 DAYS DESPITE ACKNOWLEDGING ANY VIOLENCE HAS SUBSIDED.

Since mid-June, the instances of civil unrest that purportedly gave rise to Defendants' initial federalization and deployment of the California National Guard have subsided. Following "No Kings" protests on June 14, 2025, for the remainder of June and all of July and August, there were "only a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time." Hurtado Decl., ECF No. 183-5, ¶ 11. In July and August, LAPD "had to deploy far fewer resources in response to immigration-related protest activity, including in and around federal property." *Id.* at ¶ 19. Similarly, the California Highway Patrol was not aware of any "large-scale, protest-related activity" and did not receive "reports or notification of any significant protest-related violence or property destruction in or around Los Angeles" between June 19 and the end of August. Duryee Decl., ECF No. 134-4, ¶¶ 9-10. On July 15, 2025, a Pentagon spokesperson stated that "the lawlessness in Los Angeles is subsiding." Hamme Decl., Ex. 1, ECF No. 183-2 at 3.

On July 1, Defendants released 150 California National Guard members, then released an additional 2,000 on July 15. Hamme Decl., Exs. 5 & 6, ECF No. 183-2 at 24-31. Then, on July 21, Defendants withdrew the 700 Marines they had deployed to Los Angeles. Hamme Decl., Ex. 7, ECF No. 183-2 at 35. Even as Defendants began to withdraw troops, Los Angeles remained peaceful, and DHS continued to carry out arrests. On August 14, 2025, Department of Homeland Security Secretary Kristi Noem boasted about the success of the administration's California immigration-enforcement operations, noting that since June 6, 2025, DHS had arrested 4,481

people in the Los Angeles area. Hamme Decl., Ex. 8, ECF No. 183-2 at 37.

Such events could have been the end of this matter. Defendants could—and should—have returned all remaining federalized California National Guard members to the Governor's command and control in August. But they did not. Instead, on August 5, 2025, Defendants issued a new order federalizing 300 National Guard troops for an additional 90 days, through November 4, 2025. Decl. of Meghan H. Strong ("Strong Decl."), filed concurrently, Ex. 1. The order stated that the "mobilization is in response to direction from the President of the United States . . . to provide forces to protect federal functions, personnel, and property," but provided no further explanation for why the continued deployment was necessary. *Id.* A second order, this one issued by Secretary of Defense Hegseth on August 15, clarified that the balance of the remaining federalized Guardsmen would be released, but it still did not provide any justification for the federalization of 300 Guardsmen through November 4. Kurland Decl., Ex. A, ECF No. 190-1 at 5.

Plaintiffs challenged this August federalization order via a new motion for preliminary injunction, ECF No. 183, which the Court initially stayed and which Plaintiffs now renew following the lifting of that stay, ECF No. 208.

## IV. DEFENDANTS EXPAND THEIR MILITARY CAMPAIGN TO OREGON.

Meanwhile, Defendants began to implement in other parts of the country the model of military occupation that began in Los Angeles. In August, as this Court was presiding over the trial of Plaintiffs' Posse Comitatus Act claims in this action, the President announced he was sending National Guard troops into the District of Columbia. Later that month, the President issued an Executive Order ordering "the Secretary of Defense [to] ensure the availability of a standing National Guard quick reaction force that shall be resourced, trained, and available for rapid nationwide deployment." Strong Decl., Ex. 2. By the end of September, just a few weeks after this Court stayed consideration of Plaintiffs' preliminary injunction motion, the President picked his next target: Portland, Oregon.

After months of criticizing Portland based on unsupported allegations of crime and violence, on September 27, 2025, the President posted on his Truth Social account: "At the

request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!" Strong Decl. Ex. 6.

On September 28, 2025, after the Oregon Governor declined to mobilize Oregon's National Guard voluntarily, the Secretary of Defense issued a memorandum calling 200 members of the Oregon National Guard into federal service for a period of 60 days, under 10 U.S.C. § 12406. *Oregon v. Trump*, No. 3:25-cv-01756, ECF No. 1, at ¶ 58. Even though nearly four months had passed since the President's June 7 memo, the Secretary of Defense claimed that this new deployment to Portland was a "further implementat[ion]" of that memo. *Id.* In doing so, the Secretary of Defense made clear that he viewed the June 7 memo, which was not limited in scope, either geographically or temporally, as granting him a blank check to federalize troops anywhere, in any number, for any length of time.

The State of Oregon and the City of Portland filed suit later that same day, challenging the Trump administration's unlawful federalization and deployment of Oregon National Guard troops, and seeking a temporary restraining order enjoining their conduct. *Oregon*, ECF No. 6. On October 4, 2025, the United States District Court for the District of Oregon held that Oregon was likely to succeed on its claims and granted a temporary restraining order ("First Oregon TRO") that enjoined "Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." *Oregon*, ECF No. 56.

## V. DEFENDANTS SEND CALIFORNIA TROOPS TO PORTLAND.

Blocked by the First Oregon TRO from federalizing or deploying the Oregon National Guard, Defendants circumvented that order hours later by deploying the still-federalized California National Guard stationed in Los Angeles to Oregon instead. *Oregon*, ECF No. 59. By 6:30 a.m. on Sunday, October 5, 2025, Defendants had already transported approximately 100 federalized California National Guard soldiers to Portland.[1] *Id.*; *Oregon*, ECF No. 60, at ¶ 18.

[1] Earlier that week, Defendants had also sent an initial group of 14 federalized California National Guard soldiers to train the federalized Oregon National Guard, Declaration of Paul S. Eck ("Eck Decl."), filed concurrently, at ¶ 5.

An additional 100 soldiers joined them soon after, and currently 200 members of the California National Guard that were initially deployed to Los Angeles are stationed in Oregon.[2] *Id.* Though Defendants initially planned to send all federalized California National Guard members to Oregon, they ultimately kept some stationed in Los Angeles, and there are 101 federalized California National Guardsmen still stationed in Los Angeles today. *See id.*; Eck Decl. ¶¶ 6, 10.

Oregon and Portland, now joined by California in an amended complaint, filed a motion for a second TRO ("Second Oregon TRO") to block this second illegal attempt to deploy the military to Portland. *Oregon*, ECF No. 59. After a hearing held that same evening, in which the district court stated that Defendants' overnight movement of troops from California to Oregon appeared to be "in direct contravention" of its first order, the district court granted the Second Oregon TRO, this time enjoining Defendants from "deploying federalized members of the National Guard from any State into Oregon." *Oregon*, ECF No. 68. Though the Second Oregon TRO prohibited deployment of any National Guard in Portland, the 200 federalized California Guard members remained stationed in Oregon, drawing them away from California even though Defendants could not make use of them in Oregon. On October 16, 2025, Defendants purported to further extend the federalization of all currently federalized members of the California National Guard, including those still stationed in Los Angeles, through February 2, 2026. Strong Decl. Exs. 4 & 5.

Defendants appealed the First Oregon TRO, but not the Second. On October 20, a Ninth Circuit panel stayed the First Oregon TRO pending appeal. *Oregon v. Trump*, No. 26-6268, Dkt. 61.1. On October 28, the en banc court vacated the panel's decision and granted rehearing en banc. *Id.*, Dkt. 89.1. Separately, the Ninth Circuit administratively stayed the First Oregon TRO to the extent it would require outright de-federalization of the Oregon National Guard members; that partial stay remains in effect pending the outcome of en banc proceedings. *Id.*, Dkt. 90.1.

Meanwhile, the district court proceeded with the *Oregon* plaintiffs' claims and, on October 29 through 31, held a trial on the merits of the claim that any deployment to Oregon

[2] In addition to the California National Guard, on the evening of October 5, Defendants also federalized 400 members of the Texas National Guard to send to cities of Defendants' choosing, including Portland. *Oregon*, ECF No. 65.

violates 10 U.S.C. § 12406. On November 2, the court found the *Oregon* plaintiffs were likely to succeed on their claims and issued a preliminary injunction order to replace the TRO that expired that day. *Oregon*, ECF No. 134. And on November 7, the court issued Findings of Fact and Conclusions of Law in which it concluded "that even giving great deference to the President's determination, the President did not have a lawful basis to federalize the National Guard under 10 U.S.C. § 12406." *Oregon*, ECF No. 146 at 2. The court found Oregon's witnesses credible and Defendants' witnesses not credible, concluded that Oregon had standing based on a sovereign injury caused by the unlawful federalization and deployment of the National Guard, and held that Defendants violated both § 12406 and the Tenth Amendment in calling forth the National Guard without a legal basis to do so. *Id.* at 20, 21 n.1, 25-26, 30, 34, 44, 57-61, 73-86, 99-103.

As to the California National Guard specifically, the court held that even if the California National Guard was "validly federalized under 10 U.S.C. § 12406(3) for deployment *in California*, the plain text of the statute only permits them to be deployed to 'execute those laws' that the President was 'unable with the regular forces to execute,'" and therefore the California National Guard "cannot proceed to enforce other laws in other states that have no connection to their initial federalization." *Id.* at 86 n.22 (emphasis original).

Based on these findings, the court permanently enjoined Defendants from implementing any memoranda federalizing and deploying members of the National Guard in Oregon based on the same predicate conditions. *Id.* at 104-05. The court stayed its judgment in part to the extent it enjoined the federalization of any State's National Guard, allowing the Guard to remain federalized without deploying and maintaining the status quo preserved by the Ninth Circuit's administrative stay. *Id.* at 105. With respect to the Oregon National Guard, that stay lasts fourteen days and will expire on November 21. *Id.*

## VI. DEFENDANTS SEND NATIONAL GUARD TROOPS TO ILLINOIS.

In addition to Oregon, Defendants have also extended their use of the military to Illinois. On October 4, 2025, Defendants once again federalized the National Guard over a state Governor's objection. *Illinois v. Trump*, No. 25-cv-12174, ECF No. 1, at ¶¶ 126-30. On the evening of October 4, the Secretary of Defense issued a memorandum calling into service 300

members of the Illinois National Guard under 10 U.S.C. § 12406. *Id.* ¶ 130. The very next day, Secretary Hegseth also issued the above-described order federalizing the Texas National Guard, which designated Chicago as another city to which these Texas soldiers were to be sent. *Id.* ¶¶ 133-34. In addition, on or about October 7, Defendants sent 14 of the same California Guardsmen assigned to train the Oregon National Guard to Chicago for 10 days to train the Illinois and Texas National Guards.[3] Eck Decl. ¶ 7.

Illinois, like California, the District of Columbia, and Oregon before it, challenged this unlawful federalization in court. On October 9, 2025, the district court held Illinois was likely to succeed on its claims and issued a TRO enjoining Defendants from federalizing and deploying any members of the National Guard within Illinois. *Illinois*, ECF Nos. 67 & 70. On appeal, the Seventh Circuit denied Defendants' motion for a stay pending appeal, and though it allowed Defendants to keep troops federalized rather than returning them to their home States, it maintained that Defendants could not deploy any members of the National Guard in Illinois, concluding that "the facts do not justify the President's actions in Illinois under § 12406." *Illinois v. Trump*, 2025 WL 2937065, at *1 (7th Cir. Oct. 16, 2025). Defendants sought further review before the Supreme Court and have asked the Court for a stay pending appeal. Briefing on that request is ongoing through November 17.

## VII. CITIZENS OF LOS ANGELES CONTINUE TO PROTEST PEACEFULLY

Throughout all of this, there have been no events in Los Angeles in recent months resembling anything close to those that prompted the federalization in June. As described above, the incidents of unrest that purportedly gave rise to the initial June deployment had already subsided by July and August, leading Defendants to release approximately 3,700 of the 4,000 federalized California National Guard troops. That has remained the case ever since. In October, "No Kings" protesters gathered across California to protest the Trump administration's policies, including immigration enforcement operations. Strong Decl. Ex. 7. These protests were largely peaceful, were successfully managed by state and local law enforcement, and resulted in no significant violence or property destruction. Decl. of German Hurtado, filed concurrently, at

[3] Those California Guardsmen have since returned to Los Angeles. Eck Decl. ¶ 8.

¶¶ 13, 21; Decl. of Sean Duryee, filed concurrently, at ¶¶ 7-8. Despite this, 101 soldiers remain in Los Angeles, with no apparent end in sight to their occupation. Eck Decl. ¶ 10. Defendants continue to keep soldiers federalized based on a remote and unsubstantiated risk that they *might* be needed at some point in the future, but that is simply not what § 12406 permits.

## LEGAL STANDARD

Plaintiffs "seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (citation omitted); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ARGUMENT THAT FURTHER FEDERALIZATION ORDERS OF THE CALIFORNIA NATIONAL GUARD WERE AND ARE UNJUSTIFIED

There was no colorable basis to federalize and deploy soldiers to Los Angeles under 10 U.S.C. § 12406 on August 5, there was no basis for extending their deployment on October 16, and there is still no basis for any military presence in Los Angeles today. Defendants have not and cannot offer any justification for their repeated invocation of § 12406 in Southern California. Even if there was a colorable basis to invoke § 12406 in Los Angeles in June, that does not authorize Defendants to keep soldiers deployed there indefinitely. An exigency is not "a ghost that continues to persist once it has passed," and events in June may not be used to justify subsequent federalizations and deployments once those events have "qualitatively changed." *Oregon*, ECF No. 146 at 79.

Defendants must be able to justify the current federalization and deployment based on events as they stand in Los Angeles now. But there is no evidence that Defendants are currently,

or were at any point during or since August, "unable with the regular forces to execute the laws of the United States."[4] 10 U.S.C. § 12406(3). There have been no events of violence like those that occurred in June for months. By mid-July, Defendants admitted that "the lawlessness in Los Angeles [was] subsiding." Hamme Decl., Ex. 1, ECF No. 183-2 at 3. By August, the National Guard was assisting on "zero" ICE Enforcement and Removal field operations. Santacruz Test., Trial Tr. 198:19-21, ECF No. 162. In October, Defendants removed 214 of the troops from Los Angeles—more than two-thirds of those stationed there—and sent them to Oregon and Illinois. And 200 of those troops have remained stationed in Oregon since, even after the district court enjoined their deployment. Indeed, at one point Defendants were prepared to remove *all* the remaining federalized California National Guard troops from California, confirming there was and is no need or colorable basis for any military presence there.

What's more, the October orders that federalize the California National Guard through February, including those California soldiers still in Los Angeles, are based on events in *Oregon* not California. Strong Decl. Exs. 4 & 5. Those events are not even sufficient to support deployment of troops to Oregon, as the district court held in that case, *Oregon*, ECF No. 146, let alone deployment to California. And the *Oregon* decision does not resolve the issue of federalization and deployment of National Guard troops in and around Los Angeles. That issue remains before this Court, and Defendants have provided no justification for the continued military presence there and intrusion on the State's sovereignty. In short, even if there was a

[4] The meaning of "regular forces" under § 12406(3) is currently the subject of briefing before the Supreme Court. While Defendants have taken the position that "regular forces" means federal law enforcement, as noted in Plaintiffs' amicus brief on this topic, it is also reasonable to construe "regular forces" to refer to members of the regular military. *Trump v. Illinois*, No. 25A443, Amicus Br. of California and Oregon. But whatever the proper meaning of "regular forces," Defendants cannot satisfy § 12406(3)'s requirements in Los Angeles.

Nor is there any colorable basis for concluding that there is a rebellion or danger of rebellion in Los Angeles under § 12406(2). Though Defendants have attempted to rely on that argument as a secondary justification for their actions across the country, no court that has substantively considered the argument has found any merit in it. Order Granting TRO, ECF No. 64 at 16-22; *Oregon v. Trump*, 2025 WL 2817646, at *12-13 (D. Or. Oct. 4, 2025); *Oregon*, ECF No. 146 at 86-102; *Illinois v. Trump*, 2025 WL 2886645, at *15 (N.D. Ill. Oct. 10, 2025); *Illinois v. Trump*, 2025 WL 2937065, at *6 (7th Cir. Oct. 16, 2025); *cf. Newsom*, 141 F.4th at 1051 (9th Cir. 2025) (declining to reach rebellion argument). There is no rebellion in Los Angeles or anywhere else Defendants have tried to federalize the National Guard under § 12406.

lawful basis for invoking § 12406(3) based on a legitimate need for troops in Los Angeles in June, that need has long since ended. The deployment of troops must end with it.

Instead of defending their actions under the law, Defendants continue to try to evade judicial review entirely. When Plaintiffs sought relief before the Ninth Circuit after this Court stayed their original motion, Defendants argued that the President was exercising his discretion to determine the number and duration of Guardsmen and advanced the remarkable claim that there is "no time limit on federalization." *Newsom v. Trump*, No. 25-3727, Dkt. 136.1 at 12-15. But the text, structure, and history of § 12406 show otherwise. Section 12406 authorizes federalization "[w]henever" one of its factual predicates is met, and only then. Most relevant here, the President may federalize the National Guard if he "*is* unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3) (emphasis added). The use of the present tense means that the federalization must be tied to a *present* inability, not a past one. And while the statute gives the President discretion to "call into Federal service" members of the National Guard "in such *numbers* as he considers necessary" (emphasis added), that does not assign discretion to the question of the federalization's *duration*. Section 12406 is clear that the President may federalize troops only "whenever" one of the factual predicates *is* met.

Nor does § 12406 permit Defendants to keep troops stationed in Los Angeles based on the mere risk that events might arise that could pose a challenge to their execution of the laws. Whereas subsections one and two of § 12406 "'permit deployment whenever there is an invasion or rebellion *or a danger of those events*,' subsection three 'asks only whether the President is presently unable to execute the laws; the subsection does not ask in the alternative whether the President is in danger of being unable to execute the laws.'" *Oregon*, ECF No. 146, at 80 (quoting *Oregon v. Trump*, 2025 WL 3008050, at * 27 (Graber, J., dissenting)) (internal citation omitted, emphasis in original). "Consequently, Defendants' attempt [in Oregon] to rely on aberrational violence in June to establish the existence of an emergency in September 'runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason.'" *Id.* (quoting *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017)).

So too here. Defendants have conceded that events in Los Angeles have meaningfully changed since June and claim that they have responded by decreasing the number of troops there. *Newsom*, No. 25-3727, Dkt. 136.1 ("Protests are now less frequent, less violent, and generally pose a less significant risk to federal personnel and property . . . But that risk has not disappeared entirely."). They apparently seek to maintain troops in Los Angeles until any risk of violence "disappear[s] entirely," *id.*, but § 12406(3) does not authorize that kind of standing army. Some degree of risk is *always* present, which is why § 12406(3) does not authorize federalizing and deploying the National Guard based on a mere risk alone. Only when the President is *actually* unable to execute the laws may he invoke § 12406(3).

Because the President is not currently "unable with the regular forces to execute the laws"—and indeed, has had no colorable basis to reach that conclusion for some time (if he ever did)—he cannot continue to keep California's soldiers federalized and deployed in and around Los Angeles. He must return those soldiers to the command and control of the Governor unless and until new events arise that give him a colorable basis for invoking § 12406. Because he has not done so and continues to violate § 12406, he also violates the Tenth Amendment by continuing to unlawfully commandeer the State's militia to enforce a federal law enforcement program. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Plaintiffs have suffered and will continue to suffer irreparable harm every day that even a single California National Guard member is unlawfully federalized and deployed in Los Angeles. Prevailing on a constitutional claim "will almost always demonstrate [the plaintiff] is suffering irreparable harm." *Oregon*, ECF No. 146 at 104 (quoting *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023)). Here, Plaintiffs suffer constitutional harms resulting from the unlawful federalization and deployment of the National Guard for which "there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Defendants' wresting of control of the National Guard from the Governor and the State directly violates Plaintiffs' sovereign rights, and that harm will continue until the Guard is returned to the Governor's command and control. *See Alfred L. Snapp & Son, Inc. v. Puerto*

*Rico, ex rel., Barez*, 458 U.S. 592, 607-08 (1982) ("the State has an interest in securing observance of the terms under which it participates in the federal system"); *Bond v. United States*, 564 U.S. 211, 225 (2011) ("action that exceeds the National Government's enumerated powers undermines the sovereign interests of States"); *Oregon*, 2025 WL 1817646, at *14. And because Defendants' violation of § 12406 is also a violation of the Tenth Amendment, "[t]he existence of [that] continuing constitutional violation constitutes proof of an irreparable harm." *Illinois*, 2025 WL 2886645, at *23 (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).

In addition, Defendants' unlawful commandeering of the National Guard interferes with California's police powers and "interest in having only well-trained law enforcement officers deployed" within its communities and borders. *See id.* at *24; *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (noting "ongoing and concrete harm to [State's] law enforcement and public safety interests"); s*ee also United States v. Morrison*, 529 U.S. 598, 618 (2000) (reservation of police powers to the States "is one of the few principles that has been consistent since the [Constitution] was adopted"). These violations of sovereignty are irreparable injuries because they "cannot be economically quantified, and thus cannot be monetarily redressed." *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 905 n.42 (1988)); *see also Ariz. Dream Act Coal.*, 757 F.3d at 1068 ("Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm." (internal quotation marks, citation, and alteration omitted)). California also plainly suffers irreparable harm when its own troops are depleted to serve an unlawful federal mission, including because those troops are diverted from critical work for the State and harm the State's ability to rapidly respond to unexpected emergencies.[5]

Defendants' recent actions only exacerbate the State's harms. Approximately 200 members of California's National Guard are currently hundreds of miles away, in another State, hindering their capacity to respond to emergencies within California. And there is no reason to

[5] As just one example of the important work the California National Guard performs for the State, on October 22, 2025, Governor Newsom deployed members of the California National Guard to support food banks in preparing and distributing meals to families in need, in anticipation of delays to federal food benefits. Eck Decl. ¶¶ 11-16.

think that Defendants' actions will abate any time soon. Defendants take the remarkable position that federalized troops may be "relocat[ed]" anywhere because, in their view, the federalization orders are "not limited in any way to the state" where the troops were initially federalized. Strong Decl., Ex. 3, Oct. 5, 2025 Tr. 5:20-6:23. The President has also made no secret of his desire to continue using the Nation's "cities as training grounds for our . . . National Guard." Strong Decl. ¶ 9. Nor has the President hidden his desire to have a "standing" National Guard force. Strong Decl., Ex. 2. Defendants' continued federalization and deployment of troops in and around Los Angeles thus threatens to allow California's National Guard—federalized in response to specific events in Los Angeles over five months ago—to be diverted indefinitely and dispersed across the country as part of the President's unprecedented experiment in militarized law enforcement.

### III. THE REMAINING *WINTER* FACTORS FAVOR INJUNCTIVE RELIEF.

Plaintiffs have suffered and will continue to suffer grave sovereign injuries absent an injunction. By contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct. Defendants have already acknowledged they will suffer no harm through their willingness to send troops out of Los Angeles, to Oregon and Illinois. And an injunction will serve the public interest by protecting the "traditional and strong resistance of Americans to any military intrusion into civilian affairs" and bringing an end to this unlawful occupation. *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) ("[It is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## CONCLUSION

For the foregoing reasons, the Court should enjoin Defendants' federalization and deployment of the National Guard in and around Los Angeles and order the return of any members of the federalized California National Guard remaining in California to the command and control of the Governor.

Dated: November 13, 2025

Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
JESSE BASBAUM
BRENDAN HAMME
IRAM HASAN
BARBARA HORNE-PETERSDORF
JANE REILLEY
DELBERT TRAN
Deputy Attorneys General

*/s/ Meghan H. Strong*
MEGHAN H. STRONG
Deputy Attorney General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

Case Name: *Newsom v. Trump* No. **3:25-cv-04870-CRB**

I hereby certify that on November 13, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF MEGHAN H. STRONG IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION (with Exhibits 1-7)**

**DECLARATION OF GERMAN HURTADO**

**DECLARATION OF PAUL S. ECK**

**DECLARATION OF SEAN DURYEE**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on November 13, 2025, at San Francisco, California.

| M. Paredes | */s/ M. Paredes* |
|---|---|
| Declarant | Signature |

SF2025303707
44867483

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

GAVIN NEWSOM, et al.,

*Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

*Defendants.*

Case No. 3:25-cv-04870-CRB

DECLARATION OF COLONEL EDWARD SAUTER

I, Colonel Edward Sauter, hereby state and declare as follows:

1. I am currently the Chief of Operations for United States Army North (ARNORTH), which is the Army Service Component Command (ASCC) of the United States Northern Command (USNORTHCOM). I have held this position since January 2024. I have served as a commissioned Army Officer for more than 23 years. My current responsibilities include overseeing the daily operations of ARNORTH, as well as the aviation and personnel recovery operations. This declaration is based on my personal knowledge, as well as information made available to me during the routine execution of my official duties.

2. USNORTHCOM is one of the Department of War's (DoW) eleven unified combatant commands. Its mission includes providing command and control of DoW homeland defense efforts and coordinating defense support of civil authorities. ARNORTH supports USNORTHCOM in its mission as the ASCC and Joint Forces Land Component Command for USNORTHCOM.

3. When federalized, members of a state's National Guard serve pursuant to Title 10 of the United States Code under the command of the President and the Secretary of War. Relevant to

this case, Commander USNORTHCOM has delegated operational control of members of the California, Illinois, Oregon, and Texas National Guards who are in a Title 10 status in support of ARNORTH.

4. Since June 7, 2025, some members of the California Army National Guard (CAARNG) have been federalized due to the "[n]umerous incidents of violence and disorder . . . in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal Immigration laws." *See* June 7 Memorandum, *Department of Defense (DoD) Security for Protection of Homeland Security (DHS) Functions* (June 7, 2025).

5. As recently as June 17, 2025, approximately 4,119 CAARNG members were mobilized in a Title 10 status, and those Guardsmen, as well as 821 active-duty United States Marines, were conducting operations in support of the Federal Protection Mission (FPM) in the State of California. After the subsequent decrease in FPM requirements in the State of California, the Secretary of War directed the immediate drawdown of forces in Los Angeles on or about July 30, 2025, to approximately 300. Later, approximately 200 of these Guardsmen were moved to Oregon to assist with a FPM there.

6. Before undertaking any FPM, federalized members of the Oregon and Illinois Army National Guards were required to undergo Civil Disturbance Operations (CDO) training, among other training, to be qualified to perform anticipated mission taskings. CDO training ensures that the federalized National Guard members are proficient in crowd control techniques that will ensure their safety as well as the safety of the protestors. This training includes de-escalation, display of presence, and how to safely move back protestors who fail to abide by law enforcement lawful orders to vacate Federal properties to ensure the safety of the Federal

properties, as well as of individual National Guard members, DoW members, Federal law enforcement officers, and protestors.

7. Since members of the federalized CAARNG have recent experience with CDO tasks, among other training, ARNORTH determined that ordering fifteen federalized members of the CAARNG to Oregon would facilitate proper, experience-based CDO training for the federalized members of the Oregon National Guard. The decision to use these fifteen federalized members of the CAARNG outside of California to provide efficient and experience-based CDO training to federalized members of the Oregon and Illinois Army National Guards does not negate or diminish the mission requirements for federalized members of the CAARNG in California. Rather, given the limited personnel resources available, ARNORTH determined that these fifteen federalized members of the CAARNG should be deployed to efficiently train federalized members of other state National Guards on FPMs outside of California.

8. Later, fourteen of the fifteen federalized members of the CAARNG who were sent to train the Oregon Army National Guard in Portland were sent to Illinois to provide CDO training, among other training, to the federalized members of the Illinois Army National Guard. The fifteenth member of the CAARNG remained in Portland as an advisor. By October 18, 2025, all fifteen federalized members of the CAARNG had returned to California.

9. Since the movement of some federalized members of the CAARNG from Los Angeles, California, to Portland, Oregon, the remaining approximately 100 federalized members of the CAARNG continue to be staged at various locations throughout Los Angeles providing rapid response protection support to federal facilities, functions, and personnel. These troops have also been supporting a DHS request for assistance mission by providing perimeter security at the

Roybal Federal Building in Los Angeles, which has been the focus of various protest activities in the past few months.

10. As of today, approximately 300 members of the CAARNG are on Title 10 orders through January 31, 2026. Further, in response to recent guidance from the DoW, 200 of those members will be released early. Precise numbers and dates for these releases are still being determined. With respect to the CAARNG, these troop adjustments will result in a trained and ready task force of approximately 100 troops in the Los Angeles area to continue to perform the FPM.

11. When operations in support of the FPM in any state near their end, several key timelines are implicated. First, contracting closeout and site clearance begin approximately one to two weeks ahead of the end of the mission. Second, federalized members of the Army National Guard begin a demobilization process lasting approximately seven days before their Title 10 orders expire. Third, before final demobilization most federalized members are likely to take advantage of any leave entitlements they may have accrued during mobilization. Altogether, the demobilization process may take up to two weeks since it involves travel from the current duty location to a demobilization site and includes mandatory medical and behavioral health screenings to document and safeguard the troops medical entitlements, equipment turn-in, and several other personnel and finance briefings.

12. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

SAUTER.EDWARD.BYRON.1177227575 Digitally signed by SAUTER.EDWARD.BYRON.1177227575 Date: 2025.11.18 16:43:10 -06'00'

COLONEL EDWARD SAUTER
CHIEF OF OPERATIONS
U.S. ARMY NORTH

BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 598-7755
ben.kurland@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, et al.,<br><br>*Defendants*. | Case No. 3:25-cv-04870-CRB<br><br>**DECLARATION OF MICHAEL J. GERARDI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** |

I, Michael J. Gerardi, declare, pursuant to 28 U.S.C. § 1746 and Local Rule 7-5, as follows:

1. I am a member in good standing of the Bar of the District of Columbia. I am a Senior Trial Counsel in the United States Department of Justice, Civil Division, Federal Programs Branch, and an attorney of record for Defendants in this action. I am authorized to practice in this Court under Local Rule 11-2. I make this declaration in support of Defendants' Opposition to Plaintiffs' Renewed Motion for a Preliminary Injunction.

2. I am over the age of 18. The facts set forth in this declaration are within my personal knowledge or based upon documents and information I have received in the course of this litigation.

3. Attached herein as Exhibit A is a true and accurate copy of a declaration prepared by Roger Scharmen, the Deputy Regional Director for Region 9 of the Federal Protective Service in proceedings before the U.S. Court of Appeals for the Ninth Circuit in this matter on October 16, 2025. The declaration can be found on the docket of *Newsom v. Trump*, No. 25-3727, Dkt. Entry 136.1, at SA17–20.

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 18, 2025

Respectfully submitted,

Michael J. Gerardi
*Senior Trial Counsel*

# EXHIBIT A

**No. 25-3727**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of California

---

**DECLARATION OF ROGER SCHARMEN**

I, Roger Scharmen pursuant to 28 U.S.C. § 1746, hereby declare as follows:

This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

1. I serve as the Deputy Regional Director for Region 9 of the Federal Protective Service (FPS). My primary place of duty is San Francisco, CA, but I continue to work in Los Angeles periodically.

2. The FPS remains the lead law enforcement agency protecting federal facilities, property, and people therein in Los Angeles in accordance with its statutory authority provided in 40 U.S.C. § 1315.

3. Beginning in June 2025, the National Guard has provided assistance to FPS in a support role at the Federal buildings in Los Angeles located at 255 E. Temple St. (Roybal Building), 300 N Los Angeles St. (Los Angeles Federal Building), and 11000 Wilshire Blvd. (Wilshire Federal Building). Those National Guard troops have been providing protection to the federal buildings, the personnel working there, and by extension, the functions ongoing at those buildings, consistent with the President's June 7 memorandum. For example, the National Guard has established outside perimeters, observation posts, and perimeter patrols for these federal buildings.

4. In early June, FPS reported protests in front of the Roybal and Los Angeles Buildings that would sometimes number in the thousands, including a protest on June 8 in front of the Roybal Building that included 3700 protesters. As has been documented elsewhere in this litigation, there were numerous acts of violence directed at federal law enforcement officers and the facilities.

5. The presence of the National Guard in Los Angeles significantly reduced the size, frequency, and violence of the protests at Federal Buildings, while not preventing any First Amendment protected activities. Beginning in mid-June and continuing to the present, protests have continued, albeit in reduced numbers. The number of protesters is typically below 100 protesters, but protests that are attended by up to 500 people still occur. Typically, protests occur each day between Thursday through Sunday of each week.

6. While the smaller protests are for the most part peaceful, threatening and harassing incidents still occur. A recent example occurred on October 9, 2025, when a verbal threat was made towards an FPS Inspector at approximately 12:20 a.m. It was reported that a Hispanic male, a known gang member, had come onto federal property and stated to the FPS Inspector "watch out" and that the officer should "leave and gangs

run this." The individual then left the property and entered a van. He exited the van and said to the officer "you think I am playing?" A female exited the van and pulled the male individual back into the van.

7. Another incident occurred on October 10, 2025, at approximately 8:58 p.m., when an immigration protestor assaulted an FPS Inspector and an FPS Protective Service Officer (PSO) by shining a high-powered laser in the officer's eyes, causing eye damage. The PSO cannot work due to his injury.

8. Having the National Guard available to assist FPS is key to maintaining officer safety and continuing our property protection operations. Although violence and threats directed at federal officials and property has been reduced since June, it is clear that this is due at least in part to the Guard's presence, which serves as both a deterrent and as support for overburdened FPS officers. There is no question that, from the perspective of the FPS officers responsible for protecting the federal facilities, the National Guard's presence has prevented violence from reoccurring on a frequent basis. and has been critical to maintaining the safety of all law enforcement officers involved.

9. Notwithstanding the two recent incidents, having the National Guard present at the federal facilities that FPS protects has not only helped keep most protests from becoming violent, but it also has allowed FPS to reduce its staffing levels. It is not uncommon for the National Guard to provide a force equal to or greater than what FPS is able to provide at a particular facility. For example, during a peaceful protest that occurred on September 16, 2025, FPS only needed to have 39 of its officers on site because the National Guard provided 40 of its members.

10. Most importantly, having the National Guard on site allows FPS officers perform law enforcement operations that it would otherwise have to forego. For example, when attempting to conduct an arrest during a crowded protest, teamwork is essential for officer safety. Having the National Guard available to remain on the property allows the FPS arrest teams officers to leave federal property to effectuate arrests of protesters who are suspected of committing crimes directed at federal property

or persons at or near the property. The National Guard members will form a line on the border of federal property while FPS officers are engaged in detaining the subjects. This creates a vital safety barrier for federal property and the FPS Officers.

11. FPS is a small agency with a total of 776 law enforcement officers. Of that number, only 497 are Inspectors, whose primary mission is to patrol and respond to law enforcement incidents at the federal buildings in their area of responsibility. While FPS can surge its Inspectors to respond to emergency situations, it is not resourced to provide a large-scale response to ongoing civil unrest or sustained attacks on federal facilities or federal employees working in those facilities. Given that so many FPS officers have been deployed to Portland, OR, to help protect the Portland ICE facility, FPS continues to be spread extremely thin operationally.

12. If the National Guard were no longer available to assist FPS, there is a concern that if the protests grow in size and become violent again, FPS would not have the resources on hand to respond fully. This would increase the threat to law enforcement, the public and the federal facilities.

13. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 16, 2025, at Los Angeles, California.

Roger Scharmen

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN, SBN 222993
THOMAS S. PATTERSON, SBN 202890
Senior Assistant Attorneys General
ANYA M. BINSACCA, SBN 189613
MARISSA MALOUFF, SBN 316046
JAMES E. STANLEY, SBN 316288
Supervising Deputy Attorneys General
JESSE BASBAUM, SBN 273333
BRENDAN HAMME, SBN 285293
IRAM HASAN, SBN 320802
BARBARA HORNE-PETERSDORF, SBN 327738
DELBERT TRAN, SBN 323993
JANE REILLEY, SBN 314766
MEGHAN H. STRONG, SBN 324503
Deputy Attorneys General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**

Plaintiffs,

**v.**

**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**

Defendants.

**NO. 3:25-cv-04870-CRB**

**NOTICE OF SUBMISSION REGARDING PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT**, pursuant to the Court's request during the December 5, 2025 hearing on Plaintiffs' renewed motion for preliminary injunction, Plaintiffs hereby submit the December 2, 2025 press release issued by the U.S. Attorney's Office for the Central District of California entitled "Koreatown Man Charged with Throwing Molotov Cocktails Inside Federal Building in Downtown Los Angeles." The press release is publicly available on the U.S. Department of Justice's website[1] and is attached hereto as Exhibit 1.

[1] *See* https://www.justice.gov/usao-cdca/press-releases.

Dated: December 5, 2025

Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
JESSE BASBAUM
BRENDAN HAMME
IRAM HASAN
BARBARA HORNE-PETERSDORF
JANE REILLEY
DELBERT TRAN
Deputy Attorneys General

*/s/ Meghan Strong*

MEGHAN H. STRONG
Deputy Attorney General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

# EXHIBIT 1

PRESS RELEASE

# Koreatown Man Charged with Throwing Two Molotov Cocktails Inside Federal Building in Downtown Los Angeles

Tuesday, December 2, 2025

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – A Koreatown man was charged today with throwing Molotov cocktails at security officers inside a federal building in downtown Los Angeles, an attack law enforcement believes was motivated by anti-immigration enforcement sentiment.

Jose Francisco Jovel, 54, was arrested Monday and is charged with attempted malicious damage of federal property.

Jovel is expected to make his initial appearance on Wednesday in United States District Court in Los Angeles.

“This case exemplifies how misleading and hateful rhetoric against federal law enforcement can and does result in violence,” said First Assistant United States Attorney Bill Essayli. “Irresponsible rhetoric by politicians and activists have real-world consequences. It must stop.”

"There can be zero tolerance for any targeting of law enforcement officials – let alone violent acts – and we're lucky that the devices allegedly thrown by the subject did not physically injure anyone," said Akil Davis, the Assistant Director in Charge of the FBI's Los Angeles Field Office. "The FBI's Joint Terrorism Task Force is dedicated to investigating and holding accountable anyone who conducts targeted attacks against government employees."

According to an affidavit filed with the complaint, Jovel – who hours earlier had set his Koreatown apartment on fire after receiving an eviction notice – arrived Monday morning at the Federal Building, located in the Civic Center of downtown Los Angeles. Jovel arrived outside the building with multiple shopping bags. The Federal Building houses offices for several federal agencies, including United States Immigration and Customs Enforcement (ICE).

While standing at the base of the stairs outside the building's main entrance, Jovel reached into one of the bags on his bicycle's handlebars and then threw a Molotov cocktail through the building's sliding door, which was open at the time, and is marked as an employee entrance.

Jovel then threw another Molotov cocktail through the then-open door of the Federal Building's public entrance, where a line of members of the public were waiting to go through security to enter the building.

Evidence collected from the scene, including surveillance video, indicates Jovel attempted to light at least one of the devices.

Federal officers immediately arrested Jovel then searched the bags he brought with him, which included a lighter and five additional Molotov cocktails. During his arrest, Jovel said he was motivated by his anger at the federal government of its immigration policies and actions.

Jovel described his actions as "a terrorist attack" and said to the officers, "you're separating families" – a remark commonly made by opponents of current United States government immigration policies. He then yelled for people to "start shooting these," referring to the officers.

*A complaint contains allegations that a defendant has committed a crime. Every defendant is presumed to be innocent until and unless proven guilty beyond a reasonable doubt in court.*

If convicted, Jovel would face a mandatory minimum sentence of five years in federal prison and a statutory maximum sentence of 20 years in federal prison.

The FBI is investigating this matter with assistance from the Federal Protective Service, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Homeland Security Investigations, the Los Angeles Police Department, and the Los Angeles Fire Department.

Assistant United States Attorney Jenna W. Long of the National Security Division is prosecuting this case.

**Contact**

Ciaran McEvoy
Public Information Officer
ciaran.mcevoy@usdoj.gov
(213) 894-4465

*Updated December 2, 2025*

**Topics**

IMMIGRATION

VIOLENT CRIME

**Component**

USAO - California, Central

Press Release Number: 25-268

# Related Content

PRESS RELEASE

## Former Laguna Niguel Resident Found Guilty of Threatening to Kill Judge Who Presided Over His Family Law Case

A former Orange County resident was found guilty by a jury today of threatening to kill a superior court judge who presided over his family law case.

December 4, 2025

PRESS RELEASE

## CEO of L.A.-Based Childcare Company and Camp Counselor Charged with More Than a Dozen Child Sexual Exploitation Crimes

A federal grand jury today charged a childcare program CEO, camp counselor, and private babysitter in a 16-count indictment with using his positions of authority to sexually exploit at least...

November 25, 2025

PRESS RELEASE

## Central Coast Man Arraigned on Federal Grand Jury Indictment Charging Him with Making Threats to Bomb Synagogues

A San Luis Obispo County man was arraigned today on a three-count federal grand jury indictment charging him with threatening via social media last summer to bomb every synagogue within...

November 25, 2025

**Central District of California**

312 N. Spring St. Suite 1200

Los Angeles, CA 90012

Phone: (213) 894-2400

Fax: (213) 894-0141

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

GAVIN NEWSOM, et al.,
Plaintiffs,
v.
DONALD J. TRUMP, et al.,
Defendants.

Case No. 25-cv-04870-CRB

**ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION**

The Founders designed our government to be a system of checks and balances.[1] Defendants, however, make clear that the only check they want is a blank one. Six months after they first federalized the California National Guard, Defendants still retain control of approximately 300 Guardsmen, despite no evidence that execution of federal law is impeded in any way—let alone significantly. What's more, Defendants have sent California Guardsmen into other states, effectively creating a national police force made up of state troops. In response to Plaintiffs' motion to enjoin this conduct, Defendants take the position that, after a valid initial federalization, all subsequent re-federalizations are completely, and forever, unreviewable by the courts. Defendants' position is contrary to law. Accordingly, the Court **ENJOINS** Defendants' federalization of California National Guard troops.

[1] The Federalist No. 51 (James Madison) ("TO what expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several departments, as laid down in the Constitution? The only answer that can be given is, that as all these exterior provisions are found to be inadequate, the defect must be supplied, by so contriving the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places.").

## I. BACKGROUND

The Court has chronicled the background of this dispute in previous orders, and so will not repeat it in detail here. See Order Granting TRO (dkt. 64); Opinion Granting Injunctive Relief (dkt. 176). Instead, the Court summarizes the circumstances of the temporary restraining order ("TRO") in this case, recounts the developments that occurred in California and elsewhere during the stay in this case, and outlines the present dispute.

### A. TRO in This Case

On June 6, 2025, Immigration and Customs Enforcement ("ICE") began immigration raids across Los Angeles, at locations like Home Depot, a donut shop, and a clothing wholesaler. Opinion Granting Injunctive Relief at 3; Espiritu Decl. Ex. G (dkt. 8-1) at 52. Protests, some unruly, followed. President Trump—despite quick responses from the Los Angeles Police Department ("LAPD") and the Los Angeles Sheriff's Department ("LASD")—responded by federalizing the California National Guard. Opinion Granting Injunctive Relief at 4. He did so by way of a June 7 memorandum invoking Section 12406, in which he stated that the Guardsmen's "duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." See June 7 Memo (Espiritu Decl. Ex. O at 108–09). "The memorandum never specifically mentioned Los Angeles or California; to the contrary, it instructed the Secretary of Defense 'to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard.'" Opinion Granting Injunctive Relief at 5 (quoting June 7 Memo at 108). Secretary Hegseth subsequently issued his own memorandum, stating that 2,000 members of the California National Guard would be "called into Federal service effective immediately for a period of 60 days." June 7 DOD Memo (Trial Ex. 18). Two days later, Secretary Hegseth issued another memorandum federalizing an additional 2,000 members of the California National Guard. June 9 DOD Memo (Trial Ex. 3).

The federalized National Guard deployed in Los Angeles on June 8. Opinion Granting Injunctive Relief at 9. Plaintiffs filed suit the next day, arguing that Defendants'

actions exceeded the scope of their authority. See Compl. (dkt. 1). On June 12, this Court issued a TRO holding that the June federalization did not satisfy Section 12406. See Order Granting TRO. The Ninth Circuit stayed the TRO pending appeal, articulating a deferential standard of review that courts in this Circuit must apply to federalization orders under Section 12406. See Newsom v. Trump, 141 F.4th 1032, 1040 (9th Cir. 2025). The Ninth Circuit recently held a hearing on Defendants' appeal of the TRO; it has not yet issued a ruling.

**B. Events in California Following the TRO**

From the "No Kings" protests in mid-June through August, there were "only a few immigration-related protests around [Los Angeles] with often just a few dozen protestors at a time." Hurtado Decl. (dkt. 183-5) ¶ 11; see also Duryee Decl. (dkt. 183-4) ¶ 9 ("I am not aware of any large-scale, protest-related activities in the Los Angeles area since June 19, 2025, and therefore there have been no arrests resulting from such activities occurring after June 19."); Opp'n (dkt. 214) at 1 ("The deployment has succeeded."). The LAPD was "well equipped to handle these protests and did so without mutual aid, the National Guard, or even the Department's own specialized crime suppression units." Hurtado Decl. ¶ 11.

**1. Draw Down of Troops**

In a series of orders, Defendants released the majority of federalized members of the California National Guard. See Hamme Decl. Ex. 5 (dkt. 183-2) at 25 (July 1, 2025 press release: "Task Force 51 releases 150 members of the California National Guard"); Sauter Decl. (dkt. 214-1) at ¶ 5 (On July 30, 2025, Secretary Hegseth directed a draw down of forces to approximately 300.); Kurland Decl. Ex. A. (dkt. 190-1) ("August 15 Memo") at 5 (memorializing directive on July 30, 20225 to release 1,350 members of the California National Guard from federal service).[2] In mid-August, Department of Homeland Security Secretary Kristi Noem announced that the immigration enforcement mission had

[2] Secretary Hegseth signed the memo by hand, adding "Thanks Gavin!" August 15 Memo at 5.



United States District Court
Northern District of California

succeeded: the administration had "Removed the Worst of the Worst Illegal Aliens," arresting "4,481 illegal aliens in the Los Angeles area" since June 6. Hamme Decl. Ex. 8 (dkt. 183-2) at 37.

#### 2. August Federalization Order

In the midst of that draw down, however, and despite the calm in Los Angeles, on August 5, 2025, Defendants issued a new federalization order. That order, issued the day before the initial federalization was set to expire, federalized 300 members of the California National Guard for 90 days, through November 4, 2025. Strong Decl. Ex. 1 (dkt. 212-2) ("August 5 Order") at 2 (calling Guardsmen into service for a "tour length" of 90 days). The August 5 Order stated in part:

> [] The Secretary of Defense, pursuant to Title 10, US Code, Section 12406, authorizes the mobilization of units and members of the National Guard. This mobilization is in response to direction from the President of the United States . . . to provide forces to protect federal functions, personnel, and property.
> [] This message implements SecDef's order to call units and members of the Army National Guard into federal service. The National Guard unit(s) listed . . . below are called into federal service under Presidential Reserve Callup (Title 10, USC 12406). . . .
>
> [] The following unit(s) is/are hereby called into federal service under the provisions of 10 USC 12406 effective[.]

Id. at 1–2. A subsequent letter from Secretary Hegseth on August 15, 2025 confirmed that "300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025." Kurland Decl. Ex. B (dkt. 190-1) at 7.[3]

#### 3. Filing of Motion for Preliminary Injunction

On September 2, 2025, Plaintiffs filed a motion for preliminary injunction, challenging the August 5 Order. See First MPI (dkt. 183).[4] This Court stayed that motion,

---

[3] Secretary Hegseth again added a handwritten "thanks!" to Governor Newsom. Kurland Decl. Ex. B at 7.

[4] That same day, following a three-day bench trial, this Court granted injunctive relief for



United States District Court
Northern District of California

explaining: "[t]he complicated and fragmented procedural posture leaves the Court skeptical of its jurisdiction to consider Plaintiffs' motion." Order re: Jurisdiction (dkt. 192) at 1. The Ninth Circuit later clarified that "Plaintiffs' challenge to Secretary Hegseth's August 5 order extending the California National Guard's federalization through November 5 is not the subject of this appeal," and so held that this Court has jurisdiction over Plaintiffs' challenge to that order. USCA Order (dkt. 204).

### C. Events During Stay

While the case was stayed before this Court, a series of significant events occurred, all demonstrating Defendants' expansive view of President Trump's powers under Section 12406.

#### 1. Oregon

On September 28, 2025, after the Governor of Oregon declined to mobilize Oregon's National Guard, Secretary Hegseth called 200 members of the Oregon National Guard into federal service. Compl. (dkt. 1) ¶¶ 57, 58 in Oregon v. Trump, 3:25-cv-01756-IM. Secretary Hegseth asserted that the Oregon federalization was a "further implement[ation]" of the June 7 Memo in this case, which, as noted above, was justified based on events in Los Angeles but unlimited in its geographic scope. Id. ¶ 58; June 7 Memo.[5] On October 4, 2025, U.S. District Judge Karin J. Immergut granted a TRO in favor of the State of Oregon and the City of Portland, holding that Defendants' actions failed to satisfy Section 12406, and temporarily enjoining the federalization and deployment of the Oregon National Guard in Portland. See Opinion and Order Granting Motion for TRO (dkt. 56) in Oregon v. Trump, 3:25-cv-01756-IM ("Portland TRO"). The next day, Defendants deployed 200 of the 300 remaining federalized members of the California National Guard to Oregon. Sauter Decl. ¶ 5; Second Mot. for TRO (dkt. 59) at

Plaintiffs on their Posse Comitatus Act claim. See Opinion Granting Injunctive Relief at 3. The Posse Comitatus Act claim is not material to the pending motion.

[5] See also Order Granting TRO at 34 n.13 (noting that amici from other states argued in early June that they were "'impacted by the unlimited scope of' the June 7 Memo.") (quoting States Amici (dkt. 30-1) at 2).

2 in Oregon v. Trump, 3:25-cv-01756-IM. Defendants also federalized 400 members of the Texas National Guard to send to Portland and other cities. Marshall Decl. Ex. 1 (dkt. 65-1) in Oregon v. Trump, 3:25-cv-01756-IM. On October 5, Judge Immergut granted a second TRO, enjoining the deployment of any National Guard members in Oregon. Second TRO (dkt. 68) in Oregon v. Trump, 3:25-cv-01756-IM ("Second Portland TRO").

Defendants appealed the first TRO but not the second. Although the Ninth Circuit stayed the first TRO pending appeal, an en banc court has since vacated the panel's decision and granted rehearing. See Oregon v. Trump, No. 26-6268 dkt. 61.1; 89.1.[6] In the interim, Judge Immergut held a trial on the merits, and ultimately granted the plaintiffs a permanent injunction because "even giving great deference to the President's determination, the President did not have a lawful basis to federalize the National Guard under 10 U.S.C. § 12406." Findings of Fact and Conclusions of Law (dkt. 146) at 2 in Oregon v. Trump, 3:25-cv-01756-IM ("Portland FOFCOL"). As of October 31, 2025, 200 federalized California National Guard members remain stationed in Portland "to perform infrastructure protection." Eck Decl. (dkt. 212-3) ¶ 9. At the motion hearing in this case, Defendants suggested that they are in the process of de-federalizing these 200 Guardsmen.

**2. Illinois**

On October 4, 2025, Defendants again federalized a state's National Guard over its governor's objection. Compl. (dkt. 1) ¶¶ 126–32 in Illinois v. Trump, 1:25-cv-12174. Secretary Hegseth issued a memo calling up 300 members of the Illinois National Guard to protect ICE, Federal Protective Service (FPS), other U.S. personnel performing federal functions, and federal property. Id. ¶ 130. Defendants also stated that federalized Texas National Guard members would be sent to cities including Chicago. Id. ¶¶ 133–34. And on October 7, Defendants sent fourteen federalized California National Guard members from Oregon to Illinois to train the National Guard in that state. Sauter Decl. ¶ 8; Eck Decl. ¶ 7.[7]

[6] The en banc hearing has yet to take place at the time of this Order.
[7] Those individuals returned to Los Angeles by October 30, 2025. Eck Decl. ¶ 8.



United States District Court
Northern District of California

On October 10, 2025, U.S. District Judge April M. Perry granted a TRO in favor of the State of Illinois and the City of Chicago, holding that they were likely to succeed in demonstrating that Defendants' deployment of the National Guard violated Section 12406. Opinion and Order (dkt. 70) in Illinois v. Trump, 1:25-cv-12174 ("Chicago TRO"). The Seventh Circuit denied Defendants' motion to stay the TRO pending appeal. Illinois v. Trump, 155 F.4th 929, 933 (7th Cir. Oct. 16, 2025) ("[T]he facts do not justify the President's actions in Illinois under § 12406, even giving substantial deference to his assertions."). The case is currently before the Supreme Court after briefing concluded in November. See Jason Meisner, Illinois and Trump brief US Supreme Court over administration's National Guard deployment powers, Chicago Trib. (November 11, 2025 at 4:08 PM CST), https://perma.cc/9W3Q-372U.

**3. October Federalization Order**

Meanwhile, despite the ongoing calm in Los Angeles, on October 16, 2025, a couple of weeks before the August 5 Order lapsed, Defendants again federalized 300 members of the California National Guard. Strong Decl. Exs. 4 and 5. Secretary Hegseth wrote:

> In response to a request for assistance from the Department of Homeland Security, and at the direction of the President, I direct the Secretary of the Army to extend the orders of all remaining California (CA) National Guard (NG) personnel called into Federal service under 10 U.S.C. § 12406, from November 4, 2025 to February 2, 2026, and I directed that Commander, U.S. Northern Command . . . redeploy 200 CA NG personnel to Oregon. . . .
>
> [T]hese individuals will temporarily protect [ICE] and other U.S. Government personnel who are performing Federal functions, including personnel enforcing Federal law, and will protect Federal property.

Strong Decl. Ex. 4 ("October 16 Order"); see also Strong Decl. Ex. 5 (Oct. 16, 2025 memo from Anthony C. Fuscellaro: "These 200 CA NG and 200 TX NG personnel, along with additional headquarters and support staff, will deploy to Oregon effective immediately to protect Federal functions, personnel, and property.").

As of now, 100 federalized California National Guard members remain "at various

locations throughout Los Angeles providing rapid response protection to federal facilities, functions, and personnel." Sauter Decl. ¶ 9. They also provide perimeter security at the Roybal Federal Building in Los Angeles. Id.

### D. Pending Motion

On November 4, this Court lifted the stay in accordance with guidance from the Ninth Circuit, and directed Plaintiffs to file an updated motion that included the relevant events that transpired during the stay. See Order Lifting Stay (dkt. 208). Briefing is now complete. See MPI (dkt. 212); Opp'n; Reply (dkt. 215). Plaintiffs challenge two orders under Section 12406: (1) the August 5 Order federalizing 300 members of the California National Guard for an additional 90 days, through November 4, 2025, and (2) the October 16 Order federalizing 300 members of the California National Guard through February 2, 2026.

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. DISCUSSION

Plaintiffs argue that they are entitled to a preliminary injunction because they have satisfied each of the Winter elements. The Court agrees.

### A. Likelihood of Success on the Merits

A party seeking a preliminary injunction must establish a likelihood of success on

the merits. Winter, 555 U.S. at 20. Plaintiffs argue that they are likely to succeed in arguing that the subsequent federalization orders are unjustified, because there was no colorable basis to federalize the National Guard on August 5 or October 16. Defendants respond that Plaintiffs are unlikely to succeed, because (1) courts lack the authority to review a president's subsequent federalization orders; (2) Plaintiffs have failed to state an ultra vires claim; (3) the August 5 and October 16 Orders satisfy the highly deferential standard of review; and (4) Plaintiffs seek relief that goes beyond the scope of the complaint. The Court addresses and rejects each of Defendants' arguments.

**1. Reviewability**

Defendants first argue that the August 5 and October 16 Orders are not subject to judicial review. But "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Deciding whether a party's "interpretation of [a] statute is correct" is a "familiar judicial exercise." Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 196 (2012). And every court to consider whether federalization under Section 12406 is reviewable has answered in the affirmative. See, e.g., Newsom, 141 F.4th at 1047 ("[W]e disagree with Defendants' contention that § 12406 completely precludes judicial review of the President's determination that a statutory precondition exists."); Illinois, 155 F.4th at 937 (same). Undeterred, Defendants justify their recycled arguments by contending that Newsom was only "controlling" as to the President's June 7 Memo, and that the Orders now at issue require different consideration. Opp'n at 4.

Defendants' second run at reviewability also falls flat.

**a. Sections 12406 and 12407 on Reviewability**

For starters, Defendants concede that "Newsom allows some measure of review of Section 12406's prerequisites when Guardsmen are 'call[ed] into Federal service.'" Opp'n at 4 (quoting 10 U.S.C. § 12406). That is explicitly what both challenged Orders here do. August 5 Order ("The National Guard unit(s) . . . are called into federal service under Presidential Reserve Callup (Title 10, USC 12406)."); October 16 Order (California

National Guard personnel were "called into Federal service under 10 U.S.C. § 12406, from November 4, 2025 to February 2, 2026"). By Defendants' own admission, then, these orders are reviewable.

Defendants nevertheless attempt to circumvent the scope of Section 12406 by characterizing the Orders as extensions of federalization, which they argue are outside the statute's reach. Opp'n at 4 ("Congress decided against subjecting the continuation of a mission to further regulation by Section 12406."). Indeed, at the motion hearing, Defendants confirmed their position that, after an initial federalization, all extensions of federalization orders are utterly unreviewable, forever.

That is shocking. Adopting Defendants' interpretation of Section 12406 would permit a president to create a perpetual police force comprised of state troops, so long as they were first federalized lawfully. Such a scenario would validate the Founders' "widespread fear [of] a national standing Army," which they believed "posed an intolerable threat to individual liberty and to the sovereignty of the separate States." Perpich v. Dep't of Def., 496 U.S. 334, 340 (1990). Defendants' argument for a president to hold unchecked power to control state troops would wholly upend the federalism that is at the heart of our system of government. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring) ("Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.").

The statutory framework repudiates Defendant's position. As Plaintiffs argue, and as this Court discusses in greater detail below, Section 12406 "authorizes federalization only when one of its factual predicates is presently satisfied." Reply at 1 (emphasis in original) (citing Portland FOFCOL at 37). Accordingly, each affirmative order authorizing federalization—whether a subsequent, distinct federalization or what Defendants call an extension—must comply with Section 12406's exigency requirements at the time it is effectuated.

Section 12407, the statute regarding the period of federal service, further confirms



United States District Court
Northern District of California

the judicial authority for reviewability of the Orders.

Section 12407 establishes that federalization terminates at the end of a president's chosen period of service, or sooner. 10 U.S.C. § 12407(a) ("Members and units called shall serve inside or outside the territory of the United States during the term specified, unless sooner relieved by the President."). It necessarily follows that an order bringing the Guard back into service must again go through the President's vehicle for federalization: Section 12406. Moreover, there are no statutes specifically relating to continuation or extension; as Defendants admitted at the motion hearing, only Sections 12406 and 12407 apply.

The timeline in this case is also illustrative. The President's initial memorandum in June specified that "the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." June 7 Memo. Secretary Hegseth's memorandum carrying out the President's declaration then specified that the federalization was "for a period of 60 days." June 7 DOD Memo.[8] Then on August 5, the day before that initial period lapsed, Secretary Hegseth again called up National Guard troops for a 90-day period starting on August 8. August 5 Order. And then again, shortly before this new period ended, Secretary Hegseth issued his October Order for another 90-day period ending on February 2, 2026. October 16 Order. Clearly, Defendants' own conduct demonstrates their understanding that Sections 12406 and 12407 work in tandem, requiring a re-federalization when the service period is set to expire.[9] The August 5 Order and the October 16 Order are properly construed as calling Guardsmen into federal service and are thus reviewable under Section 12406.[10]

---

[8] As Defendants argue, it is possible to construe President Trump's June memorandum as not defining a closed period of service, since it is for 60 days or at Secretary Hegseth's discretion. June 7 Memo. But Secretary Hegseth's subsequent memorandum forecloses this possibility. See June 7 DOD Memo; see also 10 U.S.C. § 12407(a) (period of service is specified "in the call").
[9] Why else would Defendants continue to issue orders if the June 7 Memo alone was sufficient?
[10] During oral argument in the Ninth Circuit for this case, Judge Bennett raised this exact issue, asking, "Let's say the President's original call-up had a termination date. Would you agree that your argument [for nonreviewability] wouldn't apply to a subsequent order of the President extending the date?" Oral Argument at 5:27, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT.

The parties dispute the relevance of Section 12407. Defendants assert that "the duration of federalized Guardsmen's service is committed to the President's discretion." Opp'n at 5. During the motion hearing, Defendants insisted that there is no language in Sections 12406 or 12407—or in the Ninth Circuit's decision in Newsom—that allows judicial review for anything but the initial federalization. On the other side, Plaintiffs argue that Section 12407's "purpose is to limit the President's power over the duration of federalization, not grant him absolute discretion." Reply at 4 (emphasis in original). In the Court's view, Defendants have the better reading. Section 12407 explicitly gives the President the option to specify a period of service in the call. Nowhere does it prescribe a maximum period the President may authorize. Further, Defendants correctly point out that Section 12406's predecessor statute did have a nine-month maximum service period. Opp'n at 6 (citing Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776). This language was removed in a later amendment and remains absent in the current iteration. See Act of May 27, 1908, ch. 204, §§ 3, 4, 35 Stat. 400.

But that does not mean that the President's discretion over the service period is absolute or that the service period can be infinite.[11] Plaintiffs persuasively point to legislative history indicating that Congress did not intend for the service period to last forever—just long enough to address the present emergency. See Reply at 6–7. The removal of the nine-month limitation was part of an effort to ensure the Guardsmen could "respond to a call for troops issued by the President under the conditions of emergency." H.R. Rep. No. 1067, at 5 (1908). Then-Acting Secretary of War Robert Shaw Oliver made clear that the limit was "generously waived" with the understanding that Guardsmen would "render service in any theater of military activity to which they may be called, and to

[11] During oral argument in the Ninth Circuit for this case, Judge Miller expressed concern about this idea, asking if there was "any time limit on how long [the Guardsmen] can stay federalized." Oral Argument at 1:20, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT. When Defendants answered that there was no limit, Judge Miller asked if "the fact that [Section 12406] says the President is unable with the regular forces to execute the laws—not, you know, was some distant time in the past when he decided to federalize them—doesn't that suggest that it has to be tied to what current conditions are?" Id. at 1:30.

United States District Court
Northern District of California

continue in such service until the necessity for their employment no longer exists." Id. at 6 (emphasis added).

Consequently, if this were a case where the President had neglected to specify a call-up period, it would still be reviewable under Section 12406's preconditions. After all, it is nonsensical to suggest that the law would permit a president to take advantage of an exigency, omit a call-up period, and then send Guardsmen wherever he wanted for as long as he wanted. See Youngstown, 343 U.S. at 650 (Jackson, J., concurring) (explaining that the Founders "knew what emergencies were" and "how they afford a ready pretext for usurpation," including how "emergency powers would tend to kindle emergencies."). Such a scenario would make a mockery out of the narrow preconditions Congress set forth in Section 12406 when it delegated its call-up power. See Newsom, 141 F.4th at 1045 ("Congress has delegated some of its power to call forth the militia to the President by statute, including 10 U.S.C. § 12406, which authorizes the President to 'call into federal service members and units of the National Guard of any state' under specified exigent circumstances.").

Of course a president is not required to identify a service period when first issuing a federalization order, because presidents cannot be expected to know at the start of an exigency how long it will last. But if the exigency is over and the President refuses to relinquish control over a state's National Guard, the state may seek court review of whether Section 12406's preconditions are still met, with all appropriate deference given to the President. Regardless, this scenario is not an issue here, where the President and the Secretary of War did identify periods of service. Those subsequent orders federalizing troops are reviewable under Sections 12406 and 12407.

**b. Other Arguments on Reviewability**

Defendants also raise other arguments opposing reviewability, which the Court briefly addresses here.

First, Defendants attempt to characterize Plaintiffs' motion as being centered on the quantity of Guardsmen federalized. Opp'n at 4. Because Section 12406 gives the

President the discretion to federalize the National Guard "in such numbers as he considers necessary," Defendants argue that his management of headcount is unreviewable. 10 U.S.C. § 12406; Opp'n at 4–5. But that is a red herring. Plaintiffs do not dispute the appropriate "number of federalized Guardsmen," but instead argue that "the federalization is wholly unlawful." Reply at 5. [12]

Second, Defendants argue that judicial review poses separation of powers concerns. They contend that review of the Commander-in-Chief's on-the-ground decision making "would inject the Judiciary into the military chain of command" and constitute improper "micromanagement." Opp'n at 8. "[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Department of Navy v. Egan, 484 U.S. 518, 530 (1988). But reluctance does not mean refusal. Courts have reviewed—albeit cautiously—military actions before. See, e.g., Sterling v. Constantin, 287 U.S. 378, 401 (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."). And the Judiciary's willingness to intrude into military affairs is greatest when the military is deployed domestically. The Supreme Court has emphasized:

> Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Laird v. Tatum, 408 U.S. 1, 15–16 (1972). In Sections 12406 and 12407, Congress has articulated the necessary preconditions for the President to exercise his delegated power; it is then up to the courts to review, with appropriate deference, whether those preconditions have been met.

---

[12] At the hearing, Defendants implied that Plaintiffs are in fact arguing about headcount, as Plaintiffs want zero federalized Guardsmen. That is too clever by half. Plaintiffs' core argument does not transform into one about headcount merely because it would result in a complete lack of Guardsmen in federal service.

Finally, Defendants' argument that reviewability would permit "judicial review on every day of the mission" is unsupported by the facts. Opp'n at 4. Plaintiffs certainly have not peppered the Court with frequent challenges to Defendants' federalizations, and the Court is not aware that Defendants have faced this issue in their other National Guard cases, either. Even if Defendants' fear did come to pass, courts have long been capable of handling vexatious litigants and meritless actions.

The Court determines that both the August 5 and October 16 Orders are reviewable.

**2. Ultra Vires**

Defendants next argue that Plaintiffs are unlikely to succeed because they cannot meet the high threshold necessary for relief on an ultra vires theory. Opp'n at 11–12. But as the Court explained previously, "emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory." Order Granting Injunctive Relief at 49. An ultra vires claim succeeds only if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." NRC v. Texas, 605 U.S. 665, 681 (2025) (emphasis in original) (citation omitted). Such claims also apply to presidential actions that extend beyond delegated statutory authority. See Murphy Co. v. Biden, 65 F.4th 1122, 1129–31 (9th Cir. 2023). An ultra vires claim is unavailable "where a statutory review scheme provides aggrieved persons with an adequate opportunity for judicial review." NRC, 605 U.S. at 681.

Certainly, Section 12406 represents a delegation by Congress of its authority to call forth the militia. See Newsom, 141 F.4th at 1045 ("Congress has delegated some of its power to call forth the militia to the President by statute, including 10 U.S.C. § 12406."). If the Ninth Circuit had agreed with Defendants' contention that there can be no ultra vires claim based on a president's violation of Section 12406, it would presumably have said so when it ruled on Defendants' motion to stay the Court's grant of a TRO in June.[13] Instead,

[13] The Circuit even referenced the ultra vires claim without raising any such concern. Id. at 1044.

it held that alleged violations of Section 12406 are judicially reviewable. See id. at 1047. "Section 12406 is nothing if not a delegation of authority, and so [the] Court's analysis of whether Plaintiffs are likely to succeed on the merits [of their ultra vires claim] will hinge on the degree to which Defendants' actions are in violation of Section 12406's command." Chicago TRO at 30 n.13. Accordingly, Plaintiffs can demonstrate that Defendants exceeded their delegated authority if they can show that Defendants federalized the National Guard on August 5 and October 16 without satisfying the narrow prerequisites of Section 12406.[14]

**3. Merits**

Defendants also argue that Plaintiffs are unlikely to succeed because, even if the Court can review the August 5 and October 16 Orders, those Orders "easily" satisfy Section 12406. Opp'n at 9–11. Not so. In rejecting Defendants' argument that a president's determinations under Section 12406 are entirely unreviewable, the Ninth Circuit instructed that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" Newsom, 141 F.4th at 1051 (citation omitted). Even under that "highly deferential standard of review," see id. at 1052, Plaintiffs are likely to succeed on the merits.[15]

Section 12406 provides that a president "may call into Federal service members and units of the National Guard" "[w]henever" one of three preconditions is met: "(1) the United States . . . is invaded or is in danger of invasion by a foreign nation," "(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States," or "(3) the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406 (emphasis added).

[14] Defendants do not assert that Plaintiffs have some other opportunity for judicial review. See Opp'n at 11 ("[H]ere, the only possible avenue for review is an ultra vires claim.").
[15] At the motion hearing, Defendants asserted that if the Court can review a federalization order after the initial federalization, it should apply an even "more deferential" standard of review. They provided no support for that position.

Of these three preconditions to federalization, Defendants only truly advance one. Defendants do not argue that there was a foreign invasion (or danger thereof) that justified federalization. And they make only a passing argument in their briefing—and perfunctorily asserted at the motion hearing—that there was a rebellion (or danger thereof) in Los Angeles that justified federalization, see Opp'n at 10 ("including the need to protect against any risk of rebellion"), id. at 11 ("There remains . . . a danger of a rebellion in California."). But the suggestion that there was any danger of a rebellion was even more farfetched in August and October than it was in June, when this Court first rejected it.[16] As the Court explained then, "[w]hile Defendants have pointed to several instances of violence, they have not identified a violent, armed, organized, open and avowed uprising against the government as a whole." Order Granting TRO at 20; see also id. ("Moreover, the Court is troubled by the implication . . . that protest against the federal government, a core civil liberty protected by the First Amendment, can justify a finding of rebellion.").[17] Other courts in recent months have reached a similar understanding. See, e.g., Illinois, 155 F.4th at 939 ("[B]ecause rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion."); Portland FOFCOL at 98–

[16] Defendants made the incredible argument at the motion hearing that there is a current danger of rebellion in Los Angeles. The evidence they offered was the protests six months ago and the fact that, on December 1, 2025, a single individual—acting alone and having burned down his own apartment that morning—threw two unlit Molotov cocktails at a federal building, injuring no one. See Notice (dkt. 220) Ex. 1. But the exigency of the June protests has long since passed, and the misconduct of a lone individual hardly represents "deliberate, organized violence to resist government authority." See Illinois, 155 F.4th at 939. The idea that there is a current danger of rebellion rings especially hollow in light of Defendants' ongoing draw down of federalized Guardsmen: if Defendants truly believed that there was such a danger, how could only 100 Guardsmen be the answer?

[17] At the motion hearing, Defendants again made the concerning argument that any demonstration against the policy of the Executive, if organized, can constitute a threat of rebellion. But organized protest is not inherently violent, nor is it an "unusual and extreme" exigency. See Newsom, 141 F.4th at 1051. To the contrary, it is quite common and part of the fabric of our nation. Indeed, "[p]ublic demonstrations and protests are clearly protected by the First Amendment." Index Newspapers LLC v. United States Marshals Serv., 977 F.3d 817, 830 (9th Cir. 2020). And the "Government is not free to disregard the First Amendment [even] in times of crisis." Cf. Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 21 (2020) (Gorsuch, J., concurring).

102 (defining rebellion as "an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means"). Defendants point to no evidence that the scattered protesters in Los Angeles in August or October were organized, collectively armed, or determined to overtake the federal government.

Accordingly, the Court turns to the remaining precondition to federalization, and the one upon which Defendants primarily rely: that "the President is unable with the regular forces to execute the laws of the United States." See Opp'n at 9. Defendants fail to satisfy two different requirements of that precondition: "is unable" and "regular forces."

**a. "Is Unable"**

First, the Court turns to the requirement that the President "is unable" to execute federal law.

**i. The Meaning of "Is Unable"**

The Ninth Circuit has already defined "unable" in this context, holding that "unable . . . to execute the laws" does not actually mean not able to execute the laws. See Newsom, 141 F.4th at 1051–52 (rejecting the notion that Section 12406 requires that the president "be completely precluded from executing the relevant laws").[18] Rather, the Circuit held, it is enough that the president be "significantly impeded" in executing the laws. Id. at 1052. But see Newsom v. Trump, 158 F.4th 984, 999 (9th Cir. 2025) (Berzon, J., regarding the denial of rehearing en banc) ("But § 12406(3) says nothing about 'interference' or 'significant impediments.' It requires that the President be 'unable with the regular forces to execute the laws' before he is authorized to call in the National Guard. . . . 'Unable' requires something much closer to complete incapacity than a two-day

[18] To be clear, in granting a TRO, this Court held that President Trump had not been "unable" to execute the laws because ICE had continued to detain and arrest people in Los Angeles despite the protests, Defendants provided no support for their argument that ICE could have detained more people in the absence of protests, the statute said "unable to execute the laws" and not "faces obstacles that cause him to underperform in executing the laws," and Defendants' showing compared unfavorably to the Postal Service Strike, when the mail system was "paralyzed." Order Granting TRO at 22–24.

minor disruption in a discrete location." (emphasis in original)); Chicago TRO at 43 ("[T]he Court frankly does not agree that 'significantly impeded' is the same thing as 'unable.'"); id. at 35 (explaining that "unable" at the time of Section 12406's enactment meant "not able").

The Ninth Circuit also explained the term "significantly impeded," holding that "any minimal interference with the execution of the laws" is insufficient. Newsom, 141 F.4th at 1051–52. Because invasion and rebellion both involve "unusual and extreme exigencies," which would render a president unable to execute some laws, the Ninth Circuit indicated that the third precondition must mean something similarly unusual and extreme, or else it would swallow the first two preconditions. Id. The Ninth Circuit pointed to evidence of violent protests (including protesters throwing "objects at ICE vehicles trying to complete a law enforcement operation") on the day before the June 7 federalization as colorably demonstrating an inability to execute the laws. Id. at 1052.

The Ninth Circuit did not address the meaning of the word "is" in Section 12406, as there was no real dispute at the time of the TRO that the protest activity was ongoing. It is clear to this Court, however, that the word "is" conveys the present tense.[19] See Portland FOFCOL at 79 ("Section 12406(3) asks whether 'the President is unable with the regular forces to execute the laws,' not whether the President was at some point in the past unable to do so." (emphasis in original)); Oregon v. Trump, 157 F.4th 1013, 1046 (9th Cir. 2025) (vacated opinion) (Graber, J., dissenting) (noting that "use of the present tense clearly conveys congressional intent that the present state of affairs is the relevant time" and collecting cases); see also Oral Argument at 1:30, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT (Judge Miller asking about "the fact that [Section 12406] says the President is unable . . . not . . . was at . . . some distant time in the past . . . doesn't that suggest that it has to be tied to what current conditions are?").

Congress did not say "was unable with the regular forces to execute the laws," and

[19] The word "whenever" in Section 12406 also communicates a temporal limitation to the present moment. See MPI at 12.

for good reason: the preconditions in Section 12406 are "specified exigent circumstances." See Newsom, 141 F.4th at 1045. Presently existing exigent circumstances, like an invasion, may demand streamlined responses. See Circumstance, Black's Law Dictionary (12th ed. 2024) (defining "exigent circumstances" as "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures, as when a neighbor breaks through a window of a burning house to save someone inside."); cf. United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993) (exigent circumstances justify exception to Due Process requirements of notice and opportunity to be heard). Past exigent circumstances do not. See Portland FOFCOL at 79 ("Of course, an exigency does not exist only at a discrete point in time, but nor is it a ghost that continues to persist once it has passed."); see also Oregon, 157 F.4th at 1046 (Graber, J., dissenting) ("Nor would it make sense for this narrow statute, which focuses on extreme and unusual occurrences, to allow the President to call up the National Guard to address an exigency that no longer exists.").

Defendants reject this emphasis on the present tense, insisting that "past experiences necessarily inform any analysis of whether, and to what degree, continued federalization is appropriate moving forward." Opp'n at 10. True enough. But there must be a colorable basis to conclude, based on past events, that there was an ongoing inability to execute the law at the time of federalization. Common sense must guide that inquiry.[20] In order to assess the facts, the Court must evaluate them holistically. See Newsom, 141 F.4th at 1051 (Courts "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'"). A colorable basis

[20] As Judge Immergut asked, "could the President rely solely on the civil unrest in Portland, Oregon, in 2020, to justify his deployment of military troops to the Portland ICE facility in 2025?" Portland FOFCOL at 78; see also Oral Argument at 4:04, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT] (Judge Bennett: "So if . . . for example, this statute were in effect at the Founding, and President Washington had called up militia to deal with the Whiskey Rebellion, notwithstanding the Whiskey Rebellion having gone away, that they could be called up forever without judicial review."); Oregon, 157 F.4th at 1045 (Graber, J., dissenting) (rejecting the government's suggestion that "even if there is complete calm for weeks beforehand, we should look further back in time to assess whether a present exigency exists.").

requires evidence linking a past event to a present inability to execute the law, such as the impact of any intervening events or the lack of attenuation to the time of the call-up. It is insufficient to simply point to a past event in and of itself.

Next, Defendants insist that Section 12406 permits federalization based on "'mere risk.'" Opp'n at 10 (quoting MPI at 12–13). Defendants asserted to the Ninth Circuit that "[p]rotests [in Los Angeles] are now less frequent, less violent, and generally pose a less significant risk to federal personnel and property compared to before the Guard was deployed[,] [b]ut that risk has not disappeared entirely." Opp'n to Mot. to Vacate Stay (dkt. 137) at 5 in Newsom v. Trump, No. 25-3727. They similarly assert here that there is a "continued threat of harm to federal personnel and property." Opp'n at 10. The Court shares Defendants' concerns about public safety: all citizens in this country deserve to feel safe, and it is a core function of government to ensure that safety.

Yet it is also a core right of the people to be able to gather in protest of their government and its policies—even when doing so is provocative, and even when doing so causes inconvenience. See, e.g., Cohen v. California, 403 U.S. 15, 24–25 (1972) ("To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. . . . That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength."); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508 ("But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. . . Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk."). Every protest, and indeed any large gathering of people in public, carries with it a risk of violence, however unlikely. But the specter of a protest that is not a current impediment to the President's ability to execute the laws becoming a future impediment is not adequate. See United States v. Weekley, 24 F.3d 1125, 1125 (9th Cir. 1994) ("A risk is a risk. But a risk of a risk is not enough of a risk."). It is profoundly un-American to suggest that

people peacefully exercising their fundamental right to protest constitute a risk justifying the federalization of military forces.[21] Such logic, if accepted, would dangerously water down this precondition for federalization and run headfirst into the First Amendment. See Bise v. Int'l Bhd. of Elec. Workers, AFL-CIO Loc. 1969, 618 F.2d 1299, 1304 (9th Cir. 1979) ("First Amendment rights are among the most fragile possessions of a citizen." (citation omitted)).

Regardless, the applicable standard when reviewing a president's decision to federalize the National Guard is not whether there are some threats of harm or risks to personnel and property. Those considerations are relevant to Section 12406(3) only insofar as they render the President presently unable to execute the laws. Notably, the first two preconditions for federalization permit a president to call up the National Guard even if there is only a danger of an invasion or rebellion. See 10 U.S.C. § 12406(1), (2). The third precondition, in contrast, does not permit federalization when there is a "danger" that the president will be unable to execute the laws, but requires a present inability to do so. See 10 U.S.C. § 12406(3); see also Portland TRO at 22 ("[C]oncern about hypothetical future conduct does not demonstrate a present inability to execute the laws."); Portland FOFCOL at 80 (same); Oregon, 157 F.4th at 1046 (Graber, J., dissenting) ("[T]he text of subsection three contrasts with the text of the other two subsections in a way that removes any doubt about the relevant time frame. . . . [S]ubsection three exclusively concerns the present, not the past and not the future."). Without a demonstration that the President's ability to execute the law is currently being impeded at the time of deployment, he lacks adequate grounds for federalization under Section 12406(3).

---

[21] See Cox v. State of La., 379 U.S. 559, 574 (1965) ("We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society."); cf. Snyder v. Phelps, 562 U.S. 443, 460–61 (2011) ("As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); Hon. Thurgood Marshall, Civil Rights And Race Relations: A Seminar 18 (1966) ("[T]his government was founded on protest."); Theodore Roosevelt, Jr., Sedition, a Free Press and Personal Rule, Kansas City Star, May 7, 1918 ("To announce that there must be no criticism of the President, or that we are to stand by the President, right or wrong, is not only unpatriotic and servile, but is morally treasonable to the American public.").

### ii. Application to the August and October Orders

The Court now turns to whether the President's determination on August 5, 2025 and October 16, 2025 that he "is unable with the regular forces to execute the laws" "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" See Newsom, 141 F.4th at 1051 (emphasis added). Plaintiffs contend that "[e]ven if there was a colorable basis to invoke § 12406 in Los Angeles in June, that does not authorize Defendants to keep soldiers deployed there indefinitely." MPI at 10. Defendants concede that "conditions have now improved," and even declare that "the federal protection mission has been a success," yet still insist that "the conditions required for federalization under Section 12406 continue to exist in California." Opp'n at 9.

The Court notes that Defendants focus on the current state of affairs. See, e.g., id. ("[T]he conditions required for federalization under Section 12406 continue to exist in California."). But the motion's focus, and therefore the Court's focus, is whether the President had a colorable basis for federalization at the time that he issued the challenged Orders, in August and October of 2025. Nevertheless, Defendants point to no evidence currently justifying federalization either. Their assertion that "[t]here remains an inability to execute the laws . . . in California" is not only unsupported, but actually borders on a misrepresentation. See Opp'n at 11.[22]

**August Order.** In August of 2025, the situation in Los Angeles was calm. Defendants, nonetheless, rely on two points to justify the August 5 Order. First, they cite to the declaration of Roger Scharmen, Deputy Regional Director for FPS, see Opp'n at 9 (citing Scharmen Decl. (Opp'n Ex. A)), which mentions the violence at the Roybal

[22] As discussed above, see supra note 16, the December 1 incident fails to demonstrate a current inability to execute federal law. While it no doubt represents an illegal and dangerous act of violence, that lone bad actor does not rise to the level of an "unusual or extreme exigenc[y]." See Newsom, 141 F.4th at 1051. Indeed, in their press release about the incident, the Justice Department states that it was able to manage this incident "immediately" and that the "FBI is investigating this matter with assistance from [FPS], the Bureau of Alcohol, Tobacco, Firearms and Explosives, Homeland Security Investigations, the [LAPD], and the Los Angeles Fire Department." See Notice Ex. 1. There was no mention of the need for, or involvement of, the California National Guard. Defendants also fail to articulate any federal laws that the brief December 1 incident significantly impeded the President from executing.

Building in "early June" and then no other incidents until October, see Scharmen Decl. ¶¶ 4–6. Scharmen states that "continuing to the present, protests have continued, albeit in reduced numbers," adding that typically there are fewer than 100 protesters, "but protests that are attended by up to 500 people still occur." Id. ¶ 5. He also states that "the smaller protests are for the most part peaceful." Id. ¶ 6. Second, Defendants point to a July 10 incident in Camarillo, California at a cannabis farm. Opp'n at 10–11. In Camarillo, federal law enforcement initially requested assistance from the National Guard, then canceled that request, before coming under attack by a crowd throwing rocks. Id. Defendants reason that "[m]ilitary decision-makers could reasonably rely upon such considerations in concluding that a small deployment of Guardsmen is still required." Id. at 11.

But an incident on July 10, 50 miles from Los Angeles, is not a compelling reason in and of itself to federalize troops on August 5. Even if there were exigent circumstances on July 10 in Camarillo, they had passed in the weeks thereafter, when there was no indication that ICE intended to return to Camarillo, when the National Guard was in fact assisting on "zero" ICE field operations like the one in Camarillo, see Santacruz Test. on 8/11/2025 (dkt. 162) at 198:5–21, and when Defendants had decided to release most of the Guardsmen, see Sauter Decl. ¶ 5.

Likewise, even if there were exigent circumstances in early June at the Roybal Building, two months thereafter that exigency had passed, as there were often just a few dozen protesters, no violent incidents, and no arrests at that location. See Hurtado Decl. ¶ 11; see also Scharmen Decl. ¶¶ 4–6; Duryee Decl. ¶ 9. "[A]n exigency [is not] a ghost that continues to persist once it has passed." Portland FOFCOL at 79. Defendants reason that while the unrest in June subsided, that abatement "was due at least in part to the presence of Guardsmen in Los Angeles." Opp'n at 10; see also Scharmen Decl. ¶ 5 (crediting "the presence of the National Guard" for reduction in violence in protests at federal buildings). But as Plaintiffs respond, "The point of federalization is to abate the exigency, so the claimed success of the federalization cannot be grounds for finding a further exigency."

See Reply at 8. If federalization justified federalization, it would become a positive feedback loop that perpetually rationalized federal control of state troops. Defendants' rank speculation regarding the effects of the Guardsmen's presence is insufficient as Defendants have been unable to identify even "minimal interference with the execution of the laws" in August 2025. See Newsom, 141 F.4th at 1052.

The Court also rejects Defendants' argument that the risk of future impediments was enough to federalize the National Guard in August. Even accepting Defendants' contention that future risk is relevant to Section 12406(3), Defendants have identified no colorable basis for the August federalization based on such risk. Defendants cannot credibly assert that the National Guard is necessary to "keep most protests from becoming violent," when they concede that protests since June now only occur "in reduced numbers." See Scharmen Decl. ¶¶ 5, 9. The protests around that time specifically had been small and peaceful. Hurtado Decl. ¶ 12; Scharmen Decl. ¶ 6. Again, peaceful protests cannot be the sole justification for federalization. See supra pp. 21–22.

Moreover, risk must be viewed in the context of what resources are available to prevent, mediate, or manage it. The risk that a handful of people could overtake a federal building, for example, looks different if there is just one guard, as opposed to many, protecting that building. Consequently, it defies the record—and common sense—to conclude that risks stemming from protests—in August, October, or even present day—could not have been sufficiently managed without resorting to the National Guard. After all, local law enforcement like the LAPD, the LASD, and the California Highway Patrol ("CHP") have not only been willing to manage the protests,[23] but have capably done so since June.[24] See Hurtado Decl. ¶ 12 (LAPD was "well-equipped" to handle the recent

[23] Defendants' suggestion at the motion hearing that because Los Angeles is a "sanctuary city," its law enforcement officers might be unwilling to assist with violence against federal personnel or property has absolutely no support in the record. As the Court pointed out and Defendants agreed, many crimes against federal personnel and property would constitute both state and federal crimes that state law enforcement would have a sworn duty to address. Nor is there any evidence that because Los Angeles is a "sanctuary city," its law enforcement officers are significantly impeding ICE's ability to execute the law in Los Angeles.

[24] While not pertinent to the August and October Orders, the LAPD and CHP were more than

protests and did so "without mutual aid, the National Guard, or even the Department's own specialized crime suppression units."); Duryee Decl. ¶ 9 ("CHP stands ready to respond to any future significant protest activities anywhere in California, including in the Los Angeles area."). That is even before considering the resources of FPS, other federal civil law enforcement, or the military.[25] One cannot colorably conclude that these organizations were so unable to manage the then-existing risk that the National Guard was required to protect the city's federal buildings.

As this Court can attest, individuals protesting the federal government often gather outside federal buildings. There is always some risk that a protester will engage in violence. But, as the Court has explained, if the threat that a protester might engage in violence outside a federal building was all that it took for the President to federalize the National Guard, then the narrow preconditions of Section 12406 would be rendered meaningless. See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund, 583 U.S. 416, 431 (2018) ("Congress does not hide elephants in mouseholes." (internal quotation marks omitted)).

Based on a holistic evaluation, there is no colorable basis to conclude that the President was "significantly impeded" from executing federal law on August 5, 2025.

**October Order.** The Court's analysis of the October 16 Order differs from its analysis of the August 5 Order in only a few respects.

First, and most obvious, October is two months even further removed from the unrest in June that the Ninth Circuit held satisfied Section 12406(3), making that justification for federalization that much weaker.

Second, Defendants have identified two other incidents that occurred in October, apparently at the Roybal Building. On October 9, 2025, "a known gang member" verbally

---

capable of handling the "No Kings" protest in Los Angeles on October 18, 2025, which had between 75,000 and 100,000 participants. Hurtado Decl. ¶ 13 (only "normal operational resources" were required to manage the protest); Duryee Decl. ¶ 7 (no "direct deployment of [CHP] resources" was required for the protest).

[25] The Court holds that the term "regular forces" in Section 12406 refers to the federal military, rather than federal civilian forces. See infra pp. 28–30. For purposes of the present analysis, however, the Court determines that both kinds of forces would have been able to manage the risk stemming from protests in coordination with local law enforcement.

threatened ("watch out," "leave and [let] gangs run this," "you think I am playing?") an FPS Inspector. Opp'n at 9 (citing Scharmen Decl. as evidence that threats have continued); Scharmen Decl. ¶ 6. That threat did not escalate into any physical violence and the gang member apparently left on his own. See Scharmen Decl. ¶ 6. The next day, an immigration protestor shined "a high-power laser" in an FPS officer's eyes, "causing eye damage." Id. ¶ 7. Defendants provide no further information about whether any National Guard members or law enforcement intervened in those incidents or how long they lasted. In any case, while it is never acceptable to threaten or injure an FPS officer, Section 12406(3) does not ask whether there are threats to individual federal employees, but whether the President is presently unable to execute the laws. See supra p. 22. These isolated incidents do not show that.[26] Even if the two October incidents were enough to create a risk that the President would be unable to execute the laws, there is no indication that local law enforcement, FPS, other federal civil law enforcement, or the military were incapable of managing that risk.

Third, the October 16 Order is based on events in Oregon, not anything occurring in Los Angeles.[27] See Strong Decl. Exs. 4 & 5. In the same breath that the Order federalized the Guard, it immediately redeployed 200 federalized National Guards members from California to Oregon. Id. Indeed, in sending 200 of the 300 remaining federalized California National Guard members to Oregon, and keeping them there, Defendants signaled that there was no pressing need for them in Los Angeles. See Eck Decl. ¶ 9 (200 federalized California National Guard members remained in Portland as of 10/31/25). Judge Immergut held that the events in Oregon did not justify the deployment of the

[26] Scharmen also declares that "having the National Guard present at the federal facilities that FPS protects . . . has allowed FPS to reduce its staffing levels." Scharmen Decl. ¶ 9. He goes on to explain that "FPS is a small agency with a total of 776 law enforcement officers." Id. ¶ 11. But Section 12406(3) does not permit the President to federalize the National Guard to make up for staffing shortages in other agencies. As discussed elsewhere, the President has many other resources available to him. Only if the president is unable with the regular forces to execute the law may he federalize the National Guard pursuant to Section 12406(3).

[27] The August 5 Order did not actually reference events in California, but it at least did not explicitly concern events in any other state. See Strong Decl. Ex. 1.

National Guard there. See generally Portland FOFCOL. Those same events certainly do not justify federalization in California.

Based on a holistic evaluation, there is no colorable basis to conclude that the President was "significantly impeded" from executing federal law on October 16, 2025.

**b. "The Regular Forces"**

Next, the Court turns to the requirement that the President "is unable with the regular forces" to execute federal law.

**i. The Meaning of "the Regular Forces"**

The Ninth Circuit has not addressed Section 12406(3)'s use of the term "the regular forces." See Newsom, 158 F.4th at 1000 (Berzon, J., regarding the denial of rehearing en banc) (noting that "[t]he panel opinion gives no role whatever to the 'with regular forces' requirement.").[28] In addition, this Court's order granting a TRO paid the term little attention, concluding that, "[i]n this case, the regular forces were and are still very much on duty," as ICE continued to execute the federal immigration laws in Los Angeles notwithstanding the protests. Order Granting TRO at 24. To the extent that this Court assumed that "the regular forces" meant civilian workers or civilian law enforcement, that assumption might have been in error. A review of materials related to the statutory history of Section 12406(3) not before the Court at the time of the TRO persuasively demonstrates that "the regular forces" means the regular forces of the military.

When the predecessor to Section 12406(3) was enacted, "regular forces" meant "the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen who did not make it their livelihoods to serve their country but instead took up arms only when called forth in times of national emergency." Chicago TRO at 35. As Professor Martin Lederman of Georgetown Law explained, in December of 1901, President Roosevelt "implored Congress to [establish] a means by which the states' militia could be

[28] The parties also have not addressed this point in any detail before this Court. See, e.g., MPI at 11 n.4 (asserting in a footnote that it is reasonable to construe "regular forces" as federal law enforcement or members of the regular military); see Opp'n (not addressing).

enhanced and effectively called into service." Lederman Br. (dkt. 14) in Trump v. Illinois, Case No. 25A443 (Oct. 21, 2025) at 9 (quoting Perpich, 496 U.S. at 341). Congress responded to Roosevelt's appeal by passing the Dick Act in 1903, which among other things sought "to establish closer relations and better cooperation between the National Guard and the Regular Army." Id. at 9–10 (quoting S. Rep. 57–2129 at 2 (1902)). When Congress amended the Dick Act in 1908, it was "to ensure that in cases where the use of the 'regular forces' was inadequate to execute federal laws, the President would have to call upon the National Guard as the initial supplement to the standing army before deploying any volunteer units." Id. at 11 (emphasis in original); see also id. at 12 ("The effect of the law was to prescribe the National Guard as the 'second line of defense' . . . as a supplement to the regular army." (citation omitted)). Professor Lederman recounted plentiful references to "Regulars" and "the Regular Army" in the congressional reports surrounding the 1903 and 1908 legislation, and in the over-hundred years leading up to it. Id. at 12–14. He concluded that "whenever anyone in one of the three branches discussed 'the regular forces' in relation to the militia, the National Guard or the volunteer forces, they were referring to those persons serving within the standing U.S. military, particularly the army." Id. at 17.[29] Indeed, he asserted that he was "unaware of any counterexamples." Id. Unsurprisingly, when asked at the motion hearing whether there is any historical basis for believing that in 1908, "regular forces" meant anything other than the standing army, Defendants were unable to point to any.[30]

This Court finds this historical review persuasive on the meaning of "the regular forces." But this Court is also well aware that the Supreme Court will soon rule on this

[29] See also Chicago TRO at 36–37 (noting that in McClaughry v. Deming, 186 U.S. 49, 56 (1902), the Supreme Court distinguished between "the men composing the militia"—i.e., the Guard—and "the Regular Army"); Lederman Br. at 16–17 (noting, for example, that Secretary of State Luke Edward Wright distinguished between the militia and the "regular forces" in an annual report to the President in 1908).

[30] Defendants argued instead that they believe from the context of Section 12406(3) that "regular forces" means the authorities normally charged with executing the laws. That reading would be more persuasive if the Court interpreted statutory language in a vacuum; here, the statutory history makes Congress's intent clear.

issue, and will have the last word. Accordingly, the Court will apply both the "military" meaning of regular forces and the Court's earlier understanding of that term.

**ii. Application to the August and October Orders**

The Court now turns to whether the President's determination on August 5 and October 16 that he "is unable with the regular forces to execute the laws" "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" See Newsom, 141 F.4th at 1051. Even if the evidence that Defendants point to in support of the August and October Orders represented a significant impediment to executing federal law in Los Angeles, Defendants do not even attempt to show that the President would have had any difficulty executing federal law with the assistance of the significant available military force at his command in California.[31]

The Court takes judicial notice that there are 34 military installations in California. See California Installations, Military OneSource, https://perma.cc/N5NT-PDW5. There were 160,074 active members of the military in California as of June 2025. See DoD Personnel, Workforce Reports & Publications, Defense Manpower Data Center, https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports. And there are 7,319 active members of the Army in California. See id. The notion that such a substantial military force, if otherwise permitted to execute the laws, see 18 U.S.C. § 1385 (Posse Comitatus Act), would have had any difficulty managing the small, ongoing, peaceful protests in Los Angeles, or the two incidents at the Roybal Building in October, each involving a single individual, has no merit.

Even under this Court's previous understanding of "the regular forces," there is no colorable basis to conclude that civilian law enforcement alone would have had any difficulty enabling the President to execute federal law in August or October. See Illinois, 155 F.4th at 939–40 ("We need not fully resolve these thorny and complex issues of

[31] This fact is devastating not only as to the actual evidence that Defendants say demonstrates a present inability to execute the law, but also as to Defendants' speculative arguments about future risk, like violence only being abated due to the presence of the National Guard.

United States District Court
Northern District of California

statutory interpretation now, because we conclude that the administration has not met its burden under either standard."). As discussed earlier, Plaintiffs submitted evidence that the LAPD was "well equipped to handle these protests and did so without mutual aid, the National Guard, or even the Department's own specialized crime suppression units." Hurtado Decl. ¶ 11. And Defendants submitted no contravening evidence suggesting that civilian law enforcement was inadequate. Defendants' hypothetical that the FPS "would not have the resources on hand to respond fully" "if the protests grow in size and become violent again," see Scharmen Decl. ¶ 12, does not mean that FPS did not have the resources available to deal with the altogether manageable circumstances in August and October, that the President could not employ support beyond FPS, or that local or state law enforcement would not also have been available to assist.

Accordingly, notwithstanding the highly deferential standard of review, Plaintiffs are likely to succeed in arguing that the August 5 and October 16 Orders fail to meet two requirements of Section 12406(3)—that the president "is unable" to execute the laws or that he is unable to do so with "the regular forces." Because Plaintiffs are likely to succeed on the merits as to Section 12406, they are also likely to succeed on the merits of their Tenth Amendment claim. See Bond v. U.S., 564 U.S. 211, 225 (2011) ("[A]ction that exceeds the National Government's enumerated powers undermines the sovereign interests of States."); see also Newsom, 141 F.4th at 1044 ("[P]arties agree that Plaintiffs' Tenth Amendment claim, at this stage, rises and falls with their ultra vires claim based on § 12406.").

**4. Amendment**

Finally, Defendants argue that Plaintiffs are unlikely to succeed because Plaintiffs' motion seeks relief that goes beyond the scope of the complaint. Opp'n at 12. Defendants assert that the complaint, which Plaintiffs filed on June 9, made "no mention of any decisions to extend the federalization," and so "Plaintiffs must amend their complaint before the Court could possibly entertain their motion." Id. This argument is both impractical—as it would require Plaintiffs to return to court to amend their complaint

every time Defendants filed a new federalization order, unnecessarily slowing the adjudication of these issues—and wrong.

Although the complaint predates the August 5 and October 16 Orders, it anticipates them, asking the Court to declare that the June 7 Memo "and any future orders" that call the California National Guard "into service under the stated authority of the President's use of 10 U.S.C. § 12406 are unauthorized by and contrary to the laws of the United States." Compl. at 21. The central claim in the complaint was that Defendants' June 7 Memo did not satisfy any of the preconditions in Section 12406, see id. ¶ 88, and the central relief sought in the complaint was the enjoining of the federalization, see id. ¶ 92. The motion now pending seeks to "enjoin any continued federalization and deployment of the National Guard troops in and around Los Angeles, and end this unlawful federalization now," MPI at 1, and turns entirely on Section 12406, id. at 10. Of course there is a "sufficient nexus" between the two. See Pacific Radiation Oncology, LLC v. Queen's Medical Center, 810 F.3d 631, 636 (9th Cir. 2015). Indeed, it is Defendants who refer to the June 7 Memo and the August and October Orders as part of one big "mission." See Opp'n at 4.[32] Moreover, when this Court expressed caution about proceeding on this motion, the Ninth Circuit held that the Court had jurisdiction over Plaintiffs' challenge to that order, something it presumably would not have done if the motion sought relief beyond the scope of this case. See USCA Order.

Plaintiffs therefore need not have amended the complaint for the Court to entertain this motion.

### B. Irreparable Harm

A party seeking preliminary injunctive relief must "demonstrate that irreparable

[32] Defendants' position is that the August 5 and October 16 Orders were not new orders "calling up" the National Guard but mere continuations of the June 7 Memo. See Opp'n at 2 (distinguishing these orders, which they characterize as "[t]he continuation decision[s] challenged here," from "the initial decision to federalize."); see also id. at 9 (reiterating "continuation of . . . valid federalization" characterization). By their own reasoning, then, there is all the more "relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." See Pacific Radiation Oncology, 810 F.3d at 636.

injury is likely in the absence of an injunction." Winter, 555 U.S. at 22; see also Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 788 (7th Cir. 2011) (holding that harm need not be certain to occur for injunctive relief to issue). The moving party must show a "sufficient causal connection" between the defendant's conduct and their anticipated injury. Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014).

Plaintiffs have demonstrated the likelihood of irreparable harm in the absence of preliminary injunctive relief based on their "constitutional sovereign harms" under the Tenth Amendment. Reply at 9; see also Bond, 564 U.S. at 225. Defendants attempt to frame the harm as "statutory, not constitutional," because Plaintiffs bring "alleged violations of a federal statute." Opp'n at 13. But those statutory violations themselves give rise to constitutional, sovereign injury as federalization wrests control of the National Guard from the State. Indeed, the other courts with National Guard cases are in accord. See, e.g., Illinois, 155 F.4th at 940 ("[T]he administration's likely violation of Illinois's Tenth Amendment rights by deploying Guard troops in the state over the state's objections constitutes proof of an irreparable harm." (cleaned up)); Preliminary Injunction (dkt. 134) in Oregon v. Trump, 3:25-cv-01756-IM (granting a preliminary injunction based, in part, on a likelihood of irreparable harm to Oregon's sovereignty). Because Plaintiffs are likely to succeed on their constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." Baird v. Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023).

### C. Balance of Equities and Public Interest

A party seeking injunctive relief must also demonstrate that the balance of equities tips in its favor, and that an injunction is in the public interest. See Winter, 555 U.S. at 20. "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. (quoting

Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Because the federal government is a party, the last two Winter factors merge. E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 668 (9th Cir. 2021).

The balance of the equities and the public interest tip in Plaintiffs' favor. Because Plaintiffs have demonstrated a likelihood of success on the merits of their Tenth Amendment injury claim, their showing "tips the merged third and fourth factors decisively in [their] favor." Baird, 81 F.4th at 1042. That is because it is "always in the public interest to prevent the violation of a party's constitutional rights." Riley's Am. Heritage Farms v. Elsasser, 32 F.4th 707, 731 (9th Cir. 2022) (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). In contrast, the harm of denying Defendants access to California's National Guard members is minimal given that Defendants "have adjusted downward the number of federalized Guardsmen" because, as they say, the "deployment has succeeded." Opp'n at 1.

The Court also notes that it is contrary to the public interest to have "militarized actors unfamiliar with local history and context" roaming the streets. Chicago TRO at 24. Rather, "the public has a significant interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods." Illinois, 155 F.4th at 940.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

- Defendants are temporarily ENJOINED from deploying members of the California National Guard in Los Angeles.[33]
- Defendants are DIRECTED to return control of the California National

[33] Plaintiffs asked the Court at the motion hearing to enjoin any future federalizations based on the same circumstances. In light of the deference owed the President's determinations under Section 12406 and the Court's recognition that circumstances are always changing, the Court DENIES this request. Plaintiffs may return to this Court to challenge any future federalization order that they believe violates the law.

Guard to Governor Newsom.

- The Court STAYS this order until noon on Monday, December 15, 2025.
- Plaintiffs are ORDERED to post a nominal bond of $100 within 24 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court. If said bond is not posted by the aforementioned date and time, this Order shall be dissolved.

**IT IS SO ORDERED.**

Dated: December 10, 2025

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

No. 25-3727

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

---

**On Appeal from the United States District Court**
**for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

---

**MOTION TO VACATE STAY OR, IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL**

---

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*

CHRISTOPHER D. HU*
*Deputy Solicitor General*
BRENDAN M. HAMME
BARBARA HORNE-PETERSDORF
MEGHAN H. STRONG
JANE REILLEY
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3917
Christopher.Hu@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

October 7, 2025

# TABLE OF CONTENTS

**Page**


Introduction ........................................................................................ 1

Statement ........................................................................................ 4

Argument ........................................................................................ 9

I. The Court should vacate the stay pending appeal ..................... 9

II. Alternatively, the Court should issue an injunction pending appeal to block defendants' prolonged, unlawful federalization of California's National Guard ......................... 16

Conclusion ........................................................................................ 22

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Feldman v. Arizona Sec'y of State's Off.*
843 F.3d 366 (9th Cir. 2016) (en banc) .................................................... 16

*In re World Trade Ctr. Disaster Site Litig.*
503 F.3d 167 (2d Cir. 2007) ........................................................................ 10

*Laird v. Tatum*
408 U.S. 1 (1972)........................................................................................ 15

*Log Cabin Republicans v. United States*
2011 U.S. App. LEXIS 16310 (9th Cir. July 22, 2011) ............................ 10

*Maryland v. King*
567 U.S. 1301 (2012).................................................................................. 20

*Mi Familia Vota v. Fontes*
111 F.4th 976 (9th Cir. 2024) ..................................................................... 10

*NetChoice, LLC v. Fitch*
145 S. Ct. 2658 (2025)................................................................................ 10

*Nken v. Holder*
556 U.S. 418 (2009).................................................................................... 10

*Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers*
472 F.3d 1097 (9th Cir. 2006) ...................................................................... 9

*Trump v. Int'l Refugee Assistance Project*
582 U.S. 571 (2017).................................................................................... 15

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008)........................................................................................ 16

# TABLE OF AUTHORITIES
(continued)

**Page**

**STATUTES**

10 U.S.C. § 12406 ........................................................................... *passim*

**COURT RULES**

9th Cir. R. 27-10 .................................................................................10

**OTHER AUTHORITIES**

Exec. Order 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025) ..............................21

Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c ................................................6

*Speech: Donald Trump Addresses Military Leadership in Quantico, Virginia*, Vimeo (Sept. 30, 2025), https://vimeo.com/1123254617?fl=pl&fe=sh ..........................................21

## INTRODUCTION

Earlier this year, the Court recognized the need for judicial review to serve as a check on abuses by the President and Secretary of Defense when exercising their limited authority to federalize members of the National Guard. Stay Order 21. As the Court explained, "the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Id.* at 20. The Court also recognized that sovereign States have "significant interests . . . implicated" when the President federalizes their Guard troops. *Id.* at 39. Although the Court provisionally determined that defendants "had a colorable basis for" federalizing California's Guard under 10 U.S.C. § 12406(3) in response to certain forms of disorder on June 6-7 in Los Angeles, *id.* at 33, the Court "emphasize[d] . . . that [its] decision addresse[d] only the facts before [it]" in early June, *id.* at 40. On that limited basis, and on the basis of representations by defendants that they needed the Guard to protect personnel and property in Los Angeles, *see id.* at 38-39, the Court agreed to stay an injunction issued by the district court requiring the return of the Guard to state control.

Since that time, the relevant circumstances have changed in fundamental ways. Not long after the Court entered its stay order, defendants began deploying members of the Guard to areas far from Los Angeles on missions that had nothing to do with the original basis for federalizing the Guard. Defendants also issued an

order extending the federalization from its initial 60-day period to 150 days, even while acknowledging that there was little (if any) remaining security risk to federal personnel in Los Angeles. And in recent weeks, defendants have greatly expanded their efforts to deploy the military on the streets of communities across the Nation. Most relevant here, defendants sent about 200 members of California's National Guard—nearly all of the remaining federalized troops—out of California entirely, to Portland, after a separate district court enjoined the federalization of the Oregon National Guard. A-404-405 (*Oregon v. Trump*, No. 25-cv-1756 (D. Or. Oct. 4, 2025), Dkt. 56-1).[1] Defendants also told California they plan to issue yet another order extending the federalization of California's Guard—this time, to January 31.

The ever-expanding mission of California's federalized Guard bears no resemblance to what this Court provisionally upheld in June. And it is causing irreparable harm to California, our Nation's democratic traditions, and the rule of law. The most straightforward way for the Court to address these circumstances would be to vacate the stay entered on June 19. The effect would be to restore the district court's temporary restraining order, thereby requiring the return of the 300 members of the Guard to state control. This Court has authority to vacate a stay when changed circumstances undermine the basis for it. That is the case here: Because most of the Guard is no longer in Los Angeles and the episodes of

[1] All references to "A-##" are to the addendum submitted with this motion.

disorder from early June have long since subsided, defendants could not plausibly show that they would suffer the forms of irreparable harm identified in this Court's prior stay order. *See* Stay Order 38-39. And whatever the public interest may have been on June 19, *see id.* at 39, it would be ill-served by maintaining a stay that has the practical effect of facilitating defendants' efforts to deploy the military on the streets of an increasing number of communities across our Nation. The Oregon district court has temporarily blocked defendants from circumventing its initial order by substituting members of the California National Guard for the Oregon National Guard. *See* A-414-415 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 68). But defendants are likely to attempt their novel experiment in cross-state deployments again in the near future. Indeed, defendants have already sent some members of California's National Guard to Illinois. A-454.[2]

Alternatively, the Court should issue an injunction to block defendants' unlawful orders extending the federalization of California's Guard through November 2025 and potentially even January of next year. The Court has broad equitable authority to grant relief of that nature. Although such a request would ordinarily be made in the district court in the first instance, the district court has

[2] At A-454, plaintiffs have included a new supplemental declaration from Paul S. Eck, Deputy General Counsel of the California Military Department. All other documents in the addendum were filed in district court, either in this case or in *Oregon v. Trump*, No. 25-cv-1756 (D. Or.).

concluded that it lacks jurisdiction over requests for renewed injunctive relief while the appeal before this Court remains pending. And defendants can no longer show any "colorable basis" under Section 12406 for federalizing members of California's Guard. Stay Order 33. If there were any remaining need for the troops in Los Angeles, defendants would not have sent most of them to Portland. Similarly, if there were any remaining need in Los Angeles, members of the Guard would have been assisting on more than "zero" ICE field operations in the city as of the time that trial was held in this case several weeks ago. A-201. For those reasons, and because the remaining equitable factors strongly support relief, the Court should grant this motion and restore the Guard to state control.[3]

## STATEMENT

The legal and procedural background are well known to the Court. *See, e.g.*, Answering Br. 3-13, 16-48. This Statement focuses on certain factual and procedural developments most relevant to the relief requested in this Motion.

1. In June 2025, the State of California and Governor Newsom filed a lawsuit challenging the President's federalization of 4,000 members of California's National Guard and moved for a temporary restraining order. ER-212-233. The district court granted interim relief, enjoining defendants "from deploying

[3] Counsel for defendants have represented that they oppose the motion.

members of the California National Guard" and directing defendants "to return control of the California National Guard to Governor Newsom." ER-37-38.

This Court granted a stay pending appeal, applying a "highly deferential standard of review." Stay Order 33. The Court concluded that defendants had "presented facts" establishing a "colorable basis for invoking" Section 12406(3). *Id.* at 33-34. In the Court's view, defendants had established that protests and other unlawful conduct in early June had "significantly impeded the ability of federal officers to execute the laws," *id.*, including at an ICE building "in downtown Los Angeles," *id.* at 11; in front of federal property "in Paramount, California," *id.*; and at federal buildings near the "Federal Courthouse" in "downtown Los Angeles," *id.* at 13. While the Court credited the "declarations submitted by Defendants" about the interference with federal officers' ability to execute the laws in Los Angeles, *id.* at 33-34, it also emphasized that the President lacks authority to "federalize the National Guard based on no evidence whatsoever," and rejected the argument that "courts would be unable to review a decision that was obviously absurd or made in bad faith." *Id.* at 30-31. Courts may "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 31.

2. Between June and August 2025, defendants deployed members of the Guard on missions that had very little—if anything—to do with the circumstances

and security risks discussed in this Court's stay order. For example, federalized Guard units were "sent more than 100 miles away" from Los Angeles to assist the DEA in enforcement actions "on suspected illegal marijuana farms." Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://tinyurl.com/7r9xtb7c; *see also* A-83-84. And as part of "Operation Excalibur," defendants deployed 80 troops in Humvees and tactical vehicles to Los Angeles' MacArthur Park for a "show of presence"—that is, to "demonstrat[e] federal reach" in a "high-visibility urban environment." A-38, 40, 41. Defendants also substantially reduced the number of federalized troops based on their view that "the lawlessness in Los Angeles is subsiding." A-214.

On August 5, however, defendants issued a new order that deployed 300 federalized members of California's Guard for a period of 90 days, through November 5. The order states that the "mobilization is in response to direction from the President . . . to provide forces to protect federal functions, personnel, and property." A-2. But it provides no other justification for continued federalization. *See id.*; *see also* A-359 (defendants agreeing that August order does not "cite new grounds or interject new considerations" to support continued federalization).

In response, plaintiffs asked the district court to preliminarily enjoin the new federalization order. D.Ct. Dkt. 183. Plaintiffs explained that there was no

colorable basis under Section 12406 to support it. Rather than addressing the motion on the merits, however, the district court concluded that it lacks jurisdiction to rule on the motion while the appeal before this Court remains pending. A-369-372. The district court also observed that plaintiffs could "move for an injunction before the Ninth Circuit" and pledged to "lift its stay and proceed expeditiously" if this Court offered direction that the district court could hear the preliminary injunction motion in the first instance. A-372.

3. On September 28, 2025, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 members of Oregon's National Guard. A-375 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 4, 2025), Dkt. 56). The State of Oregon and City of Portland filed a lawsuit in the District of Oregon challenging the federalization order, and sought a temporary restraining order.

On Saturday, October 4, the district court granted the requested relief, enjoining defendants "from implementing Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland." A-404. The court explained that "it had been months since there was any sustained level of violent or disruptive protest activity in Portland," and that there was substantial evidence that federal law enforcement "*were able* to execute the laws of the United States" in Portland. A-391, 393. The district court also rejected defendants' argument that "occurrences

of violence elsewhere" could support federalization in Portland. A-393. "[V]iolence in a different state . . . do[es] not provide a colorable basis to invoke Section 12406(3)." *Id.* "To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the President to federalize one State's National Guard based on events in a different state or mere speculation about future events." A-393-394; *see* A-394 ("In other words, violence *elsewhere* cannot support troop deployments *here*[.]").

Hours later, the U.S. Army Northern Command communicated to the California Military Department Leadership that they planned to send 200 federalized California National Guard personnel to Portland. A-409 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 60). By 6:30 a.m. the next day, approximately 100 of those Guardsmen departed Los Angeles for Portland and additional transport was scheduled for later in the day. *Id.* The California Military Department later learned that all 300 federalized California National Guard personnel would be deployed to Portland and that an order extending their federalization through January 31, 2026, would soon be issued. *Id.*[4]

---

[4] Defendants appear to have changed their minds about sending all 300 troops to Portland—at least for now. *See* A-420 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025)). The 200 troops most recently deployed to Portland remain there. A-454. An additional 15 members of the California National Guard were sent to Portland several days earlier to train members of Oregon's National Guard for their Portland deployment. *Id.* That means 85 members of the Guard remain in Los (continued…)

Through an amended complaint, the State of California joined Oregon's lawsuit, challenging the order deploying California's Guard to Portland. Together, the two States requested a temporary restraining order to prevent the active deployment of federalized members of California's National Guard in the State of Oregon. Shortly before the hearing on the temporary restraining order, Secretary Hegseth issued a memorandum mobilizing up to 400 members of the Texas National Guard to "perform federal protection missions where needed, including in the cities of Portland and Chicago." A-413 (*Oregon*, No. 25-cv-1756 (D. Or. Oct. 5, 2025), Dkt. 65-1). In response to that order and the motion filed by Oregon and California, the district court entered an order temporarily enjoining defendants "from deploying federalized members of the National Guard in Oregon." A-414. In granting that relief, Judge Immergut stated that "I see [defendants' actions] as direct contravention of . . . the order that this Court [previously] issued." A-434.

## ARGUMENT

### I. THE COURT SHOULD VACATE THE STAY PENDING APPEAL

To justify vacating a stay, a party must "demonstrate that facts have changed sufficiently since" the issuance of the stay, and that circumstances no longer satisfy the standard for a stay. *Southeast Alaska Conservation Council v. U.S. Army*

---

Angeles. *Id.* And California has learned that 14 members of the Guard were recently sent from Portland to Illinois to train members of the National Guard deployed in that State. *Id.*

*Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006); *see also Log Cabin Republicans v. United States*, 2011 U.S. App. LEXIS 16310, at *4 (9th Cir. July 22, 2011) (applying standard to vacate stay pending appeal in light of changed circumstances); *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (same). Under that standard, a stay is warranted—and can only remain in place—when the applicant has established that it "will be irreparably injured." *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J. concurring) (despite concluding that a challenged law was likely unconstitutional, concurring in denial of application for a stay because applicant had "not sufficiently demonstrated that the balance of harms and equities favors it at this time").[5]

The relevant circumstances have changed in significant ways such that defendants can no longer make any convincing claim of the sort of harms or equities that would justify a continued stay. When this Court issued a stay in June 2025, it relied on disturbances and isolated instances of violence involving federal facilities and personnel in Los Angeles that had occurred before the deployment of the National Guard. *See* Stay Order 38. After reviewing several of those incidents,

[5] The Court also has authority to reconsider its June 19 stay order in light of "[c]hanges in . . . factual circumstances." 9th Cir. R. 27-10; *see Mi Familia Vota v. Fontes*, 111 F.4th 976, 980 (9th Cir. 2024) (vacating motions panel's order staying district court injunction pending appeal).

this Court concluded that "the federal government's interest in preventing incidents like these is significant." *Id.* at 39. While the Court also acknowledged the State's "significant interests" in the "constitutional balance of power between federal and state government," it credited defendants' arguments that "[b]oth irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property." *Id.* at 38, 39.

Whatever interest the federal government could profess in "the protection of federal agents and property" in Los Angeles at that time, the situation in Los Angeles and defendants' recent actions have undercut any claim to such an interest now. For one, since the Court issued the stay order, the instances of civil unrest that gave rise to the deployment have subsided. "[T]here have only been a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time," A-351; the LAPD "has had to deploy far fewer resources in response to immigration-related protest activity, including in and around federal property," A-353; the California Highway Patrol has not seen any large-scale, protest-related activities in the area since June 19—over 100 days ago—and they are unaware of any requests from another law enforcement agency for protest-related assistance, A-346. As early as mid-July, moreover, a Pentagon spokesperson conceded that "the lawlessness in Los Angeles is subsiding." A-214.

Consistent with those substantially changed circumstances on the ground, defendants have deployed the federalized National Guard for only routine law enforcement operations—operations where defendants' own risk assessments concluded that the security risk to federal personnel is "low"—*not* to respond to any extraordinary threats or other circumstances significantly limiting the ability of civilian agents to execute federal law. *E.g.*, A-36, A-88-89. For example, over 300 troops and approximately 50 military vehicles were deployed to accompany law enforcement officers on a raid at a cannabis farm in Mecca, over 140 miles from downtown Los Angeles. A-83-84. Defendants also sent troops to a July 10 operation in Carpinteria, California, despite no evidence that the absence of Guard forces "would result in loss of life or significant property damage to federal personnel." A-89; *see also* A-108-110 (discussing Operation Excalibur).

In recognition of that reality, defendants began to release members of the National Guard from federalized service—with no harm or elevated risk to federal personnel or property. On July 1, defendants released 150 National Guard members, A-236; on July 15 they released an additional 2,000 troops, A-240; and by August 5, defendants maintained a federalized force comprising only 300 members of the National Guard, A-2-3; *see also infra* pp. 17-18 (describing current conditions in Los Angeles in greater detail).

Defendants' recent actions reveal that they do not view even those 300 Guard members to be necessary to protect federal personnel and property in Los Angeles. In response to an order in a separate case temporarily enjoining defendants from federalizing 200 members of the Oregon National Guard, defendants in the early morning hours of October 5 transported 100 members of California's Guard from Los Angeles to Portland. A-409. By the same evening, approximately 200 troops had moved to Portland. A-424. And defendants told California military leaders that they planned to send "all 300 federalized" troops to Portland as well. A-409; *see also* A-454 (some 200 California Guard troops remain in Portland).

Transporting the entirety of the federalized guard, some 800 miles away, cannot be reconciled with defendants' assertions about the harm they would suffer without federalized troops on the ground in the Los Angeles area. In prior proceedings, defendants represented to this Court that federal employees would be exposed "to violence at the hands of rioting mobs in Los Angeles," C.A. Dkt. 5.1 at 20; others would be "violently pummeled with stones," *id.*; and "extensive damage" would be inflicted on federal property, *id.* "The federal government," they stated, would suffer "significant harms" if they could not "prevent[] these extraordinary acts of violence causing both personal injury and property damage." *Id*. Even if those representations were accurate in mid-June, defendants' own actions reveal that they cannot credibly be asserted now.

Meanwhile, the ongoing stay irreparably harms California, the public, and the rule of law. As the State has previously explained, *see* C.A. Dkt. 16.1 at 21-25, C.A. Dkt. 48.1 at 16-18, it suffers a sovereign harm when the federal government federalizes its National Guard, and it plainly suffers harm when its troops are diverted from critical work for the State. *See, e.g.*, ER-75; SER-17-19. And whatever the public interest may have been when this Court first entered the stay, it would be ill-served by maintaining a stay that only emboldened defendants and enabled their efforts to circumvent another federal court's injunction. A-421 (Immergut, J.) ("Aren't defendants simply circumventing my order?").

The public interest would also be ill-served by exposing California and its federalized Guard members to the risk that they will be re-deployed to yet another State, such as Illinois or one of the many other American communities that the President has mentioned as possible targets. *See, e.g.*, A-413. That risk is far from hypothetical, and it could materialize at moment's notice—just as it did when defendants transported hundreds of troops from California to Oregon mere hours after the district court enjoined the Oregon Guard's deployment. Indeed, defendants have already deployed members of both the California and Texas National Guard to Illinois. *Supra* pp. 8-9 & n.4; A-454. And defendants have taken the position that they have authority to send California's Guard anywhere in the country, even though the ongoing federalization and deployment has zero

connection to the original mission in Los Angeles. *See, e.g.*, A-422 (counsel for defendants arguing that "[Section 12406] doesn't limit itself to [the] Guard in the state where—where a problem is").

Vacating the stay, in contrast, would restore the district court's temporary restraining order, thereby "return[ing] control of the California National Guard to Governor Newsom." ER-37-38. That would validate the public's "significant interest[]" in the proper "constitutional balance of power between federal and state government." Stay Order 39. And it would safeguard our Nation's longstanding tradition against "military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, D.Ct. Dkt. 124-1 at 11 (describing the "bedrock principle of American democracy" that "our military is apolitical").

At a minimum, the Court should vacate its prior stay order in part. *Cf. Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("This Court may, in its discretion, tailor a stay so that it operates with respect to only 'some portion of the proceeding.'"). The principal concern expressed by the Court in the June order was the security risk at the time to federal property in Los Angeles. *See, e.g.*, Stay Order 33-34. For the reasons discussed above, there is no longer any basis in fact for that concern. If the Court disagrees, however, it could lift its stay of the district court's temporary restraining order, except to the extent that federalized members

of California's National Guard are needed for and engaged in the protection of federal property in the Los Angeles area. Defendants could then seek to make a "good faith," "honest judgment," Stay Order 31 (emphases omitted), about the number of troops needed for that purpose, if any.

## II. ALTERNATIVELY, THE COURT SHOULD ISSUE AN INJUNCTION PENDING APPEAL TO BLOCK DEFENDANTS' PROLONGED, UNLAWFUL FEDERALIZATION OF CALIFORNIA'S NATIONAL GUARD

If the Court declines to vacate its prior stay order, it should grant an injunction blocking defendants' unlawful efforts to prolong the federalization of California's National Guard.[6] The Court has broad authority to issue injunctions while an appeal is pending. *See, e.g.*, *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). "The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Id.*; *see generally Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, that standard is satisfied:

[6] Specifically, the Court should order defendants to return the remaining 300 federalized members of the California National Guard to state control. At a minimum, for similar reasons to those discussed above, *supra* pp. 15-16, the Court should enjoin defendants from deploying members of the Guard for any activities beyond the protection of federal property in the Los Angeles area.

Defendants' order renewing the federalization for 90 additional days has no basis in Section 12406. And the remaining equitable factors strongly support relief.[7]

1. In early August, defendants issued an order federalizing hundreds of California's National Guard forces beyond the initial 60-day deployment. *Supra* p. 6. And if recent information provided by defendants to California is accurate, 300 members of the Guard are now set to remain under federal control until January 31, 2026, nearly eight months after the events in early June that originally prompted the federalization. *Supra* p. 8. Those actions violate Section 12406, which requires a showing of "invasion" or "rebellion," or that the President is "unable with the regular forces to execute the laws of the United States." As this Court previously recognized, "any minimal interference with the execution of laws" is not "enough to justify invoking § 12406(3)." Stay Order 33. Section 12406(3) also requires the President to identify an "unusual," "extreme" exigency similar in kind to "invasions" or "rebellions." *Id.*

Nothing of the sort has transpired in Los Angeles in recent months. *See supra* p. 11. Protest activity since early June has fallen significantly and recent activity

[7] Although a request for injunctive relief is typically addressed in the first instance at the district-court level, the district court here concluded that it lacks jurisdiction to resolve requests for injunctive relief while this appeal remains pending. *Supra* pp. 6-7. In the district court's view, the proper avenue is filing a motion for injunctive relief before this Court. *See* A-372.

has been limited and almost entirely lawful.[8] Defendants have admitted that the circumstances on the ground in Los Angeles have substantially changed since early June.[9] And on a number of missions where the Guard was deployed in June and July, military leaders determined that there would be a "low" risk to federal personnel in the absence of the Guard's participation. *E.g.*, A-36, 88-89. For instance, during "Operation Excalibur" in Los Angeles' MacArthur Park, *see supra* p. 6, Guard troops were deployed for a mere "show of presence" where there was no indication of any "threat to federal functions." A-40, 42-43.

If there were any doubt about the continued need for the Guard in Los Angeles, defendants resolved it over the weekend by sending hundreds of the remaining federalized units out of Los Angeles—and out of California entirely—to serve some 800 miles away in Portland, Oregon. *Supra* pp. 8-9. There is no "colorable basis" for federalizing the Guard to protect federal law enforcement or property in California, Stay Order 33, when defendants have sent most of those troops to Oregon and expressed their intent to send them all there. *See* A-409, 454;

---

[8] A-351 ("there have been only a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time."); A-346 (CHP not aware of any large-scale, protest-related activities in the Los Angeles area since June 19, 2025 or any requests for assistance, and have made no arrests resulting from such activities after June 19).

[9] On July 15, a spokesperson for the Department of Defense stated that "lawlessness in Los Angeles is subsiding," A-214, and as of August, the National Guard was assisting on "zero" ICE field operations, A-201.

*supra* p. 8 & n.2. Even under the "highly deferential standard of review" applied by this Court, which allows for actions "within a 'range of honest judgment," Stay Order 31, 33, defendants' efforts to extend the federalization of California's National Guard falls far short. *See id.* at 30-31 (executive actions that are "obviously absurd or made in bad faith" are impermissible).

Elsewhere, defendants have argued that plaintiffs cannot challenge the August federalization order because, in defendants' view, it simply represents a continuation of the original June 7 federalization. *See* A-358-359. But defendants have cited no authority for treating the June 7 federalization as a blank check—that is, an authorization of all future deployments indefinitely, no matter what factual circumstances develop and how much they diverge from the original circumstances that justified federalization. And the fact that defendants attempt to rely on a months-old justification, rather than the current situation on the ground in Los Angeles, merely underscores their inability to satisfy the predicate requirements under Section 12406 with respect to orders extending the federalization. *Cf.* A-393 (Immergut, J.) ("To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406[.]").

2. The equitable factors also strongly favor injunctive relief. Defendants can no longer credibly claim that federalizing California's National Guard is necessary to avert "extraordinary acts of violence causing both personal injury and property

damage" in Los Angeles. C.A. Dkt. 5.1 at 20. If there were any doubt on that point, their stated intention of sending all of the remaining federalized California National Guard members to Oregon—and the reality that 215 members of the Guard were in fact deployed to Oregon—reveals that defendants have no pressing need for troops in Los Angeles. *See supra* p. 8 & n.4, p. 13; A-409, A-454.

At the same time, the continuing and unwarranted federalization of the State's Guard harms California's sovereign interests, intrudes on the State's traditional law enforcement functions, and diverts members of the Guard from performing critical work for the State. *See supra* pp. 14-15; *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (noting "ongoing and concrete harm to [State's] law enforcement and public safety interests"). Although the number of troops that remain federalized has fallen from the 4,000 that were initially called up, hundreds still are unavailable for "important state services." ER-35. And there is nothing under defendants' understanding of the relevant legal principles that would guard against a sudden upsurge in the "number of National Guard members" that would be "appropriate to deploy" in California and beyond. C.A. Dkt. 5.1 at 15. After all, in defendants' view, such decisions are not subject to "judicial second-guessing" and are "entrusted to the political branches" alone. *Id.*

Defendants' recent actions only exacerbate the harms suffered by the State. At the moment, approximately 200 members of California's Guard are hundreds of

miles away, in another State, hindering their capacity to respond to emergencies within California. *Supra* p. 8 n.4; A-409, 454. Others were routed to Illinois earlier today. A-454. And there is no reason to think that defendants' recent actions will abate any time soon. Defendants take the remarkable position that federalized troops may be "relocat[ed]" anywhere because, in their view, the federalization orders are "not limited in any way to the state" where the troops were initially federalized. A-421. The President has also made no secret of his desire to continue using the Nation's "cities as training grounds for our . . . National Guard."[10] The August order extending federalization thus threatens to allow California's Guard—federalized in response to specific circumstances in Los Angeles four months ago—to be dispersed across the country as part of the President's unprecedented experiment in militarized law enforcement.[11]

None of this serves any interest previously recognized as valid by this Court. The public interest strongly supports relief that would prevent the President from

[10] *See Speech: Donald Trump Addresses Military Leadership in Quantico, Virginia*, Vimeo, at 42:45-43:01 (Sept. 30, 2025), https://vimeo.com/1123254617?fl=pl&fe=sh.

[11] *See, e.g.*, *Illinois v. Trump*, No. 25-cv-12174 (N.D. Ill. Oct. 6, 2025), Dkt. 1 (challenging President's federalization and deployment of troops to Chicago); *see also* Exec. Order 14339, 90 Fed. Reg. 42121-42122 (Aug. 25, 2025) (directing the Secretary of Defense to establish a "standing National Guard quick reaction force" for "rapid nationwide deployment").

abusing the limited authority conferred on him by Congress under Section 12406 to address "unusual and extreme exigencies." Stay Order 33.

## CONCLUSION

The Court should vacate the June 19 order entering a stay of the district court's temporary restraining order, or, in the alternative, grant the motion for an injunction pending appeal.

Dated: October 7, 2025

Respectfully submitted,

*s/Christopher D. Hu*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
CHRISTOPHER D. HU
*Deputy Solicitor General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*
BRENDAN M. HAMME
BARBARA HORNE-PETERSDORF
MEGHAN STRONG
JANE REILLEY
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,172 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 29 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GAVIN NEWSOM, Governor of California, In his official capacity as Governor of the State of California and STATE OF CALIFORNIA,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; et al.,<br><br>Defendants - Appellants. | No. 25-3727<br><br>D.C. No.<br>3:25-cv-04870-CRB<br>Northern District of California,<br>San Francisco<br><br>ORDER |

Before: BENNETT, MILLER, and SUNG, Circuit Judges.

Plaintiffs-Appellees filed the present Motion for Injunctive Relief because "the district court has concluded that it lacks jurisdiction over requests for renewed injunctive relief while the appeal before this Court remains pending." It is true that the pending interlocutory appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). But "an appeal from an interlocutory order does not stay the proceedings, as it is firmly established that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the

case." *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982). Thus, the district court "retains jurisdiction to address aspects of the case that are not the subject of the appeal." *United States v. Pitner*, 307 F.3d 1178, 1183 n.5 (9th Cir. 2002).

Plaintiffs' challenge to Secretary Hegseth's August 5 order extending the California National Guard's federalization through November 5 is not the subject of this appeal. Nor is it the subject of the appeal in case number 25-5553. The district court therefore has jurisdiction over Plaintiffs' challenge to the August 5 extension order. Accordingly, the Motion for Injunctive Relief (Dkt. No. 126) is **DENIED** as unnecessary.

No. 25-5553

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL BY SEPTEMBER 11 AND AN IMMEDIATE ADMINISTRATIVE STAY BY SEPTEMBER 4**

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7234*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

# TABLE OF CONTENTS

Page

INTRODUCTION ............ 1

STATEMENT ............ 3

A. Legal Background ............ 3

B. Factual Background ............ 5

C. Prior Proceedings ............ 7

ARGUMENT ............ 9

A. The federal government is likely to prevail on the merits. ............ 9

1. Plaintiff's PCA claim fails on threshold grounds. ............ 10

2. The federal government is not violating the PCA. ............ 16

C. The other stay factors strongly favor the government. ............ 21

CONCLUSION ............ 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 13

*Bissonette v. Haig*,
776 F.2d 1384 (8th Cir. 1985) .......... 20

*Bryan v. United States*,
524 U.S. 184, 195 (1998) .......... 20

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) .......... 11

*Davis v. State*,
No. 8:24-cv-02907, 2025 WL 992899 (M.D. Fla. Mar. 17, 2025) .......... 12

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 11, 12

*In re Debs*,
158 U.S. 564 (1895) .......... 18, 19

*In re Neagle*,
135 U.S. 1 (1890) .......... 18, 19

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 11

*Murphy Co. v. Biden*,
65 F.4th 1122 (9th Cir. 2023) .......... 11

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) .......... 8, 10, 21, 23

*Newsom v. Trump*,
No. 3:25-cv-04870, 2025 WL 1663345 (N.D. Cal. June 12, 2025) .......... 8

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 10, 13

*Perpich v. Department of Def.*,
496 U.S. 334 (1990) .......... 3, 4

*Robinson v. Overseas Military Sales Corp.*,
21 F.3d 502 (2d Cir. 1994) .......... 12

*Shivkov v. Artex Risk Sols., Inc.*,
974 F.3d 1051 (9th Cir. 2020) .......... 19

*Smith v. United States*,
293 F.3d 984 (7th Cir. 2002) .......... 12

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) .......... 12

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) .......... 12

*United States v. Dreyer*,
804 F.3d 1266 (9th Cir. 2015) .......... 20

*United States v. Khan*,
35 F.3d 426 (9th Cir. 1994) .......... 18, 19, 20

*United States v. Klimavicius-Viloria*,
144 F.3d 1249 (9th Cir. 1998) .......... 18, 19, 20

*United States v. Texas*,
599 U.S. 670 (2023) .......... 12, 16

**U.S. Constitution:**

Art. I, § 8, cl. 15 .......... 3

Art. II, § 2, cl. 1 .......... 3

**Statutes:**

10 U.S.C. § 10101 .......... 3

10 U.S.C. § 10106 .......... 4

10 U.S.C. § 12406 .......... 4, 6, 7, 15

10 U.S.C. § 12406(3) .......... 2, 8, 10, 14, 15

18 U.S.C. § 1385 .................................................................................... 4, 10, 11, 14, 20

**Executive Orders:**

Executive Order 11519, 35 Fed. Reg. 5003 (1970) ..........................................................15

**Other Authorities:**

*Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday Demonstrations & Consequent Impairment of Gov't Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971) ............18

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018) ..................................................................................................... 4, 15

U.S. Dep't of Def., Instr. 3025.21, *Defense Support of Civilian Law Enforcement Agencies* (Feb. 27, 2013)......................................................................................................4

## INTRODUCTION

The district court has again entered an extraordinary order that interjects the court into the military chain of command and superintends the Executive Branch's control over lawfully federalized National Guard members, who have been deployed to protect federal officers and property from mob violence. A unanimous panel of this Court stayed the district court's previous order, concluding that the President likely acted lawfully when he deployed the National Guard to address violent attacks that interfered with federal immigration officers' federal functions in Los Angeles and that the district court's order threatened the federal government's significant and uncontested interest in protecting its personnel and property. The district court's latest order enjoins the government on a different claim—that the President and the Department of Defense have violated the Posse Comitatus Act (PCA)—but it is equally, if not more, erroneous: the order exceeds the court's authority, misconstrues the PCA, impermissibly intrudes on the authority that Congress vested in the President as Commander in Chief, and threatens the safety of federal personnel. This Court should stay the order pending appeal.

The government takes seriously its obligations under the PCA and has not violated those obligations. Plaintiffs' arguments to the contrary fail for multiple reasons, and the district court erred in concluding otherwise. At the threshold, there is no private right of action for civil injunctive relief from an asserted violation of the PCA. The PCA is a criminal statute, and there is no tradition or practice of allowing

ultra vires review to challenge the federal government's alleged violation of that law, which protects public rights. Implying a private cause of action in this context would intrude on the Executive's prosecutorial discretion over whether and how to enforce federal criminal law. Moreover, the PCA's prohibition on the use of federal armed forces to enforce the law is, by its plain terms, inapplicable when such law enforcement is expressly authorized by statute. And the statute the President invoked to federalize the Guard here—the invocation of which this Court has already held was likely lawful—expressly authorizes the Guard to "execute those laws" of the United States that the President deemed the regular forces "unable . . . to execute." 10 U.S.C. § 12406(3).

Even if plaintiffs could overcome these threshold obstacles, plaintiffs adduced no evidence—during a multi-day trial—that the National Guard and the Marines engaged in federal law enforcement, let alone that defendants willfully violated the law by ordering conduct they knew was unlawful. Protecting federal personnel as they conduct federal operations is not law enforcement prohibited by the PCA, and the district court erred in holding otherwise.

At every turn, the district court justified its flawed rulings by questioning the validity of prior pronouncements of the Supreme Court and this Court. That underscores the appropriateness of this Court's immediate intervention. The balancing of harms also weighs strongly in favor of relief pending appeal. The district

court's order impinges on the Commander in Chief's supervision of military operations, countermands a military directive, and puts federal officers (and others) in harm's way.

This Court should also grant an administrative stay pending consideration of this motion. Defendants-appellants ask this Court to decide this motion by 9 am PT on September 11, 2025, so that the Solicitor General can seek immediate relief in the Supreme Court, if necessary, before the district court's temporary stay expires at 12 noon PT on September 12, 2025.

## STATEMENT

### A. Legal Background

**1.** The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (Congress can "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation marks omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*,

496 U.S. at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.** Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406. Section 12406 authorizes the President to call the National Guard into federal service if certain conditions are met. As relevant here, the third condition provides that "[w]henever . . . the President is unable with the regular forces to execute the laws of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . execute those laws." *Id.*

**3.** The PCA makes it a federal crime to "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. When activated into the U.S. National Guard, members of a State National Guard are "part of the Army" or the "Air Force," as the case may be, within the meaning of Section 1385. *Id.*; *see* U.S. Dep't of Def., Instr. 3025.21, *Defense Support of Civilian Law Enforcement Agencies* para. 2.d (Feb. 27, 2013); *see also* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 61-62 (2018) (CRS Report). Accordingly, the PCA criminalizes the willful use of federalized members of the National Guard "to execute the laws" of the United States except as authorized by the Constitution or another federal statute.

### B. Factual Background

**1.** On June 6, 2025, officers from U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) conducted immigration-enforcement operations in Los Angeles, California. *See* A5 ¶ 7.[1] Protesters tried to prevent ICE officials from operating by throwing objects at ICE vehicles. A5 ¶ 7. That evening, a crowd gathered at an ERO facility. A6 ¶ 9. The mob quickly turned violent, throwing "concrete chunks, bottles of liquid, and other objects" at federal officers attempting to prevent the mob from breaching the federal property. A6-7 ¶ 11. The federal officers were "pinned down in a defensive position by protesters and severely outnumbered," while rioters attempted "to use large rolling commercial dumpsters as a battering ram" to "break open the garage gate and break into the federal building." A6-7 ¶ 11.

The next day, the violence intensified and spread as officers prepared for additional enforcement operations. A9 ¶ 18. Large crowds assaulted a group of ERO and Customs and Border Protection officers for seven hours, launching potentially lethal commercial-grade, "mortar-style fireworks" at the officers, trapping one officer in her vehicle while violently pummeling it with stones, shattering the wrist of another officer, and damaging federal buildings. A9-10 ¶¶ 20-21. The violence continued in

[1] Citations to "A" are to the addendum accompanying this motion.

the days that followed: More officers were injured, and federal buildings were seriously damaged. A16-22.

**2.** On June 7, 2025, the President signed a memorandum activating members of the California National Guard to protect federal personnel and property. A63-64. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other officials' enforcement of federal law. A63. "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." A63. "In light of these incidents and credible threats of continued violence," the President invoked Section 12406 to mobilize the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." A63.

Based on the President's order, Secretary of Defense Peter Hegseth federalized 2,000 Guardsmen and eventually activated an additional 2,000 federal Guardsmen and deployed several hundred Marines. A66-68.

**3.** Once in service, National Guard members and Marines began "providing protection to Federal installations, personnel, and functions consistent with the President's June 7 memorandum." A27-28 ¶ 9; *see* A140-41, A146-47, A153-54, A156, A168-70, A172, A229. The Guard members and Marines "establish[ed] outside perimeters, observation posts, and perimeter patrols for federal property at locations

targeted by protests," and the National Guard members "provided personnel protection" for federal law-enforcement officers conducting operations in Los Angeles County "to enable [them] to conduct their Federal functions safely and with minimal interference from bystanders." A27-28 ¶ 9(A)-(C); *see* A140-41, A146-47, A153-54, A156, A168-70, A172, A229.

As of August 8, 2025, there were approximately 300 Guardsmen assigned to the mission in Los Angeles, continuing to protect federal personnel and property. *See* A59 ¶ 21.[2] The Marines have been released. A59 ¶ 19.

### C. Prior Proceedings

**1.** Shortly after the National Guard members were activated, the State of California and Governor Gavin Newsom sued alleging, among other things, that the President exceeded his authority under 10 U.S.C. § 12406 and that the defendants violated the PCA.

Plaintiffs sought a temporary restraining order, which the district court granted. Concluding that the federalization of the Guard was not authorized by Section 12406, the district court enjoined defendants "from deploying members of the California National Guard in Los Angeles" and directed defendants "to return control of the California National Guard to Governor Newsom." *Newsom v. Trump*, No. 3:25-cv-

[2] On August 5, 2025, Secretary Hegseth issued an order that maintains the presence of 300 federalized National Guard troops in California for 90 days. On September 2, 2025, plaintiffs sought a preliminary injunction against that order.

04870, 2025 WL 1663345, at *10-16, *21 (N.D. Cal. June 12, 2025). The court did not reach the PCA claim. *Id.* at *17.

**2.** Defendants appealed, and in a published opinion issued after oral argument, a unanimous panel of this Court granted a stay pending appeal. *Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam). On the merits, the panel held that the President likely acted within his authority in federalizing the National Guard under 10 U.S.C. § 12406(3). *Id.* at 1052. The panel also noted that the federal government provided ample evidence of "protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard on June 7." *Id.* The panel did not address the PCA.

On the remaining stay factors, the panel concluded that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Newsom*, 141 F.4th at 1054. It recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and a "significant interest[]" in preventing violent attacks like those that occurred before the National Guard deployed. *Id.* at 1054-55. The panel held that those interests outweighed any "speculative" concerns plaintiffs may have "about escalation and interference with local law enforcement." *Id.* at 1055.

**3.** After discovery, plaintiffs sought another preliminary injunction based on their PCA claims. From August 11-13, 2025, the district court held a hearing on the motion and a trial on the merits of the PCA claim. On September 2, 2025, the district

court enjoined Secretary Hegseth and the Department of Defense "from deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until [d]efendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act." A369 & n.29. The court stayed its injunction until 12 noon on September 12, 2025, A369, and entered partial final judgment for plaintiffs, A370.

## ARGUMENT

The government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

### A. The federal government is likely to prevail on the merits.

Plaintiffs' request for injunctive relief should have been rejected at the threshold. The PCA is a criminal statute, and allowing plaintiffs to enforce such a statute via a civil claim for injunctive relief impermissibly usurps the Executive Branch's prosecutorial discretion. The claim also fails because the PCA's prohibition on the willful use of the armed forces "as a posse comitatus or otherwise to execute the laws" excludes "cases" and "circumstances expressly authorized" by federal

statute—here, 10 U.S.C. § 12406(3). As this Court held, the President "likely acted within his authority in federalizing the National Guard under" that provision, *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025) (per curiam)—one of several binding holdings that the district court flouted. In any event, no evidence suggests the National Guard engaged in law enforcement within the PCA's meaning, and the district court's contrary conclusion was premised on a legally erroneous view of what that entails.

### 1. Plaintiff's PCA claim fails on threshold grounds.

**a.** Plaintiffs lack a cause of action to enforce the PCA. That Act imposes criminal penalties for "willfully us[ing] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Plainly, the PCA does not provide a cause of action for civil claims, and the district court did not conclude otherwise. *See* A365 n.26. Instead, the district court created an extra-statutory path for relief, applying the narrow exception that allows for ultra vires review of agency action. A365-67. That was error.

Nonstatutory ultra vires review is an artifact of history. *NRC v. Texas*, 605 U.S. 665, 680 (2025). Before the Administrative Procedure Act was enacted, "courts sometimes entertained a bill in equity to attack administrative action when no statutory review was available." *Id.* (quotation marks and citation omitted). The ultra

vires doctrine preserves such review in limited circumstances, but it cannot be used to create a cause of action far removed from what was available in a court of equity in 1789. *Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

That is precisely what the district court did here. There is no longstanding tradition of suits in equity for private enforcement of the criminal laws against the government. Ultra vires review historically has been used to redress injuries caused by violations of regulatory statutes. *Leedom v. Kyne*, 358 U.S. 184 (1958) (National Labor Relations Act); *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023) (Antiquities Act). Criminal statutes, by contrast, protect the rights of the public and "rarely impl[y] a private right of action." *See Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979). This contrast is especially stark in criminal statutes with specific intent requirements—like the PCA. *See* 18 U.S.C. § 1385 (requiring "willful[]" conduct). It would be exceedingly strange for a criminal statute to allow for civil actions—let alone injunctions—contingent on peering into the intent of the federal government or its officers. This explains why the district did not cite, and the government is not aware of, any case in which a court enjoined the government from violating a criminal law.

A365-67.[3] There is no historical tradition of authorizing enforcement of criminal laws via private civil injunction against the Executive.

Certainly, the court observed that injunctions have issued against executive officials for violation of other types of laws. *See* A364. But reliance on those inapposite examples contravenes the Supreme Court's direction to identify a much closer historical fit to support a court's exercise of its equitable powers. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554-56 (2025) (rejecting analogy between universal injunctive relief and decree obtained on a bill of peace); *Grupo Mexicano*, 527 U.S. at 319 (rejecting analogy between injunction preventing asset transfer to relief obtained by creditors post-judgment).

The district court's reasoning also ignores the significance of criminal law to this inquiry. The Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023). That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680-81. These principles operate as a

[3] Numerous courts have held that the PCA does not create a private civil cause of action. *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Davis v. Florida*, No. 8:24-cv-02907, 2025 WL 992899, at *5-6 (M.D. Fla. Mar. 17, 2025), *report and recommendation adopted*, 2025 WL 987514 (M.D. Fla. Apr. 2, 2025).

"limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). By allowing plaintiffs to pursue their PCA claim, the district court violated these principles and impermissibly empowered California to override the federal government's decisions with respect to the enforcement of federal criminal law.

The district court similarly erred in suggesting that its conclusion that defendants "exceeded the authority delegated to them by Congress and directly violated the [PCA]" was sufficient to justify plaintiffs' ultra vires claim. A366. As discussed below, the government has complied with the PCA in all respects. But regardless, an ultra vires claim is a "Hail Mary pass" that will not lie merely because an "agency has arguably reached a conclusion which does not comport with law." *NRC*, 605 U.S. at 681 (quotation marks omitted). Plaintiffs cannot possibly satisfy that demanding standard, where, as here, the weight of authority supports the defendants' conclusion that protecting federal personnel and property, as the Guard members did here, is not impermissible law enforcement under the PCA. Nor can plaintiffs base their PCA claim on the on-the-ground operational decisions of the National Guard and Marines while deployed in Los Angeles, A41-45, as those sorts of tactical decisions are not the kind of gross abuse of power that triggers ultra vires review. *See NRC*, 605 U.S. at 680-81.

**b.** Plaintiffs' PCA claim fails at the threshold for the additional reason that the alleged National Guard actions challenged here are expressly permitted by the PCA.

The PCA's prohibition on the use of armed forces "as a posse comitatus or otherwise to execute the laws" does not apply "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Section 12406(3)—the statute that, as a prior stay panel already held, likely authorized the President's mobilization of the National Guard—expressly authorizes the President to federalize the National Guard "to execute the laws of the United States" when he is unable to do so with "regular forces." *See* 10 U.S.C. § 12406(3). The parallel between Section 12406(3) and the PCA is undeniable. The latter prohibits use of the military to "execute the laws" unless authorized by, *inter alia*, an Act of Congress, 18 U.S.C. § 1385, and Section 12406(3) allows the National Guard to be federalized for that purpose. Thus, the federalized National Guard may be used to execute federal law where regular forces are unable to do so, without violating the PCA. Otherwise, Section 12406(3) would be meaningless.

The district court did not contend with this text, instead focusing on the purported novelty of the interpretation. *See* A343-44. But Congress's own research service has recognized Section 12406(3) as an exception to the PCA. *See* CRS Report 31 n.224. More fundamentally, novelty cannot foreclose an interpretation where the text of the statute demands it. At bottom, the district court's objections amount to a disagreement with this Court's prior stay decision, which the district court characterized as lacking any "limiting principle" and creating an "expansive view of presidential discretion to invoke [Section] 12406(3)." A348. That disagreement does

not authorize the district court to ignore this Court's precedent, the text of the PCA, and the obvious parallels between the PCA and Section 12406(3).

Contrary to the district court's suggestion, *see* A348-49, this Court's prior interpretation of Section 12406(3) does not nullify the PCA. Section 12406 authorizes only the National Guard to execute laws, so it would not authorize the President to use other members of the armed forces to execute laws. Section 12406(3) also requires the President to determine that the regular forces are unable to execute the laws; the PCA prohibits execution of the laws where the President has not so determined. Finally, the Guard members can execute only "those laws" that the regular forces are unable to execute. 10 U.S.C. § 12406.

The district court's interpretation is also inconsistent with historical practice. President Nixon invoked Section 12406(3) to federalize the National Guard during the Postal Strike of 1970. *See* Executive Order 11519, 35 Fed. Reg. 5003 (1970). It is undisputed that the troops there were used to deliver mail—*i.e.*, execute the federal mail laws—and no one suggested they violated the PCA in doing so. Section 12406(3) provides express authorization for the conduct complained of here, and that is sufficient to bring it within the PCA's express exception.

**c.** Finally, plaintiffs lack standing. The only injury the district court relied upon—harm to federal-state relations—is not tied to the specific conduct plaintiffs claim was unlawful. *See* A341. Ensuring the safety of federal personnel and property does not intrude upon states' police powers, the latter being directed to the protection

of state citizens and interests. After all, it is beyond dispute that ICE agents would be free to protect federal personnel and property, and nothing about that protection would intrude upon California's interest in policing its citizens. At minimum, there is no standing as to the Marines' actions, which were limited to protecting property and thus could not implicate California's policing powers. Even if plaintiffs have a redressable injury, it would not be judicially cognizable. *Texas*, 599 U.S. at 676-78 (desire to see criminal law enforced against another is not a cognizable interest).

**2. The federal government is not violating the PCA.**

Even if plaintiffs could overcome these threshold obstacles, they have not established that the federal government in fact is violating the PCA.

The President clearly limited the National Guard members' mission to "protect[ing] ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law," and "protect[ing] Federal property, at locations where protests against these functions are occurring or are likely to occur." A63. At trial, witnesses testified that the National Guard and Marines deployed to Los Angeles adhered to this limited protective mission. William Harrington, who until recently served as the Deputy Chief of Staff of the unit responsible for the deployed troops, described the military's role as "provid[ing] force protection," A153-54, A156, and emphasized that the military did not "interact[]with any civilians," A154; *see also* A156. Major General Scott M. Sherman, who served as commanding general of the deployed force until July 10,

described the training the Guard members and Marines received about their mission, *see, e.g.*, A168, which instructed soldiers that "they weren't allowed to do any law enforcement actions" and "were strictly there to protect law enforcement, allowing them to do their law enforcement job," A229. Ernesto Santacruz, the Field Office Director of the Los Angeles ERO Field Office, explained that he understood the military's role in immigration enforcement operations was "only . . . to protect federal property and only to protect federal personnel." A295. The size of a protective force, and the benefits protection offers for the effectiveness of federal operations, do not render a protective mission any less protective in nature. *Contra* A360-61 n.24.

The district court nevertheless concluded that National Guard members were engaged in impermissible law enforcement, reasoning that protecting federal officials who are executing the laws and forming perimeters around their operations itself constitutes law enforcement prohibited by the PCA. *See* A359-62. That logic defies common sense: When National Guard members protect federal law enforcement agents who are engaged in immigration enforcement actions, it is the federal law enforcement agents—not any Guard personnel—who are executing federal immigration laws. By analogy, when the Secret Service protects the President, they are not executing the President's authorities; and when the U.S. Marshals protect the judiciary, they are not exercising the judicial power of the United States.

The court's reasoning is also inconsistent with the longstanding understandings of the Executive and the courts. The Executive Branch has long recognized that the

PCA "does not impair the President's inherent authority to use troops for the protection of federal property and federal functions." *Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday Demonstrations & Consequent Impairment of Gov't Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971). The Supreme Court has similarly observed that the Executive Branch has inherent power to use the military to protect federal personnel as they perform federal functions. *See In re Neagle*, 135 U.S. 1, 65, 69 (1890); *see also In re Debs*, 158 U.S. 564, 582 (1895). And this Court has twice rejected the argument that providing security for law enforcement operations violates the PCA. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998); *United States v. Khan*, 35 F.3d 426, 432 (9th Cir. 1994).

The district court dismissed the importance of this inherent protective authority, asserting that the President cannot "declare an exception to the [PCA]." A355; *see also* A350-58. But that proceeds from the erroneous assumption that protecting federal personnel and property is impermissible law enforcement under the PCA. That is, the district court suggests the federal government must rely on state or local law enforcement to protect federal personnel and property. *See* A362. There is no basis in the statutory text or precedent to support such a conclusion. Instead, clear authority demonstrates that Congress, in crafting the PCA's prohibition on the use of the military to "execute the laws," would have understood it to preserve the Executive's core protective functions.

The court's logic is also internally inconsistent. The court seems to concede that "protecting federal property [is] unlikely as a descriptive matter to execute federal laws in violation of the [PCA]," A358 n.22, and yet somehow concludes that the protection of federal personnel is impermissible. The court fails to explain why safeguarding federal officials is any more of a law-enforcement function than safeguarding federal property. And the very example it provides belies any such distinction. *See* A358 n.22. Preventing protesters from "blocking federal employees from reaching their job posts" involves protecting both persons and property. *See* A358 n.22. After all, those protesters might seek to harm the employees or damage the property—both in service of preventing employee access.

The district court similarly erred in attempting to distinguish the Supreme Court and this Court's precedent. The court dismissed as dicta the Supreme Court's discussion of the President's authority in *In re Neagle* and *In re Debs*. But Supreme Court dicta "have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold"; courts cannot "blandly shrug them off because they were not a holding." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1067 (9th Cir. 2020) (quotation marks omitted). The court also implausibly distinguished this Court's precedents in *Klimavicius-Viloria* and *Khan* as involving "passive" and "isolated" military actions. A361. In both cases, the military was arguably more involved than the Guard members are here, as the Navy provided equipment and logistical support to law enforcement, along with backup security. *See Klimavicius-*

*Viloria*, 144 F.3d at 1259; *Khan*, 35 F.3d at 432. And the limited protective function that the National Guard served here distinguishes its actions from cases relied on by the district court, which involve direct and extensive military involvement in law enforcement. In one, the defendants purportedly "seized and confined plaintiffs within an 'armed perimeter'" and sealed off a village for ten weeks. *Bissonette v. Haig*, 776 F.2d 1384, 1385 (8th Cir. 1985). In the other, a military official "initiated an operation to search for individuals sharing child pornography online," prepared a report that "formed the basis of the state warrant to search [the criminal defendant's] home," the execution of which "yielded the evidence that led to the charges against [the defendant]," and conducted an "investigation" that was "active." *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc).

The district court further erred when it concluded that defendants acted willfully—a predicate for any PCA violation. *See* 10 U.S.C. § 1385. The district court reasoned that it did "not matter" if defendants "believed that some constitutional or other exception applied" to allow for their conduct. A362. But willfulness in the criminal-law context requires "knowledge that the conduct [was] *unlawful*." *Bryan v. United States*, 524 U.S. 184, 195 (1998) (emphasis added). If defendants believed they were acting *lawfully*, their conduct cannot be willful. That is precisely what occurred here. The President and Secretary Hegseth federalized the National Guard, invoking "10 U.S.C. § 12406" to "enforce[] . . . Federal law," A63; *see also* A66-68, and limited

the Guard's mission to protecting federal personnel and property—functions that do not constitute impermissible law enforcement under the PCA, *see supra* pp. 17-19.

**C. The other stay factors strongly favor the government.**

In staying the district court's prior order, a unanimous panel of this Court held that the equitable factors support defendants. *See Newsom*, 141 F.4th at 1054-56. The panel recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and determined that the mob violence in Los Angeles threatened to irreparably harm that interest. *Id.* at 1054. And the panel further explained that any concerns that the mobilization would inflame tension or impair the State's ability to perform critical functions "are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured." *Id.* at 1055.

That remains true today. At trial, witnesses testified that National Guard members continue to respond to requests for assistance, A216-17, and that National Guard members have been critical in addressing threats to ERO personnel as they conduct immigration enforcement. Ernesto Santacruz, the ERO Field Director, explained that prior to the Guard's federalization, he received reports of officer assaults multiple times a day. A297. Those officer assaults hampered ERO's ability to perform its federal functions, as officers had to pivot to address the violence. A297. During one incident, a mob outnumbered officers taking an individual into custody, helped that individual to escape, and forced the officers to flee as it became too

dangerous. A297-98. During another, 1,500 protesters became violent and assaulted federal officers outside a three-building federal complex. A299. During a third incident, a crowd started forming around an operation and quickly became violent: Officers were "assaulted by members of the public with projectiles" and "rocks," and "there was an individual" present who "had a weapon that appeared to look like he was shooting in the direction of" federal officers. A303-04.

After the National Guard deployment, these incidents decreased. A300. The numbers of officer assaults "reduce[d] drastically." A297. And, as Santacruz explained, the presence of the Guard has deterred potential bad actors and has helped assure federal officers that they will not be assaulted. *See* A300-01. The district court's injunction threatens once again to expose federal personnel to violence and to impede federal officials' ability to enforce federal law.

On the other side of the ledger, plaintiffs still have not established irreparable injury warranting extraordinary relief. Plaintiffs continue to argue that deployment of the National Guard will inflame tensions in Los Angeles and divert resources from other important state functions. *See* A88-90. But even after a trial, plaintiffs have not provided any evidence supporting their speculative assertions. And the stay panel already determined that those interests "are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured." *Newsom*, 141 F.4th at 1055. Indeed, California's purported harms are weaker on the present record, where all but approximately 300 Guard members have been released.

The district court's speculation about potential future National Guard deployments, A368, cannot support an injunction here.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay pending consideration of the motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN

*<u>/s/ J. Kain Day</u>*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*
*Sharon.swingle@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,526 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ J. Kain Day*
J. KAIN DAY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

SEP 4 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

GAVIN NEWSOM, in his official capacity as Governor of the State of California and STATE OF CALIFORNIA,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; et al.,

Defendants - Appellants.

No. 25-5553

D.C. No.
3:25-cv-04870-CRB
Northern District of California,
San Francisco

ORDER

Before: BENNETT, MILLER, and SUNG, Circuit Judges.

The court has received the government's emergency motion for stay pending appeal. Dkt. No. 5. The request for an administrative stay is GRANTED. The district court's September 2, 2025, order is temporarily stayed pending further order. The court's administrative stay "is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits, and does not constitute in any way a decision as to the merits" of the appeal. *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).